**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
KristenO@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiff Luke Kahnert*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE KAHNERT, derivatively on behalf of ACTIVISION BLIZZARD, INC.<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. KOTICK, BRIAN KELLY, REVETA BOWERS, ROBERT CORTI, HENDRIK HARTONG III, BARRY MEYER, ROBERT MORGADO, PETER NOLAN, DAWN OSTROFF, DENNIS DURKIN, SPENCER NEUMANN, and CASEY WASSERMAN,<br><br>Defendants,<br><br>ACTIVISION BLIZZARD, INC., a Delaware Corporation,<br><br>Nominal Defendant. | Case No.: 2:21-cv-08968<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>[REDACTED VERSION OF COMPLAINT PROPOSED TO BE FILED UNDER SEAL]<br><br><u>DEMAND FOR JURY TRIAL</u> |

# <u>TABLE OF CONTENTS</u>

I.    NATURE AND SUMMARY OF THE ACTION .......................................... 2

II.   JURISDICTION AND VENUE.......................................................... 6

III.  THE PARTIES ........................................................................ 7

    A.    Plaintiff......................................................................... 7

    B.    Defendants...................................................................... 7

IV.   STATEMENT OF FACTS.............................................................. 10

    A.    Activision's Business And Mission Statement ..................................... 10

    B.    Federal And State Law Prohibit
    Discriminating Against And Harassing Activision's Employees .................. 14

    C.    Activision's Sordid History Of
    Systemically Violating Workers' Rights........................................... 15

    D.    The Company Practices And Perpetuates
    Illegal Sex Discrimination...................................................... 20

    E.    The DFEH Action And Activision's Gross
    And Ongoing Failures In Accountability ......................................... 22

    F.    The EEOC Action ................................................................. 27

    G.    The National Labor Relations Board Complaint ................................. 28

    H.    The SEC Investigation ............................................................ 29

V.    THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS............ 30

    A.    The Material Misstatements And Omissions...................................... 30

        1.    2018 Misstatements And Omissions ......................................... 31

        2.    2019 Misstatements And Omissions ......................................... 38

        3.    2020 Misstatements And Omissions ......................................... 45

        4.    2021 Misstatements And Omissions ......................................... 58

i

        5.      Activision's Code of Conduct ..................................................... 72

    B.      Reasons The Individual Defendants'
    Statements Were Improper .............................................................. 75

    C.      The Truth Emerges ........................................................................ 77

VI.    INSIDER SELLING ................................................................................. 77

VII.   BREACHES OF THE INDIVIDUAL
       DEFENDANTS' FIDUCIARY DUTIES ................................................. 79

    A.      Defendants' Fiduciary Duties ........................................................ 79

    B.      Duties Of The Audit Committee Defendants ................................. 80

    C.      Activision's Code Of Conduct And Board Principles ................... 83

    ■       ████████████████████ .............................................. 86

    E.      Control, Access, Authority, And,
    Reasonable And Prudent Supervision ........................................... 87

    F.      Breaches Of Fiduciary Duties ....................................................... 88

    G.      Conspiracy, Aiding And Abetting,
    And Concerted Action .................................................................... 90

    H.      Damages To Activision .................................................................. 91

VIII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................. 93

    A.      Demand is Excused Because A
    Majority Of The Board Faces A Substantial
    Likelihood of Liability for Their Misconduct ................................ 93

    B.      Demand Is Futile As To The Audit
    Committee Defendants ................................................................... 99

    C.      Demand Is Futile As To The N&CG
    Committee Defendants ................................................................. 100

    D.      Demand is Futile As To The
    Compensation Committee Defendants .......................................... 101

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

E.     Demand Is Futile As To
Defendant Kotick For Additional Reasons ................................................... 101

F.     Demand Is Futile As To Defendants
Wasserman, Morgado, And Kelly Based On Insider Selling ....................... 102

G.     Demand Is Futile As To All
Directors For Additional Reasons ............................................................... 103

IX.  CLAIMS FOR RELIEF ........................................................................................... 105

COUNT I
Breach of Fiduciary Duties
(Against the Individual Defendants) ............................................................ 105

COUNT II
Waste of Corporate Assets
(Against the Individual Defendants) ............................................................ 106

COUNT III
Unjust Enrichment
(Against the Individual Defendants) ............................................................ 106

COUNT IV
Derivatively for Contribution Under
Sections 10(B) and 21D of the Exchange Act
(Against the Securities Class Action Defendants) ....................................... 107

COUNT V
Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against the Individual Defendants) ............................................................ 109

COUNT VI
Breach of Fiduciary Duty through the
Misappropriation of Material, Non-Public Information
(Against the Insider Selling Defendants) ..................................................... 110

X.   PRAYER FOR RELIEF ........................................................................................... 111

XI.  DEMAND FOR JURY TRIAL ................................................................................. 113

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Luke Kahnert ("Plaintiff"), by and through his undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant Activision Blizzard, Inc. ("Activision" or the "Company") against certain current and former officers and directors of the Company for violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, insider selling, and for violations of the federal securities laws.

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of corporate records produced by Activision in response to a Demand for Inspection of Books and Records pursuant to 8 Del. C. § 220 (the "Books and Records Production")[1]; (ii) review and analysis of public filings made by Activision and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (iii) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (iv) review of news articles, shareholder communications, and postings on Activision's website concerning the Company's public statements; (v) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *Cheng v. Activision Blizzard, Inc., et al.*, Case No. 2:21-cv-06240 (C.D. Cal.) (the "Securities Class Action"), the civil rights enforcement action instituted by California's Department of Fair Employment and Housing ("DFEH") styled *DFEH v. Activision Blizzard, Inc. et al.*, Case No. 21stcv26571 (Cal. Sup. Ct., Los Angeles) (the "DFEH Action"), and the federal civil rights enforcement action instituted by the U.S. Equal Employment Opportunity Commission ("EEOC") styled *U.S. Equal Employment Opportunity Commission v.*

---

[1] By letter dated November 15, 2021, Activision's counsel certified completion of the Books and Records Production ("This completes Activision's rolling production of the documents the Company agreed to produce in response to your client's demand.").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Activision Blizzard, Inc., et al*., Case No. 2:21-CV-07682 DSF-JEM (C.D. Cal.) (the "EEOC Action"); and (vi) review of other publicly available relevant information.

## I.  NATURE AND SUMMARY OF THE ACTION

1.     Activision is a venerable but troubled company.  It claims the mantle of one of the world's biggest gaming companies, with 9,500 employees worldwide, a market capitalization of more than $60 billion and hit franchises like *Call of Duty* and *World of Warcraft*.  This wide repute is now juxtaposed with a newly emerged [damning] picture of Activision: a gaming empire plagued by a toxic glut of sexual misconduct and endemic discrimination.

2.     Indeed, this action comes squarely amid the complex of reckonings precipitated by the #MeToo movement, which has—through the collective courage of its survivors—created an evolutionary leap in workplace culture by upending entrenched power structures and outing systemic misconduct.[2]

3.     Activision is no stranger to the movement. #MeToo (and an investigation by the FBI) forced the video game industry into a certain moral reckoning following an insidious online harassment campaign in 2014 and 2015 dubbed "Gamergate," which subjected feminist cultural critics and prominent women in the video game industry to doxing (*i.e.* the act of publicly revealing or publishing an individual's private information) and a violent slew of rape and death threats.  Activision's platforms, among other major game publisher platforms, were catalyzed by Gamergate harassers to organize.

4.     The Company has also been mired in civil rights litigation over the course of the last decade.  Beginning at least as early as November 18, 2014—when the Company was sued for violations of California's anti-harassment and anti-discrimination laws by a Company manager alleging, *inter alia*, he was constructively

---

[2]  *See* Burke, Tarana. "Get To Know Us | History & Inception." *Me Too. Movement*, 16 July 2020, metoomvmt.org/get-to-know-us/history-inception.   "Full Agenda." *Survivors' Agenda*, 17 Mar. 2021, survivorsagenda.org/agenda/full-agenda..

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   discharged for not conforming to gender stereotypes—Activision has maintained a

2   toxic "frat house" workplace culture abounding in sexual and discriminatory

3   delinquency at every pay level.

4       5.      Activision's "frat" cultural paradigm was rife with gross pay disparities

5   between men and their female counterparts performing substantially similar work,

6   groping and unwanted sexual advances against women, copious, "frat house" levels

7   of alcohol consumption, a practice known as "cube crawls" (which involved male

8   employees "crawling" through various cubicles to engage in lewd behavior toward

9   female employees), and a multitude of other illegal practices that functioned as both

10  an assault on and a professional and pecuniary detriment to women and other minority

11  employees.  In one notably tragic example of Activision's toxic culture, one female

12  employee committed suicide following a period of sexual harassment at work and an

13  incident involving Activision employees passing around nude photos of the employee.

14      6.      Activision's board of directors (the "Board") had a direct line to the

15  Company's refusal to adhere to laws intended to protect employees, as well as these

16  fatal failures of governance and human resource policies and procedures – but failed

17  at every turn to implement adequate remedial measures.

18      7.      Indeed, the Board could not have ignored the litany of "red flags" alerting

19  them to the problem of crippling harassment and discrimination practiced and endemic

20  at Activision on a global scale—and the woeful deficiencies of the Company's

21  purported anti-discrimination and anti-harassment policies, which amounted to no

22  more than an absurd veneer because they had continuous, unfettered access to direct

23  and ongoing reports of pervasive sexual harassment and discrimination at the

24  Company. ████████████████████████████████

25  ████████████████████████████████████

26  ████████████████████████████████████

27  ███████████████████

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

8.      Moreover, unbeknownst to the Company's shareholders, the mismanagement and wrongdoing described herein precipitated robust investigations by ██████████████████████████████ the EEOC, and the DFEH over the course of a three-year period. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████ But conciliation attempts between the agencies and Activision failed, and the Company's officers and directors likewise failed to institute the prophylactic anti-discrimination and anti-harassment policies necessary to meaningfully remedy and forestall continued wrongdoing.

9.      Notwithstanding the foregoing, Activision's officers and directors authorized repeated representations to shareholders that the Company was not subject to any "significant" "claims, suits, investigations, audits, and other proceedings" that would "have a material adverse, effect on [Activision's] business, financial condition, results of operations, or liquidity." These statements were authorized and made while omitting, altogether, the existence of rampant and endemic sexual harassment and discrimination at the Company, ████████████████████████████████
██████████████████ and the ongoing pendency of investigations by the DFEH and the EEOC.

10.      Activision's day of reckoning came on July 21, 2021, when *Bloomberg Law* reported that the DFEH—the California agency responsible for enforcing California's civil rights laws and the largest state civil rights agency in the United States—had filed the DFEH Action against Activision alleging damning civil rights violations following more than two years of investigation. In response, Activision's officers and directors issued a blanket denial of wrongdoing, calling into question the integrity and veracity of the DFEH's investigation. Among other criticisms, the

4

1  Company claimed the DFEH complaint distorted and lied about the Company's past,

2  characterizing the complaint as "inaccurate," "disgraceful," and "unprofessional."

3       11.    The Company's patent attempt to minimize its own malfeasance was met

4  with public outrage.  On July 23, 2021, just two days after the Company's refusal to

5  take accountability, a chorus of current and former employees confirmed widespread

6  abuse suffered at the hands of Activision's management.  Hundreds of personal

7  accounts poured in across multiple social media platforms corroborating the DFEH

8  allegations of illegal sexism, gender discrimination, and harassment at Activision.

9       12.    On July 27, 2021, following *Bloomberg*'s report that thousands of current

10  and former Activision employees had signed a petition in protest of the Company's

11  "abhorrent and insulting" response to the DFEH Action, the price of Activision shares

12  traded at unusually high volumes and fell $5.89, or over 6%, to close at $84.05

13  on July 27, 2021.

14       13.    The damage to Activision caused under the watch of the Board

15  precipitated by a lawless work culture has continued to mount.  For example, on

16  September 20, 2021, the Company announced that it was under investigation by the

17  SEC relating to "employment matters."  Activision's stock slumped more than 3.7%

18  following the Company's disclosure.

19       14.    Then, on September 27, 2021, the EEOC commenced its own action for

20  violations of federal anti-discrimination and anti-harassment laws following its nearly

21  three-year investigation.

22       15.    Similarly, by making and authorizing false and misleading statements

23  and omissions to shareholders concerning the Company's business, operations, and

24  financial prospects, the wrongdoing by Activision's officers and directors has resulted

25  in the filing of the Securities Class Action against the Company and its President and

26  Chief Executive Officer ("CEO"), Defendant Robert A. Kotick, the Company's Chief

27  Financial Officer ("CFO"), Defendant Dennis Durkin, and the Company's former

28  CFO, Defendant Spencer Neumann.

16.     The Board has not commenced, and will not commence, litigation against those responsible for the mismanagement and wrongdoing alleged herein, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board were directly involved in the propagation and concealment of the misconduct described herein, and thus face a substantial likelihood of liability for breaching their fiduciary duties.

17.     Accordingly, Plaintiff did not bring a pre-suit demand upon the Board because doing so was, and is, a useless and futile act.  Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Activision and its shareholders.

## II.     JURISDICTION AND VENUE

18.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 10b-5 and 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

19.     Jurisdiction is also conferred by 28 U.S.C. § 1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act  (15 U.S.C.  § 78aa)  and  28 U.S.C.  §§ 1391(b),  (c),  and  (d),  and  because: (i) Activision maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  substantial portion of the transactions and wrongs complained of herein, including the

2  defendants' primary participation in the wrongful acts detailed herein, dissemination

3  to the public of materially false and misleading information, occurred in and were

4  issued from this District, and aiding and abetting and conspiracy in violation of

5  fiduciary duties owed to Activision, occurred in this District; and (iv) defendants have

6  received substantial compensation in this District by doing business here and engaging

7  in numerous activities that had an effect in this District.

8       22.   This action is not a collusive action designed to confer jurisdiction on a

9  court of the United States that it would not otherwise have.

10 **III.   THE PARTIES**

11      **A.   Plaintiff**

12      23.   Plaintiff Luke Kahnert is a current shareholder of Activision.  Plaintiff

13 has continuously held Activision common stock during the relevant times alleged

14 herein.  Plaintiff is a citizen of Canada.

15      **B.   Defendants**

16      24.   Nominal Defendant Activision is incorporated under the laws of the State

17 of Delaware and has its principal executive offices located at 3100 Ocean Park Blvd.,

18 Santa Monica, California.  Activision's stock trades on NASDAQ under the symbol

19 "ATVI."  As of October 13, 2021, the Company had approximately 777.71 million

20 shares outstanding.

21      25.   Defendant Robert Kotick ("Kotick") is the Company's founder and has

22 served as Chief Executive Officer ("CEO") and a director since 1991.  Defendant

23 Kotick received $33,065.560 in total compensation from the Company in 2016,

24 $28,698,375 in 2017, $30,841,004 in 2018, $30,122,896 in 2019, and $154,613,318

25 in 2020.  Defendant Kotick is a citizen of California.

26      26.   Defendant Brian Kelly ("Kelly") has served as Chairman of the Board

27 since September 2013 and as a director of the Company since 2013.  Defendant Kelly

28 received $290,517 in total compensation from the Company in 2016, $489,677 in

2017, $489,713 in 2018, $489,434 in 2019, and $489,631 in 2020.  Defendant Kelly is a citizen of California.

27.     Defendant Reveta Bowers ("Bowers") has served as a Company director since 2018.  Defendant Bowers received $470,239 in total compensation from the Company in 2018, $344,934 in 2019, and $345,131 in 2020.  Bowers is a citizen of California.  Defendant Bowers served on the Compensation Committee.

28.     Defendant Robert Corti ("Bloom") has served as a Company director since 2003.  Defendant Corti received $379,543in total compensation from the Company in 2016, $379,667 in 2017, $379,713 in 2018, $379,434 in 2019, and $379,631 in 2020.  Corti is a citizen of New York.  Defendant Corti served on and was Chair of the Audit Committee.

29.     Defendant Hendrik Hartong III ("Hartong") has served as a Company director since 2015.  Defendant Hartong received $350,543 in total compensation from the Company in 2016, $350,667 in 2017, $350,713 in 2018, $350,434 in 2019, and $379,631 in 2020.  Hartong is a citizen of Connecticut.  Defendant Hartong served on the Audit Committee.

30.     Defendant Barry Meyer ("Meyer") has served as a director of the Company since 2014.  Defendant Meyer received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $345,213 in 2018, $344,934 in 2019, and $345,131 in 2020.  Meyer is a citizen of California.  Defendant Meyer served on the Nominating and Governance Committee ("N&GC").

31.     Defendant Robert Morgado ("Morgado") has served as a director of the Company since 1997.  Defendant Morgado received $420,543 in total compensation from the Company in 2016, $920,001 in 2017, $448,546 in 2018, $459,434 in 2019, and $459,631 in 2020.  Morgado is a citizen of New York. Defendant Morgado served on the Audit Committee from January 2016 through January 2018, and was the Chair of the N&GC and Chair of the Compensation Committee.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.     Defendant Peter Nolan ("Nolan") has served as a director of the Company since 2013.  Defendant Nolan received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $347,963 in 2018, $350,434 in 2019, and $350,631 in 2020.  Nolan is a citizen of Florida.  Defendant Nolan served on the N&GC from January 2016 through January 2018 and was a member of the Audit Committee.

33.     Defendant Dawn Ostroff ("Ostroff") has served as a director of the Company from since 2020.   Defendant Ostroff received $302,687 in total compensation from the Company in 2020.   Ostroff is a citizen of New York. Defendant Ostroff has served on the Compensation Committee since June 2020.

34.     Defendant Casey Wasserman ("Wasserman") has served as a director of the Company since 2015.   Defendant Wasserman received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $345,213 in 2018, $344,934 in 2019, and $345,131 in 2020.  Defendant Wasserman is a citizen of California.

35.     Defendant Dennis Durkin ("Durkin") served as the Company's CFO from 2016 through May 2017 and from January 2019 through 2021.  Defendant Durkin received $1,746,591 in total compensation from the Company in 2016, $5,802,145 in 2017, $9,511,753 in 2019, and $12,999,754 in 2020.  Defendant Durkin is a citizen of California.

36.     Defendant Spencer Neumann ("Neumann") served as the Company's CFO from May 2017 to January 2019.  Defendant Neumann received $9,465,807 in total compensation from the Company in 2017, and $6,738,174 in 2018. Defendant Neumann is a citizen of California.

37.     The defendants identified in ¶¶ 25-34 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶ 28-29, 31, 32 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶ 26, 31, 34, 35 are referred to herein as the "Insider Selling Defendants."  The defendants

identified in ¶¶ 25, 35, and 36 are referred to herein as the "Security Class Action Defendants."  Collectively, the defendants identified in ¶¶ 25-36 are referred to herein as the "Individual Defendants."

## IV.    STATEMENT OF FACTS

### A.    Activision's Business And Mission Statement

38.    Activision lauds itself as a leading global developer and publisher of "legendary" entertainment content and services.  The Company's venerable portfolio of video game franchises includes *Call of Duty* (which has generated an estimated $27 billion in sales and holds the Guinness World Record as the best-selling first-person shooter game series), *Overwatch* ($1 billion in revenue during the first year of its release) and *World of Warcraft* (over $9 billion in total revenue).

39.    Activision operates through three reportable business subsidiaries: (i) Activision Publishing, Inc., which develops and publishes interactive software products and entertainment content primarily for console platforms; (ii) Blizzard Entertainment, Inc., which develops and publishes interactive software products and entertainment content primarily for PC platforms ("Blizzard Entertainment"), and (iii) King Digital Entertainment ("King"), which develops and publishes interactive entertainment content and services primarily for mobile platforms.

40.    At the helm of the Activision goliath-ship is its CEO, Defendant Kotick. Since 2007, Kotick has received $461 million in compensation—making him the second-highest paid male CEO in the S&P 500 index in 2020.[3]

41.    As of December 31, 2020, Activision had approximately 9,500 employees, with approximately 65% in North America, approximately 30% in the Europe, Middle East, and Africa region, and approximately 5% in the Asia Pacific region.

---

[3]  As calculated by The Associated Press and Equilar.  *See* "Paycom Software's Richison, AMD's Su Among Highest Paid CEOs." *AP NEWS,* 28 May 2021, apnews.com/article/who-are-the-highest-paid-ceos-2021-719ad52ec522a79baf9870cd2bc73f1d. (last visited November 10, 2021).

42.     The Company represents that it "***takes an active role in the entirety of the employee lifecycle***, from candidates to alumni" and "remain[s] focused on attracting, recruiting, enabling, developing, and retaining a diverse and innovative employee population."   Activision cites human capital—*i.e.* a byproduct of the Company's ability to "attract, retain, and develop top talent"—as a critical lynchpin to the Company's "continued success and growth."[4]

43.     According to the Company's most recent proxy statement (the "2021 Proxy Statement"), Activision's stated "Mission" purports, *inter alia*:

> Activision Blizzard has a long track record of focus and operational excellence, driving increased value for our shareholders. That continued in 2020. **With the safety of our employees always our priority**, we successfully transitioned nearly 10,000 employees safely and efficiently to work from home. And our team didn't miss a beat, delivering content of the highest quality, creating new ways for our players to connect and find community, significantly expanding our delivery of live, online content to fans around the world, and substantially growing our presence on mobile platforms. And, we delivered $45 billion in additional value to our shareholders since 2016.
>
> The consistency, expertise, and remarkable dedication of our team members are key reasons for this growth and are why, over the last 20 years, we have achieved financial, operational, and creative success. Our total shareholder return over the past two decades has exceeded 8,100%, compared to 322% for the S&P 500. If you had invested $1,000 in our company 20 years ago, that investment, including dividend reinvestment, would have been worth $82,190 at the end of 2020, or around 20 times the S&P 500's $4,223 over the same period.
>
> With Total Shareholder Return for 2020 at over 50%—outperforming most of our direct competitors and far exceeding the S&P 500's 18%—our record results in 2020 illustrate the scale of the opportunity for our company, the strength of our pipeline, and our agility. ***The key to our success has come from our significant investments in people*** and new

---

[4]  Activision Blizzard, Inc. "Annual Report Pursuant to Section 13 or 15(D)." *Securities and Exchange Commission*, 23 Feb. 2021, www.sec.gov/ix?doc=/Archives/edgar/data/718877/000162828021002828/atvi-20201231.htm.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

content, focused execution of our multi-year strategy to grow our franchises, audience of global players, and expansion to new platforms, and strong execution in premium content, in-game operations, expanding our presence on mobile, and ramping up new engagement models.

We are fortunate to have some of the most popular and successful entertainment franchises in the world as we continue to develop our pipeline of new content across multiple platforms. We had roughly 400 million players in 2020, and we're accelerating our path to reach 1 billion players per month as we deploy our Call of Duty model to other franchises and pursue a clear path to drive expanded reach, engagement, and player investment across our largest franchises. We expect to grow earnings per share meaningfully in 2021 and then build upon that financial performance in 2022. We will continue to pursue new opportunities to build on our already leading franchises, reintroduce franchises from our rich library, and develop original intellectual property—and in an industry with only a few franchises generating $1 billion a year in revenue, we have three and expect to add an additional two $1 billion franchises over the next few years.[5]

44.     Notably, the 2021 Proxy Statement cites "inclusion" and "unity" as central to the Company's values:

Our company and our franchises convene and unite. ***We bring people together***, 400 million players from 190 countries. They come to play, to collaborate, to share moments of joy, and to challenge themselves. ***And we bring them together in ways that foster understanding and inclusion***—across geography, race, gender, orientation, and ideology.

Our values are visible in our work and our actions as a team—from our board to our nearly 10,000 employees in 36 countries collaborating every day to bring the best of ourselves to our players, to each other, and to our communities

**WE ARE ACTIVE LISTENERS AND ACTION TAKERS.**

Our games unite.

Our games inspire.

---

[5]  Emphasis added unless otherwise noted.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Our games bring the world closer together. We celebrate participation. We celebrate our communities, anchored in our franchises.

And, we celebrate dedicated people who work, every day, in every way, for the benefit of our players and our shareholders.

Our values drive our team to excellence and drive our vision in shaping the future of our company.

• **OUR PLAYERS**—the center of our world is our players—400 million in 190 countries.

• **OUR PEOPLE**—from designers and programmers to artists and accountants, we all embody the spirit of our communities, and we have a deep commitment to the impact our games have for society.

• **INCLUSION**—we embrace our responsibility to ensure that our games reflect society—accurately, accessibly, and aspirationally.

• **SHARED INSPIRATION**—manifested through our creativity, this motivates all we do to perform at the highest level for players and our shareholders.

Embracing these values—delighting our players every day and profitably operating and growing our business—we strive to succeed for our shareholders. And succeed we have, creating more than $55billion of value during the last decade with purpose and impact in the service of our social responsibility.

45.     Finally, Activision's Code of Conduct states in part:

### The law: don't mess with it

Our company, and we as employees, ***must comply with all of the laws, rules and regulations that apply to our business wherever we do business*** – in every city, state and country. And no, you don't need to know the details of every law related to your area of responsibility by heart. But yes, you do need to know enough to do your job with integrity and to recognize when it's time to get in touch with one of our friends in the Legal Department. If you're ever unsure whether or not to act or what action to take – or whether or not that action is legal and respectful in any location – it's always better to just ask!

### B. Federal And State Law Prohibit Discriminating Against And Harassing Activision's Employees

46.     Federal and state laws protect American workers from discrimination and harassment.  On the federal level, Title VII of the Civil Rights Act of 1964 (as amended by the Civil Rights Act of 1991 and the Lily Ledbetter Fair Pay Act of 2009, "Title VII") prohibits employment discrimination based on race, color, religion, sex and national origin.  The EEOC is the federal agency responsible for enforcing Title VII.

47.     At all relevant times herein, Activision was a covered employer under Title VII.  Businesses are covered by and subject to Title VII if they have 15 or more employees who worked for the employer for at least twenty calendar weeks in the current or prior year.

48.     States have their own anti-discrimination and anti-harassment laws which function as analogs to Title VII, and confer at least as much protection—sometimes more—as Title VII.  In California, where Activision is headquartered, the DFEH is the state agency charged with enforcing California's civil rights laws, including the Fair Employment and Housing Act ("FEHA").

49.     At all times relevant herein, Activision was a covered employer and thus subject to FEHA.  FEHA prohibits employers of 5 or more employees to discriminate against job applicants and employees because of a protected category, or retaliate against them because they have asserted their rights under the law.  The FEHA prohibits harassment based on a protected category against an employee, an applicant, an unpaid intern or volunteer, or a contractor.  Harassment is prohibited in all workplaces, even those with fewer than five employees.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## C.  Activision's Sordid History Of
### Systemically Violating Workers' Rights

50.     Notwithstanding the Company's professed commitment to global ethics and inclusion, the Individual Defendants harbored a dark secret beneath Activision's veneer as the leading gaming platform of the western world: the Company was historically entrenched in illegal harassment and discrimination and devoid, completely, of effective anti-harassment or antidiscrimination policies and procedures.  The Individual Defendants were well-apprised of Activision's toxic work culture long before the DFEH commenced its investigation in 2018.

51.     As the DFEH Action would later reveal and as corroborated by droves of ongoing Company workers' statements to the press, Activision's female employees—who are managed almost exclusively by white men and comprise approximately 20% of Activision's workforce—have long been routinely subjected to sexual harassment, rape jokes, unequal pay as compared to their male colleagues, and pregnancy-related discrimination and retaliation.  These incidents appear to be neither discrete nor happenstance but occur with such regularity that they comprise an ongoing, ambiently hostile and discriminatory culture at every level of Activision.

52.     In one representative example, Shay Stein, a former customer service employee at Activision from 2014 to 2017, reported to the *New York Times* in July 2021 that she was consistently paid less than her ex-boyfriend performing substantially similar work despite that they had joined the Company at the same time.  She alleged further that her manager retaliated against her for declining drugs at a holiday party and that she was routinely subject to sexual harassment by her manager and colleagues, including a manager suggesting she liked "freaky stuff" and asking her what type of pornography she watched.  She also alleged that she frequently overheard male colleagues discussing that certain female employees only had their

1  jobs because they performed sexual favors for male superiors.[6]

2      53.    Such reports abound in the public domain and the problems and

3  allegations appear to plague every pay level at Activision.  Indeed, former Vice

4  President of Consumer Strategy and Insights Lisa Welch also provided a report to the

5  *New York Times* in July 2021 concerning her experience with what she described as a

6  "combative" culture at Activision.  She indicated that an unnamed executive had

7  pressured her to have sex with him on a work trip in 2011 after her boyfriend had died

8  weeks earlier, and that her colleagues routinely commented on her appearance over

9  the course of her Activision tenure.  Ms. Welch, who is 52, also alleged that she had

10  been repeatedly denied promotions in favor of less qualified men.[7]

11      54.    Female employees have also long been forced to regularly fend off

12  unwanted groping and sexual advances by their colleagues and supervisors at

13  Activision, which was akin to working in a frat house.  This "frat" cultural paradigm

14  included Company-endorsed "cube crawls" and other events where male employees

15  were encouraged to drink copious amounts of alcohol and "crawl," inebriated, through

16  the office, often harassing and groping female employees.[8]

17      55.    Male Activision employees also engage in a practice of routinely arriving

18  at work hung over only to play video games for extended periods of time on the clock,

19  during which their work was delegated to female employees.[9]

20      56.    In an open letter posted to Twitter on July 25, 2021, former Activision

21  employee Joy Fields alleged, *inter alia*, that she was "constantly treated by men like

22  a sex object" at the Company between 2006 and 2012:

23

24  [6]  Browning, Kellen, and Mike Isaac. "Activision, Facing Internal Turmoil, Grapples
   With #MeToo Reckoning." *The New York Times*, 28 Oct. 2021,

25  www.nytimes.com/2021/07/29/technology/activision-walkout-metoo-call-of-
   duty.html.

26  [7]  *Id.*

27  [8]  ¶¶6, 46-47. (all references herein to ¶ refer to the First Amended Complaint filed in
   the DFEH Action on October 23, 2021).

28  [9]  ¶¶5, 39.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*. . .[T]here was a dark underbelly that every woman at Blizzard knew about*. I want to talk about that.

Throughout my time at Blizzard I was constantly treated by men like a sex object. Men in positions of power would offer me trips and money if I would just go out on a date with them. A coworker would constantly 'neg' me as a way of flirting and just generally harass me. When I stood up for myself they would play the victim and tell me to calm down. Another coworker lured me into his office, closed the door and turned the lights off. He then sat next to me on the couch and started talking to me about sex and tried to pressure me to sleep with him. I was harassed by both my senior and lead in CS to the point of openly sobbing at my desk. I have heard from my female friends countless times about instances of men speaking about my body and being generally lewd about me. Some men had the audacity to straight up ask me if my breasts were real to my face and would argue with me when I said "yes". These are the types of things that I dealt with on a day-to-day basis.

I want to point out a few specific instances of sexual harassment by people in positions of power who should have known better. A Battle of the Bands event (a rock band competition that is attended by much of the company) was judged by a panel of senior Blizzard employees. I was playing guitar and just generally rocking out for our performance. During the judging portion of the event one of the judges commented on a microphone in front of the entire company about my breasts. He liked how much I was jumping up and down and thought I had "big talent". Everyone laughed. It was a joke and I was forced to laugh along with it.

Jeff Donais, who at the time was the head of CDev, was shaking a shake weight in his office when I walked past in the hallway. He stopped to make a joke about how I should give the shake weight a try in case I ever needed the talent for giving hand jobs in the future.

\*     \*     \*

The harassment didn't stop at work and it wasn't just harassment. Assault happened too. Men would pretend to be your friend and then assault you when you felt safe. I have been groped, coerced, and forced into sexual situations at the homes of coworkers and Blizzard events like BlizzCon and holiday parties. Men not taking "no" as an answer and pushing for sex once they had me alone with them. These are the kinds of people that Blizzard would hire. These are the kinds of people who got promoted and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

were put in positions of power. These people were the main culprits for the toxic culture of Blizzard.

This kind of behavior was prevalent in every department I worked in.

*     *     *

I believe this culture was fostered by Blizzard's hiring practices. Hires happened based on a "culture fit" more than anything else, and as we can see, the culture is toxic and one of sexual harassment and assault. For my own part, I'm not sure if my transfer into CDev was based on merit alone, as *I was told multiple times by those around me that I was only hired because of my body and for the opportunity of sex*.

*     *     *

I consider myself to be one of the lucky ones. Other women were put through far worse than I was. I believe every woman who has spoken on this issue thus far. Blizzard needs to be held accountable for what was done and what is still happening. I don't believe that those at the top had no idea what was happening. They knew. They enabled it, and it's long past time for change.

57.    In a notably tragic example of Activision's pervasive toxic work culture, one female Activision employee committed suicide following a holiday party where male co-workers were alleged to be passing around a picture of the deceased's genitals.[10]

58.    The Company failed to protect even pregnant employees from harassment.   One former Company employee reported to video game and entertainment media website IGN that the Company's lactation rooms did not have locks and men would "walk into the breastfeeding room [and]. . .just stare."[11]  Of the Company's purported commitment to safety and inclusion, another former employee

---

[10]  ¶ 48.

[11]  Bailey, Kat. "Fury, Worry, and Walkouts: Inside Activision Blizzard's Week of Reckoning." *IGN*, 30 July 2021, www.ign.com/articles/inside-activision-blizzards-week-of-reckoning.

1   stated "We had the illusion that every voice matters.  **We had the illusion of the**

2   **values**. . . [b]ut they were very much used by some people."[12]

3       59.    In yet another example of the sweeping toxicity that was and remains

4   endemic to Activision, Kotaku reporter Ethan Gach published a photograph on

5   July 28, 2021, of former World of Warcraft developer Alex Afrasiabi and other

6   current and former Company developers posing with a portrait of convicted rapist

7   Bill Cosby.  The photo was allegedly taken inside Afrasiabi's hotel room in 2013 at

8   BlizzCon, an annual company convention.   The Kotaku article cites images and

9   comments Afrasiabi allegedly posted on his Facebook confirming that his "Cosby

10  Suite" (as it became known due to Afrasiabi's pervasive sexual harassment of female

11  employees, well-known to Activision supervisors) was a booze-filled meeting place

12  for all levels of Company employees.  The social media posts allegedly feature an

13  Activision HR representative as one of the employees inside the so-called Cosby Suite

14  and a message by former Company designer David Kosak indicating that he was

15  "gathering the hot chixxx [for BlizzCon]."

16      60.    On March 8, 2017, Jeremi Gosney, founder & CEO of high-performance

17  password cracking firm Terahash (formerly Sagitta HPC), published an email alleging

18  that one of his C-suite executives had been ridiculed and sexually harassed by

19  Activision employees at a Black Hat security conference in Las Vegas in

20  August 2015.  The email alleges that Activision recruiters asked her, among a slew of

21  other harassing questions, whether she liked being penetrated and how often she was

22  penetrated.  Mr. Gosney alleged in a Tweet dated July 30, 2021, that he had sent the

23  email directly to Activision in 2017, alerting Defendants to the misconduct of the

24  Company's employees thereby.[13]

25

26  _____

[12]  *Id.*

27  [13]    "Jeremi   M.   Gosney   on."   *Twitter*,   8   Mar.   2017,
    twitter.com/jmgosney/status/1421225449351430145. Franceschi-Bicchierai, Lorenzo.

28  "Blizzard Recruiters Asked Hacker If She 'Liked Being Penetrated' at Job Fair." *Vice*,

---

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### D.   The Company Practices And Perpetuates Illegal Sex Discrimination

61.   White male employees enjoy a certain degree of inoculation at Activision.  For example, the Company has long engaged in a practice of steering women—including women of color, to their professional and pecuniary detriment—into lower levels of the Activision hierarchy and requiring them to work harder and longer to earn commensurate promotional and other opportunities as men at the Company.  Notwithstanding the Company's public representation that it strives to pay its employees "fairly for equal or substantially similar work" and ensure that pay is driven by "non-discriminatory factors," such as performance, the Company's female workforce is routinely passed over for promotions in favor of male counterparts despite having highly rated performance reviews and generating significantly more revenues than those male counterparts.

62.   Women of color are routinely passed over for promotions in favor of their white male counterparts known to be playing video games on the clock, and are also micromanaged so disproportionately that many have left Activision's employ.[14]

63.   Shockingly, supervisors also routinely ignore medical restrictions given to pregnant employees and issue negative performance evaluations or otherwise retaliate against these individuals for taking maternity leave.[15]

64.   The Company, as the Individual Defendants well-know, also broadly engages in a continuing pattern and practice of paying its female employees significantly less in base pay and total compensation than their male counterparts, at all pay and hierarchy levels.  Activision also terminates female employees more

---

30 July 2021, www.vice.com/en/article/3aq4vv/blizzard-recruiters-asked-hacker-if-she-liked-being-penetrated-at-job-fair.

[14]  ¶¶ 31-45.

[15]  ¶¶ 39-40.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   quickly than their male comparators on an ongoing basis.[16]

2   65.     The foregoing practices have mired the Company in civil rights litigation

3   over the years.  In 2014, an Activision employee filed a civil rights action alleging,

4   *inter alia*, that he was disparaged on the basis of his gender and was discharged for

5   taking paternity leave (the "*McNamee Action*").[17]

6   66.     Specifically, Mr. McNamee, a former manager at Activision who

7   spearheaded launch support strategy of the Company's Skylanders SWAP Force

8   game, alleged in his complaint that he was (i) given a lower performance evaluation

9   after reporting sexual misconduct and perceived violations of Company policy,

10  (ii) mocked by upper management for taking paternity leave and for his purported

11  failure to conform with gender stereotypes, and (iii) was the subject of a defamation

12  campaign by upper management.  The *McNamee Action* reached a settlement in 2015.

13  67.     In 2018, the same year the DFEH commenced its investigation, another

14  plaintiff filed a civil rights action against the Company (the "*Gonzalez Action*").[18]  In

15  the *Gonzalez Action*, an Activision Database Engineer accused the Company of

16  harassment while at work on the bases of his Mexican heritage and a medical

17  disability.

18  68.     Specifically, Mr. Gonzalez alleged that his colleagues routinely referred

19  to him as "the Mexican" and verbally harassed and berated him, and that he was denied

20  certain quarterly compensation by his supervisor on the basis of an unlawful

21  subterfuge.  The *Gonzalez Action* settled in 2019.

22  69.     The *Gonzalez Action* should have alerted the Individual Defendants to

23  the gross inefficacies of the Company's purported anti-discrimination and anti-

24  harassment policies and procedures following the *McNamee Action* settlement three

25  years prior.

26  _____
    [16]  ¶¶ 31-45.

27  [17]  *McNamee v. Activision Blizzard* (Cal. Sup. Ct., Case No. BC564232).

28  [18]  *Gonzalez v. Blizzard Entertainment* (Cal. Sup. Ct., Case No. BC713943).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

70.    In 2020, yet another Activision employee filed a civil rights lawsuit against the Company for gender discrimination, alleging that, *inter alia*, (i) during her tenure, a female was never promoted to or offered a director-level position, (ii) she was passed over for promotional opportunities in favor of male candidates, despite having consistently strong performance reviews, and (iii) she was terminated after she formally complained to Activision's Human Resources department and upper management on the basis of an unlawful subterfuge (the "*Adelmeyer Action*").[19]  The *Adelmeyer Action* reached a settlement in early 2021.

71.    The Individual Defendants were well-apprised of the problem of illegal harassment and discrimination endemic to Activision.  Beyond the foregoing civil rights litigation, droves of complaints were lodged over the years with the Company's Human Resources department and Activision executives—including Blizzard Entertainment's then-President Allen Brack—by Activision employees, yet no meaningful or effective remedial measures were taken to preempt of forestall further harm to the Company, its employees, or its shareholders.[20]  Indeed, notwithstanding retaining Paul Hastings LLP from 2015 to 2017 and Miller Law Group in 2018 to purportedly analyze compensation data, Activision failed to eliminate the Company's discriminatory pay practices and took virtually no steps to eliminate known sexual harassment.[21]

**E.    The DFEH Action And Activision's
Gross And Ongoing Failures In Accountability**

72.    On July 21, 2021, *Bloomberg Law* reported that the DFEH—the California agency responsible for enforcing California's civil rights laws and the largest state civil rights agency in the United States—had filed the DFEH Action

---

[19]  *Adelmeyer v. Infinity Ward*, Inc., naming Activision as a defendant (Cal. Sup. Ct. 20STcv05581).

[20]  ¶ 7.

[21]  ¶ 42.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

against Activision alleging a litany of civil rights violations.

73. Unbeknownst to the Company's shareholders, the DFEH Action was precipitated by a two-year investigation of the Company and alleges that the Company has long fostered a "frat boy" workplace culture that functions as a toxic breeding ground for illegal harassment and discrimination. In other words, the Individual Defendants knew that the Company was engaged in violations of law during the [more than] two-year pendency of the investigation but failed to take any effective remedial measures whatsoever. The lawsuit also followed three failed mediation attempts between the DFEH and Activision's internal dispute resolution division.

74. The *DFEH Action* seeks compensatory and punitive damages for a litany of FEHA violations, unpaid wages under the Equal Pay Act, and injunctive relief, among other relief.

75. On July 21, 2021, the Company responded to the DFEH Action with a blanket denial of wrongdoing, calling into question the integrity and veracity of the DFEH's investigation. Among other criticisms, Activision claimed the DFEH complaint distorted and lied about the Company's past, characterizing the complaint as "inaccurate," "disgraceful," and "unprofessional."

76. The Company's patent attempt to minimize its own malfeasance was met with public outrage. On July 23, 2021, just two days after the Company's statement, a chorus of current and former employees confirmed widespread abuse suffered at the hands of Activision and their management team. Hundreds of personal accounts poured in across multiple social media platforms corroborating the DFEH allegations of illegal sexism, gender discrimination, and harassment.

77. On July 23, 2021, Activision's Chief Compliance Officer, Frances F. Townsend, sent out an email to Activision staff. The email doubled down on Activision's denial of wrongdoing, characterizing the DFEH complaint as "a distorted and untrue picture of our company, including factually inaccurate, old, and out of context stories - some from more than a decade ago."

78.     On July 24, 2021, *World of Warcraft* developer Jeff Hamilton released a statement condemning the "horrible trauma that has been inflicted upon my coworkers, friends and colleagues."  Two days later, hundreds of former and current employees signed a petition condemning Activision's July 21, 2021, statement.  In an open letter sent to IGN, Bloomberg, and others, employees posited and relayed that, *inter alia*:

    i.    They agreed that "statements from Activision Blizzard, Inc. and their legal counsel regarding the DFEH lawsuit, as well as the subsequent internal statement from Frances Townsend, are abhorrent and insulting;"

    ii.    While executives have claimed that actions will be taken to protect employees, there's no longer trust the leaders can protect victims and put safety above self-interest;

    iii.    Employees call for official statements that "recognize the seriousness of these allegations and demonstrate compassion for victims of harassment and assault;"

    iv.    Employees call for Frances Townsend to step down as Executive Sponsor of the ABK Employee Women's Network.

79.     Also on July 26, 2021, according to media reports, Activision Blizzard hosted an "allhands" meeting to address the DFEH Action, though only 500 employees were reportedly able to attend the Zoom call.  Activision Publishing's Chief Operating Officer, Joshua Taub, hosted the meeting, during which he reportedly suggested that the only proper way to handle the allegations is through internal handling rather than a lawsuit, despite the lawsuit explicitly indicting Activision's failure to internally handle the alleged misconduct.

80.     The same day, *The Wall Street Journal* published an article titled "Activision Blizzard Gender-Bias Suit Shows Videogame Culture Remains a Flashpoint," which indicated:

Some former Activision employees said they weren't surprised by the lawsuit.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Shay Stein worked for Activision's Blizzard Entertainment unit at the company's Austin, Texas, campus from 2014 to 2017 as a game master. She said the mistreatment of women outlined in the complaint as taking place at Blizzard's Irvine, Calif. Campus was "on par" with what she personally experienced in Austin. For examples, she said in her first year on the job she was offered drugs by a senior male colleague at an off-site employee gathering to help "get me in the mood" because "I wasn't having enough fun."

Now 28 years old and working as a freelance graphic designer in Brooklyn, N.Y., Ms. Stein said she didn't report the incident to Blizzard's human-resources department because she hadn't yet completed the company's probation period for new recruits and was afraid of losing her job. "It was a really uncomfortable experience," she said.

81.    Then, on July 27, 2021, Activision employees organized a work stoppage for Wednesday, July 28, 2021, to support their open letter against the Company and to thoroughly denounce Activision's failure to admit fault or effect any prophylactic changes.  The organizers of the protest called for four specific governance changes:

i.      End mandatory arbitration clauses in employee contracts, which are widely believed to protect companies and not employees;

ii.     Institute hiring practices that improve representation and equity for women, people of color, nonbinary people, and other marginalized groups;

iii.    Publicly publish compensation data, promotion rates, and salary ranges for employees in the company; and

iv.     Creation of diversity, equity, and inclusion task force from a third party to audit the HR department, executive staff, and the company reporting structure.

82.    On the same day, Kotick issued an email to all Company employees apologizing for the Company's "tone deaf" initial response to the DFEH Action. Faced with no choice but to save face, Activision hired WilmerHale the same day to carry out an internal investigation into Activision's policies and procedures.

83.   On July 28, 2021, Activision employees walked out in protest, with in-person employees meeting at the gates of Activision's Irvine headquarters and virtual employees abstaining from work and using #ActiBlizzWalkout online.

84.   On August 2, 2021, Blizzard Entertainment President, J. Allen Brack—who the DFEH Action alleges directly received numerous complaints about harassment and discrimination and failed to take remedial measures—stepped down amid the colossal backlash from the DFEH Action and the Company's ensuing response.

85.   Activision shares dropped 4% on August 3, 20201 following Brack's exit.  On the same day, The Motley Fool reported that "[f]ighting a two-front war against both the state and its own employees apparently didn't appeal to Activision [ ], and so today, *the company moved to end the crisis by replacing Brack*."

86.   On August 4, 2021, the Company's Senior Vice President of Human Resources quietly stepped down from the Company.

87.   Two days later, Kellog's ended its relationship with Overwatch League, Activision's professional esports franchise.

88.   On August 11, 2021, the Company fired Luis Barriga, director of Activision's Diablo 4 game, and lead level designer Jesse McCree.  McCree and LeCraft were featured in the Cosby Suite photo published by Kotaku on July 28, 2021.

89.   On September 14, 2021, the Company announced the hiring of two senior executives: Julie Hodges, Chief People Officer (replacing former Chief People Officer Claudine Naughton), effective September 21, and Sandeep Dube, Chief Commercial Officer, effective September 27.

90.   Also on September 20, 2021, Activision's chief legal officer, Claire Hart, announced her departure from the Company.

91.   To date, the Individual Defendants have done nothing to remediate a Company culture of endemic harassment and discrimination plaguing the Company from the "top, down," *i.e.*, the executive level through the Company's lower-level

1   employees.  Based upon the litany of published, personal accounts of harassment and

2   discrimination at Activision, reports to HR and executives of widespread harassment

3   and discrimination, Board and employee derogation from Company policy, and the

4   DFEH Action alleging similar conduct over the span of over a decade, sufficient "red

5   flags" exist such that the Individual Defendants knew, or must have known, that

6   Activision culture of harassment and discrimination was chronically pervasive.

7       92.    In a too-little, too-late attempt to curtail the Company's colossal

8   regulatory and litigation exposure, Kotick announced on October 28, 2021, that he

9   would take a pay cut and end mandatory arbitration for internal harassment and

10  discrimination claims.  Kotick, who was the second-highest paid chief executive in

11  the country in 2020, earned $154 million in 2020.

12      93.    The next day, SOC Investment Group ("SOC")[22]—an organization that

13  advises union pension funds with the stated mission of holding companies accountable

14  for unethical behavior—issued a statement to gamesindustry.biz admonishing

15  Kotick's paycut:

> "We read [the] announcement by Activision Blizzard with mixed feelings and many questions. . .[w]hile Activision is taking steps forward to addressing shareholder and other stakeholders' concerns about exorbitant pay, wage inequality, diversity, and harassment*, these steps fall short of lasting changes that will set the company on the right track for long-term success*."[23]

### F.    The EEOC Action

94.    On September 27, 2021, the EEOC commenced the EEOC Action against Activision.   The EEOC Action alleges that on September 26, 2018, EEOC Commissioner Chai R. Feldblum signed Commissioner's Charge Number 480- 2018-

---

[22]  SOC was formerly known as CtW Investment Group.

[23]  Batchelor, James. "SOC Investment Group: Bobby Kotick Paycut 'Falls Short of Lasting    Changes.'"     *GamesIndustry.Biz*,    1    Nov.    2021, www.gamesindustry.biz/articles/2021-10-29-soc-investment-group-bobby-kotick-paycut-falls-short-of-lasting-changes.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

05212, initiating an investigation by the EEOC relating to Activision's practice of: "1. Subjecting female employees to sex-based discrimination, including harassment, based on their gender. 2. Retaliating against female employees for complaining about sex-based discrimination, based on their gender. 3. Paying female employees less than male employees, based on their gender" (the "Charge").

95.    The EEOC Action further alleges that the agency conducted an extensive investigation from September 26, 2018, to June 15, 2021, of the allegations of sexual harassment and related retaliation against the putative defendants and additional entities beyond the Charge at their worksites in the United States. The lawsuit further alleges conciliation attempts between the putative defendants and the EEOC were unsuccessful.

96.    The EEOC Action seeks a permanent injunction of Activision's practice of harassment and discrimination in violation of Title VII, back pay to adversely affected employees, past and future pecuniary losses, and non-pecuniary losses precipitated by Activision's pattern and practice of discrimination. On September 27, 2021, the EEOC and Activision entered a consent decree contemplating an $18 million settlement fund, among other terms, thereby confirming liability.

G.    **The National Labor Relations Board Complaint**

97.    On September 10, 2021, the Communications Workers of America, a union supporting workers at Activision, filed an unfair labor practice complaint with the National Labor Relations Board (the "NLRB Complaint"), accusing Activision of violating federal labor law through coercive rules, actions and statements.

98.    The National Labor Relations Board is an independent federal agency enforcing the National Labor Relations Act, which guarantees the right of most private sector employees to organize, to engage in group efforts to improve their wages and working conditions, to determine whether to have unions as their bargaining representative, to engage in collective bargaining, and to refrain from any of these

activities.  It acts to prevent and remedy unfair labor practices committed by private sector employers and unions.

99.     Congress enacted the National Labor Relations Act ("NLRA") in 1935 to protect the rights of employees and employers, to encourage collective bargaining, and to curtail certain private sector labor and management practices, which can harm the general welfare of workers, businesses and the U.S. economy.

100.   The NLRB Complaint alleges that Activision's management has "repeatedly engaged in unlawful conduct" against workers fighting against working conditions at Activision.  It further alleges that Activision's management threatened employees to not discuss pay or working conditions and engaged in unlawful "surveillance" of its employees.

101.   Complaints, such as the NLRB Complaint, filed with the labor board are investigated by regional offices and, if found to have merit and not settled, can be prosecuted by the agency's general counsel and heard by administrative law judges. The rulings can be appealed to NLRB members in Washington, D.C., and from there to federal court.  The agency can require remedies such as posting of notices and reversals of policies or punishments but has no authority to impose punitive damages.

## H.   The SEC Investigation

102.   The consequences for Activision's lawless work culture have continued to mount.  On September 20, 2021, the Company announced that it was under investigation by the SEC relating to "employment matters":

> It also confirmed that [the Company] is complying with a recent U.S. Securities and Exchange Commission (SEC) subpoena issued to the Company and several current and former employees and executives regarding disclosures on employment matters and related issues. The Company is confident in its prior disclosures and is cooperating with the SEC's investigation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

103.   *The Wall Street Journal* reported the same day that the SEC issued a subpoena for notes recorded during Board meetings since 2019, the files of six former employees, and separation agreements from 2021.[24]

104.   According to *The Wall Street Journal*, the SEC investigation "significantly ratchets up the regulatory pressure on Activision" as the "SEC is requesting information to discern whether Activision and its executives properly disclosed allegations of workplace harassment and gender-pay issues, and whether any of that information should have been shared earlier with investors and other parties, according to the documents and people familiar with the investigation."

105.   The SEC is asking for Defendant Kotick's communications with other senior executives regarding complaints of sexual harassment or discrimination by Activision employees or contractors, according to *The Wall Street Journal*.

## V.   THE INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS

### A.   The Material Misstatements And Omissions

███ ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████ ███████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[24]   Grind, Kirsten, and Sarah Needleman. "SEC Is Investigating Activision Blizzard Over Workplace Practices, Disclosures." *WSJ*, 20 Sept. 2021, www.wsj.com/articles/sec-is-investigating-activision-blizzard-over-workplace-practices-disclosures-11632165080.

[25] ████████████████████████



**1. 2018 Misstatements And Omissions**

109. On February 27, 2018, the Individual Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). Iteratively, the 2017 10-K stated:

> ***In addition, we are party to routine claims, suits, investigations, audits, and other proceedings arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, labor and employment matters, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business, financial condition, results of operations, or liquidity.***

110.  The 2017 10-K contained a certification, pursuant to SOX and signed by Defendant Kotick, in his capacity as CEO, and Neumann, in his capacity as CFO.  The SOX certification stated that the 2017 10-K "(1) fully complies with the requirements of section 13(a) or 15(d) of the Exchange Act; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Kotick and Durkin each signed a separate certification stating, in relevant part:

> 1. I have reviewed this annual report on Form 10 K of Activision Blizzard, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



116.

Then, on October 12, 2018, the DFEH filed a Complaint for Group/Class Relief against the Company through its subsidiary Blizzard Entertainment, Inc.

117.   On October 29, 2018, the DFEH filed an Amended Director's Complaint to add the Company as a Defendant.

40

41

42

43

44

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



123.  On December 7, 2018, a Second Amended Director's Complaint was filed and served to add Activision Publishing, Inc. (collectively with all iterations, the "DFEH Director's Complaints").   The DFEH Director's Complaints alleged that Defendants engaged in discrimination against their employees on the basis of sex-gender, including failing to hire, select, or employ persons because of their sex, as

---

[45]

[46]

[47]

[48]

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  well as discriminating in compensation or in the terms, conditions, privileges of

2  employment due to their sex.   The Director's Complaints further alleged that

3  Defendants failed to take all reasonable steps to prevent unlawful discrimination,

4  harassment, or retaliation.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



### 2.    <u>2019 Misstatements And Omissions</u>

128.    On February 28, 2019, the Individual Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). Iteratively, the 2018 10-K stated:

> ***We are party to routine claims, suits, investigations, audits, and other proceedings arising from the ordinary course of business***, including with respect to intellectual property rights, contractual claims, labor and employment matters, regulatory matters, tax matters, unclaimed property matters, compliance matters, and collection matters. In the opinion of management, after consultation with legal counsel, ***such routine claims and lawsuits are not significant and we do not expect them to have a material adverse. effect on our business, financial condition, results of operations, or liquidity.***

129.    The 2018 10-K contained a certification, pursuant to SOX and signed Defendant Kotick, in his capacity as CEO, and Durkin, in his capacity as CFO.  The SOX certification stated that the 2018 10-K "(1) fully complies with the requirements of section 13(a) or 15(d) of the Exchange Act; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of operations of the Company." Defendants Kotick and Durkin each signed a separate certification stating, in relevant part:

1. I have reviewed this annual report on Form 10-K of Activision Blizzard, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



62
63
64
65 *Id.*
66

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



143.    On February 12, 2020, with the nonpublic knowledge of the pendency of the ▮▮▮ EEOC, and DFEH investigations as well as the un-remediated culture of endemic harassment and discrimination plaguing the Company, Defendant Morgado sold 32,000 shares of personally held shares of Activision stock at artificially inflated prices for proceeds of $1,991,561.60.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### 3.    2020 Misstatements And Omissions

144.   On February 27, 2020, the Individual Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). Iteratively, the 2019 10-K stated:

> In addition, *we are party to routine claims, suits, investigations, audits, and other proceedings* arising in the ordinary course of business, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, labor and employment matters, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business, financial condition, results of operations, or liquidity*.

145.   The 2019 10-K contained a certification, pursuant to SOX and signed Defendant Kotick, in his capacity as CEO, and Durkin, in his capacity as CFO.  The SOX certification stated that the 2019 10-K "(1) fully complies with the requirements of section 13(a) or 15(d) of the Exchange Act; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Kotick and Durkin each signed a separate certification stating, in relevant part:

> 1. I have reviewed this annual report on Form 10 K of Activision Blizzard, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

146.   On April 14, 2020, the New York City Comptroller's office announced that Activision's Board had "approved, and publicly disclosed" a policy requiring the consideration of qualified women and racially/ethnically diverse candidates for director and external CEO searches."  The policy was to be putatively implemented as part of an agreement the Company struck with the New York City Comptroller's office whereby the office agreed to withdraw a shareholder proposal seeking to require the adoption of an analogous rule.

147.   On April 24, 2020, the Board caused Activision to issue its definitive 2020 proxy statement in advance of the annual shareholder meeting scheduled for June 11, 2020 (the "2020 Proxy Statement").  The record date for voting shareholders was April 15, 2020.

148.   The 2020 Proxy Statement characterized "[d]iversity and inclusion" as "a strategic priority for Activision Blizzard," citing the Company's purported efforts on that front, including the following so-called "strategic areas":

- ***Our People***—We believe that in order to create products that attract a growing global audience, it is important that our employees reflect that diversity, and that they have the opportunities and resources to unlock their potential. While we define diversity in its broadest sense to include characteristics both seen and unseen, we know representation at all levels of the organization matters. To that end, we partner with organizations like the Grace Hopper Celebration and Women in Games International, and continue to focus on connecting with underrepresented groups through our University Relations programs, where we have continued to increase our representation of women and underrepresented minorities. We are reviewing and updating our recruiting and interviewing processes and tools to help mitigate the potential for bias. We have also invested in unconscious bias awareness workshops for all employees to support inclusive, high-performing teams across Activision Blizzard. By embedding D&I practices and programs in the full employee lifecycle, we work to recruit, attract, retain and grow world-class talent that represents our player communities.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- ***Our Leaders***—In 2020, we amended our Corporate Governance Principles and Policies to provide that the initial list from which any new independent director nominee is chosen will include qualified female and racially/ethnically diverse candidates and, similarly, if we conduct an external search for a new CEO, that the initial list of external candidates will include qualified female and racially/ethnically diverse candidates. In addition to ensuring diversity at the senior most levels, we also believe in developing leaders for whom diversity and inclusion is a priority. As such, in 2019, all people managers were required to attend an "Inclusive Leadership Experience" workshop in order to further develop this capability with the knowledge and tools needed to create the conditions for their teams to flourish. To further reinforce D&I as a strategic business priority, some of our most senior leaders serve as executive sponsors of our Employee Networks (our employee resource groups).

- ***Our Culture***—Across our entire organization, fostering an inclusive culture where employees feel valued and heard, and a sense of belonging is mission critical. One way we are doing this is through expanding our Employee Networks community at Activision, Blizzard, King, and our corporate headquarters. These groups support our employees, our culture and our business by driving cultural awareness, professional development, networking, community involvement, and support for recruiting efforts. In 2019, we celebrated various heritage moments, including: our 6th annual Veterans Day of Service, in which employees at 30 sites in multiple countries partnered with local organizations to support veterans; an International Women's Day celebration at every one of the Company's offices, which included a development-oriented Women's Summit for our all of our employees; and Pride Month celebrations, which saw thousands of employees participating in office events and marching in three Pride parades around the world. During last year's Game Developers Conference, we hosted our 3rd annual D&I Mixer for employees from across the enterprise to engage in dialogue and activities focused on diversity and inclusion in our Company, as well as our games.

- ***Our Content***—We believe that inclusive game design is an opportunity for us to lead the industry and influence more open and inclusive gaming communities. Part of the effort means creating

48

content that reflects and attracts a global and diverse player base. In 2019, a character from Overwatch®, Soldier: 76, was identified as gay, making him the franchise's second openly LGBTQ character. Also, Call of Duty: Modern Warfare engaged players in breathtaking combat operations with a diverse cast of international special forces. Our Employee Networks groups are leveraged to provide feedback to development teams on content ranging from narratives to worlds/levels and character skins and names. Creating more diverse characters and worlds is only part of what it means to be more inclusive in game design. We are also looking at ways to make our games more accessible to gamers with varying physical, visual, auditory, or cognitive processing abilities, and have a growing community of accessibility champions in our game development and studio teams.

- ***Our External Communities***—We see the opportunity to drive positive impact outside our walls through external communities and partners. As such, across the Company, we focus on the next generation of talent through programs that provide girls, women and/or young people in underserved communities with exposure to education and career opportunities in science, technology, engineering, and mathematics (STEM). In 2018, Activision Blizzard established a fellowship through Minds Matter of Los Angeles, a non-profit organization that offers college prepatory programs for students in under-resourced communities, which we continue to support today. In 2019, King became the first U.K.-based gaming company to sign onto the "Tech Talent Charter," a commitment by signatories to work together to increase the diversity of the technology workforce in the U.K. For the second year in a row, Blizzard partnered with "Girls Who Code," an organization focused on closing the gender gap in technology, to sponsor two major initiatives, including a seven-week program hosted at Blizzard headquarters for girls to learn to code and gain exposure to technology jobs. For the fifth year in a row, King partnered with Diversi, a non-profit organization working for greater diversity in gaming, to award 15 female students full scholarships to the Game Developers Conference, with a tailored development program and special access to industry champions. For the second year in a row, our University Relations team worked with STEM Advantage, an organization that mentors and prepares women and underserved communities to pursue careers in STEM, in selecting participants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for our intern program. Further, Blizzard hosted an "Inclusion Nexus" for the nearly 40,000 people who visit its annual BlizzCon event to share with them how we value diversity and inclusion at Blizzard, in the gaming industry, and in games themselves.

149.   Under a heading titled "Environmental, Social and Governance Matters," the 2020 Proxy Statement further represented:

Our Board appreciates that reporting on environmental, social and governance ("ESG") matters is of increasing importance to many of the Company's stakeholders, especially as embedded ESG initiatives, policies, strategies and goals can help mitigate risk, reduce costs, protect brand value and identify market opportunities. Therefore, we have (1) established a cross-functional ESG working group, which includes members of our management, to identify, gather and analyze ESG information in order to both report on and advance our existing enterprise-wide commitment to ESG matters; and (2) engaged an external consultant to help support and counsel this working group. A variety of corporate social responsibility and sustainability subjects—some of which are discussed in this proxy statement—will be covered by the Company's ESG team in this process, including, without limitation, our: corporate governance practices; business ethics and compliance; data privacy and data security measures; energy usage and waste reduction efforts; human capital management practices; diversity and inclusion initiatives; and community engagement and philanthropy. The Company intends to provide further information on its ESG initiatives in the upcoming months and years. We currently intend to finalize and publish a detailed outline of our ESG reporting efforts in 2020, and release our first annual ESG report in 2021.

150.   The 2020 Proxy Statement represents an explicit admission by the Individual Defendants that—in soliciting shareholder votes to support the Board's re-election—reporting on ESG issues was of material importance to shareholders and, because of the material importance of ESG issues, the Individual Defendants engaged a consultant to focus on disclosure of "human capital management practices" and "diversity and inclusion initiatives."   The 2020 Proxy Statement further assured shareholders that the Individual Defendants would finalize and publish a detailed outline of these efforts and publish the Company's first annual ESG report in 2021.

151.   The 2020 Proxy Statement was entirely devoid, however, of any disclosure of the pendency of the ██ DFEH and EEOC investigations or the systemic harassment and discrimination issues already plaguing Activision which prompted those investigations.

152.   Moreover, in a document the Individual Defendants caused the Company to publish on its website dated June 1, 2020, and titled "Activision Blizzard Environmental, Social and Governance Overview," the Individual Defendants caused the Company to identify the four "ESG metrics we believe are most relevant to our business."  Item 3 stated:

> 3) Social disclosure, designed to show how Activision Blizzard is investing in attracting, retaining and developing talent as well as serving the broader community, including information with respect to:
>
> a) Employee health and safety;
>
> b) Employee engagement;
>
> c) Talent development;
>
> d) Employee retention;
>
> e) Diversity and inclusion; and
>
> f) Community engagement.

██████    ████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████████████████████████    ████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

[77] ███████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



157.   On May 14, 15, and 18, 2020, Defendant Kelly sold Activision stock unlawfully with the benefit of nonpublic knowledge concerning the pendency of the EEOC, and DFEH investigations as well as the un-remediated culture of endemic

harassment and discrimination plaguing the Company.  Specifically, Defendants Kelly sold 250,000 Activision shares for proceeds of $18,105,250 on May 14, 2020.  The next day, he sold 75,000 shares of Activision stock for $5,502,202.50.  Then, on May 18, 2020, Defendant Kelly sold 50,000 shares of Activision stock for $3,663,920.

158.  On June 3, 2020, SOC issued a public letter on behalf of Activision's shareholders imploring Activision shareholders to vote against the Company's say-on-pay proposal for executive compensation at the upcoming 2020 annual meeting, citing, *inter alia*, that the Company's CEO to median pay ratio was 319:1 during fiscal 2019 and that "[o]ver the past four years, Activision [] CEO Robert Kotick has received over $20 million in combined stock/option equity per year.  These equity grants have consistently been larger than the total pay (the sum of base salary, annual bonus, and equity pay) of CEO peers at similar companies."

159.  On June 11, 2020, at the 2020 annual meeting, less than 60% of shareholder votes were cast in favor of management's advisory proposal on the executive compensation included in the Company's 2020 Proxy Statement.

160.  Then, on June 23, 2020, the *New York Times* published an article titled "Dozens of Women in Gaming Speak Out About Sexism and Harassment," citing a litany of allegations of gender-based discrimination, harassment and sexual assault.

161.  Just six months later, in December 2020, the AFL-CIO, an Activision shareholder, submitted a shareholder proposal for the 2021 annual meeting:

> Resolved: Shareholders request that the Board of Directors of Activision Blizzard, Inc. (the "Company") adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company shall include, but need not be limited to, qualified women and minority candidates (a "Diverse Candidate Search Policy").
>
> A diverse workforce at all levels of a company can enhance long-term company performance. Workforce diversity provides a competitive advantage to companies by helping to attract and retain talented employees, strengthening customer relationships, increasing employee

satisfaction, improving corporate decision-making, and enhancing corporate reputations.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  

166.   On August 27, 2020, Defendant Durkin sold 50,000 shares of Activision stock at artificially inflated prices for proceeds of over $4,175,480.   Similarly, Defendant Wasserman sold 10,000 shares of Activision stock for proceeds of over $800,000 on August 31, 2020.   These sales were unlawful because they were made with the benefit of nonpublic knowledge of the pendency of the ████ EEOC, and DFEH investigations as well as the un-remediated culture of endemic harassment and discrimination plaguing the Company.

86 *Id.*
87
88
89



172.   On November 2, 3, and 4, 2020, Defendant Kelly sold Activision stock unlawfully with the benefit of nonpublic knowledge concerning the pendency of the ███ EEOC, and DFEH investigations as well as the un-remediated culture of endemic harassment and discrimination plaguing the Company.  Specifically, Defendants Kelly sold 200,000 Activision shares for proceeds of $15,329,980 on November 2, 2020. The next day, he sold 100,000 shares of Activision stock for $7,665,240.  Then, on November 4, 2020, Defendant Kelly sold 75,000 shares of Activision stock for $5,918,602.50.

173.   Thereafter, the Individual Defendants caused Activision to reject the AFL-CIO's proposal for workforce diversity.  In a letter dated January 19, 2021 to the SEC, the Individual Defendants caused the Company to explain that its refusal to

90 ████████████
91 *Id.*
92 ████████████
93 ████████████████



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

allow the proposal on the ballot was because doing so would require the Company to consider diversity in all hiring decisions:

> As noted by the Proponents, the Company has implemented a Rooney Rule policy for new independent director nominees and any new CEO position. The Company takes matters of diversity seriously and is committed to building and sustaining a culture of belonging, where everyone thrives and diversity drives business value and growth. While the Company has implemented a Rooney Rule policy as envisioned, ***implementing a policy that would extend such an approach to all hiring decisions amounts to an unworkable encroachment on the Company's ability to run its business and compete for talent in a highly competitive, fast-moving market***.
>
> \*       \*       \*
>
> The Proposal leaves no room for the Company's management or Board of Directors to exercise discretion in how new hire decisions are structured, and instead asks shareholders to determine how the Company should conduct its hiring decisions for purposes of workplace diversity.



94
95
96 *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



177.   The next day, *Vice* magazine published an article dated January 27, 2021 titled "Activision Is Resisting Diversity Hiring Push by America's Unions."  The article included a quote by a Company spokesperson that, "***Our talent is the lifeblood of Activision Blizzard.  We value the diversity of the Activision Blizzard community and understand that our employees and players come from a wide array of backgrounds***.  In order to deliver epic and engaging entertainment for a diverse, growing global audience, ***our workforce must reflect these communities***."

### 4.   2021 Misstatements And Omissions

178.   On February 23, 2021, the Individual Defendants caused the Company to file its Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K").  Iteratively, the 2020 10-K stated:

> ***We are party to routine claims, suits, investigations, audits, and other proceedings*** arising in the ordinary course of business, including with respect to intellectual property, competition and antitrust matters, regulatory matters, tax matters, privacy matters, labor and employment

[97] *Id.*

[98] ███████████████

matters, compliance matters, unclaimed property matters, liability and personal injury claims, product damage claims, collection matters, and/or commercial claims. In the opinion of management, after consultation with legal counsel, *such routine claims and lawsuits are not significant and we do not expect them to have a material adverse effect on our business, financial condition, results of operations, or liquidity*.

179.   The 2020 10-K contained a certification, pursuant to SOX and signed Defendant Kotick, in his capacity as CEO, and Durkin, in his capacity as CFO.  The SOX certification stated that the 2020 10-K "(1) fully complies with the requirements of section 13(a) or 15(d) of the Exchange Act; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Kotick and Durkin each signed a separate certification stating, in relevant part:

1. I have reviewed this annual report on Form 10 K of Activision Blizzard, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known

to me by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



182. In other words, the Compensation Committee of the Board—which included Defendants Bowers, Morgado, and Ostroff— ██████████████████████ ████████████████████████████████ Nevertheless, the Individual Defendants continued to keep the Company's shareholders in the dark about the existence of and pendency of the ███ EEOC, and DFEH investigations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



185.   On April 30, 2021, in advance of the Company's annual shareholder meeting scheduled for June 14, 2021, the Individual Defendants caused the Company to issue its 2021 Proxy Statement.  The 2021 Proxy Statement contained the following statement, signed by Defendants Kotick and Kelly:

> To keep providing engaging gaming experiences that will resonate with our diverse players, our own company must continue to reflect the diversity and values of our players and fans. ***We remain committed to developing an employee base that represents the global communities in which we operate***. To this end, we enhanced our sourcing, hiring, and retention practices even further in 2020 to improve our impact and it will remain an ongoing process. ***We have also significantly enhanced the diversity of our leadership team. At the same time, we are continuing to invest in diversity, equity, and inclusion programs across the globe and expanded career pathways for talented people, especially those from***

---

104 
105
106 *Id*.

*backgrounds that have been historically underrepresented in technology and entertainment*.

While there is still important work to do, we are proud of the accomplishments we have made on this front, such as more than doubling the number of women in leadership roles in our game development functions and receiving a perfect score of 100 on the Human Rights Campaign Foundation's Corporate Equality Index, as well as, receiving the distinction of being a "Best Place to Work for LGBTQ Equality." We remain focused on doing even more to drive this commitment forward in the months ahead.

186. The 2021 Proxy Statement also reflected on the slim (<60%) majority of Company shareholders that had voted in favor of Defendant Kotick's compensation and Activision's purported response:

In 2020, our compensation program received the support of 57% of the total votes cast at our annual meeting. Over the ensuing several months, Activision's Board and management team actively sought feedback from shareholders to better understand what motivated their votes. As part of these efforts, we offered engagement with our CEO, Mr. Kotick, and Chair of the Compensation Committee, Mr. Morgado, to shareholders owning approximately 66% of outstanding shares, including each of our top 50 institutional holders. We held over 70 meetings, engaging with over 50 institutions owning approximately 63% of outstanding shares. Our Board was directly involved in the majority of these dialogues, with a member of our Compensation Committee and/or CEO (and, in most cases, both) participating in over 40 meetings with shareholders owning approximately 59% of outstanding shares. To ensure candid discussions, in conversations where the CEO participated, he offered to step off the call when executive compensation was discussed.

187. The 2021 Proxy Statement also stated that the Company "follow[s] best practices in corporate governance—not just among our peer group, but in the market generally. Highlights of our corporate governance program include: . . . ***Our Nominating and Corporate Governance Committee oversees risks associated with overall governance and Board succession planning, as well as ESG***."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

188.   In other words, the Nominating and Corporate Governance Committee (N&CG) of the Board—which included Defendants Meyer, Morgado, Nolan, and Wasserman—directly oversaw the Company's environment, social and governance risks, including matters of corporate culture, diversity and inclusion, and anti-discrimination and anti-harassment policies.

189.   The 2021 Proxy Statement further illuminated the ESG oversight responsibilities of the Board in its entirety in the following statement:

> Our Board and its committees oversee matters related to our environmental, social, and governance (i.e., ESG) practices, performance, and disclosure. Through this process, directors provide management with feedback and guidance on the Company's ESG efforts. Please see "—Board Committees" above for a description of our Board, its committees and their respective roles and responsibilities. In 2020, our management established both an ESG steering committee, which is currently chaired by our Chief Administrative Officer and includes our Corporate Secretary and Chief Compliance Officer, Chief People, Diversity & Inclusion Officer, Chief Legal Officer, Chief Financial Officer, SVP of Investor Relations, Chief Communications Officer, and a cross-functional, enterprise-wide ESG working group, which includes members of our executive management team and employees from all of our business units and corporate functions and supports the steering committee by identifying the ESG matters that are most relevant to our business. As part of our long-term strategy, we will continue to expand our internal ESG expertise and advance our reporting activities.

> In addition to the preparation of our first annual ESG report, which we will publish later this quarter, our ESG efforts in 2020 focused on using our platforms and the resources in three key areas: (1) protecting our people in the fight against COVID-19; (2) driving diversity, equity, and inclusion in our communities; and (3) protecting our planet.

190.   The 2021 Proxy Statement further represented:

> Our Company and Talent Pipeline

> Driving diverse communities first means creating a diverse and inclusive culture with our own company. We know that the most innovative and compelling work only originates from a culture in which all employees can

64

be, and bring, their authentic and best selves. Beyond being an equal opportunity employer, we are committed to building and sustaining a culture of DE&I, beginning with the tone from the top and extending through our company. Our continuous work in this space drives greater reach, engagement and growth and allows us to continually invest in building upon, expanding and amplifying our efforts, making DE&I a competitive advantage.

- Since 2016, the number of women in our game development leadership roles has more than doubled. The promotion rates for minorities and non-minorities are identical, and the promotion rate for women is slightly higher than the promotion rate for men.

- The pool from which any new independent nominee to our Board of Directors or external candidates for CEO are chosen will include qualified women and racially or ethnically diverse candidates.

- All slates for VP and above positions require diverse candidates. Our CEO has been clear that all positions at all levels of hiring should include diverse candidates.  Hiring partners likewise are expected to provide a diverse slate of candidates for these positions.

- In 2020, to accelerate women into leadership roles, we created the "Kicking Glass" program, which aims to provide networking and exposure opportunities, development and mentoring to women and non-binary employees. This includes tailored modules for our employees at various stages in their careers.

- For the second year in a row, our University Relations team has partnered with STEM Advantage, an organization that mentors and prepares women and other students from underserved communities to pursue careers in science and technology, which helps us select the very best talent for our internship program.

- Our broader Talent Acquisition team is equally focused on connecting with underrepresented groups, such as participating in career fairs such as Grace Hopper Celebration and AfroTech World.

- Our support for the UNCF provided transformative scholarships to Historically Black Colleges and Universities for some of our nation's most promising young adults.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Our investment in Management Leadership for Tomorrow allowed the organization to double participation in its extraordinary career preparation program, equipping high-achieving Black, Latinx, and Indigenous Americans with skills and coaching to accelerate their careers.

191.  The 2021 Proxy Statement also included a letter from the Compensation Committee stating, in relevant part:

In direct response to the feedback we heard in conversations with our shareholders, we extended Mr. Kotick's 2016 employment agreement on April 28, 2021, amending it in several key aspects, and made several changes to our broader executive compensation program and disclosures.

Highlights of the changes to Mr. Kotick's agreement, and other arrangements with the Company, are detailed further on pages 59–60, include:

\*      \*      \*

- Increased the weighting of financial metrics in the annual cash bonus program (*i.e.*, the CAIP) for the CEO and the broader executive compensation team from 60% to 80%, and for the remaining 20% of strategic objectives, ***these will be based on measurable ESG initiatives (i.e., human capital management, corporate social responsibility, and sustainability goals, which may include diversity, equity and inclusion metrics centered around the hiring/promotion of members of underrepresented communities, hiring of veterans and sustainability)***.

\*      \*      \*

In response to shareholder feedback received the Committee has committed to two changes in the operation of the CAIP:

- Disclose ESG objectives, which may include diversity, equity, inclusion, recruiting veterans, and sustainability, will be incorporated into the strategic objective component for 2021.

192.  The 2021 Proxy Statement was devoid, entirely, of any disclosure of the pendency of ████████████ the DFEH and the EEOC's investigations or the systemic harassment and discrimination issues already plaguing the Company.

193. Thereafter, on May 26, 2021, Glass Lewis issued a recommendation that the Company's shareholders reject management's say-on-pay proposal. The Board's Compensation Committee responded two days later, stating:

> Our Compensation Committee takes its responsibilities seriously and after extensive shareholder engagement has taken meaningful action to be responsive to shareholder feedback. We are available to engage with our shareholders and Glass Lewis to answer any questions ahead of the Annual Meeting.

194. On June 7, 2021, SOC implored the Company's shareholders to vote against Activision's say-on-pay proposal, citing the reasons that (i) "the Compensation Committee did not address longstanding shareholder concerns about executive pay practices at Activision by extending CEO Kotick's contract by less than two years. Given the repeated opposition to CEO Kotick's pay over the years, shareholders should expect to see a long-term reform of his compensation over a greater period than merely one year"; and (ii) "the CEO's 2021 equity award will accelerate at maximum payout level leaving most of the compensation reductions to apply to only one full year, 2022, and as such may only cover the equity award for next year."

195. On June 11, the Individual Defendants caused the Company to publish its first annual ESG report, titled "Activision Blizzard 2020 Environmental, Social, and Governance Report" (the "2020 ESG Report"). The 2020 ESG Report included a letter signed by Defendant Kotick which stated, *inter alia*:

> Our cross-functional ESG working group, now chaired by our Chief Administrative Officer, will execute against these commitments under oversight from me as well as our Board of Directors. Over the course of the next year, we will continue to engage with shareholders to share our successes and commitments. We welcome your feedback on our investments in our ESG initiatives.
>
> CHAMPIONING OUR PEOPLE

We value the increasingly global and diverse backgrounds of our players and employees, and we commit to delivering epic experiences that reflect the communities we serve. Achieving this requires us to attract and retain a diverse and inclusive group of highly talented and motivated employees. We are committed to providing our employees with the opportunities and resources they need to unlock their potential. We can uniquely leverage our scale to increase diversity in our industry and create richer, more fulfilling opportunities for future generations of game-changers. And we create pathways for our future employees by nurturing young minds through investments in education programs in science, technology, engineering, arts, and mathematics (STEAM).

196.   The 2020 ESG Report further stated:

We do this by creating courageously, driving inclusion, and thriving together. Most of all, we are committed to building teams that express the diversity needed to effectively serve our hundreds of millions of players around the world. Video games, unlike any other social or entertainment media, have the ability to foster understanding and to break down the barriers that drive intolerance. Celebrating differences is at the core of our culture and ensures we can create games for players of diverse backgrounds. The strength, creativity, and dedication of our talent make Activision Blizzard who we are today. We provide the leadership, innovation, and global resources to empower our employees to create amazing games.

*     *     *

We celebrate the global and diverse backgrounds of our players and employees, and we commit to delivering epic experiences that reflect the communities we serve. That begins with a diverse and inclusive workplace. We cannot successfully create broad-appeal entertainment without people with diverse backgrounds and skills. We commit to leveraging our scale and partnerships to increase diversity in our industry and create bigger and better opportunities for future generations of gamechangers. And we nurture young minds through support for education programs in science, technology, engineering, arts, and mathematics (STEAM).

*     *     *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Our CEO has personally recruited the most talented individuals from historically underrepresented groups who hold senior roles throughout the Company, including at the C-level and within the leadership of each of our business units and corporate functions.

Creating truly diverse leadership teams sets the example and expectation that diversity is to be reflected throughout the organization.

- We expect all candidate slates for VP and above positions to include diverse candidates. Our commitment to diversity from the top sets the example for all of our employees.

- We prioritize a diverse panel of interviewers in our interview processes.

- We provide ongoing coaching and training to recruiters and hiring managers on methods to reduce unconscious bias.

- Our hiring processes use artificial intelligence-driven technologies and policies to maximize focus on candidate qualifications and experiences, and to minimize the effects of personal characteristics and unconscious bias on candidate selection.

- Starting in 2021, employees who have a succession plan as part of their performance objectives will be required to include at least one diverse external candidate.

- Also starting next year, we will make our consolidated EEO-1 report publicly available and will supplement our EEO-1 data with fuller information on the demographics of our workforce using classifications and job levels that we believe are more accurate and useful in assessing our progress in every country in which we operate.

197.   The 2020 ESG Report also misleading stated that Activision has "equal" promotion rates between minority and non-minority workers and "higher promotion rates for women than men."  The 2020 ESG Report further stated:

Equal Pay for Equal Work: It has been our practice for a number of years to specifically take into account our pay equity objectives when making compensation decisions. In our 2022 ESG report, we will publish the conclusions of our Companywide analysis of pay by gender and non-

binary populations. It is our promise to not let up on this work, and to continue to work towards the removal of unconscious bias and ensuring equal pay for equal work.

198.   The 2020 ESG Report further proffered to the investing public that "Upon joining the Company, and again every two years, every employee is required to take our bespoke online Equality & Diversity Training, which underscores our commitment to creating a respectful workplace."

199.   With respect to employee complaint hotline, the Individual Defendants caused the Company to represent in the ESG Report that "All reports or disclosures that come through the Integrity Line or other employee-reporting avenues are taken seriously, and we conduct timely and thorough investigations as appropriate.  We do not tolerate retaliation against any employee who makes a good faith report or assists in good faith in an investigation."

200.   On June 14, 2021, knowing the strong calls for rejection of the Company's say-on-pay resolution by SOC would likely render shareholder approval of the resolution impossible, the Individual Defendants announced that the Company would be adjourning the annual meeting until June 21, 2021.

201.   The following day, SOC penned another letter to Activision shareholders stating:

Dear Activision Blizzard shareholders:

At the Activision Blizzard Inc.'s (NASDAQ: ATVI) Annual Meeting on June 21, 2021, please vote AGAINST the "Say-On-Pay" proposal. On Monday, the board of directors of Activision Blizzard recommended an adjournment of its annual meeting for one week to allow additional time for shareholders to submit proxies with respect to the Say on Pay proposal. This delay is desperate attempt to avoid a loss.

Since the voting is closed on all the other agenda items, including the director elections, shareholders who disagree with this almost unprecedented maneuver should vote against the MSOP. With 86% of shares already voted as of the end Monday's meeting, we doubt that a

70

significant number of shareholders wanted more time to consider the company's executive pay practices.

The arguments for a vote against the Say-on-Pay proposal are clear:

- **Activision's Say on Pay proposal has, in fact, received repeated low votes**. Activision has received low support for its Say-on-Pay proposal (below 70%) in five out of the past seven years, including last year: **2020 (56.8%),** 2019 (82.0%), 2018 (92.1%), **2017 (59.7%)**, **2016 (66.3%), 2015 (65.4%), 2014 (69.8%).**

- **Activision's compensation changes, while positive, are not applicable over a long enough period to be meaningful**. Because CEO Robert Kotick's contract extension is only until the end of March 2023 and his 2021 equity incentive award was accelerated at maximum, thus the only full year for which Mr. Kotick will see a meaningful equity pay reduction is 2022. The cash reductions do not comprise the bulk of his total pay. At the end of the extension period, Activision is free to raise Mr. Kotick's equity award size again. Ideally, the contract extension should have been at or near the length of the original contract (5 years) to lock in the changes to be meaningful.

- **Increased holding requirements rendered moot as Mr. Kotick's wealth far exceeds the increased requirement**. The company has increased its CEO equity-holding requirement to 50x his base salary (reduced to $875,000), which is approximately $43.75 million. Mr. Kotick meets that requirement with less than one equity award alone: just a portion of Mr. Kotick's 2020 equity award earn-out was $50 million.

In sum, the short contract extension does not represent a strong enough effort on the part of the compensation committee to truly reign in Mr. Kotick's continued outsized equity pay. As such, we urge you to vote AGAINST the Say on Pay proposal on June 21, 2021.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████ █

203. On June 21, 2021, the say-on-pay resolution was approved by a narrow 55% margin, when shareholders remained in the dark about the ongoing pendency of the DFEH investigation, ████████████████████████████ and the endemic harassment and discrimination crippling the Company.

███ ███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ██

### 5. **Activision's Code of Conduct**

205. The Individual Defendants also caused the Company to tout a false commitment to safety and inclusion at Activision through the Company's Code of Conduct (the "Code of Conduct"). The Code of Conduct is incorporated by reference in the 2019 10-K and 2020 10-K.

206. Moreover, all Activision employees, according to the Code of Conduct, are required to "share [an] ethical foundation" underscored by "responsibility," "creativity," and "integrity."

207. The Code of Conduct states, in relevant part:

**We all play by the same rules**

It doesn't matter if you are a studio head or an art intern on your first day – the rules described in this Code apply to all employees. We all work together, and we're all expected to follow our Code – doing the right thing and even admitting when we're wrong.

\*     \*     \*

**Managers: be a role model**

---

107 ████████████████████

108 ████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We're all expected to be role models in living our Code, standing up for what's right and acting proactively to stay on the right track. If you are a manager, it's also an important part of your job to:

**Make our Code a priority**. Emphasize its importance and make sure your team gets the training they need to get to know our Code and policies.

**Be accessible**. Let your team know that they can come to you whenever they have questions, concerns, or something to report.

**Just ask!** Even though you are one of the go-to people for questions about the Code, you're not expected to have all the answers. Just turn to the ASK list (you'll find it under the main menu or under the ASK list button in bottom right corner) whenever you're unsure about something.

**Escalate**. An important part of your job is how you handle questions and concerns that are brought to you. If a report or question raises any concern at all, you should escalate it right away

**And of course, walk the talk!** It's crucial that you lead by example in living our Code.

**The law: don't mess with it**

Our company, and we as employees, must comply with all of the laws, rules and regulations that apply to our business wherever we do business – in every city, state and country. And no, you don't need to know the details of every law related to your area of responsibility by heart. But yes, you do need to know enough to do your job with integrity and to recognize when it's time to get in touch with one of our friends in the Legal Department. If you're ever unsure whether or not to act or what action to take – or whether or not that action is legal and respectful in any location – it's always better to just ask!

\*     \*     \*

**HARASSMENT: DON'T DO IT**

What it all comes down to is one simple, yet so important word: Respect. We all want to go to work feeling safe and comfortable when we step through the doors and interact with each other. It's an absolute necessity in order to work well together and achieve our goals. Each of us is expected

to do our part to create a respectful workplace culture – one that is free of unlawful bias, harassment, intimidation, and discrimination of any kind.

We do not tolerate these actions in any form – physical, verbal or non-verbal – including:

- Remarks, gestures or behavior relating to a legally protected characteristic that offends someone

- Offensive comments, jokes or pictures related to personal characteristics

- Sexual harassment, like unwanted advances, inappropriate sexual jokes, sexually suggestive comments, inappropriate touching, requests for sexual favors and inappropriate comments about another's appearance

\*      \*      \*

## DIVERSITY AND NON-DISCRIMINATION: RESPECT DIFFERENCES

***Diversity is one of our greatest strengths as a company***. With all of our unique talents and our great mix of people, we spark innovation, create stronger teams and stay ahead of our competition. And it's up to each and every one of us to help our company build and maintain an inclusive work environment that fosters respect and reflects the diversity of the communities where we operate. Our company doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law.

\*      \*      \*

**Drugs and alcohol: stay sharp**

We trust each other to keep our heads straight and minds clear at work. That's why it's never okay to possess, use or be under the influence of illegal drugs while on the job. Abusing drugs or alcohol at work, or before work, can lead to safety issues, damage your business relationships, or hurt your productivity and innovation. Simply put, it all comes down to using good judgment and common sense.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

\*       \*       \*

*Workplace laws: we follow them*

We comply with all applicable wage and labor laws. This can be a complex area, so always feel free to reach out to someone on the ASK list if you have any questions. Of course, we don't tolerate retaliation against employees for asking questions or attempting to invoke their rights under applicable laws."

208.   The Code of Conduct was also incorporated in the 2020 ESG Report as the chief resource for the Company's employment training on anti-discrimination and anti-harassment policies.

### B.   Reasons The Individual Defendants' Statements Were Improper

209.   The foregoing statements and omissions (*supra*, IV.A) were improper and misleading.  At the time the Individual Defendants either made or authorized these statements and omissions, they were each aware (or recklessly disregarded) the true facts but concealed the truth from Activision's shareholders.

210.   *First*, the foregoing statements and omissions were improper because the Individual Defendants failed to implement and maintain adequate internal controls at Activision to prevent unlawful conduct, including sexual and racial harassment and discrimination at Activision.

211.   *Second*, the Individual Defendants fostered and engendered a culture that permitted rampant sexual and racial harassment and discrimination at Activision.

212.   *Third*, despite the fact that the Individual Defendants represented that the Company had increased the number of women in its game development leadership roles since 2018, Activision failed to disclose that it broadly engaged in a continuing pattern and practice of paying its female employees significantly less in base pay and total compensation than their male counterparts, at all pay and hierarchy levels.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

213.   *Fourth*, Activision actively participated in a culture of sexual and racial harassment and discrimination by retaliating against and ignoring employee complaints of harassment and discrimination, and by failing to take action against known harassers.

214.   *Fifth*, the Individual Defendants failed to ensure that Activision complied with anti-harassment and anti-discrimination laws and regulations.

215.   *Sixth*, the Individual Defendants failed to disclose to shareholders that Activision was under investigations for sexual and racial harassment and discrimination in violation of state and federal law by the EEOC and DFEH for more than two years.



219.   As a result of the Individual Defendants' false and misleading statements and omissions, Activision shares traded at artificially inflated prices.  Once the true facts regarding unlawful conduct, including sexual and racial harassment and discrimination, Activision's stock price fell dramatically, erasing millions of dollars market capitalization and eroding the market's confidence in Activision to conduct its operations ethically and lawfully.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## C. **The Truth Emerges**

220. The truth about Activision's toxic and illegal work culture was finally revealed to the market on July 21, 2021, when *Bloomberg* broke the news that the DFEH had filed its lawsuit against Activision.

221. The Individual Defendants' ensuing response was met with swift and scathing investor backlash. On July 27, 2021, just days after the Company characterized the DFEH Action as "inaccurate" and "disgraceful," *The Motley Fool* reported that the Company's "response. . .did nothing to help the situation" and that the game maker's stock "is likely to remain depressed for some time."

222. The same day, following *Bloomberg's* report that thousands of current and former Activision employees had signed a petition in protest of the Company's "abhorrent and insulting" response to the DFEH Action, the price of Activision shares traded at unusually high volumes and fell $5.89, or over 6%, to close at $84.05 on July 27, 2021, damaging investors.

## VI. **INSIDER SELLING**

223. Not all of the Company's shareholders were harmed by the Individual Defendants' misconduct. During the pendency of the DFEH investigation—which began at least as early as June 24, 2019[109] and was finally revealed to the investing public on July 21, 2021 (the "DFEH Investigation Period")—while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Activision stock at artificially inflated prices. Specifically, the Insider Selling Defendants (including Defendants Wasserman, Morgado, Kelly, and Durkin) took advantage of the artificially inflated prices to sell their Activision shares for substantial proceeds. As detailed below, these Insider Selling Defendants sold ***more than $63 million*** of personally held common stock.

---

[109] The DFEH filed the first of the Directors' Complaints on October 12, 2018. The DFEH Action states that the agency issued a cause finding on June 24, 2021 after more than two-years of investigation, meaning the agency's investigation would have initiated no later than June 24, 2019.

224. During the DFEH Investigation Period, and before the existence of the DFEH and EEOC investigations was finally revealed to shareholders, Defendant Wasserman was aware of material, non-public information regarding the inaccuracy of the Company's statements in its press releases and public filings. During the DFEH Investigation Period, Wasserman sold at least 10,002 personally held shares of Activision stock at artificially inflated prices for proceeds of $807,706.18.

225. Similarly, Defendant Morgado was aware of material, non-public information regarding the inaccuracy of the Company's statements in its press releases and public filings. During the DFEH Investigation Period, Morgado sold at least 32,000 personally held shares of Activision stock at artificially inflated prices for proceeds of $1,991,561.60.

226. Defendant Durkin served as the Company's CFO from 2016 through May 2017 and from January 2019 through 2021. During the DFEH Investigation Period and before the existence of the DFEH and EEOC investigation was finally revealed to the investing public, Durkin was aware of material, non-public information regarding the inaccuracy of Activision's statements. During the DFEH Investigation Period, Durkin sold at least 50,000 personally held shares of Activision stock at artificially inflated prices for proceeds of $4,175,480.

227. Finally, Defendant Kelly was also aware of material, non-public information regarding the inaccuracy of Activision's public statements. During the DFEH Investigation Period, Kelly sold at least 750,000 personally held shares of Activision stock *at artificially inflated prices for proceeds of $56,185,195*.

228. These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VII.    BREACHES OF THE INDIVIDUAL
##         DEFENDANTS' FIDUCIARY DUTIES

### A.    Defendants' Fiduciary Duties

229.    By reason of their positions as officers, directors, and fiduciaries of Activision, and because of their ability to control the business and corporate affairs of Activision, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage Activision in a fair, honest, and an equitable manner.

230.    The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the company and its shareholders.  The Individual Defendants were and are required to act in furtherance of the best interests of Activision and its shareholders to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

231.    Each director and officer of the Company owes to Activision and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

232.    The Individual Defendants, because of their positions of control and authority as directors and officers of Activision, were able to, and did, directly and indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Activision, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so

that the market price of the Company's stock would be based on truthful and accurate information.

233.   To discharge their duties, the officers and directors of Activision, including the Individual Defendants, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    i.    ensure that Activision operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

    ii.    ensure that Activision complied with its legal obligations and requirements and refrained from engaging in deceptive conduct;

    iii.    conduct the affairs of Activision in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

    iv.    remain informed as to how Activision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such reforms as necessary to comply with applicable laws.

**B.   Duties Of The Audit Committee Defendants**

234.   In addition to the duties discussed in the proceeding section, Activision's directors who served on the Audit Committee (the previously defined "Audit Committee Defendants") owed specific duties to Activision under the Company's Audit Committee Charter (the "Audit Charter").  Specifically, they are mandated to:

[O]versee the accounting and financial reporting processes of the Company and its subsidiaries and the audits of the financial statements of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

235.   The Audit Charter confers a number of responsibilities on the Audit Committee to oversee internal controls and risk management, including:

1. Review and evaluate:

(a) the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, and staffing of the Company's internal audit function, through inquiry and periodic meetings with the Company's independent auditors and internal audit department;

(b) the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K; and

(c) the Committee's level of involvement and interaction with the Company's internal audit function, including the Committee's line of authority and role in appointing employees in the internal audit function.

2. Review with the Chief Executive Officer, principal financial officer, principal accounting officer and independent auditors, periodically, the following:

(a) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

3. Discuss with management guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company, including the internal audit department, assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and manage such exposures.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4. Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the chief internal audit executive.

5. Receive periodic reports from the Company's independent auditors, management and chief internal audit executive to assess the impact of significant accounting or financial reporting developments on the Company.

6. Review and discuss with the independent auditors the results of the year-end audit of the Company, including any comments or recommendations of the Company's independent auditors. Based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K.

7. Establish and maintain free and open means of communication between and among the Committee, the Company's independent auditors, the Company's internal audit department and management, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis.

8. Discuss the Company's earnings, press releases (including the use of "pro forma" or "adjusted" information), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies. This discussion may be general in nature (i.e., to discuss the types of information to be disclosed and the type of presentations to be made). The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

**D. Miscellaneous**

1. Establish and implement policies and procedures for the Committee's review and approval or disapproval of proposed transactions or courses of dealings with respect to which executive officers or directors or members of their immediate families have an interest (including all transactions required to be disclosed by Item 404(a) of Regulation S-K promulgated by the SEC).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2. Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

## C.     Activision's Code Of Conduct And Board Principles

236.   The Individual Defendants, as officers and directors of Activision, were also bound by the Code of Conduct.  According to the Code of Conduct, incorporated by reference in the 2018 10-K, 2019 10-K, and 2020 10-K, all Activision employees—including the Individual Defendants—were and are required to "share [an] ethical foundation" underscored by "responsibility," "creativity," and "integrity."  The Code of Conduct states, in relevant part:

> **"We all play by the same rules**
>
> It doesn't matter if you are a studio head or an art intern on your first day – the rules described in this Code apply to all employees. We all work together, and we're all expected to follow our Code – doing the right thing and even admitting when we're wrong.
>
> \*       \*       \*
>
> **Managers: be a role model**
>
> We're all expected to be role models in living our Code, standing up for what's right and acting proactively to stay on the right track. If you are a manager, it's also an important part of your job to:
>
> **Make our Code a priority**. Emphasize its importance and make sure your team gets the training they need to get to know our Code and policies.
>
> **Be accessible**. Let your team know that they can come to you whenever they have questions, concerns, or something to report.
>
> **Just ask!** Even though you are one of the go-to people for questions about the Code, you're not expected to have all the answers. Just turn to the ASK list (you'll find it under the main menu or under the ASK list button in bottom right corner) whenever you're unsure about something.

**Escalate**. An important part of your job is how you handle questions and concerns that are brought to you. If a report or question raises any concern at all, you should escalate it right away

**And of course, walk the talk!** It's crucial that you lead by example in living our Code.

**The law: don't mess with it**

Our company, and we as employees, must comply with all of the laws, rules and regulations that apply to our business wherever we do business – in every city, state and country. And no, you don't need to know the details of every law related to your area of responsibility by heart. But yes, you do need to know enough to do your job with integrity and to recognize when it's time to get in touch with one of our friends in the Legal Department. If you're ever unsure whether or not to act or what action to take – or whether or not that action is legal and respectful in any location – it's always better to just ask!

\*     \*     \*

**HARASSMENT: DON'T DO IT**

What it all comes down to is one simple, yet so important word: Respect. We all want to go to work feeling safe and comfortable when we step through the doors and interact with each other. It's an absolute necessity in order to work well together and achieve our goals. Each of us is expected to do our part to create a respectful workplace culture – one that is free of unlawful bias, harassment, intimidation, and discrimination of any kind.

We do not tolerate these actions in any form – physical, verbal or non-verbal – including:

• Remarks, gestures or behavior relating to a legally protected characteristic that offends someone

• Offensive comments, jokes or pictures related to personal characteristics

• Sexual harassment, like unwanted advances, inappropriate sexual jokes, sexually suggestive comments, inappropriate touching, requests for sexual favors and inappropriate comments about another's appearance

\*     \*     \*

84

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

***DIVERSITY AND NON-DISCRIMINATION: RESPECT DIFFERENCES***

***Diversity is one of our greatest strengths as a company***. With all of our unique talents and our great mix of people, we spark innovation, create stronger teams and stay ahead of our competition. And it's up to each and every one of us to help our company build and maintain an inclusive work environment that fosters respect and reflects the diversity of the communities where we operate. Our company doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law.

\* \* \*

**Drugs and alcohol: stay sharp**

We trust each other to keep our heads straight and minds clear at work. That's why it's never okay to possess, use or be under the influence of illegal drugs while on the job. Abusing drugs or alcohol at work, or before work, can lead to safety issues, damage your business relationships, or hurt your productivity and innovation. Simply put, it all comes down to using good judgment and common sense.

\* \* \*

**Workplace laws: we follow them**

We comply with all applicable wage and labor laws. This can be a complex area, so always feel free to reach out to someone on the ASK list if you have any questions. Of course, we don't tolerate retaliation against employees for asking questions or attempting to invoke their rights under applicable laws.

237. Correspondingly, Activision's Board was and is required to abide by the Corporate Governance Principles and Policies (the "Board Principles").

238. The Board Principles contain a number of overtures professing the Company's purported commitment to an "ethical business environment":

***The Board insists on an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates. The Board expects that management will conduct operations in a manner supportive of this view.*** The Board is committed to avoiding

85

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

any transactions that compromise, or appear to compromise, director independence. The Board also oversees a corporate compliance program, which includes a Company code of conduct, the maintenance of accounting, financial and other controls, and the review of the adequacy of such controls.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ██████████████████████ ██████████████████████

2 █████████████████████████████████████████████

3 ██████████████

### E.    Control, Access, Authority, And, Reasonable And Prudent Supervision

243.   The Individual Defendants, because of their positions of control and authority as directors and officers of Activision, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements the Individual Defendants made or authorized Activision to make.

244.   Because of their advisory, executive, managerial, and directorial positions with Activision, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Activision.

245.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Activision and was at all times acting within the course and scope of such agency.

246.   To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

    i.    ensure that Activision complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to shareholders;

    ii.    conduct the affairs of Activision in an efficient, business-like manner so as to make it possible to provide the highest quality

---

[114] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

performance of its business, to avoid wasting the Company's assets, and to maximize the value of Activision's stock;

iii. properly and accurately guide investors and analysts as to the true financial and business prospects of Activision at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

iv. remain informed as to how Activision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

v. refrain from trading Activision stock on material, adverse, non-public information; and

vi. ensure that Activision operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## F.    **Breaches Of Fiduciary Duties**

247.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Activision, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware (or reckless in not being aware) posed a risk of serious injury to the Company.

248.   The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that caused Activision to incur substantial damage, including loss of reputation and good will, defense costs, and the potential for colossal pecuniary liabilities in connection with the DFEH Action, EEOC Action, SEC investigation (and potential litigation), as well as any pending or putative employee litigation arising from the illegal culture of harassment and discrimination the Individual Defendants allowed to pervade and damage Activision.

249.   The Individual Defendants, because of their positions of control and authority as officers or directors of Activision, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Activision will be forced to expend significant sums of money and loss of reputation and good will with respect to the necessary overhaul of its woefully deficient antidiscrimination and antiharassment policies and procedures and in the Company's retention and recruitment of human capital.

250.   Moreover, the Individual Defendants each breached their duty of loyalty, including the subsidiary duties of good faith, oversight and disclosure, by issuing, or causing the Company to issue, false and misleading statements that misled shareholders into believing that disclosures related to the Company's compliance with applicable laws, financial condition, and business prospects were truthful and accurate when made, and by permitting Activision's illegal culture of harassment and discrimination to continue un-remediated.

251.   As described herein, the Individual Defendants allowed Activision to maintain a toxic "frat house" workplace culture abounding in sexual and discriminatory delinquency at every pay level, including gross pay disparities between men and their female counterparts performing substantially similar work, groping and unwanted sexual advances against women, copious, "frat house" levels of alcohol consumption, a practice known as "cube crawls" (which involved male employees "crawling" through various cubicles to engage in lewd behavior toward female employees), and a multitude of other illegal practices that functioned as both an assault on and a professional and pecuniary detriment to women and other minority employees, in violation of state and federal laws.

252.   The Individual Defendants knew (or were recklessly unaware) that the Company's purported antidiscrimination and antiharassment policies were woefully

1  ineffective—as evidenced by the nearly three-year pendency of robust harassment and

2  discrimination investigations by ████████████ the DFEH and the EEOC, which the

3  Individual Defendants concealed from the Company's shareholders—but failed to

4  implement any adequate remedial measures at Activision to protect the Company.

5  **G.  Conspiracy, Aiding And**
   **Abetting, And Concerted Action**

6

7  253.  Each of the Individual Defendants aided and abetted and rendered

8  substantial assistance in the wrongs complained of herein.  In taking such actions to

9  substantially assist the commissions of the wrongdoing complained of herein, each

10  Individual Defendant acted with knowledge of the primary wrongdoing, substantially

11  assisted the accomplishment of that wrongdoing, and was aware of his or her overall

12  contribution to and furtherance of the wrongdoing.  In committing the wrongful acts

13  alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a

14  common course of conduct, and have acted in concert with and conspired with one

15  another in furtherance of their wrongdoing.  The Individual Defendants further aided

16  and abetted or assisted each other in breaching their respective duties.

17  254.  Specifically, during all times relevant hereto, the Individual Defendants

18  collectively and individually initiated a course of conduct that was designed to and

19  did: (i) mislead shareholders into believing that the Company's business and financial

20  prospects were better than they actually were, by concealing ████████████████

21  ████████████████████████  the ongoing pendency of investigations by the

22  DFEH and EEOC; (ii) mislead shareholders into believing Activision was committed

23  to the "entirety of the employee lifecycle," with "the safety of [the Company's]

24  employees always [its] priority;" (iii) maintain a [false] veneer of a culture driven and

25  underscored by "inclusion and unity;" (iv) prioritize profits over people and legal

26  compliance, as evidenced by the Company's failure to allocate the necessary resources

27  to effect meaningful prophylactic anti-discrimination and anti-harassment policies

28  necessary to remedy and forestall continued unlawful conduct.  In furtherance of this

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  plan, conspiracy, and course of conduct, the Individual Defendants collectively and
2  individually took the actions set forth herein.

3      255.   The purpose and effect of the Individual Defendants' conspiracy,
4  common enterprise, and common course of conduct was, among other things, to:
5  (i) disguise the Individual Defendants' violations of law, including breaches of
6  fiduciary duties and unjust enrichment; and (ii) disguise and misrepresent the
7  Company's actual compliance with state and federal laws concerning harassment and
8  discrimination, as well as Activision's business and financial prospects.

9      256.   The Individual Defendants accomplished their conspiracy, common
10 enterprise, and common course of conduct by causing the Company to purposefully,
11 recklessly, or negligently: (i) make or authorize false and misleading materially
12 statements and omissions; and (ii) fail in the face of red flags to remedy the
13 Company's broadly illegal work culture which routinely violated applicable state and
14 federal laws prohibiting harassment and discrimination.   Because the actions
15 described herein occurred under the authority of the Board, each of the
16 Individual Defendants was a direct, necessary, and substantial participant in the
17 conspiracy, common enterprise, and common course of conduct complained of herein.

18     **H.    <u>Damages To Activision</u>**

19     257.   As a result of the Individual Defendants' wrongful conduct, the "frat
20 house" cultural paradigm at Activision was permitted to abound at every Company
21 pay level while the Individual Defendants concealed the substantial scrutiny the
22 Company was facing in connection with government investigations.   These gross
23 failures of oversight, in conjunction with the propagation of false and misleading
24 material statements and omission to Company shareholders, have devastated
25 Activision's credibility.   Activision has been, and will continue to be, severely
26 damaged and injured by the Individual Defendants' misconduct.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

258.   Further, as a direct and proximate result of the Defendants' conduct, Activision has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

     i.     costs incurred in connection with the multiyear investigation that precipitated DFEH Action, and the defense of Activision therein;

     ii.     costs incurred in connection with the multiyear investigation that precipitated EEOC Action, and the defense of Activision therein;

     iii.     ███████████████████████████████ ███████████████████████████████ ████████

     iv.     costs incurred in connection with the investigation initiated by the SEC, and any putative litigation and liabilities that may follow;

     v.     costs incurred in investigating and defending Activision and certain officers in the Securities Class Action;

     vi.     costs incurred in connection with any pending or putative litigation by Activision workers asserting their rights under federal or state antidiscrimination and antiharassment laws;

     vii.     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially inflated stock price;

     viii.     costs incurred in retaining and recruiting human capital; and

     ix.     costs incurred from the loss of the Company's customers' confidence in Activision and its products.

259.   Moreover, these actions have irreparably damaged the Company's corporate image and goodwill.  Activision's once-venerable reputation is now marred by allegations of virulent harassment and discrimination comparable to a "frat house," underscored by a web of illegal sexism, outright abuse, and fatal governance and oversight failures by the Individual Defendants.  Moreover, because the Individual Defendants concealed the pendency of material government investigations over a nearly three-year period and the problem of endemic harassment and discrimination

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  at the Company from its shareholders, for at least the foreseeable future, Activision

2  will suffer from what is known as the "liar's discount"—a term applied to the stocks

3  of companies who have been implicated in illegal behavior and have misled the

4  investing public, such that Activision's ability to raise equity capital or debt on

5  favorable terms in the future is now impaired.

6  **VIII.  DERIVATIVE AND**
   **DEMAND FUTILITY ALLEGATIONS**
7

8        260.  Plaintiff brings this action derivatively in the right and for the benefit of

9  Activision to redress injuries suffered, and to be suffered, by Activision, as a direct

10  result of the Individual Defendants' breaches of fiduciary duties and other violations

11  of law.  Activision is named as a nominal defendant solely in a derivative capacity.

12        261.  Plaintiff will adequately and fairly represent the interests of Activision in

13  enforcing and prosecuting the Company's rights.  Plaintiff is, and has continuously

14  been, a shareholder of Activision stock since April 4, 2019.

15        262.  Plaintiff did not make a pre-suit demand on the present Board to pursue

16  this action because such a demand would have been a futile, wasteful, and useless act.

17        263.  At the time this action was commenced, the Board of Activision

18  consisted of the following ten individuals: Defendants Bowers, Corti, Hartong III,

19  Kelly, Kotick, Meyer, Morgado, Nolan, Ostroff, and Wasserman.  A majority of these

20  individuals are not disinterested and independent with respect to the wrongful

21  conduct, acts and omissions alleged herein.  Where a plaintiff alleges that at least half

22  of the members of the current board are not independent or disinterested, demand is

23  excused as futile.

24        **A.    Demand is Excused Because A Majority Of The Board**
             **Faces A Substantial Likelihood of Liability for Their Misconduct**
25

26        264.  Director Defendants Bowers, Corti, Hartong III, Kelly, Kotick, Meyer,

27  Morgado, Nolan, Ostroff, and Wasserman (the previously defined "Director

28  Defendants") face a substantial likelihood of liability for their individual misconduct

and mismanagement of Activision. As directors of Activision, the Director Defendants had fiduciary duties to institute the prophylactic anti-discrimination and anti-harassment policies necessary to meaningfully remedy and forestall continued wrongdoing, and to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its compliance with applicable laws and financial and business prospects were accurate.

265. The Director Defendants each breached their fiduciary duties of loyalty and good faith by permitting the Company's illegal culture of discrimination and harassment to go un-remediated in the face of a litany of red flags that showed Activision's purported anti-discrimination and anti-harassment policies and procedures were woefully ineffective. As members of the Board, the Director Defendants had a fiduciary duty to ensure (i) that the Company comported with state and federal antidiscrimination and antiharassment laws; and (ii) that the Company's and Securities Class Action Defendants' public statements and SEC filings were complete, accurate, and true.

266. The Director Defendants had unfettered access to the failures of the Company's woefully deficient anti-discrimination and anti-harassment policies articulated in the Code, having been mired in civil rights litigation against the Company since at least 2014 in the *McNamee Action* spanning through the nearly three-year pendency of the DFEH and EEOC investigations ██████████████

████████████████

267. Indeed, the Director Defendants could not have ignored the litany of red flags alerting them to the material illegal harassment and discrimination practiced and endemic at Activision at every level. ██████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



272.   They also recognized the material importance of such oversight to the Company's shareholders: the Director Defendants caused Activision to represent in the 2020 Proxy Statement that the Board had engaged a consultant to purportedly focus on disclosure of "human capital management practices" and "diversity and inclusion initiatives," and make an explicit admission that social and governance matters were of material importance to Company stockholders. ¶¶ 151, 152.

273.   Notwithstanding the foregoing red flags, the Director Defendants failed to institute prophylactic anti-discrimination and anti-harassment policies necessary to meaningfully remedy and forestall continued wrongdoing.



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

274. Further—in stark contrast to the Company's active, undisclosed participation in ███████████████████ the DFEH and EEOC, and despite the Company's entrenchment in comprehensive investigations and the known potential for litigation by these government agencies—the Director Defendants authorized repeated representations to shareholders that the Company was not subject to any "significant" "claims, suits, investigations, audits, and other proceedings" that would "have a material adverse, effect on [Activision's] business, financial condition, results of operations, or liquidity."

275. By authorizing the false and misleading statements alleged herein, and by failing to correct or prevent the Company's endemic culture of harassment and discrimination, the Director Defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to a lawsuit asserting violations of the federal securities laws, the DFEH Action, the EEOC Action, and an investigation by the SEC.

276. Moreover, with the benefit of nonpublic knowledge of the pendency of the ███ EEOC, and DFEH investigations as well as the un-remediated culture of endemic harassment and discrimination plaguing the Company, the Director Defendants failed to prevent Defendants Wasserman, Morgado, and Kelly from selling at least 792,002 personally held shares of Activision stock at artificially inflated prices for proceeds of approximately $58.9 million during the DFEH Investigation Period.

277. The Director Defendants approved and permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from the Company's shareholders or, recklessly and with gross negligence, disregarded the wrongs complained of herein, and are therefore not disinterested parties.

278. The Director Defendants also authorized and permitted the false statements to be disseminated directly to shareholders and made available and distributed to shareholders, authorized and permitted the issuance of various false and

1  misleading statements, and are principal beneficiaries of the wrongdoing alleged
2  herein, and thus, could not fairly and fully prosecute such a suit even if they instituted
3  such an action to hold the wrongdoers accountable.

4       279.   Additionally, the Director Defendants, owed a duty to, in good faith and
5  with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure
6  that the Company's disclosure controls and procedures and internal auditing and
7  accounting controls over financial reporting were sufficiently robust and effective
8  (and were being implemented effectively), and to ensure that the Audit Committee's
9  duties were being discharged in good faith.

10      280.   Instead, the Director Defendants knowingly and with reckless disregard
11 reviewed, authorized, and caused the publication of materially false and misleading
12 statements and failed to correct the woeful failures of the Company's antiharassment
13 and antidiscrimination policies that caused the Company's stock to trade at artificially
14 inflated prices.  As such, they all face a substantial likelihood of liability for the claims
15 asserted herein.  Demand is therefore futile.

16      281.   Further, Defendant Kotick breached his fiduciary duties when he signed
17 and certified Activision's 2018 10-K, 2019 10-K and 2020 10-K which contained false
18 and misleading statements and omitted necessary information to make the statements
19 contained therein not false and misleading, as alleged herein.  As a result, Defendant
20 Kotick faces a substantial likelihood of liability for making the false and misleading
21 statements contained therein, rendering any demand upon him futile.

22      282.   The Director Defendants also wasted corporate assets by paying
23 improper and excessive compensation, bonuses, and severance to certain of
24 Activision's executive officers and directors.  The handsome remunerations paid to
25 wayward fiduciaries who proceeded to breach their fiduciary duties to the Company
26 was improper and unnecessary, and no person of ordinary, sound, business judgment
27 would view this exchange of consideration for services rendered as fair or reasonable.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

283.   In short, the Director Defendants' making or authorization of false and misleading statements and omissions alleged herein —notwithstanding their direct, continuous and unfettered access to information relating to the existence of rampant and endemic sexual harassment and discrimination at the Company, ███████ ████████████████████████████ and the ongoing pendency of investigations by the DFEH and the EEOC concealed from shareholders— constitute breaches of fiduciary duties, for which they face a substantial likelihood of liability.

284.   Similarly, the Director Defendants' failure to timely correct such false and misleading statements and omissions, failure to effectively remediate the Company's toxic culture of discrimination and harassment, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.

285.   If they were to bring a suit on behalf of Activision to recover damages sustained from the misconduct, the Directors Defendants would expose themselves to significant liability.  This is something they will not do.  For this additional reason, demand is futile.

**B.     Demand Is Futile As To
        The Audit Committee Defendants**

286.   Defendants Corti, Hartong, and Nolan served as members of the Audit Committee during the wrongdoing alleged herein.  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were specifically responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls

over financial reporting, and discharging their other duties described herein.  Despite these clear duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and materially misleading statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Securities Class Action Defendants and authorized for the Company regarding its business and financial prospects were accurate.

287.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**C.    Demand Is Futile As To**
**The N&CG Committee Defendants**

288.  Demand is futile as to Defendants Meyer, Morgado, Nolan, and Wasserman because, in connection with their duties on the N&CG Committee, they directly oversaw the Company's environment, social and governance risks, including matters of corporate culture, diversity and inclusion, and anti-discrimination and anti-harassment policies.  ¶¶ 184-186.

289.  Notwithstanding their explicit oversight of the foregoing policies, Defendants Meyer, Morgado, Nolan, and Wasserman allowed a rampant culture of discrimination and harassment to pervade the Company un-remediated, to the professional, personal, and pecuniary detriment of the Company's own workers.

290.  Accordingly, the members of the N&CG Committee face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the N&CG Committee Defendants therefore is futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### D. Demand is Futile As To The Compensation Committee Defendants

291.    Demand is also futile as to Defendants Bowers, Morgado, and Ostroff, because, in connection with their duties on the Compensation Committee, ███ ████████████████████████████████████████████████████████████ ██████████████ ██████

292.    Nevertheless, and notwithstanding their explicit concession that the EEOC investigation was a material, market-moving event, Defendants Bowers, Morgado, and Ostroff continued to keep the Company's shareholders in the dark about the existence of and pendency of the ████ EEOC, and DFEH investigations.

293.    Accordingly, the members of the Compensation Committee face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Compensation Committee Defendants therefore is futile.

### E. Demand Is Futile As To Defendant Kotick For Additional Reasons

294.    Demand is also futile as to Defendant Kotick, as Activision admits that Kotick does not meet the standards of director independence, given his status as a current employee of the Company.  Defendant Kotick currently serves as Activision's CEO, and in that executive capacity, he received substantial compensation from the Company.   For example, ***Kotick received $154,613,318 in total compensation*** (including salary, bonus, stock awards, option awards and other compensation) from Activision in 2020.   Accordingly, Kotick is neither independent nor disinterested because he financially benefited from his own wrongdoing and the wrongdoing of other Individual Defendants, and because he continues to depend on compensation from Activision to support his livelihood.

[122] ████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

295.   Defendant Kotick also cannot disinterestedly consider a demand to bring suit against himself because he is named as a defendant in the Securities Class Action, which alleges he made or directly certified many of the misstatements described above in violation of the federal securities laws.  If Kotick is ultimately found liable in the Securities Class Action, then Activision will be held liable for securities fraud under theories of respondent superior and Section 20A of the Exchange Act.

296.   Thus, if Defendant Kotick were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  Kotick will not do this. Any demand on Kotick is therefore futile.

**F.    Demand Is Futile As To Defendants Wasserman, Morgado, And Kelly Based On Insider Selling**

297.   Demand is futile as to Defendants Wasserman, Morgado, and Kelly because, as alleged herein, they engaged in unlawful insider trading activities during the DFEH Investigation Period when they knew of adverse, material, non-public information about the Company's business condition and financial outlook that was not being disclosed to shareholders.

298.   On the basis of this non-public information, Defendants Wasserman, Morgado, and Kelly timed sales of Activision stock to maximize profit from the Company's then artificially inflated share price.  As a result of these illicit insider sales, they received direct financial benefits not shared with Activision shareholders, and are, therefore, directly interested in a pre-suit demand.  In fact, while in possession of material, non-public information, Defendants Wasserman, Morgado, and Kelly sold at least 792,002 personally held shares of Activision stock at artificially inflated prices for proceeds of approximately $58.9 million.  Furthermore, they are interested in a demand because they face a substantial likelihood of liability for breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  As such, demand upon Defendants Wasserman, Morgado, and Kelly is futile.

### G.     Demand Is Futile As To
###         All Directors For Additional Reasons

299.   The current Board of Activision has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite ongoing misconduct by the Company's executive officers, including Defendant Kotick, who still serves as Activision's CEO, the Board has taken no action to address the harm this misconduct has caused to the Company.

300.  Moreover, each of the current Directors receives annual cash compensation, as well as awards of Activision stock, purely for serving as Board member.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.

301.   Finally, a pre-suit demand on each of the Directors is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Activision's Board.  If Activision's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Activision against the Individual Defendants, known as the "insured versus insured exclusion."

302.   As a result, if the members of Activision's Board were to sue themselves or certain officers of Activision, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

303. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Activision by prosecuting this action. Therefore, demand on Activision and its Board is futile and is excused.

304. Activision has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

305. Plaintiff has not made any demand on shareholders of Activision to institute this action since such demand would be a futile and useless act for the following reasons:

    i.     Activision is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

    ii.     Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Activision's shareholders; and

    iii.     Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IX.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Individual Defendants)

306.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

307.    The Individual Defendants owed, and owe, Activision fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Activision the highest obligation of good faith, loyalty, due care, and candor.  In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders, and not to act in furtherance of their own self-interests.

308.    As set forth herein, the Individual Defendants violated and breached their fiduciary duties of good faith, loyalty, due care, and candor.  The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning Activision.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

309.    Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Activision's disclosures were complete and accurate, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

310.    As executive officers of Activision and members of the Activision Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein.  Each of them had knowledge of, actively participated in, and/or approved of, or acquiesced in, the wrongdoings alleged herein, or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing

have subjected Activision to unreasonable risks of loss and expenses.

311.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties, Activision has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

312.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

## COUNT II

### Waste of Corporate Assets
### (Against the Individual Defendants)

313.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

314.   As a result of the Individual Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, and by failing to remedy the Company's cultural problem of illegal discrimination and harassment, Activision is subject to the DFEH Action, the EEOC Action, and the Securities Class Action.

315.   The Individual Defendants have caused Activision to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigations and investigations, in addition to any ensuing costs from a potential settlement or adverse judgment.

316.   As a result of their waste of corporate assets, Defendants are liable to the Company.

317.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### (Against the Individual Defendants)

318.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

319.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Activision.   Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

320.   Plaintiff, as a shareholder and representative of Activision, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

321.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

### COUNT IV

**Derivatively for Contribution Under Sections 10(B)
and 21D of the Exchange Act
(Against the Securities Class Action Defendants)**

322.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

323.   Activision and the Securities Class Action Defendants carried out a plan, scheme, and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff and other shareholders, as alleged herein; and (ii) caused Plaintiff and other shareholders to purchase Activision common stock at artificially inflated prices.

324.   The Securities Class Action Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Activision common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

325. Activision and the Securities Class Action Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

326. The Securities Class Action Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

327. Activision and the Securities Class Action Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Activision and the Securities Class Action Defendants engaged in this misconduct to conceal Activision's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

328. Plaintiff and the shareholders have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Activision's common stock. Plaintiff and other shareholders would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Activision's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

329. As a direct and proximate result of Activision's and the Securities Class Action Defendants' wrongful conduct, Plaintiff and the other shareholders suffered damages in connection with their respective purchases of the Company's common stock.

330. By virtue of the foregoing, Activision and the Securities Class Action Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated

thereunder.

## COUNT V

### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against the Individual Defendants)

331.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

332.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

333.   Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2020 and 2021 Proxy Statements (collectively, the "Proxy Statements"). In the Proxy Statements, the Board solicited shareholder votes to reelect themselves to the Board and cast an advisory vote on executive compensation while being devoid, entirely, of any disclosure of the pendency of the ███ DFEH or EEOC's investigations or the systemic harassment and discrimination issues already plaguing the Company.

334.   This omission from the Proxy Statements was particularly glaring in light of the explicit admission by Defendants in the 2021 Proxy Statement that—in soliciting shareholder votes to support the Board's re-election—reporting on ESG issues was of material importance to shareholders and, because of the material importance of ESG issues, the Individual Defendants caused the engagement of a consultant to focus on disclosure of "human capital management practices" and "diversity and inclusion initiatives."

335.   The Proxy Statements, however, misrepresented and failed to disclose that: (i) the Company failed to implement and maintain adequate internal controls at Activision; (ii) the Company fostered and engendered a culture that permitted rampant sexual and racial harassment and discrimination at Activision; (iii) the Company actively participated in the culture of harassment and discrimination by retaliating against and/or ignoring employee complaints of harassment and discrimination, and by failing to take action against known harassers; (iv) the Company failed to ensure that Activision complied with anti-harassment and anti-discrimination laws and regulations; (v) the Company failed to disclose to investors that it was under investigation by the ███ DFEH and the EEOC for more than two years; and (vi) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  By reasons of the conduct alleged herein, Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Activision misled and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Activision's recommendation to reelect certain Board members and cast an advisory vote on executive compensation.

336.   The misleading information contained in the Proxy Statements was material to the integrity of the directors that were proposed for election to the Board and the propriety of executive compensation.

337.   Plaintiff, on behalf of Activision, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper reelection of the members of the Board.

### COUNT VI

**Breach of Fiduciary Duty through the
Misappropriation of Material, Non-Public Information
(Against the Insider Selling Defendants)**

338.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

339.   At the time the Insider Selling Defendants sold their Activision stock, they knew the information described above and sold Activision stock on the basis of such information.

340.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Activision stock.

341.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

342.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

343.   Plaintiff, on behalf of Activision, has no adequate remedy at law.

## X.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

A.   Directing Activision to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote on the following corporate governance proposals, actions, or policies:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

2.    a proposal to strengthen the Company's reporting and response mechanisms for complaints of harassment and discrimination;

3.    a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.    a provision to permit the shareholders of Activision to nominate three candidates for election to the Board;

5.    an accounting by the Activision officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the DFEH Action, the EEOC Action, the Securities Class Action, or any related or similar litigation;

6.    the termination, for cause, any Company employee responsible for the wrongdoing alleged herein, including its current CEO, Kotick;

7.    the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and

8.    the payment of interest by Activision officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

B.    Against each Defendant in favor of Activision for the amount of damages sustained by Activision, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

C.      Requiring Defendants to return to Activision all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

D.      Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Activision' directors, officers, and employees do not engage in wrongful or illegal practices;

E.      Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

G.      Granting such other and further relief as this Court deems just and equitable.

## XI.      DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

                                             Respectfully submitted,

Dated:  November 15, 2021              **JOHNSON FISTEL, LLP**

                              By:   *s/ Brett M. Middleton*
                                    BRETT M. MIDDLETON

                                    FRANK J. JOHNSON
                                    KRISTEN O'CONNOR
                                    501 West Broadway, Suite 800
                                    San Diego, CA 92101
                                    Telephone: (619) 230-0063
                                    Facsimile: (619) 255-1856
                                    BrettM@johnsonfistel.com
                                    FrankJ@johnsonfistel.com
                                    KristenO@johnsonfistel.com

                                    *Counsel for Plaintiff Luke Kahnert*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DocuSign Envelope ID: E5439F18-B468-46FA-8A3C-EC94489419D5

## **VERIFICATION**

I, Luke Kahnert, hereby declare as follows:

I am a plaintiff in this derivative action. I have read the Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:


Dated:  11/10/2021


DocuSigned by:

*luke kahnert*

82BC17321644448C

LUKE KAHNERT