**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
KristenO@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiffs Luke Kahnert and Boyan Gigov*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE KAHNERT and BOYAN GIGOV, derivatively on behalf of ACTIVISION BLIZZARD, INC. <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT A. KOTICK, BRIAN KELLY, REVETA BOWERS, ROBERT CORTI, HENDRIK HARTONG III, BARRY MEYER, ROBERT MORGADO, PETER NOLAN, DAWN OSTROFF, AND CASEY WASSERMAN, <br><br> Defendants, <br><br> ACTIVISION BLIZZARD, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: 2:21-cv-08968-PA-JEM <br><br> **SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> [REDACTED VERSION OF SECOND AMENDED COMPLAINT PROPOSED TO BE FILED UNDER SEAL] <br><br> <u>DEMAND FOR JURY TRIAL</u> <br><br> *Assigned for all purposes to:* <br> *USDC Judge: Hon. Percy Anderson* <br> *Mag. Judge: Hon. John E. McDermott* |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ............................................. 2

II.   JURISDICTION AND VENUE ........................................................... 6

III.  THE PARTIES ................................................................................ 7

      A.    Plaintiffs ........................................................................ 7

      B.    Defendants ..................................................................... 8

      C.    Relevant Non-Party ...................................................... 11

IV.   SUBSTANTIVE ALLEGATIONS ...................................................... 11

      A.    Activision's Business And Background ........................ 11

      B.    Activision's Hostile Work Environment ...................... 14

            1.    Sexual Harassment ........................................... 14

            2.    Women Were Physically Assaulted ................... 17

            3.    Sex Discrimination .......................................... 19

            4.    Improper Supervisor–Subordinate Relationships ...... 22

            5.    Alcohol Consumption At Work Encouraged ........ 24

            6.    Activision Protected High-Ranking Executives ...... 25

            7.    Retaliation Against Those Who Complained ........ 29

      C.    The Fall-Out From The Board's Mismanagement ............ 31

            1.    The DFEH Files A Legal Action Against
                  Activision For Civil Rights Violations ............... 31

            2.    Defendants' Public Denial Response To
                  The DFEH Action Prompts Activision's
                  Employees To Stage A Work Stoppage ............... 36

            3.    Investigative Reports By *The Washington
                  Post* And *Bloomberg* Confirm Widespread
                  Sexual Abuse .................................................. 39

            4.    The SEC Investigates Whether The Director
                  Defendants Failed To Disclose Workplace
                  Harassment And Gender-Pay Issues .................. 41

            5.    The EEOC Commences Its Action Against
                  Activision For Sex-Based Discrimination,

i

|   |   |   | Including Harassment ................................................ 42 |
| D. | | | Corporate Liability For Misconduct .......................... 48 |

            6.   *The Wall Street Journal's* Investigative Report Further Exposes Kotick's Knowledge Of Violent Sexual Misconduct .............................. 43

            7.   State Treasurers Call For The Board's Removal ...................... 45

            8.   The Board Agrees To Sell Activision To Microsoft ................. 46

D.   Corporate Liability For Misconduct .......................... 48

            1.   Sexual Harassment Hostile Work Environment ...................... 49

            2.   Sex Discrimination In Pay, Promotion, And Pregnancy ...................... 52

            3.   Retaliation ................................................ 54

E.   The Board Is Responsible For Oversight Of Sexual Harassment And Discrimination At Activision ...................... 54

            1.   Today, Sexual Harassment, Sex Discrimination, And Retaliation Are Existential Corporate Threats ...................... 55

            2.   Directors Are Accountable To Shareholders For Operating The Company As An Unlawful Enterprise .............. 58

            3.   Directors Are Accountable To Shareholders For Avoiding A Culture Of Sexual Harassment And Discrimination ...................... 59

            4.   Activision Claims To Recognize The Importance Of Director Responsibility For Workplace Culture ................. 61

F.   Activision's Board Was On Notice Of Harassment And Discrimination Through Regulatory Investigations ............................ 67

            1.   The DFEH Investigation Was A Red Flag Of Serious Misconduct By Activision ................................ 67

            2.   Activision Ran A Parallel Internal Investigation Which Should Have Alerted The Board To The Underlying Problems ...................... 72

            3.   The EEOC's Investigation Was A Red Flag To The Board .................................. 74

            ████   ████████████████████████████ ............... 76

G.   The Board Received Numerous Additional Red Flags Concerning Sexual Harassment And Discrimination .......................... 78

H.   Activision's Board Was On Notice Of
     Harassment And Discrimination Through Media Reports .................. 80

     1.   In Recent Years, Prominent Press Outlets
          Have  Reported On Misogyny And
          Discrimination At Activision...................................................... 80

     2.   The Director Defendants Were On
          Notice Of The Need To Monitor The
          Company Following Gamergate.................................................. 84

     3.   Activision's Competitor Riot Games
          Faced Immense Financial And Reputational
          Backlash From Its Own Toxic Culture....................................... 88

I.   The Activision Board's Responses To The
     Red Flags Were Inadequate And Not In Good Faith ........................... 90

     1.   Activision's Board Offered
          No Response To Unlawful Gender Pay Disparity..................... 92

     2.   Activision's Board Failed
          To Respond To Unlawful Retaliations ...................................... 93

     3.   Activision's Board Provided No Response To
          Systemic Leadership-Level Sexual Harassment........................ 93

     ■    ████████████████████████████ ..................................... 96

     ■    ██████████████████████████████████ .......................... 97

     6.   Activision's Board Failed To Respond To
          Reports Of Sexual Misconduct In Good Faith .......................... 99

J.   The Board's Breaches Of Fiduciary Duty Are
     Ongoing And Require Extensive Corporate
     Governance Reform To Rectify .......................................................... 100

V.   MATERIAL PERSONAL BENEFITS ........................................................ 101

     A.   Insider Trading Allegations ..................................................... 101

     B.   The Board Is Being Unjustly Enriched .................................... 105

VI.   IMPROPER PROXY STATEMENTS ........................................................ 108

VII.   HARM TO ACTIVISION................................................................... 119

VIII.   DEFENDANTS' DUTIES ................................................................ 124

IX.   DERIVATIVE AND FUTILITY ALLEGATIONS ................................. 127

     A.   Derivative Allegations ............................................................ 127

iii

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

B.    Demand Futility Allegations .................................................. 128

    1.    A Majority Of The Director Defendants
          Face A Substantial Likelihood of Liability ............................ 128

    2.    A Majority Of The Director Defendants
          Lack Independence ................................................. 132

    3.    A Majority Of The Director Defendants Received
          A Material Personal Benefit From The Misconduct ............... 136

    4.    Demand On Activision's Shareholders Is Futile ..................... 137

X.    CLAIMS FOR RELIEF ............................................................. 138

XI.    PRAYER FOR RELIEF ............................................................. 145

XII.    DEMAND FOR JURY TRIAL .................................................. 147

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Luke Kahnert and Boyan Gigov (collectively, "Plaintiffs"), by and through their undersigned counsel, for their complaint against Defendants (defined below) bring this shareholder derivative action upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of corporate records produced by Activision in response to two Demands for Inspection of Books and Records pursuant to 8 Del. C. § 220 (the "Books and Records Production")[1]; (ii) review and analysis of public filings made by Activision and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (iii) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (iv) review of news articles, shareholder communications, and postings on Activision's website concerning the Company; (v) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *Cheng v. Activision Blizzard, Inc., et al.*, Case No. 2:21-CV-06240 (C.D. Cal.) (the "Securities Class Action"), the civil rights enforcement action instituted by California's Department of Fair Employment and Housing ("DFEH") styled *DFEH v. Activision Blizzard, Inc., et al.*, Case No. 21STCV26571 (Cal. Sup. Ct., Los Angeles Cnty.) (the "DFEH Action"), and the federal civil rights enforcement action instituted by the U.S. Equal Employment Opportunity Commission ("EEOC") styled *U.S. Equal Employment Opportunity Commission v. Activision Blizzard, Inc., et al.*, Case No. 2:21-CV-07682 DSF-JEM (C.D. Cal.) (the "EEOC Action"); and (vi) review of other publicly available relevant information.

---

[1]  By letter dated November 15, 2021, Activision's counsel certified completion of the Books and Records Production ("This completes Activision's rolling production of the documents the Company agreed to produce in response to your client's demand.").

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## I.   <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a shareholder derivative action arising out of breaches of fiduciary duties by board members entrusted with diligently, consistently, and disinterestedly protecting the interests of Activision Blizzard, Inc. ("Activision" or the "Company"). The Activision board of directors (the "Director Defendants" or the "Board"), led by the Company's founder and Chief Executive Officer Robert Kotick ("Kotick"), permitted a hostile work environment to fester and grow at Activision, causing it great harm.   This toxic work culture included unlawful sexual harassment (including assault), sexual discrimination (including unequal pay, promotion, and treatment of women), and unlawful retaliation against those employees brave enough to report the wrongdoing.

2.      The Board's oversight failures constitute ongoing breaches of their duties of loyalty and good faith, as these directors knew of the sexual misconduct and discrimination but either completely ignored the misconduct (in the case of pay disparity and retaliation) or failed to respond in good faith to the wrongdoing (in the case of pervasive sexual harassment and assault).   This is especially true when, as here, the corporate trauma at issue concerns a matter that is ***externally regulated and is "mission critical" to the business***.

3.      Activision has long characterized its "culture" as "mission critical" to its successful operations.   Likewise, it was and remains mission critical for Activision to be able to attract and retain the best talent in the gaming industry, who will only choose to work for companies that can ensure a safe working environment, free from unlawful sexual harassment, discrimination, and retaliation.   The Director Defendants' oversight failures drove down Company morale and drove away highly skilled employees who are Activision's most valuable core asset.   Over time, Activision's toxic culture exploded into a series of highly public scandals that irreparably harmed its value, resulting in multiple investigations and legal actions, and causing the Board to approve an unplanned and highly discounted acquisition by Microsoft Corporation.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.      Activision claims the mantle of one of the largest American video game developers and distributors with approximately 9,500 employees and over 100 million players worldwide.  A member of the Fortune 500 and S&P 500, Activision conducts business through its subsidiaries, Blizzard Entertainment, Inc., ("Blizzard"), King Digital Entertainment ("King"), and Activision Publishing, Inc. ("Activision Publishing").[2]  Activision operates global esports organizations, Overwatch League and Call of Duty League.  The video game franchise *Call of Duty* is Activision Publishing's most valuable product.  Blizzard maintains the online gaming service, Battle.net, and includes key franchises such as *World of Warcraft*, *Diablo*, and *Overwatch*.

5.      Activision's once vaunted reputation is now juxtaposed with a newly emerged [damning] picture of the Company: a gaming empire plagued by a toxic glut of sexual harassment, discrimination, pay disparity, and illegal retaliation against those who complain.  State and federal regulators and reliable media outlets, including *Bloomberg Law*, *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, have recently exposed Activision as a place where women are paid far less than men for the same work, where women are offered lower-level jobs, and where the "risk" of pregnancy meant women would not be promoted.

6.      Beyond discrimination, civil rights investigators found that the Company's broken culture crossed the line into pervasive sexual harassment. Activision's toxic culture is now compared to that of a "frat house," with male employees crawling under cubicles, and openly degrading women by groping them and making inappropriate sexually charged statements and jokes.  Those women brave enough to report sexual harassment or discrimination to the Company's human resources ("HR") department are often targeted for retaliation.

---

[2]  Activision Publishing, Blizzard, and King are collectively referred to herein as the previously defined "Activision" or the "Company."

7.     Activision's day of reckoning came on July 21, 2021, when *Bloomberg Law* reported that the DFEH—the California agency responsible for enforcing California's civil rights laws and the largest state civil rights agency in the United States—had filed a complaint against Activision alleging damning civil rights violations following more than two years of investigation. [3]  In response, Defendant Kotick—who has long controlled the Company's media responses—caused Activision to issue a blanket denial of wrongdoing, calling into question the integrity and veracity of the DFEH's investigation.  Among other criticisms, the Company's response claimed the DFEH Action distorted and lied about Activision's past, characterizing the complaint as "inaccurate," "disgraceful," and "unprofessional."

8.     Defendant Kotick's patent attempt to minimize the Board's own oversight failures was met with public outrage.  On July 23, 2021, just two days after the Director Defendants refused to take accountability, a chorus of current and former employees confirmed widespread abuse suffered at the hands of Activision's management.  Hundreds of personal accounts poured in across multiple social media platforms corroborating the DFEH Action's findings of illegal sexism, gender discrimination, and harassment.  On July 27, 2021, *Bloomberg Law* reported that thousands of current and former Activision employees had signed a petition in protest of the Company's "abhorrent and insulting" response to the DFEH Action.

9.     The DFEH Action was based on an investigation lasting more than two years and set forth a systemic pattern of sexual discrimination throughout the Company, finding that: "[l]ike the executive ranks, women across the company are ***assigned to lower paid and lower opportunity levels***.  Female employees receive ***lower starting pay*** and also ***earn less than male employees*** for substantially similar work.  Defendants ***promote women more slowly and terminate them more quickly*** than their male counterparts.  Faced with such adverse terms and conditions of

---

[3]  The previously defined DFEH Action.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   employment, many women have been forced to leave the company."[4]    On
2   August 23, 2021, the DFEH filed its First Amended Civil Rights Complaint ("First
3   Amended Complaint") and concluded that Activision's "discriminatory practices
4   continue to the date of this complaint."[5]

5       10.    Moreover, the DFEH Action also found numerous occurrences of sexual
6   harassment at Activision: "[u]nsurprisingly, Defendants' 'frat boy' culture is a
7   breeding ground for harassment and discrimination against women" and that women
8   at the Company are "*subjected to constant sexual harassment*, including having to
9   continually fend off unwanted sexual comments and advances by their male co-
10  workers and supervisors and being groped at the 'cube crawls' and other company
11  events." Significantly, according to the DFEH Action, "[i]n retaliation for complaints
12  regarding harassment and discrimination, female employees experienced retaliation
13  by Defendants that included involuntary transfers, selection for layoffs, and denial of
14  projects and other opportunities."[6]

15      11.    A litany of damning evidence has continued to emerge which further
16  color the depths and sweeping scope of the Board's oversight failures.  That evidence
17  appeared to reach a shocking apex on November 16, 2021, when *The Wall Street*
18  *Journal* reported, *inter alia*, *that Kotick had direct knowledge of and attempted to*
19  *conceal two incidents of rape* of an Activision employee by her supervisor, and that
20  Kotick had himself been accused of misconduct towards female employees (the "*WSJ*
21  *Report*").

22      12.    Activision's potential exposure for its stunning lawlessness is
23  substantial: in similar litigation for discrimination and harassment against a different
24  video game developer, the DFEH asserted that damages were in excess of $400
25  million.  The allegations lodged against Activision by the DFEH are even more
26
    _____
    [4]  All emphasis added unless otherwise indicated.
27  [5]  ¶45; All references to "¶__" herein refer to the DFEH First Amended Complaint.
28  [6]  ¶51.

substantial, suggesting ***the DFEH will ultimately pursue damages reaching or exceeding half of a billion dollars***.

13.     On January 18, 2022, Microsoft announced it had reached an agreement to acquire Activision for $68.7 billion (the "Proposed Acquisition").  The Board would likely not have agreed to this transaction without the pressure they each were under due to the mounting investigations and lawsuits, drop in employee morale, and loss of critical employees stemming from the hostile work environment and toxic culture at Activision.  The unplanned acquisition is yet further confirmation of the Board's oversight failures, which resulted in the loss of billions of dollars in shareholder value.  It will also unjustly enrich the Board, especially Defendant Kotick.

14.     Plaintiffs did not bring a pre-suit demand upon the Board because doing so was, and is, a useless and futile act as a majority of the Director Defendants: (i) face a substantial likelihood of liability for breach of fiduciary duty for oversight and disclosure failures; (ii) received material personal benefits from the wrongdoing; and (iii) lack independence from and are beholden to Defendant Kotick.

15.     Plaintiffs rightfully bring this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Activision and its shareholders.

## II.   <u>JURISDICTION AND VENUE</u>

16.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business in this district or is an individual, who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each Defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d), and because: (i) Activision maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, dissemination to the public of materially false and misleading information, occurred in and were issued from this District, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Activision, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.   Plaintiffs

21.     Plaintiff Luke Kahnert is a current shareholder of Activision.  He first acquired Activision common stock on April 4, 2019, and has continuously held such stock during the relevant times alleged herein.  Plaintiff Luke Kahnert is a citizen of Ontario, Canada.

7

22.    Plaintiff Boyan Gigov is a current shareholder of Activision.  He first acquired Activision common stock on June 24, 2016, and has continuously held such stock during the relevant times alleged herein.  Plaintiff Gigov is a citizen of Sofia City, Bulgaria.

**B.    Defendants**

23.    Nominal Defendant Activision is incorporated under the laws of the State of Delaware and has its principal executive offices located in Santa Monica, California.  Activision's stock trades on NASDAQ under the symbol "ATVI."  As of June 1, 2022, the Company had approximately 781.88 million shares outstanding.

24.    Defendant Kotick is the Company's founder and has served as Chief Executive Officer ("CEO") and a director since 1991.  Defendant Kotick received $33,065,560 in total compensation from the Company in 2016, $28,698,375 in 2017, $30,841,004 in 2018, $30,122,896 in 2019, $154,613,318 in 2020, and $875,000 in 2021.  Defendant Kotick is a citizen of California.

25.    Defendant Brian Kelly ("Kelly") has served as Chairman of the Board since September 2013 and as a director of the Company since 2013.  Defendant Kelly received $290,517 in total compensation from the Company in 2016, $489,677 in 2017, $489,713 in 2018, $489,434 in 2019, $489,631 in 2020, and $489,674 in 2021. Defendant Kelly is a citizen of California.

26.    Defendant Reveta Bowers ("Bowers") has served as a Company director since 2018.  Defendant Bowers received $470,239 in total compensation from the Company in 2018, $344,934 in 2019, $345,131 in 2020, and $347,007 in 2021. Bowers is a citizen of California.  Defendant Bowers served on the Compensation Committee.

27.    Defendant Robert Corti ("Corti") has served as a Company director since 2003.  Defendant Corti received $379,543 in total compensation from the Company in 2016, $379,667 in 2017, $379,713 in 2018, $379,434 in 2019, $379,631 in 2020, and $379,674 in 2021.  Corti is a citizen of New York.  Defendant Corti served on

1   and was Chair of the Audit Committee.

2       28.   Defendant Hendrik Hartong III ("Hartong") has served as a Company

3   director since 2015.  Defendant Hartong received $350,543 in total compensation

4   from the Company in 2016, $350,667 in 2017, $350,713 in 2018, $350,434 in 2019,

5   $379,631 in 2020, and $350,674 in 2021.  Hartong is a citizen of Connecticut.

6   Defendant Hartong served on the Audit Committee.

7       29.   Defendant Barry Meyer ("Meyer") has served as a director of the

8   Company since 2014.  Defendant Meyer received $345,043 in total compensation

9   from the Company in 2016, $345,167 in 2017, $345,213 in 2018, $344,934 in 2019,

10  $345,131 in 2020, and $345,174 in 2021.  Meyer is a citizen of California.  Defendant

11  Meyer served on the Nominating and Governance Committee ("N&GC").

12      30.   Defendant Robert Morgado ("Morgado") has served as a director of the

13  Company since 1997.  Defendant Morgado received $420,543 in total compensation

14  from the Company in 2016, $920,001 in 2017, $448,546 in 2018, $459,434 in 2019,

15  $459,631 in 2020, and $459,674 in 2021.  Morgado is a citizen of New York.

16  Defendant Morgado served on the Audit Committee from January 2016 through

17  January 2018 and was the Chair of the N&GC and Chair of the Compensation

18  Committee.

19      31.   Defendant Peter Nolan ("Nolan") has served as a director of the

20  Company since 2013.  Defendant Nolan received $345,043 in total compensation

21  from the Company in 2016, $345,167 in 2017, $347,963 in 2018, $350,434 in 2019,

22  $350,631 in 2020, and $350,674 in 2021.  Nolan is a citizen of Florida.  Defendant

23  Nolan served on the N&GC from January 2016 through January 2018 and was a

24  member of the Audit Committee.

25      32.   Defendant Dawn Ostroff ("Ostroff") has served as a director of the

26  Company from since 2020.   Defendant Ostroff received $302,687 in total

27  compensation from the Company in 2020, and $351,841 in 2021.  Ostroff is a citizen

28  of New York.  Defendant Ostroff has served on the Compensation Committee since

9

1   June 2020.

2       33.   Defendant Casey Wasserman ("Wasserman") has served as a director of

3   the Company since 2015.   Defendant Wasserman received $345,043 in total

4   compensation from the Company in 2016, $345,167 in 2017, $345,213 in 2018,

5   $344,934 in 2019, $345,131 in 2020, and $345,174 in 2021.  Defendant Wasserman

6   is a citizen of California.

7       34.   The defendants identified in ¶¶30, 33, are referred to herein as the

8   "Insider Trading Defendants."  Collectively, the defendants identified in ¶¶24–33 are

9   referred to herein as the "Director Defendants" or the "Board" and along with

10  Activision as the "Defendants".

11      35.   The Director Defendants have an unmanageable number of outside

12  mandates and directorships, a governance problem known as "overboarding."  The

13  chart below illustrates how significantly Activision's Board exceeds that scale—*with

14  certain Activision directors serving on as many as 12 and 16 outside boards*:

| Director Defendant | Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee | Number of Additional Board Memberships |
|---|---|---|---|---|
| Reveta Bowers | | X | | 6 |
| Robert Corti | X | | | 4 |
| Hendrik Hartong III | X | | | 12 |
| Brian Kelly | | | | 1 |
| Robert Kotick | | | | 3 |
| Barry Meyer | | | X | 2 |
| Robert Morgado | | X | X | 7 |
| Peter Nolan | X | | | 16 |
| Dawn Ostroff | | X | | 1 |
| Casey Wasserman | | | X | 6 |

36.     Accordingly, the majority of the Director Defendants have overextended themselves by serving on multiple boards outside of Activision, leaving them susceptible to sizeable blind spots in their respective abilities to properly oversee Activision.

37.     According to a 2021 survey by Spencer Stuart, 49% of S&P 500 companies limit additional company directorships to three and 42% limit additional company directorships to four.

### C.     Relevant Non-Party

38.     Non-party Lulu Cheng Meservey ("Meservey") recently joined Activision's Board of Directors in April 2022.  Meservey will stand for re-election to the Board at the Company's 2022 annual meeting on June 21, 2022.  Meservey is a citizen of Pennsylvania.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Activision's Business And Background

39.     Video games are big business.  According to the Entertainment Software Association (the "ESA"), a trade association that calls itself the "voice and advocate for the video game industry," "[o]ne in three people on the planet play video games," and "more than 214 million people play video games in the United States."[7]  In total, there are over 2 billion "gamers" world-wide, which is roughly 26% of the global population.

40.     Gaming news is principally reported on websites, including *Kotaku*, *Dot Esports*, and *PC Gamer*, which publish their stories to millions of Twitter and Facebook followers.

41.     Activision lauds itself as a leading global developer and publisher of "legendary" entertainment content and services.  The Company's venerable portfolio of video game franchises includes *Call of Duty* (which has generated an estimated

---

[7]  ESA California fact sheet.

$27 billion in sales and holds the Guinness World Record as the best-selling first-person shooter game series), *Overwatch* ($1 billion in revenue during the first year of its release) and *World of Warcraft* (over $9 billion in total revenue).  Over 400 million people in over 190 countries play the Company's games.  Half of those gamers are women.

42.    Activision operates through three reportable business subsidiaries: (i) Activision Publishing, which develops and publishes interactive software products and entertainment content primarily for console platforms; (ii) Blizzard, which develops and publishes interactive software products and entertainment content primarily for PC platforms; and (iii) King, which develops and publishes interactive entertainment content and services primarily for mobile platforms.

43.    Activision was founded in October 1979 by former Atari, Inc., game developers.   In 1991, Activision, then known as Mediagenic, was purchased by Defendant Kotick and a group of investors.  Kotick became CEO in February 1991. Since 2007, Kotick has received $461 million in compensation—making him the second-highest paid male CEO in the S&P 500 index in 2020.[8]

44.    Blizzard has been called a "magical place to create video games." Founded in 1991, under the name Silicon & Synapse, Inc. by three UCLA graduates: Michael Morhaime, Frank Pearce, and Allen Adham, the company grew and three years later changed its name to Blizzard Entertainment.

45.    In 2004, Blizzard released *World of Warcraft*, a major critical and commercial success that quickly became the most popular MMORPG ("Massively Multiplayer Online Role-Playing Game") of all-time, with estimated cumulative revenues of more than $11 billion through 2018.

---

[8]  As calculated by The Associated Press and Equilar.  *See* "Paycom Software's Richison, AMD's Su Among Highest Paid CEOs." *AP NEWS*, 28 May 2021, apnews.com/article/who-are-the-highest-paid-ceos-2021-719ad52ec522a79baf9870cd2bc73f1d.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

46.     With the success of *World of Warcraft*, Blizzard organized the first BlizzCon fan convention at the Anaheim Convention Center in October 2005. Until it was cancelled for 2022[9], BlizzCon has become an annual event featuring game-related announcements, Q&A sessions and panels and costume contests. According to online reports, BlizzCon was an effective employee recruiting event, where the Company sets up a booth where attendees can talk about employment opportunities, meet with hiring teams, or submit a resume.[10]

47.     "Activision Blizzard, Inc." (herein referred to as "Activision") was formed in 2008 when Activision, Inc. merged with Vivendi Games. Kotick had long eyed Blizzard, which had become a top player in the market for PC-based games with its blockbuster *World of Warcraft*. Kotick was particularly eager to secure *World of Warcraft*'s subscription fees, telling investors that they would "benefit from significantly increased earnings power and the recurring nature and predictability of subscription-based revenues."[11] Blizzard's financial success was naturally critical to Kotick's authority at the Company. The newly merged company adopted the name Activision Blizzard, and Kotick was installed as its President and CEO.

48.     In 2016, the Company acquired King, a mobile game creator and owner of *Candy Crush*, one of the highest grossing mobile game franchises ever created, for $5.9 billion.

49.     Activision has an established global presence, operating nearly 50 offices across seven states and 20 countries.

50.     According to *The Wall Street Journal*, Defendant Kotick, as the Company's CEO, "approves high-profile hiring decisions and the exit and pay

---

[9]  The convention did not happen in 2020-21 due to the pandemic.

[10]  *See* wadseraptor. "Is Blizzcon a good place to talk about job prospects?" *Reddit,* 30 Apr. 2018, reddit.com/r/blizzcon/comments/8g17b4/.

[11]  "Vivendi And Activision To Create Activision Blizzard," 2 Dec. 2007, https://www.sec.gov/Archives/edgar/data/718877/000110465907086435/a07-30510_4ex99d1.htm.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units."  And, as described further below, Kotick "knew for years" about sexual misconduct at Activision.[12]

51.  Kotick also controls the narrative of the Company's response to allegations that the work environment at Activision is rife with harassment, abuse, and discrimination.  *The Wall Street Journal* reports that Kotick "approves most internal companywide emails, as well as media responses."  He drafted the July 2021 Company-wide email to employees about the California DFEH lawsuit, claiming it included "factually incorrect, old and out of context stories," (but he directed that it be sent by Frances Townsend, one of the Company's few female senior executives).[13]

52.  Activision employees heavily-criticized the email, which prompted an employee walkout.  Following the walkout, Kotick backtracked, calling the statement he had drafted "tone deaf" in a new message to employees; without admitting he had drafted the message himself.  Kotick only conceded that point four months later, in a November 2021 statement sent by an Activision spokeswoman to *The Wall Street Journal*.  Meanwhile, Townsend herself apologized for the statement and resigned from the women's group she led at the Company.[14]

**B.**  **Activision's Hostile Work Environment**

**1.**  **Sexual Harassment**

53.  Activision fostered a toxic work culture, including pervasive sexual harassment and sexual assault on employees, that constituted a hostile work environment subjecting the Company to compounding liability on multiple fronts.  As the DFEH would later reveal and as corroborated by scores of ongoing Company workers' statements to the press, Activision's female employees—who are managed

---

[12] November 16, 2021, *WSJ* Report.

[13] *Id.*

[14] *Id.*

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   almost exclusively by men and comprise approximately 20% of Activision's
2   workforce—have long been routinely subjected to sexual harassment, rape jokes,
3   unequal pay as compared to their male colleagues, as well as pregnancy-related
4   discrimination and retaliation.

5         54.   Defendants' failure to remedy the Company's hostile work environment
6   for women put Activision at severe risk of federal and state hostile environment
7   claims, including for violations under Title VII and California's Fair Employment and
8   Housing Act.  Sexual exploitation was tolerated and even encouraged throughout the
9   Company.  The DFEH found that the sexually charged atmosphere and inappropriate
10  behavior towards women was "known to supervisors" and encouraged by them.  One
11  example included "a male supervisor openly encouraging a male subordinate to 'buy'
12  a prostitute to cure his bad mood."[15]

13        55.   Activision's toxic work culture towards women was pervasive
14  throughout the Company.  As a former *World of Warcraft* designer, Jennifer Klasing,
15  told *The Washington Post*, almost every woman she knew at Activision "has a story
16  of either actual, literal sexual assault that they were afraid to go to HR about, or a man
17  with power over her, undermining her and taking credit for her work, dismissing her,
18  talking over her, being the last person to get promoted, despite being eminently
19  capable."   Similarly, the DFEH interviewed a female employee who "noted that
20  random male employees would approach her on [Activision's] work site and comment
21  on her breasts."[16]  The DFEH also found that "Female employees working for the
22  *World of Warcraft* team noted that male employees and supervisors would hit on them,
23  make derogatory comments about rape, and otherwise engage in demeaning
24  behavior."[17]

25

26  ─────────────────────
    [15] ¶46.
27  [16] ¶46.
28  [17] *Id.*

15

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     In a *New York Times* article entitled "Activision, Facing Internal Turmoil, Grapples With #MeToo Reckoning," Lisa Welch, who joined Activision in 2011 as Vice President of Consumer Strategy and Insights, recalled when a Company executive propositioned her for sex during a work trip because she "deserved to have some fun" after her boyfriend had died weeks earlier.  According to Ms. Welch, other male co-workers repeatedly suggested she engage in a sexual relationship with them and regularly commented on her appearance over the years.  The article further alleges that former employee Shay Stein, reported that a manager sent her a suggestive message on Facebook, commenting that she must be into "freaky stuff."  According to Ms. Stein, who worked at Activision from 2014 to 2017, her male colleagues often joked that female employees had their jobs only because they performed sexual favors for male executives at the Company.[18]

57.     Christina Mikkonen, a Blizzard Community Manager from 2013 to 2019, confirmed to *Bloomberg* that Company executives "abus[ed] their power" by "tak[ing] advantage" of fans and Company employees alike.  Another former employee told *Bloomberg* that a top executive at Blizzard had informed several employees that young women perceived the Company's creators as "superstars," which entitled the senior creators to "benefit sexually from that."[19]

58.     The *WSJ Report* reported that Blizzard co-lead Jennifer Oneal was sexually harassed earlier in her career.  And, she reported that in 2007, she attended a party for a Company-owned development studio with Defendant Kotick where scantily clad women danced on stripper poles.  Oneal held her position as co-lead at

---

[18]   Browning, Kellen, et al. "Activision, Facing Internal Turmoil, Grapples With #MeToo Reckoning." *The New York Times*, 28 Oct. 2021, www.nytimes.com/2021/07/29/technology/activision-walkout-metoo-call-of-duty.html.

[19]   Schreier, Jason. "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed." *Bloomberg*, 6 Aug. 2021. https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Blizzard for only one month, before resigning in September 2021 because of the
2   Company's unwillingness to pay her the same as her male counterpart.[20]

3       59.    Activision employees harassed outsiders, too.  On March 8, 2017, Jeremi
4   Gosney, CEO of password cracking firm Terahash, published an email alleging that
5   one of his C-suite executives was sexually harassed by Activision employees at a
6   Black Hat security conference in Las Vegas in August 2015.  The email alleges that
7   Activision recruiters asked her, among a slew of other harassing questions, ***whether***
8   ***she liked being penetrated and how often she was penetrated***.  According to
9   Mr. Gosney, he sent the email directly to Activision as well stating: "Rather than firing
10  you and telling you we won't do business with you, we'd like to give Blizzard the
11  opportunity to redeem itself," Gosney wrote to Blizzard.  "We are determined to fight
12  inequality, and I urge Blizzard to do the same.  As you may know, today is
13  International Women's Day.  And in honor of that day, ***we're making some conditions***
14  ***for Blizzard to do business with us***."[21]

15             **2.**    **Women Were Physically Assaulted**

16      60.    The pervasive sexual harassment at Activision was severe and even
17  physical on several known occasions.  It exposed the Company to severe financial
18  risk, which the DFEH approximated to exceed $175 million at one point during its
19  investigation.

20      61.    The *WSJ Report* describes two alleged rapes by a male supervisor of his
21  female subordinate at Company-owned studio Sledgehammer Games.  With
22  ***Defendant Kotick's knowledge***, Activision settled the rape allegations out of court in
23  2018.

24  

25  [20] Grind, Kirsten, et al.  "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." *The Wall Street Journal*, 16 Nov. 2021,
26  https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexual-misconduct-allegations-11637075680.

27  [21] Walker, Ian. "Report: Blizzard Once Slapped with Misogyny Tax," *HiTechGlitz;*
28  *Kotaku*, 31 July 2021, https://www.kotaku.com.au/2021/07/report-blizzard-once-slapped-with-misogyny-tax/.

62.    In another report by *Bloomberg*, Cher Scarlett, a former employee, alleged that in 2015 she "was groped by male co-workers at two company parties" in 2015.  Senior employees **were known to grope women at the Company's worksite** and at corporate events.  Women at Activision's Irvine office were subjected to inappropriate touching of their breasts and other body parts, according to a report by the gaming website IGN.

63.    *Bloomberg* also reported the story of Nicki Broderick, who disclosed that women frequently complained about a male employee on the esports team who repeated **provided unwanted backrubs to female employees, made improper moaning noises during Company meetings, and discussed his sexual exploits**. Mr. Broderick, who was never reprimanded, was a former project manager who worked at Blizzard from 2012 to 2019.  Another colleague once told Broderick that her "ass looks great" in the shorts she was wearing. "My friend reported it to HR, but nothing happened," Broderick said.  "I never wore shorts to the office again."[22]

64.    Finally, on December 8, 2021, another Activision employee identified only as "Christine" reported in a press conference that she had been subjected to inappropriate touching and sexual harassment during her tenure.  "Since I've been employed at Blizzard I've been subjected to rude comments about my body, unwanted sexual advances, inappropriately touched, subjected to alcohol and abuse at team events and invited to have casual sex with my supervisors, surrounded by a frat boy a culture that's detrimental to women."  She also alleged that **she was demoted and denied benefits after she complained to Activision's HR**.[23]

---

[22]  Schreier, Jason.  "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed."  *Bloomberg,*   6   Aug.   2021. https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.

[23]  Gowen, Samantha. "Blizzard Employee Recounts Sexual Harassment Demotion at Irvine Game Publisher."  *The Orange County Register*, 8 Dec. 2021, https://www.ocregister.com/2021/12/08/blizzard-employee-recounts-sexual-harassment-demotion-at-irvine-game-publisher/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### 3.   <u>Sex Discrimination</u>

65.   The DFEH found that Activision "engaged in and continued to perpetuate ***discriminatory practices regarding pay, assignment, promotion and other terms and conditions of employment*** which negatively impact female employees and contingent or temporary workers."[24]   Significantly, the DFEH determined that Activision "failed to take effective steps to remedy or adequately correct its compensation disparities despite its awareness that such disparities existed" and these "discriminatory practices" continue to the date the DFEH filed its amended complaint on August 23, 2021.[25]

66.   According to the DFEH, these "discriminatory practices" first started when the employee was hired at which time "***women were offered lower compensation and less lucrative job assignments and opportunities than their male counterparts***."[26]   Moreover, the DFEH determined that Activision "paid female employees ***significantly less in starting pay*** then their male counterparts at hire" as a "pattern or practice" and the "violations are continuing."[27]

67.   At Activision, female employees were even provided "less stock and incentive pay opportunities" and "[f]emale employees were overwhelming assigned into lower grades/levels without stock and incentive pay opportunities" and "received less stock and incentive compensation than male employees" according to the DFEH.[28]   The DFEH concluded that "the pay disparity continued throughout employment for female employees and contingent or temporary workers" and Activision "paid female employees significantly less than their male counterparts after

---

[24]  ¶31.
[25]  ¶45.
[26]  ¶32.
[27]  *Id*.
[28]  ¶34.

1    hire" as a continuing pattern and practice in violation of applicable law.[29]

2        68.    The DFEH provided several examples showing that female employees

3    were "***steered into the lower levels***" of the Company's hierarchy and "often had to

4    work harder and longer ***to earn equal promotional and other opportunities*** as their

5    male counterparts."[30]

6        69.    *First*, a female Blizzard employee was "assigned to a lower level role,

7    denied equal pay, and subsequently sought a promotion because she had been carrying

8    out duties exceeding her job description" but was "repeatedly told it was not her turn

9    and others deserved a promotion ahead of her."[31]   This female employee was not

10   promoted until three years while her male counterpart was promoted within a year of

11   his hire despite having started several months after her.[32]

12       70.    *Second*, another female employee at Blizzard was assigned to a "lower

13   level, denied equal pay, and passed over for a promotion despite multiple factors that

14   suggested she earned it: (1) highly rated performance reviews; (2) she generated

15   significantly more revenue in her marketing campaigns than her male counterpart; and

16   (3) she ran almost twice as many campaigns as her male counterpart."[33]   Despite her

17   accomplishments, she was passed over for a promotion in favor of her male

18   counterpart.[34]

19       71.    *Third*, a female human resources employee at Activision "was delayed

20   and passed over for a promotion despite receiving positive performance reviews,

21   doing substantial more work than her male counterpart, and taking over the actual

22   responsibilities of the departing person."[35]

23   _____
     [29] ¶33.
24   [30] ¶35.
25   [31] ¶35.
     [32] *Id*.
26   [33] ¶36.
27   [34] *Id*.
28   [35] ¶38.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

72.     *Finally*, according to the DFEH, female accounting employees at Activision reported that "male counterparts were paid significantly more than them despite doing the same or less work and having less responsibilities."[36]

73.     Moreover, the DFEH found that at Activision, female employees were also not promoted because of the Company's "***discriminatory practices against pregnant female employees***."[37]  For example, a female employee was refused equal pay and a promotion because, as she recalled being told, "they could not risk promoting her as ***she might get pregnant and like being a mom too much***." *Id*. Other findings by the DFEH supporting its conclusion that "female employees were further treated negatively due to their pregnancies" at Activision include: (i) supervisors ignored medical restrictions given to female employees and gave them negative evaluations while they were out on maternity leave; (ii) other female employees reported that they were criticized for leaving to pick up their children from daycare while their male counterparts were playing video games; and (iii) female employees were kicked out of lactation rooms so employees could use the room for meetings.[38]

74.     The DFEH also found that Activision "***terminated female employees more quickly than their male counterparts***.  This pattern or practice and violations were continuing."[39]

75.     As a result of these discriminatory pay, assignment, promotion and other practices, the DFEH concluded that Activision's "gender pay gap is significant" in that the Company paid female employees significantly less in base pay and total compensation then their male counterparts as a continuing pattern or practice in violation of the law.[40]  Significantly, despite having retained Paul Hastings LLP from

---

[36] ¶38.
[37] ¶39.
[38] *Id*.
[39] ¶44.
[40] ¶41.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2015 to 2017 and Miller Law Group in 2018 to allegedly provide analysis related to compensation data, Activision "*failed to take effective and reasonable steps to prevent pay discrimination as the pay disparity between male and female employees was not remedied and continued*."[41]

76.    Activision continues to engage in blatant and unlawful pay discrimination even after the DFEH commenced its action.  For example, Jennifer Oneal, Blizzard's first female co-leader, who was appointed in August 2021 alongside Mike Ybarra to replace Blizzard's outgoing president, J. Allen Brack, *was denied equal pay*.   While Blizzard's announcement of Oneal and Ybarra's new roles purported them to be equals, *the Company refused to pay them equally*.  Due to the pay inequity, Oneal resigned just one month after being promoted to the position, later explaining in an email: "While the company informed me before I tendered my resignation that they were working on a new proposal, we were made equivalent offers only after I tendered that resignation."  Oneal, who is Asian-American and gay, said she had been "tokenized, marginalized, and discriminated against" while at Activision.[42]

### 4.    Improper Supervisor–Subordinate Relationships

77.    At Activision, it was common for senior executives to date (and even marry) subordinates and lower-level employees.   This practice, however, was detrimental to Activision's work environment as it clearly indicated that sexual relationships with subordinates were permitted at the Company.   Because even consensual workplace romances can create a hostile work environment for others in the workplace, *these relationships should have further alerted Defendants to the likelihood of lawsuits and the further erosion of Activision's work environment*.

---

[41]  ¶42.
[42]  Bailey, Kat, "Former Blizzard Co-Lead Jen Oneal Says She Was Offered Equal Contract Only After Resigning,"  *IGN*, 17 Nov. 2021. https://www.ign.com/articles/blizzard-jen-oneal-mike-ybarra-equal-pay-after-resignation.

78.     Former Blizzard technology chief Ben Kilgore engaged in an affair with the head of Human Resources and with his assistant during his tenure at Activision. During an investigation into allegations that Kilgore had harassed female staffers, Kilgore lied about whether he had had a relationship with a lower-level employee. Activision employees were later told: "Don't sleep with your assistant. ***But if you're going to sleep with your assistant, don't stop***."[43]

79.     In 2017, a female employee who was in an inappropriate sexual relationship with her Activision supervisor ***died by suicide while traveling for work with that supervisor***.  Her death followed the disclosure that male co-workers passed around a picture of the deceased's vagina.  Other Activision employees disclosed they ***were propositioned for sex by their superiors***, including Lisa Welch, who revealed that a Company supervisor pressured her to have sex with him while they were on a business trip together.[44]

80.     Senior management at Blizzard encouraged the hostile work environment at Activision by having improper supervisor-employee sexual relationships.  Blizzard's founder Morhaime married Amy Chen, a Blizzard business director in 2010 after dating for several years.  Blizzard's outgoing president, J. Allen Brack, married a lower-level Blizzard employee.  Frank Pearce, also a Blizzard founder, left his wife for a Blizzard customer service representative, who he married in 2012.  As Bloomberg reported on August 6, 2021, "[t]hose relationships were consensual, but they set a precedent that made some female employees uncomfortable, the women said.  That dynamic, combined with testosterone-fueled arrogance and heavy drinking that were a regular part of office culture, led to frequent and often

---

[43]  Schreier, Jason.  "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed."  *Bloomberg,*  6  Aug.  2021. https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.
[44]  ¶48.

1  unwanted sexual advances."[45]

2  ### 5.  Alcohol Consumption At Work Encouraged

3  81.  Despite permitting alcohol consumption at work, Activision's own

4  "Code of Conduct" admits that such policies contribute to a hostile work environment:

5  "Abusing drugs or *alcohol at work, or before work, can lead to safety issues, damage*

6  *your business relationships, or hurt your productivity and innovation*."  According

7  to the gaming website IGN, male employees at Activision *often bragged about*

8  *showing up at the office "hung over"* (sick from drinking too much the previous

9  evening or day) and then delegated their work to female employees while they played

10  video games for extended times during work hours.[46]

11  82.  According to the DFEH, Activision had a pervasive "frat" house cultural

12  paradigm.[47]  Male Activision employees engaged in a practice of routinely arriving at

13  work hung over only to play video games for extended periods of time on the clock,

14  during which their work was delegated to female employees.  *Id*.  This culture included

15  Company-endorsed "cube crawls" and other events where male employees were

16  encouraged to drink copious amounts of alcohol and "crawl," inebriated, through the

17  office, often harassing and groping female employees.  *Id*.

18  83.  Similarly, the EEOC identified alcohol consumption as a "risk factor[]

19  that suggests that there may be fertile ground for harassment to occur."  The EEOC

20  further found that because alcohol reduces social inhibitions and impairs judgment, it

21  should be no surprise that workplace cultures, such as Activision, that tolerate alcohol

22  consumption during and around work hours "*provide a greater opportunity for*

23  _____

24  [45]  Schreier, Jason.  "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed."  *Bloomberg*,  6  Aug.  2021.

25  https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.

26  [46]  Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booz and Fear of Retaliation Tainted 'Magical' Workplace."  *The Washington Post*,  6  Aug.  2021,

27  https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/.

28  [47]  ¶46.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *harassment*."

2                6.        **Activision Protected High-Ranking Executives**

3        84.    Activision's hostile work environment thrived due to the Director

4    Defendants turning a blind eye to blatant and egregious sexual harassment, including

5    assault by senior managers and leaders at the Company.  According to the DFEH,

6    "*High-ranking executives and creators engaged in blatant sexual harassment*

7    *without repercussions*."  ¶6.

8        85.    Alex Afrasiabi:   As an example, the DFEH described Activision's

9    "refusal" to deal with a harasser because of his seniority/position, Alex Afrasiabi, the

10   former Senior Creative Director of *World of Warcraft* at Blizzard Entertainment.  ¶47.

11   Afrasiabi "was permitted to engage in blatant sexual harassment with little to no

12   repercussions" according to the DFEH.  *Id*.

13
     > During a company event (an annual convention called Blizz Con)
14   > Afrasiabi would hit on female employees, telling him he wanted to marry
     > them, attempting to kiss them, and putting his arms around them.  This
15   > was in plain view of other male employees, including supervisors, who
     > had to intervene and pull him off female employees.  Afrasiabi was so
16   > known to engage in harassment of females that his suite was nicknamed
     > the "Cosby Suite" after alleged rapist Bill Cosby.  Afrasiabi would also
17   > call females derogatory names at company events.[48]
18

19       86.    Significantly, the DFEH concluded that Afrasiabi's sexual misconduct

20   was known to Blizzard's executives, who took no effective remedial measures: "J.

21   Allen Brack, President of Blizzard Entertainment, allegedly had multiple

22   conversations with Afrasiabi about his drinking and that he had been 'too friendly'

23   towards female employees at company events but gave Afrasiabi a slap on the wrist

24   (*i.e.*, verbal counseling) in response to these incidents."[49]  Even after this "talk" with

25   Brack, Afrasiabi continued to make unwanted advances towards female employees,

26

27   ——————————————
     [48] ¶47.
28   [49] *Id*.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   including "grabbing a female employee's hand and inviting her to his hotel room and

2   groping another woman."[50]

3        87.   <u>Dan Bunting</u>:   According to the *WSJ Report*, Dan Bunting, co-head of

4   Activision's Treyarch studio, was accused by a female employee of sexually harassing

5   her in 2017 after a night of drinking.   Activision's human-resources department and

6   other supervisors launched an internal investigation in 2019 and recommended that he

7   be fired, but Mr. Kotick intervened to keep him.   Bunting, who led Treyarch through

8   the production of several successful *Call of Duty* games, was given counseling and

9   allowed to remain at the company, according to the *WSJ Report*.   An Activision

10   spokeswoman told *The Wall Street Journal* that an outside investigation was

11   conducted in 2020.  "After considering potential actions in light of that investigation,

12   the company elected not to terminate Mr. Bunting, but instead to impose other

13   disciplinary measures," she said.   Bunting left Activision after *The Wall Street Journal*

14   asked about the incident. [51]

15        88.   <u>Ben Kilgore</u>:   The *WSJ Report* further revealed that "former Blizzard

16   technology chief Ben Kilgore faced ***multiple allegations of sexually harassing***

17   ***female staffers over the course of several years***" and that during a Company

18   investigation, "Mr. Kilgore lied about whether he had a relationship with a lower-level

19   employee"   Following his termination Michael Morhaime, the former head of

20   Blizzard, "sent an email to employees thanking Mr. Kilgore "for his many

21   contributions over the last four and a half years," according to a copy of the email.

22   Some employees said they were taken aback by the praise, particularly given that they

23   had been told not to discuss the circumstances of Kilgore's departure.   In fact, for

24   years, Kilgore's departure was never formally explained.   An August 6, 2021

25   _____

26   [50]  *Id.*

27   [51]  Grind, Kirsten, et al. "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." *The Wall Street Journal*, 16 Nov. 2021, https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexual-

28   misconduct-allegations-11637075680.  (Emphasis added).

*Bloomberg* story revealed the following:

> One summer day in 2018, employees of the video game maker Blizzard Entertainment opened their email to find a brusque message from the chief executive officer, Mike Morhaime.  It said the company parted ways with Ben Kilgore, the chief technology officer and Morhaime's heir apparent.  The email didn't give a reason, but employees immediately began to gossip.  Kilgore presided over the most notorious group of sexist drinkers at the Irvine, California, headquarters, where sexism and drinking were rampant, current and former employees said.

> Shortly afterward, they got a supposed explanation during a large staff meeting.  Derek Ingalls, now head of the technology department, was asked why his former boss had left.  Ingalls told a brief story that concluded with a strange piece of advice: "***Don't sleep with your assistant. But if you're going to sleep with your assistant, don't stop***."

> Five people who attended the meeting, which hasn't been previously reported, recounted versions of that story in interviews with *Bloomberg*. Also in the room that day was a representative from human resources who stood silently by, they said.  Ingalls's comment led to a barrage of speculation surrounding Kilgore's departure that *Bloomberg* has not been able to verify.  Regardless, a former Blizzard assistant said this sort of locker room banter was sexist and damaging to the careers of assistants and other women at the company.[52]

89.   <u>Javier Panameno:</u>  According to the *WSJ Report*, in July 2018, Defendant Kotick received an email from a lawyer representing a former Sledgehammer Games employee.  That lawyer claimed ***her client was raped in 2016 and 2017 by a male supervisor, Javier Panameno***, after being pressured to drink too much alcohol at office and work events, and sexually harassed a second woman.  While the employee reported this to human-resources and other supervisors, ***nothing was done***.  As such, the employee threatened the Company with a lawsuit, which finally prompted

---

[52] Schreier, Jason.  "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed."  *Bloomberg,*  6  Aug.  2021. https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Activision to take action, including reaching an out of court settlement with the victim

2   and terminating Panameno.

3        90.   <u>Eduard Roehrich</u>:   ***Defendant Kotick also received an email accusing***

4   ***Sledgehammer Games employee Eduard Roehrich of sexually harassing employee***

5   ***Ashley Mark***.   She had complained to supervisors and human resources in 2017,

6   following incidents including at a company party where there was heavy drinking.

7   Roehrich stated to *The Wall Street Journal* that he was investigated for the incident.

8   "It was unclear what exactly did and did not happen, since a lot of alcohol was

9   involved," Roehrich stated, "it was stupid of me and totally uncalled for to get that

10  drunk."   His subsequent punishment was two-week paid leave, and remaining at

11  Activision in a different position.   An HR letter to Roehrich, shared with *The Wall*

12  *Street Journal*, asked he "keep this matter confidential."   Roehrich ultimately left

13  Activision in 2018, following an argument with his manager regarding his green card

14  status.

15       91.   <u>Tyler Rosen</u>:   Activision's senior management concealed for years

16  known sexual misconduct by Tyler Rosen, a former business leader for Blizzard's

17  esports group.   Despite reports of sexual misconduct beginning in 2014 and continuing

18  for years, Rosen was allowed to remain as a leader in the Company until 2018.   Rosen

19  admitted to *The Washington Post* that Activision botched his employment by

20  concealing and permitting his sexually misconduct:

> "I was a part of the problem that plagues Blizzard and the wider gaming
> industry," Rosen wrote in an email to *The Post*.   "I was given a final
> warning [in 2016] related to an incident in 2014 and fired in 2018 for a
> separate instance of harm and violation that I caused.   Blizzard could not
> talk about my termination as a matter of policy, so I exited quietly which
> helped me avoid public accountability, perpetuated the culture of silence,
> and downplayed the experiences of survivors."[53]

---

[53]   Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booz and Fear of Retaliation

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## 7.   **Retaliation Against Those Who Complained**

92.   Activision's hostile work environment and toxic culture was enabled by the Company's HR department as a result of looking the other way and even retaliating against those who complained of the type of pervasive misconduct alleged herein.  The DFEH stated in its press release announcing its lawsuit that Activision's "executives and human resources personnel knew of the harassment and failed to take reasonable steps to prevent the unlawful conduct, and instead *retaliated against women who complained*."

93.   When a company retaliates against an employee for reporting discrimination or harassment, *it has violated federal and state law*, including Title VII of the Civil Rights Act of 1964 ("Title VII") and California's Fair Employment and Housing Act ("FEHA").   Accordingly, HR exacerbated the hostile work environment by retaliating against those employees who complained of harassment and discrimination and exposing the Company to even further legal exposure to such claims and lawsuits.

94.   According to the DFEH, female employees, "experienced retaliation by [Activision] that included involuntary transfers, selection for layoffs, and denial of projects and other opportunities."   Droves of female employees specifically complained to various human resources personnel, according to the DFEH, yet no reasonable actions were taken in response thereto.   Activision employees further complained to the DFEH during its investigation that their complaints were not kept confidential.  According to the DFEH, "[Activision's] *own internal investigation into their human resources unit noted that there was a 'big lack of trust' and that 'HR was not held in high regard*.'"   The DFEH "conservatively estimate[d]" that 10% of female employees suffered a compensable retaliation at the Company, *and that the*

Tainted 'Magical' Workplace."   *The Washington Post*, 6 Aug. 2021, https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    ***retaliation claims amount to $56 million in damages against the Company***.

2        95.    *The Washington Post* reported that an Activision employee claimed the

3    HR department was "like a gang that would ruin your career if you reported certain

4    individuals."[54]  *Vice* reported that an employee noted "speaking up against [certain

5    executives] was putting a target on your back."  Employees who complained to HR

6    would be put on a performance improvement plan and forced to meet goals or be fired.

7    Similarly, the *WSJ Report* reported that HR knew that a Sledgehammer employee,

8    Eduard Roehrich, had been accused of sexual harassment in 2017.  The HR

9    department declined to fire Roehrich, instead allowing him to stay on with the

10   Company in a different position.  Nevertheless, he was instructed to "keep this matter

11   confidential."

12       96.    According to an Axios report titled "Activision Blizzard Employees Say

13   HR Department Failed Them," over a dozen employees described how "[n]ot only did

14   [the Company] fail to protect those in harm's way, it actively shielded abusers from

15   punitive action."[55]  Current and former Company employees told Axios about "direct

16   interactions with HR during the past decade in which they said representatives bullied,

17   belittled, or showed skepticism after being informed of alleged harassment or assault."

18   Activision employees were cautioned by Company management against filing reports

19   or attempting to take action against harassers, as one current employee told Axios:

20   "They say things like, '***This isn't a fight you want to fight***.'"

21       97.    In 2020, an Activision employee filed a civil rights lawsuit against the

22   Company for gender discrimination, alleging that, *inter alia*, (i) during her tenure, a

23   female was never promoted to or offered a director-level position, (ii) she was passed

24

25   [54] Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booze and Fear of Retaliation
     Tainted 'Magical' Workplace."  *The Washington Post,* 6 Aug. 2021,
26   https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-
     harassment-alcohol/.

27   [55] Farokhmanesh, Megan. "Activision Blizzard Employees Say HR Department Failed
     Them."  *Axios,* 3 Aug. 2021, https://www.axios.com/2021/08/03/activision-blizzard-
28   harassment-lawsuit-hr.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

over for promotional opportunities in favor of male candidates, despite having consistently strong performance reviews, and (iii) *she was terminated after she formally complained to Activision's Human Resources department and upper management* on the basis of an unlawful subterfuge.[56]  This action settled for an undisclosed amount in 2021.

98.    Droves of complaints were lodged over the years with Activision's Human Resources department and Activision executives—including Blizzard Entertainment's then-President Brack—by Activision employees, yet no *meaningful* or *effective* remedial measures were taken to preempt of forestall further harm to these employees or the Company.  In fact, Activision "*failed to have an effective sexual harassment policy*, failed to adequately train all supervisors, managers and executives on the *prevention of discrimination and harassment based on sex*, and/or *failed to timely discipline or stop* discriminatory or harassing behavior from occurring in the workplace" according to the DFEH.

99.    Activision's HR's ineffectiveness *was well-known* among senior management.  The DFEH found following its investigation that Activision's own internal investigation into HR concluded that there was a "big lack of trust," and that HR was not held in high regard.  The DFEH explained that "human resources personnel were known to be close to alleged harassers," and thus when employees complained to HR, the "complaints fell on deaf ears."

**C.    The Fall-Out From The Board's Mismanagement**

**1.    The DFEH Files A Legal Action Against Activision For Civil Rights Violations**

100.    On July 21, 2021, *Bloomberg Law* reported that the DFEH—the California agency responsible for enforcing California's civil rights laws—had filed the DFEH Action against Activision alleging a litany of civil rights violations.  The

---

[56] *See Adelmeyer v. Infinity Ward, Inc., et al.,* No. 20STCV05581 (Cal. Sup. Ct., Los Angeles Cnty.), naming Activision as a defendant.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DFEH Action seeks compensatory and punitive damages for violations of the Fair Employment and Housing Act, unpaid wages under the Equal Pay Act, and injunctive relief, among other relief.  According to the First Amended Complaint[57] filed in the DFEH Action on August 23, 2021, the DFEH Action followed three failed mediation attempts between the DFEH and Activision's internal dispute resolution division.[58]

101.   Unbeknownst to the investing public, *the DFEH Action was precipitated by a two-year investigation of Activision* and alleges that the Company has long fostered a "frat boy" workplace culture (akin to a male only college fraternity or "frat" house) that functions as a toxic breeding ground for illegal harassment and discrimination.  In other words, *the Director Defendants knew that the Company was engaged in violations of law* during the [more than] two-year pendency of the investigation but refused to take appropriate remedial measures in good faith and failed to inform investors.

102.   The DFEH Action alleges that *Activision attempted to stonewall the DFEH in the course of its investigation*, including through *the suppression of evidence* and cloaking, improperly, germane documents and information with undue privilege designations.  For example, the DFEH First Amended Complaint states that Activision took "adverse actions aimed at curtailing employee rights in this government enforcement action such as soliciting waivers of employee rights and obtaining repressive, if not punitive, secret settlements of sexual harassment claims, non-disclosure agreements, and non-disparagement agreements with severe penalties against employees."[59]   Female employees, in fact, "*experienced retaliation* by [Activision] that included *involuntary transfers, selection for layoffs, and denial of*

---

[57]  Previously defined as "¶__" or "DFEH First Amended Complaint."

[58]  ¶¶18–19

[59]  ¶¶52–56.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *projects and other opportunities*."[60]

2    103.   According to the DFEH Action, ***the Director Defendants were aware of***

3    ***the misconduct***.   For example, under a heading titled "Retaliation and Defendants

4    Failure to Prevent Discrimination, Harassment, and Retaliation," the DFEH First

5    Amended Complaint alleges:

6        ***The problems of harassment and discrimination extended to and at a***
         ***minimum were known to those at the top***.   Defendants' former Chief
7        Technology Officer was observed by employees groping inebriated
8        female employees at company events and was known for making hiring
         decisions based on female applicants' looks.   An employee complained
9        to Blizzard Entertainment President J. Allen Brack in early 2019 that
10       employees were leaving due to sexual harassment and sexism.
         Specifically, this employee noted that women on the Battle.net team were
11       subjected to disparaging comments, the environment was akin to
12       working in a frat house, and that women who were not "huge gamers" or
         "core gamers" and not into the party scene were excluded and treated as
13       outsiders.[61]

14

15   104.   Droves of female employees specifically complained to various human

16   resources personnel, according to the DFEH Action, ***yet no reasonable actions were***

17   ***taken in response thereto***.   Activision employees further complained to the DFEH

18   during its investigation that their complaints ***were not kept confidential***.   According

19   to the DFEH First Amended Complaint, "[Activision's] own internal investigation

20   into their human resources unit noted that ***there was a 'big lack of trust'*** and that '***HR***

21   ***was not held in high regard***.'"[62]

22   105.   The DFEH First Amended Complaint further alleges that Activision had

23   a pervasive "frat" house cultural paradigm.   Male Activision employees engaged in a

24   practice of routinely arriving at work hung over only to play video games for extended

25   _____

26   [60]  ¶51.

27   [61]  ¶49.

28   [62]  ¶50.

periods of time on the clock, during which their work was delegated to female employees.[63]   This culture included Company-endorsed "cube crawls" and other events where male employees were encouraged to drink copious amounts of alcohol and "crawl," inebriated, through the office, *often harassing and groping female employees*.[64]

106.   Female employees have also long been forced to regularly fend off unwanted groping and sexual advances by their colleagues and supervisors at Activision.   In a tragic example of Activision's pervasive toxic work culture, one female Activision employee committed suicide following a holiday party where male co-workers were alleged to be passing around a picture of the deceased's genitals.[65]

107.   In an open letter posted to Twitter on July 25, 2021, former Activision employee Joy Fields alleged, *inter alia*, that she was "*constantly treated by men like a sex object*" at the Company between 2006 and 2012:

> *. . .[T]here was a dark underbelly that every woman at Blizzard knew about*. I want to talk about that.
>
> Throughout my time at Blizzard I was constantly treated by men like a sex object. *Men in positions of power would offer me trips and money if I would just go out on a date with them*.   A coworker would constantly 'neg' me as a way of flirting and just generally harass me.   When I stood up for myself they would play the victim and tell me to calm down. Another coworker lured me into his office, closed the door and turned the lights off.   He then sat next to me on the couch and started talking to me about sex and tried to pressure me to sleep with him.   I was harassed by both my senior and lead in CS to the point of openly sobbing at my desk.   I have heard from my female friends countless times about instances of men speaking about my body and being generally lewd about me.   Some men had the audacity to straight up ask me if my breasts were real to my face and would argue with me when I said "yes."   These are

---

[63]  ¶¶5, 39.

[64]  ¶¶6, 46–47.

[65]  ¶48.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the types of things that I dealt with on a day-to-day basis.

*I want to point out a few specific instances of sexual harassment by people in positions of power who should have known better*.  A Battle of the Bands event (a rock band competition that is attended by much of the company) was judged by a panel of senior Blizzard employees.  I was playing guitar and just generally rocking out for our performance. During the judging portion of the event one of the judges commented on a microphone in front of the entire company about my breasts.  He liked how much I was jumping up and down and thought I had "big talent." Everyone laughed. It was a joke and I was forced to laugh along with it.

Jeff Donais, who at the time was the head of CDev, was shaking a shake weight in his office when I walked past in the hallway.  *He stopped to make a joke about how I should give the shake weight a try in case I ever needed the talent for giving hand jobs in the future*.

\*     \*     \*

The harassment didn't stop at work and it wasn't just harassment.  *Assault happened too*.  Men would pretend to be your friend and then assault you when you felt safe.  *I have been groped, coerced, and forced into sexual situations at the homes of coworkers and Blizzard events like BlizzCon and holiday parties. Men not taking "no" as an answer and pushing for sex once they had me alone with them*.  These are the kinds of people that Blizzard would hire.  These are the kinds of people who got promoted and were put in positions of power.  These people were the main culprits for the toxic culture of Blizzard.

This kind of behavior *was prevalent in every department I worked in*.

\*     \*     \*

I believe this culture was fostered by Blizzard's hiring practices.  Hires happened based on a "culture fit" more than anything else, and as we can see, *the culture is toxic and one of sexual harassment and assault*.  For my own part, I'm not sure if my transfer into CDev was based on merit alone, as *I was told multiple times by those around me that I was only hired because of my body and for the opportunity of sex*.

\*     \*     \*

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

I consider myself to be one of the lucky ones. ***Other women were put through far worse than I was***. I believe every woman who has spoken on this issue thus far. Blizzard needs to be held accountable for what was done and what is still happening. ***I don't believe that those at the top had no idea what was happening. They knew. They enabled it, and it's long past time for change.*** [66]

### 2. Defendants' Public Denial Response To The DFEH Action Prompts Activision's Employees To Stage A Work Stoppage

108. On July 21, 2021, the Director Defendants responded to the DFEH Action with a blanket denial of wrongdoing, calling into question the integrity and veracity of the DFEH's investigation. Among other criticisms, Defendant Kotick caused the Company to respond by claiming the DFEH Action distorted and lied about the Company's past, characterizing the DFEH Action as "inaccurate," "disgraceful," and "unprofessional."

109. The Director Defendants' patent attempt to minimize their own malfeasance was met with public outrage. On July 23, 2021, just two days after the Company's statement, a chorus of current and former employees confirmed widespread abuse suffered at the hands of Activision management. Hundreds of personal accounts poured in across multiple social media platforms corroborating the DFEH Action's findings of illegal sexism, gender discrimination, and harassment.

110. In response, on July 23, 2021, Activision's Chief Compliance Officer, Frances F. Townsend, sent a company-wide email to Activision staff. The email ***doubled down on the Director Defendants' denial of wrongdoing***, characterizing the DFEH Action as "a distorted and untrue picture of our company, including factually inaccurate, old, and out of context stories - some from more than a decade ago."

111. On July 26, 2021, hundreds of former and current employees signed a

---

[66] Fields, Joy.  "I want to add my voice to the Activision Blizzard lawsuit." *TwitLonger,* 26 Jul. 2021.  https://www.twitlonger.com/show/n_1srp3fb.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

petition condemning the Director Defendants' July 21, 2021 response to the DFEH Action.  In an open letter sent to IGN, *Bloomberg*, and others, employees posited and relayed that, *inter alia*:

    i.    They agreed that "statements from Activision Blizzard, Inc. and their legal counsel regarding the DFEH lawsuit, as well as the subsequent internal statement from Frances Townsend, are abhorrent and insulting;"

    ii.    While executives have claimed that actions will be taken to protect employees, there's no longer trust the leaders can protect victims and put safety above self-interest;

    iii.    Employees call for official statements that "recognize the seriousness of these allegations and demonstrate compassion for victims of harassment and assault;"

    iv.    Employees call for Frances Townsend to step down as Executive Sponsor of the ABK Employee Women's Network.

112.  Also on July 26, 2021, according to media reports, Activision hosted an "all hands" meeting to address the DFEH Action, though only 500 employees were reportedly able to attend the Zoom call.  Activision Publishing's Chief Operating Officer, Joshua Taub, hosted the meeting, during which he reportedly suggested that the only proper way to handle the allegations is through internal handling rather than a lawsuit, ***despite the lawsuit explicitly indicting Activision's failure to internally handle the alleged misconduct***.

113. The same day, *The Wall Street Journal* published an article titled "Activision Blizzard Gender-Bias Suit Shows Videogame Culture Remains a Flashpoint," which explained:

Some former Activision employees said ***they weren't surprised by the lawsuit.***

Shay Stein worked for Activision's Blizzard Entertainment unit at the

37

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

company's Austin, Texas, campus from 2014 to 2017 as a game master. She said *the mistreatment of women outlined in the complaint as taking place at Blizzard's Irvine, Calif. Campus was "on par" with what she personally experienced in Austin*.

114.   Then, on July 27, 2021, Activision employees **organized a work stoppage for Wednesday, July 28, 2021, to support their open letter against the Company** and to thoroughly denounce the Director Defendants' failure to admit fault or effect any prophylactic changes.   The organizers of the protest called for four specific governance changes:

      i.      End mandatory arbitration clauses in employee contracts, which are widely believed to protect companies and not employees;

     ii.      Institute hiring practices that improve representation and equity for women, people of color, nonbinary people, and other marginalized groups;

   iii.      Publicly publish compensation data, promotion rates, and salary ranges for employees in the company; and

   iv.      Creation of diversity, equity, and inclusion task force from a third party to audit the HR department, executive staff, and the company reporting structure.

115.   On July 28, 2021, Activision employees walked out in protest, with in-person employees meeting at the gates of Activision's Irvine headquarters and virtual employees abstaining from work.   One week later, the Company's Senior Vice President of Human Resources resigned from the Company.   Defendant CEO Kotick then issued an email to all Company employees apologizing for the Company's "tone deaf" initial response to the DFEH Action—the response he drafted and had sent.

116.   Faced with no choice but to save face, Activision hired the law firm of WilmerHale (**the same law firm that represents the Company and all of the Director Defendants in this action**) to carry out an internal investigation into Activision's

38

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

policies and procedures.

**3.    Investigative Reports By *The Washington Post*
And *Bloomberg* Confirm Widespread Sexual Abuse**

117.   In August 2021, *The Washington Post* and *Bloomberg* published investigative reports further confirming the DFEH Action's findings of widespread sexual abuse at Activision, citing perpetrators that included former Activision Chief Technology Officer Ben Kilgore.  In an article titled "At Blizzard, groping, free-flowing booze and fear of retaliation tainted 'magical' workplace," *The Washington Post* reported:

> Multiple current and former employees said former chief technology officer Ben Kilgore, who was mentioned by title but not by name in the DFEH suit, was fired for a pattern of misconduct, including groping inebriated women at company events.  According to his profile on LinkedIn, he left the company in August 2018.  Kilgore did not respond to an email request for comment.
>
> *                *                *
>
> In October 2018, the company also parted ways with Tyler Rosen, a former business leader for Blizzard's esports group.  By Rosen's admission more than a year and a half later on social media, the reason for the departure was tied to inappropriate conduct.
>
> *                *                *
>
> "***Almost every woman I know of at Blizzard has a story of either actual, literal sexual assault that they were afraid to go to HR about, or a man with power over her, undermining her and taking credit for her work, dismissing her, talking over her, being the last person to get promoted, despite being eminently capable***," said Jennifer Klasing, a former *World of Warcraft* quest designer who left the company in October 2020. "Almost every single woman I know that's been there longer than a year has at least one of these stories."
>
> *                *                *
>
> "***I know for a fact HR was aware***," said the male former Blizzard senior leader,  referencing  the  harassment  complaints  leveled  by  other

employees and referenced in the lawsuit.  "I know that each group within Blizzard, whether it's the Battlenet group [which manages Blizzard's online gaming platform], or the marketing group, or each development team, had an HR representative who sat in their area and was assigned to be that person to keep an eye on what was happening and be that advocate for employees."

\*       \*       \*

Human resources ultimately reported to the CEO. Mike Morhaime was Brack's predecessor as CEO and president of Blizzard until he stepped down in October 2018.  He stayed on as co-founder until he left the company in early 2019.  Multiple employees confirmed to The Post that Morhaime was present at some of the company events where women alleged misconduct took place, though he is not named in the suit.

In the wake of the DFEH lawsuit, Morhaime tweeted an apology post that read in part, "I am ashamed. It feels like everything I thought I stood for has been washed away. ... To the Blizzard women who experienced any of these things, I am extremely sorry that I failed you."[67]

118.    Similarly, in an article titled "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed," *Bloomberg* reported that it had interviewed more than 50 current and former Activision employees.  The article stated, *inter alia*:

"It is absolutely a rock-star mentality, and it touched almost every aspect of Blizzard culture," said Christina Mikkonen, who worked at the company from 2013 to 2019.  "These developers were untouchable.  Not only could they tell you how to do your job, but they had so much power, they could do whatever they want in line of sight with their other powerful friends."

Blizzard management set the tone by hiring mostly men, stoking their egos and often overlooking or being unaware of misbehavior, current and former employees said.  Many executives were also dating lower-ranked

---

[67]  Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booze and Fear of Retaliation Tainted 'Magical' Workplace." *The Washington Post*, 6 Aug. 2021, https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

employees.  Morhaime, who ran the company for 27 years, courted and then married a Blizzard business director in 2010.  Another founder, Frank Pearce, left his wife for a Blizzard customer service representative, and they wedded in 2012.  J. Allen Brack, the outgoing president, also married a lower-level employee.

Those relationships were consensual, but they set a precedent that made some female employees uncomfortable, the women said.  That dynamic, combined with testosterone-fueled arrogance and heavy drinking that were a regular part of office culture, led to frequent and often unwanted sexual advances.  Cher Scarlett, who worked at Blizzard for a year starting in 2015, said she was groped by male co-workers at two company parties.  "It didn't even occur to me I should report this behavior," she said, "because in my mind this behavior was normal and protected here."[68]

**4.    The SEC Investigates Whether The Director Defendants Failed To Disclose Workplace Harassment And Gender-Pay Issues**

119.   The consequences for Activision's lawless work culture have continued to mount, subjecting the Company to additional litigation expenses, loss of shareholder value, key employee departures, delayed game releases, and reputational harm during the fall of 2021.

120.   Indeed, on September 20, 2021, Activision announced that it was ***under investigation by the U.S. Securities and Exchange Commission*** ("SEC") relating to "employment matters" and confirmed that it is complying with a recent subpoena issued to the Company and several current and former employees and executives regarding disclosures on employment matters and related issues.

121.   *The Wall Street Journal* reported the same day that the SEC issued a subpoena for notes recorded during Board meetings since 2019, the files of six former

---

[68]  Schreier, Jason.  "Blizzard Turned Game Developers Into Rock Stars. Misbehavior Followed."  *Bloomberg,* 6 Aug. 2021.  https://www.bloomberg.com/news/features/2021-08-06/activision-blizzard-atvi-news-culture-of-misbehavior-festered-before-lawsuit.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    employees, and separation agreements from 2021.[69]

2          122.  According to *The Wall Street Journal*, the SEC investigation

3    "significantly ratchets up the regulatory pressure on Activision" as the "SEC is

4    requesting information to discern ***whether Activision and its executives properly***

5    ***disclosed allegations of workplace harassment and gender-pay issues***, and ***whether***

6    ***any of that information should have been shared earlier with investors and other***

7    ***parties***, according to the documents and people familiar with the investigation."

8              **5.    The EEOC Commences Its Action Against Activision**
                      **For Sex-Based Discrimination, Including Harassment**

9

10         123.  On September 27, 2021, the EEOC commenced the EEOC Action against

11   Activision, relating to Activision's practice of: "1. Subjecting female employees to

12   sex-based discrimination, including harassment, based on their gender.  2. Retaliating

13   against female employees for complaining about sex-based discrimination, based on

14   their gender.  3. Paying female employees less than male employees, based on their

15   gender" (the "Charge")."   The lawsuit further alleges that conciliation attempts

16   between the putative defendants and the EEOC were unsuccessful.  The EEOC Action

17   ***seeks a permanent injunction of Activision's practice of harassment and***

18   ***discrimination*** in violation of Title VII, back pay to adversely affected employees,

19   past and future pecuniary losses, and non-pecuniary losses precipitated by

20   Activision's pattern and practice of discrimination.

21         124.  On September 27, 2021, the EEOC and Activision entered a consent

22   decree contemplating an $18 million settlement fund, among other terms, thereby

23   confirming liability.  The EEOC and Activision filed a proposed amended consent

24   decree on January 4, 2022, which retains the term for an $18 million settlement fund.

25

26   [69]  Grind, Kirsten, et al. "SEC Is Investigating Activision Blizzard Over Workplace
     Practices,  Disclosures."   *The  Wall  Street  Journal,*  20  Sept.  2021,
27   www.wsj.com/articles/sec-is-investigating-activision-blizzard-over-workplace-
     practices-disclosures-11632165080.
28

**SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

125.   The DFEH and former employees are challenging the EEOC's $18 million settlement as "woefully inadequate" as it would mean that no more than 60 workers could receive the maximum settlement allowed—leaving thousands of Company workers ineligible to receive compensation.  On May 23, 2022, former Activision employee Jessica Gonzalez appealed the $18 million sexual harassment and discrimination settlement between the EEOC and Activision.  Gonzalez filed an appeal on the grounds of workers potentially losing their rights under state law and Judge Fischer's decision to ignore objections made by impacted employees.[70]

126.   There is a precedent for the DFEH and former employees winning a better settlement in these types of situations.  In conjunction with the Riot litigation pending in *McCracken*, which alleged, as here, widespread sexual harassment and discrimination at gaming developer, Riot, the Company was ordered to pay $10 million to eligible employees.  DFEH later blocked that settlement, and the amount was eventually increased to $100 million.

**6.   *The Wall Street Journal's* Investigative Report Further Exposes Kotick's Knowledge Of Violent Sexual Misconduct**

127.   The lawlessness at Activision was further exposed on November 16, 2021, when *The Wall Street Journal* reported **that Defendant Kotick received an email in July 2018 reporting two rapes of an Activision employee by her supervisor** (the previously-defined "*WSJ Report*").[71]  According to the *WSJ Report*, the email was sent to Defendant Kotick by the lawyer of a former employee at

---

[70] "Former Activision Employee Appeals Activision Blizzard EEOC Settlement." *Communications Workers of America,* 23 May 2022, https://cwa-union.org/news/releases/former-activision-employee-appeals-activision-blizzard-eeoc-settlement.

[71] Grind, Kirsten, et al. "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." *The Wall Street Journal*, 16 Nov. 2021, https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexual-misconduct-allegations-11637075680.  (Emphasis added).

Sledgehammer Games, an Activision-owned studio.  The email alleged that her client had been raped in 2016 and 2017 by her male supervisor after she was pressured to overconsume alcohol in the office and at work events.

128.   The *WSJ Report* further revealed that the female employee reported the incidents to Sledgehammer's human-resources department and other supervisors, ***but nothing happened***.  Moreover, ***Defendant Kotick didn't inform the Board about the alleged rapes or a settlement*** that Activision reached with the woman.    While Defendant Kotick has told directors and other executives he wasn't aware of many of the allegations of misconduct, documents show a different story, according to the *WSJ Report*: "documents, which include memos, emails and regulatory requests, and interviews with former employees and others familiar with the company… ***show that he knew about allegations of employee misconduct in many parts of the company***." Kotick ***failed to disclose what he knew to his fellow board members***, even after regulators began investigating the incidents in 2018.

129.   According to the *WSJ Report*, the email that the accuser's lawyer sent Defendant Kotick also alleged that another Sledgehammer employee, Eduard Roehrich, had been accused of sexual harassment.  Ashley Mark said in an interview that she complained to supervisors and human resources in 2017 about harassment by Mr. Roehrich, including at a company party at which there was heavy drinking. Mr. Roehrich confirmed that he was investigated for a harassment incident, but was only given a two-week paid leave and allowed to remain at Activision in a different position.

130.   The *WSJ Report* further revealed that documents showed "***Mr. Kotick himself has been accused by several women of mistreatment both inside and outside the workplace***, and in some instances has worked to settle the complaints quickly and quietly."   In 2006, one of Defendant Kotick's assistants complained that he had harassed her, "***including by threatening in a voice mail to have her killed***." Defendant Kotick settled the matter out of court, according to the *WSJ Report*.

131.   In August 2021, Activision named a longtime employee, Jennifer Oneal, to be Blizzard's co-head, making her the first woman to lead one of the company's business units.   The following month, Ms. Oneal sent an email to a member of Activision's legal team professing a lack of faith in Activision's leadership to turn the culture around, saying "it was clear that the company would never prioritize our people the right way."  Ms. Oneal wrote that **she had been sexually harassed earlier in her career at Activision**, and that she was paid less than her male counterpart, and wanted to discuss her resignation. "I have been tokenized, marginalized, and discriminated against," wrote Ms. Oneal, who is Asian-American and gay.

132.   The *WSJ Report* revealed that following the public disclosure of the DFEH Action, **Activision has received more than 500 reports from current and former employees alleging harassment, sexual assault, bullying, pay disparities and other issues**.   In response, Activision issued a statement on November 16, 2021, characterizing *WSJ Report* as painting "a misleading view of Activision Blizzard and our CEO" and noting that it "ignores important changes underway to make this the industry's most welcoming and inclusive workplace."

### 7.   State Treasurers Call For The Board's Removal

133.   On November 17, 2021, the day after publication of the *WSJ Report*, SOC Investment Group ("SOC")—an organization that advises union pension funds with the stated mission of holding companies accountable for unethical behavior—published an open letter calling for Kotick to step down, among other demands:

> "We, therefore, call on Mr. Kotick to resign as CEO of the company, and on the board of directors to take responsibility for failing to recognize and address what the California Department of Fair Employment and Housing has described as a 'frat boy' workplace culture to flourish.  In order to ensure that the board has leadership capable of leading this effort, **we urge Chairman Brian Kelly and Lead Independent Director Robert J. Morgado to announce their retirement no later than December 31, 2021**.  The board should start a search for more qualified replacements immediately."

134.   The following day, Microsoft's head of Xbox announced he was "*evaluating all aspects of our relationship with Activision* [ ] and making ongoing proactive adjustments." Similarly, in a letter to employees dated November 17, 2021, Sony Group Corporation's PlayStation unit relayed that Sony had reached out to Activision "to express. . .*deep concern*" about the [*WSJ Report*] article and that "we do not believe their statements of response properly address the situation."

135.   Then, in a stunning letter dated November 23, 2021, the state Treasurers from California, Massachusetts, Illinois, Oregon, Delaware and Nevada called for a meeting with the Company "to discuss [Activision's] response to the challenges and investment risk exposures that face [it]"—*noting that they would weigh a call to vote against the re-election of incumbent directors.*[72]

136.   In a statement to the press, Illinois State Treasurer Michael Frerichs cited "[concerns] that *the current CEO and board directors don't have the skillset, nor the conviction to institute these sweeping changes needed to transform their culture*, to restore trust with employees and shareholders and their partners. "We think there needs to be *sweeping changes made in the company*."

### 8.   The Board Agrees To Sell Activision To Microsoft

137.   On January 18, 2022, Activision stunned the market by announcing that Microsoft had agreed to acquire it for $68.7 billion in an all-cash merger for $95 per share (the previously defined "Proposed Acquisition"). Entrenched in the massive legal and moral mess caused by their own mismanagement, oversight failures, and malfeasance—*including the stunning loss of shareholder value in Activision*, which had lost nearly a quarter of its value by late 2021—the Director Defendants determined to sell Activision in an all-cash transaction.

---

[72] Totilo, Stephen. "6 State Treasurers Pressure Activision Over Misconduct Allegations." *Axios*, 1 Dec. 2021, https://www.axios.com/state-treasurers-pressure-activision-over-misconduct-352fe2e6-64d4-4f30-ba7e-39e0e13419de.html.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

138.   According to *Bloomberg Law*, the Proposed Acquisition is the largest cash takeover since the start of the Covid-19 pandemic.  It ranks as Microsoft's biggest-ever acquisition, surpassing its $26 billion takeover of professional social network LinkedIn Corp., announced in 2016.  Acquiring Activision will consume a significant portion of Microsoft's cash, which stood at $131 billion at the end of September 2021.

139.   Microsoft and Activision gave themselves until June 2023 to complete the transaction, "giving hedge funds months to handicap how regulators will react to Microsoft bundling its Xbox platform with Activision's popular games, such as *World of Warcraft* and *Diablo*."[73]   The Company's shares ended trading at $82.15 on January 19, 2022, well below the $95 per-share Proposed Acquisition consideration, reflecting concerns that antitrust regulators may foreclose a combination that would create the third biggest gaming company.

140.   While Microsoft is offering a purported 45% "premium" to Activision's pre-announcement closing price, ***this purported premium is allegedly illusory***, ***as it is unlikely the Director Defendants would have agreed to sell the Company but for their breaches of fiduciary duties*** as alleged herein.  Specifically, the revelation of the Director Defendants' pervasive mismanagement, including severe oversight and disclosure failures with respect to Activision's hostile work environment and toxic work culture—resulting in numerous sexual harassment and discrimination investigations and actions, employee walkouts, and derivative and securities class actions—likelwy were significant contributors to Activision's stock price to plummeting during the second half of 2021.

141.   Remarkably, Activision's CEO, Defendant Kotick, despite his breaches

---

[73]  Herbst-Bayliss, Svea. "Microsoft-Activision Deal Gives Merger Speculators a New Darling."  *Reuters*, 20 Jan. 2022, https://www.reuters.com/markets/europe/microsoft-activision-deal-gives-merger-speculators-new-darling-2022-01-20/.

of fiduciary obligations as set forth herein—resulting in the toxic "frat boy" culture at Activision—stands to receive a windfall should the Proposed Acquisition close as currently structured.[74]  As *Bloomberg* reported on January 18, 2021, the day the deal was announced, "[i]t's a remarkable payout ***for a leader whose recent tenure has been marked by employee complaints over sexism, a hostile work culture and mismanagement of assault claims***."[75]  For his prior failures as CEO, the previous year Defendant Kotick received ***a 50% pay cut and the CEO*** "was the target of employee walkouts and petitions demanding his removal over reports he failed to make the company's board aware of allegations of rape and other serious misconduct."[76]  Now, by agreeing to sell Activision, Defendant Kotick stands to receive a windfall while allegedly failing to deliver fair value to shareholders.

142.   The Director Defendants would likely not have agreed to the unplanned Proposed Acquisition without the pressure they each were under due to the mounting investigations and lawsuits, personal liability exposure, drop in employee morale, and loss of critical employees stemming from the hostile work environment and toxic culture at Activision.  This unplanned transaction is yet further confirmation of the Board's oversight failures, which resulted in the loss of billions of dollars in shareholder value.  The Proposed Acquisition will also unjustly enrich the Board, especially Defendant Kotick, as further alleged herein.

### D.   Corporate Liability For Misconduct

143.   The conduct described herein exposed the Company to numerous distinct avenues of liability under federal and state employment law including, but not limited

---

[74]  Pendleton, Devon, et al. "Activision's CEO is Looking at $375 Million Payday in Microsoft Sale." *Bloomberg Law,* 18 Jan. 2022, https://www.bloomberg.com/news/articles/2022-01-18/activision-ceo-looking-at-375-million-payday-in-microsoft-sale.

[75]  *Id*.

[76]  *Id*.

1   to, Title VII, the Fair Labor Standards Act as amended by the Equal Pay Act of 1963

2   ("EPA"), FEHA, California's Equal Pay Act ("CEPA"), and California's Private

3   Attorney Generals Act ("PAGA").

4                 **1.**    <u>**Sexual Harassment Hostile Work Environment**</u>

5       144.   <u>Supervisor Harassment:</u> Under both federal and California law,

6   employers are liable for hostile work environment claims[77] by creating a workplace

7   "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently

8   severe or pervasive to alter the conditions of the victim's employment and create an

9   abusive working environment."[78] Where a supervisor creates or perpetuates a hostile

10   work environment, ***the employer is presumptively vicariously liable*** under federal

11   law, and strictly liable under California law.[79] The Supreme Court explained the

12   rationale for this rule:

> When a person with supervisory authority discriminates in the terms and
> conditions of subordinates' employment, his actions necessarily draw
> upon his superior position over the people who report to him, or those
> under them, whereas an employee generally cannot check a supervisor's
> abusive conduct the same way that she might deal with abuse from a co-
> worker. . . . Recognition of employer liability when discriminatory
> misuse of supervisory authority alters the terms and conditions of a
> victim's employment is underscored by the fact that the employer has a
> greater opportunity to guard against misconduct by supervisors than by
> common workers; employers have greater opportunity and incentive to
> screen them, train them, and monitor their performance.[80]

21       145.   In instances where the harasser is a senior executive, such as a president

22   or corporate officer, the law is at its most stringent: the high-level executive serves as

23   a "proxy" for the corporation such that the harasser's activities may be treated ***as the***

---

[77]   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 516 (1998)

[78]   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[79]   *Faragher v. City of Boca Raton*, 524 U.S. 775, 802–03 (1998); *State Dep't of Health Serv. v. Superior Ct. ("McGinnis")*, 31 Cal. 4th 1026, 1039 (2003).

[80]   *Faragher*, 524 U.S. at 803.

***Company's actions*** even in the absence of a tangible employment action against the harassed employee.[81]  To determine whether conduct is actionable, courts perform a ***totality-of-the-circumstances analysis***, looking at "the ***frequency*** of the discriminatory conduct; its ***severity***; whether it is ***physically threatening or humiliating*** . . . and whether it ***unreasonably interferes*** with an employee's work performance."[82]

146.   Under both federal and California law, the aforementioned conduct engaged in by supervisors at Activision, including groping, physical touching, "cube crawls," degrading comments directed to female employees, sexual advances towards female subordinates, and more, undoubtedly ***exposed the Company to liability for hostile work environment claims under Title VII and the FEHA***.[83]  As legal scholars have observed, "[s]exually based workplace behavior, especially a male supervisor's advances on a less powerful female worker, has become the prototypical form of sexual harassment giving rise to hostile work environment claims."[84]

147.   <u>Co-Worker Harassment:</u>  Under federal and California law, employers are also liable for sexual harassment perpetrated by peers and co-workers if the employer knew or should have known of the harassment and failed to take prompt

---

[81]  *See, e.g., id.*, 524 U.S. at 789–92 (where harasser is the president or holds a sufficiently high position in the company's management, his actions may be automatically imputed to the company); *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 384 (5th Cir. 2008) (where harasser was president of enterprise, he was a "proxy" for the corporation whose activities impose liability to corporation, even in the absence of tangible employment action).

[82]  *Harris*, 510 U.S. at 22.

[83]  *See, e.g.*, *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055–56 (9th Cir. 2007) (hostile work environment established where employee's boss pressured her to perform sexual favors); *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 280 (2006) (repeated reference to a female employee using demeaning, gender-specific terms could give rise to a hostile work environment claim).

[84]  Growe, Jennifer D. *Reform the EEOC Guidelines: Protect Employees form Gender Discrimination As Mandated by Title VII*, 24 Wash. U.J.L. & Pol'y 275, 277 (2007) (citing Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 Yale L.J. 1683, 1692 (1998)).

1  remedial action.[85]   Because ***senior leadership both participated in the***
2  ***aforementioned conduct*** and ***thus saw harassment take place*** and female employees
3  made complaints to Human Resources to no avail, Activision was exposed to liability
4  for hostile work environment claims based on co-worker harassment because ***it knew***
5  ***or should have known*** about the harassment and failed to take prompt remedial
6  action.[86]

7       148.  <u>Systemic Harassment:</u>  In addition to liability for individual conduct,
8  Activision's general inaction exposed the Company to liability for government
9  enforcement actions addressing what is known as a ***pattern or practice of hostile***
10  ***environment sexual harassment***.  In such cases, "an employer can be said to be
11  negligent for company-wide sexual harassment when it has a policy or practice of
12  ***tolerating a work environment that it knows or should have known is permeated***
13  ***with sexual harassment***, but does not take steps to address the problem on a company-
14  wide basis."[87]

15       149.  "[T]he landscape of the ***total work environment***, rather than the
16  subjective experiences of each individual claimant, is the focus for establishing a
17  pattern or practice of unwelcome sexual harassment which is severe and pervasive."[88]
18  Based on the aforementioned conduct, ***Activision tolerated a work environment***
19  ***permeated with sexual harassment*** and did not take steps to address the problem,
20  thereby exposing the company to systemic harassment claims.

21

22  [85]  *Faragher*, 524 U.S. at 789; *McGinnis*, 31 Cal. 4th at 1039.
23  [86]  *See, e.g.*, *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 876 (9th Cir. 2001)
24  (holding a company was liable for a co-worker's harassment where it made no effort to investigate the employee's complaint and did not demand the unwelcome conduct cease); *Sheffield v. Los Angeles Cnty. Dep't of Soc. Servs.*, 109 Cal. App. 4th 153, 161–
25  64 (2003) (finding a company could be liable where employee told her supervisor that a co-worker made repeated sexual advances and implied threats of violence and
26  company did nothing).
27  [87]  *E.E.O.C. v. Mitsubishi Motor Mfg. of Am. Inc.*, 990 F. Supp. 1059, 1075 (C.D. Ill. 1998).
28  [88]  *Id.,* at 1074.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

150.   <u>Failure to Prevent:</u>  Under California law, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."[89]  Because Activision's leadership failed to take the necessary steps to prevent discrimination from harassment from occurring—and, indeed, ***both encouraged harassment and shielded harassers***—the Company exposed itself to liability for this additional cause of action.

## 2.   <u>Sex Discrimination In Pay, Promotion, And Pregnancy</u>

151.   In addition to sexual harassment, Activision's conduct exposed the Company to liability for claims of sex discrimination based on ***pay, promotion, and pregnancy***.

152.   <u>Unequal Pay:</u>  Numerous federal and state laws protect employees from wage discrimination on the basis of sex.

      a.   Under Title VII and the FEHA, it is unlawful for an employer to discriminate against any individual with respect to "compensation, terms, conditions, or privileges of employment" because of an individual's sex.[90]

      b.   Under the federal EPA, an employer is prohibited from paying different wages to an individual of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[91]

      c.   The California EPA offers additional protections, requiring equal pay "for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar

---

[89]  Cal. Gov't Code § 12940(k).

[90]  42 U.S.C. § 2000e-2(a)(1); Cal. Gov't Code § 12940(a).

[91]  29 U.S.C. § 206(d).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 working conditions," with inapplicable exceptions.[92]

2     d.    In addition to liability for lost wages, interest, and liquidated

3 damages under the CEPA, employers may also be subject to

4 lawsuits filed under California's Private Attorney Generals Act

5 (PAGA), Cal. Labor Code §§ 558, 2698.   PAGA permits the

6 California Labor Workforce Development Agency (LWDA) or

7 individual employees to sue for penalties on the state's behalf.

8     153.   By systematically underpaying women in base pay and total

9 compensation and assigning them to lower paid and less opportunity levels than their

10 male counterparts, Activision exposed itself to liability under these various statutes

11 for claims of *sex discrimination based on unequal pay*.

12     154.   <u>Failure to Promote:</u>  As with pay, federal and California law prohibit an

13 employer from failing to promote an individual on the basis of sex.[93]  Indeed, "a *single*

14 promotion opportunity … is actionable."[94]   By denying women promotional

15 opportunities afforded to their male counterparts, steering women into lower-level

16 positions, and using processes that disproportionately affected women's ability to

17 advance at the Company, Activision exposed itself to liability for sex discrimination

18 based on its *failure to promote its female employees*.

19     155.   <u>Pregnancy:</u>  Pregnancy discrimination is illegal under both federal and

20 California law.[95]  This includes discrimination based on a *stereotypical assumption*

21

22 ───────────

[92]  Cal. Labor Code § 11975(a).  Similar lawsuits have been prosecuted successfully

23 against other companies that allegedly paid women less than similarly situated male

employees.  For instance, similar California EPA claims on behalf of just 300 female

24 employees settled for $4 million in *Coates v. Farmers Group, Inc.*, No. 15-CV-01913-

LHK (N.D. Cal.).

25 [93]  *See, e.g.*, *Ballou v. McElvain*, 14 F.4th 1042 (9th Cir. 2021) (denying summary

judgment where employee alleged employer failed to promote her because of sex).

26 [94]  *Breiner v. Nevada Dep't of Corr.*, 610 F.3d 1202, 1208 (9th Cir. 2010); *see also*

27 *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 705 ( 2009), *as modified* (Feb. 10, 2010).

[95]  *See* Title VII, 42 U.S.C §§ 2000e, *et seq.* (amended in 1978 to include pregnancy

28 discrimination under the Pregnancy Discrimination Act); Cal. Gov. Code § 12940(a).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*that a woman will become pregnant in the future*.[96]

156.   In addition to prohibiting discrimination on the basis of pregnancy, childbirth, or other medical conditions, Title VII—and to a greater extent, the FEHA and the California Labor Code—requires employers to accommodate pregnant workers' health needs, such as those related to breastfeeding.[97]

157.   Activision's conduct ran far afoul of state and federal law prohibiting discrimination based on pregnancy.  By refusing to promote women because they **might get pregnant** and refusing to accommodate their pregnancy-related medical needs—indeed by allowing parties in lactation rooms—Activision exposed itself to liability based on pregnancy discrimination.

### 3.   Retaliation

158.   An employer categorically may not retaliate against an employee who reports or otherwise opposes prohibited discrimination or harassment.[98]  Notably, the standard of proof for a retaliation claim is lower than that of a discrimination claim— a materially adverse employment action in the retaliation context is one that would "dissuade a reasonable worker" from exercising protected rights.[99]

159.   By not only failing to address complaints of harassment and discrimination but also by retaliating against those who complained, Activision compounded its potential liability.

### E.   The Board Is Responsible For Oversight Of Sexual Harassment And Discrimination At Activision

160.   The Board is responsible for overseeing the Company's workplace culture and preventing the systemic abuses the Director Defendants enabled.  This

---

[96]   *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991).

[97]   *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015); *James v. Dependency Legal Grp.*, 253 F. Supp. 3d 1077, 1100 (S.D. Cal. 2015).

[98]   42 U.S.C. § 2000e-2-3(a); Cal. Gov't Code §§ 12940(h), 12950(b)(7)).

[99]   *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  charge has been imposed by the expectations of all market participants—most

2  critically, shareholders, current and potential employees, consumers, and

3  advertisers—with particular urgency following a widely recognized shift in attitudes

4  towards workplace harassment and discrimination.  Moreover, the Board expressly

5  accepted this charge by various instruments, including its representations to

6  shareholders, its committee charters, the Company's Code of Conduct, and the

7  Company's Equal Employment Opportunity Policy.

### 1. Today, Sexual Harassment, Sex Discrimination, And Retaliation Are Existential Corporate Threats

10    161. Sexual harassment, sex discrimination, and retaliation causes of action

11  have existed for decades.  For good reason.  As the Supreme Court explained in its

12  1993 opinion, *Harris v. Forklift Systems, Inc*., 510 U.S. at 22:

13     A discriminatorily abusive work environment, even one that does not

14     seriously affect employees' psychological well-being, can and often will

   detract from employees' job performance, discourage employees from

15     remaining on the job, or keep them from advancing in their careers.

16     Moreover, even without regard to those tangible effects, the very fact that

   the discriminatory conduct was so severe or pervasive that it created a

17     work environment abusive to employees because of their race, gender,

18     religion, or national origin offends Title VII's broad rule of workplace

   equality.

19

20    162. Yet, women facing sex discrimination and, in particular, sexual

21  harassment have often been disbelieved and faced professional retaliation, such as

22  damage to their career and reputation.  In her June 2015 testimony before the EEOC,

23  Mindy Bergman, Texas A&M University Professor of Industrial/Organizational

24  Psychology explained that "[i]t is actually unreasonable for employees to report

25  harassment to their companies because minimization and retaliation were together

26  about as common as remedies and created further damage to people who had already

27  been harassed."

28    163. In 2017, however, ***the court of public opinion shifted with the rise of***

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *the #MeToo movement*.[100]  Thousands of women went public about their experiences

2    with sexual harassment, forcing a national reckoning about workplace harassment and

3    discrimination.[101]  What followed was ***the rapid downfall of high-profile previously***

4    ***untouchable public figures***, including Harvey Weinstein, Bill Cosby, and Matt Lauer,

5    who were accused of sexual harassment and assault.  Companies, too, bore the cost.

6    The Weinstein Company filed for bankruptcy.[102]  The market value of Wynn Resorts

7    Ltd. dropped by $2.1 billion following revelations of a pattern of sexual misconduct

8    by its chairman and chief executive.[103]  ***More CEOs were removed in 2018 for***

9    ***misconduct and ethical lapses, including harassment, than for poor financial***

10   ***performance***.[104]

11          164.  ***In 2018, #MeToo's moral reckoning reached the gaming industry***.  In

12   August 2018, the gaming industry website *Kotaku* published an exposé detailing

13   gender discrimination and harassment at Riot Games, Inc. ("Riot" or "Riot Games"),

14   including women being subjected to unwanted sexual advances, women being

---

[100]  *See, e.g.*, MacKinnon, Catherine A. "Where #MeToo Came From, and Where It's Going." *The Atlantic*, Mar. 24, 2019, https://www.theatlantic.com/ideas/archive/2019/03/catharine-mackinnon-what-metoo-has-changed/585313/ ("The #MeToo mobilization, this uprising of the formerly disregarded, has made increasingly untenable the assumption that the one who reports sexual abuse is a lying slut.").

[101]  *See* Zacharek, Stephanie, et al. "Person of the Year 2017: The Silence Breakers," *Time*, Dec. 18, 2017, https://time.com/time-person-of-the-year-2017-silence-breakers/; Kantor, Jodi. "#MeToo Called for an Overhaul. Are Workplaces Really Changing?" *The New York Times*, 23 Mar. 2018, https://www.nytimes.com/2018/03/23/us/sexual-harassment-workplace-response.html ("The #MeToo moment has shifted social attitudes, inspired widespread calls for change and resulted in unprecedented accountability."); Griffin, Riley, et al. "#MeToo: One Year Later," *Bloomberg Law*, 5 Oct. 2018, https://www.bloomberg.com/graphics/2018-me-too-anniversary/.

[102]  Barnes, Brooks. "Weinstein Company Files for Bankruptcy and Revokes Nondisclosure Agreements." *The New York Times*, 19 Mar. 2018, https://www.nytimes.com/2018/03/19/business/weinstein-company-bankruptcy.html

[103]  Eisen, Ben. "Misconduct Report Shaves $2 Billion From Wynn Market Value." *The Wall Street Journal*, 26 Jan. 2018, https://www.wsj.com/articles/misconduct-report-shaves-nearly-2-billion-from-wynn-market-value-1516992594.

[104]  Allyn, Bobby. "Top Reason For CEO Departures Among Largest Companies Is Now Misconduct, Study Finds." *NPR*, 20 May 2019, https://www.npr.org/2019/05/20/725108825/top-reason-for-ceo-departures-among-largest-companies-is-now-misconduct-study-fi.

56

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  overlooked for promotions, and male employees openly discussing the physical
2  attributes of female colleagues.

3      165.   Although Riot Games attempted to settle claims for the gender
4  discrimination and harassment enabled by its "bro culture" for $10 million, **the DFEH**
5  **intervened and objected to the proposed settlement in January 2020, arguing that**
6  **employees should receive more than $400 million**.[105]

7      166.   French video game publisher Ubisoft responded to reports of sex
8  discrimination and harassment by overhauling its workplace culture, removing four
9  top executives in 2020, hiring an external consultant to audit its human resources
10 processes, and hiring a head of diversity and inclusion.

11     167.   University of Oregon law professor Elizabeth C. Tippett explained the
12 shift in corporate thinking about sexual harassment:

13     Before MeToo, harassment was viewed as a risk that employers could
       largely contain. . . . ***MeToo altered this calculus considerably because***
14     ***employees suddenly felt free to air their experience of harassment***
15     ***publicly***. This imposed reputational costs overlooked in prior decision
       making by employers. The risk of bad publicity is less manageable, and
16     potentially far greater, than the risk of litigation. . . . *Harassment*,
17     previously viewed as a contained liability, has morphed into a *bet-the-*
       *company risk*.[106]
18

19     168.   In failing to address (and perpetuating) widespread sexual harassment
20 and gender discrimination, Activision and the Director Defendants exposed the
21 Company to regulatory risks and legal liability.

22

23

---

24 [105]    Fingas, Jon. "California Says Riot Games' Discrimination Settlement Isn't
   Enough," *Engadget*, 23 Jan. 2020, https://www.engadget.com/2020-01-22-california-
25 challenges-riot-games-discrimination-settlement.html.; Esports Giant Riot Settles
   Discrimination Case for $100 Million." *The San Francisco Chronicle*, 28, Dec. 2021,
26 https://www.sfchronicle.com/sports/article/Esports-giant-Riot-settles-discrimination-
   case-16733077.php (A new settlement of $100 million was announced in December
27 2021).
   [106] Tippett, Elizabeth C. "The Legal Implications of the MeToo Movement," (2018)
28 *Minnesota Law Review*. 57, 272 (emphasis added).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### 2. Directors Are Accountable To Shareholders For Operating The Company As An Unlawful Enterprise

169.    Directors, as corporate fiduciaries, are accountable to shareholders for operating the Company within the bounds of the law.

170.    Under Delaware law, a corporation may be chartered "to conduct or promote any *lawful* business or purposes."[107]

171.    Accordingly, "[f]or a corporate director knowingly to cause the corporation to engage in unlawful acts or activities or enter an unlawful business is disloyal in the most fundamental of senses."[108] "Delaware law does not charter law breakers. … [A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[109] "[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."[110] "[A] fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."[111]

172.    Activision's workplace as described herein was in continuous, notorious, and systemic violation of state and federal law.  Directors' maintenance of this workplace was thus "disloyal in the most fundamental of senses."

---

[107] Del. Code § 101(b) (emphasis added).

[108] Leo. E. Strine, Jr., *et al.*, "Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law," 98 Geo. L.J. 629, 650 (2010).

[109]  *In re Massey Energy Co.*, No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (Strine, V.C.).

[110]  *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (Strine, V.C.).

[111]  *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) (Strine, V.C.).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**3.   Directors Are Accountable To
Shareholders For Avoiding A Culture
Of Sexual Harassment And Discrimination**

173.   The Director Defendants as corporate fiduciaries are accountable to shareholders to prevent and eliminate a culture of sexual harassment and discrimination at the Company to avoid liability costs and risk, minimize brand damage, and maximize capacity to attract, maintain, and motivate talented employees.

174.   Maintaining a diverse and inclusive workplace free of harassment and discrimination ***is critical to a company's capacity to attract and retain talented employees***.  In 2020, video games generated $155 billion in revenue, "larger than the movie and music industry combined."[112]   Game development has become an exceedingly complex and resource-intensive undertaking.   Accordingly, talented developers, designers, and other industry professionals are in high demand and subject to ***intense competition*** from potential employers.   Activision will be incapable of attracting and retaining such employees unless it is free, and known to be free, of the abusive practices the Director Defendants enabled, and known to hold accountable those who enable them.

175.   Further, because success as a gaming industry professional requires "an interest in video games in general and an ability to keep up with rapidly changing technical and artistic trends," ***the industry's workforce is much younger than the workforce in general***, with two-thirds of respondents in a 2016 industry survey of game developers being between the ages of 20 and 34 years old.[113]   Activision's continuing success therefore ***depends on attracting and retaining talented workers***

---

[112]   Beattie, Andrew. "How the Video Game Industry Is Changing." *Investopedia*, 31 Oct. 2021, https://www.investopedia.com/articles/investing/053115/how-video-game-industry-changing.asp.

[113]   "Developer Satisfaction Survey 2014 & 2015: Diversity in the Game Industry Report."   *International Game Developers Association*, 12 Jun. 2016, p. 7, https://igda-website.s3.us-east-2.amazonaws.com/wp-content/uploads/2019/04/21180408/IGDA_DSS_2014-2015_DiversityReport-2016.pdf.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   *who came of age and entered the workforce during or since the outcry over*
2   *Gamergate, the advent of the #MeToo movement, and the drive to hold responsible*
3   *those who enable workplace harassment and discrimination*.

4       176.   A culture of, and reputation for, harassment and discrimination impairs
5   a company's ability to deal with all other market participants as well.  Consumers are
6   increasingly unwilling to patronize businesses known to enable such conduct, a trend
7   to which Activision is especially vulnerable in light of the virtually limitless digital
8   entertainment options available to them.  As the Company stated in its 2019 10-K
9   filing, "We compete for the leisure time and discretionary spending of consumers with
10  other interactive entertainment companies, as well as with providers of different forms
11  of entertainment, such as film, television, social networking, music and other
12  consumer products. The interactive entertainment industry is intensely competitive
13  and new interactive entertainment software products and platforms are regularly
14  introduced."[114]  Among the "main competitive factors" identified by the Company is
15  "brand name recognition."   The Company's business will be permanently and
16  irreparably harmed if consumers come to associate the Company's brands, not with
17  its globally popular entertainment products, *but with sexual harassment, assault, and*
18  *misogyny*.

19      177.   Advertisers are increasingly unwilling to risk their own reputations in
20  sponsoring and promoting businesses known to be abusive, as illustrated by the
21  hemorrhage of sponsors from the Company's esports leagues described above.
22  Vendors are increasingly unwilling to do likewise in providing critical goods and
23  services, as illustrated by the "misogyny tax" imposed on Activision.  A culture such
24  as that overseen by the Director Defendants here seriously impairs a business's ability
25  to function in the marketplace at all.

26

27

28  ―――――――――――――――
[114]  "Form 10-K." *Activision, Blizzard,* 27 Feb 2020.
https://investor.activision.com/static-files/32abe798-add2-4770-9c7d-4cd3a840ede2.

178.    Finally, a culture that causes a company to operate in perpetual and notorious violation of anti-harassment and antidiscrimination laws exposes the company to potentially crushing public and private liability.  The drive for workplace accountability means closer scrutiny from public regulators and private plaintiffs. ***Even settling one plaintiff's individual discrimination lawsuit can lead to eight-figure payouts***.  For example, in 2020, social media company ***Pinterest settled a discrimination and retaliation lawsuit brought by a former executive for $22 million***.[115]  The maximum potential liability incurred by years of enterprise-wide harassment, discrimination, and retaliation at the hands of colleagues and supervisors is almost incalculable.

179.    Each of the above considerations bears special weight with respect to a company's most important products (such as the Company's *World of Warcraft*), its most important employees (such as Afrasiabi), and its most important public events (such as BlizzCon), as these are the linchpins of the Company's reputation and profitability.

180.    Director responsibility for workplace culture is as essential to a company's vitality as director responsibility for major business transactions, regulatory compliance, and corporate governance.

### 4.    Activision Claims To Recognize The Importance Of Director Responsibility For Workplace Culture

181.    The importance of effective "environmental, social, and corporate governance" (ESG) has won widespread recognition since the term was first introduced into broad circulation in 2004.[116]  In 2018, one commentator observed that

---

[115]  Griffith, Erin. "Pinterest Settles Gender Discrimination Suit for $22.5 Million." *The New York Times*, 14 Dec. 2020, https://www.nytimes.com/2020/12/14/technology/pinterest-gender-discrimination-lawsuit.html.

[116]  *See* "The Global Compact: Who Cares Wins."  UNEPFI.org, Dec. 2004, https://www.unepfi.org/fileadmin/events/2004/stocks/who_cares_wins_global_compact_2004.pdf.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ESG was now "widely understood" to be an element of "[r]esponsible investing."[117]
2  Two years later, the Company belatedly reached the same conclusion.

3      182.   In June 2020, the Company told its shareholders that it understood ESG
4  reporting to be "of increasing importance to many of the Company's stakeholders,"
5  especially insofar as effective ESG could "help mitigate risk, reduce costs, protect
6  brand value[,] and identify opportunities."  Accordingly, the Company intended to
7  publish its first ESG report the following year, including a "[s]ocial disclosure" that
8  would demonstrate the Company's "invest[ment] in attracting, retaining and
9  developing talent."  The ESG metrics to be reported under this rubric included
10  "[e]mployee health and safety," "[t]alent development," and "[d]iversity and
11  inclusion."[118]

12      183.   *The Company's first ESG report was released in June 2021*.  Kotick
13  assured shareholders that the Company's new "cross-functional ESG working group"
14  would be supervised by himself "as well as our Board of Directors."[119]

15      184.   *The Company acknowledged that the "Board and its committees"*
16  *oversee ESG policy.*  The Nominating and Corporate Governance Committee
17  (including Defendants Meyer, Morgado, and Wasserman) *has primary responsibility*
18  *for implementing Board oversight of ESG policy*.  The Compensation Committee
19  (including Defendants Bowers, Morgado, and Ostroff) "broadly oversees the
20  Company's human capital matters," including "attracting, retaining, and developing
21  talent," and "diversity, equity, and inclusion."  The Audit Committee (including

22

23  ───────────────
[117] Kell, Georg. "The Remarkable Rise of ESG," *Forbes,* 11 Jul. 2018,
24  https://www.forbes.com/sites/georgkell/2018/07/11/the-remarkable-rise-of-esg/?sh=693594cc1695.
25  [118] "Activision Blizzard Environmental, Social and Governance Overview."
*Activision Blizzard,* 1. Jun. 2020, https://investor.activision.com/static-files/28633229-
26  f352-4e29-ad3d-b07da5c331d9.
[119] "2020 Environmental, Social, and Governance Report." *Activision Blizzard,*
27  11 Jun. 2021, p. 4,
https://ourcommitments.activisionblizzard.com/content/dam/atvi/activisionblizzard/a
28  b-touchui/our-commitments/FC_Activision_ESG_Report_2020_V27.pdf.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants Corti, Hartong, and Nolan) oversees the Company's "ethics and compliance program, including [its] Code of Conduct," as well as "systematic risks" posed by the "legal and regulatory environment." Finally, the full Board "receives reports" on ESG matters and "reviews the conclusions of management with respect to the Company's exposure to strategic enterprise-level risks."[120]

185. Among the ESG "commitments" made by the Company, under the Board's supervision as described above, were ***"providing our employees with the opportunities and resources they need to unlock their potential"; developing games "that reflect the communities we serve"; "begin[ning] with a diverse and inclusive workplace," as "broad-appeal entertainment" cannot be developed "without people with diverse backgrounds and skills"; and "increas[ing] diversity in our industry."***[121]

186. The Company made specific commitments to "rewarding and supporting employees." The Company told shareholders it was ***"committed to ensuring equal pay for equal work while always rewarding superior performance," had considered "pay equity" in compensation decisions "for a number of years,"*** and in its 2022 report promised to deliver "the conclusions of our Company-wide analysis of pay by gender and non-binary populations." In support of these commitments, the Company pointed to its "support [of] both current and hopeful parents," observing that Company employees "should be able to embrace both parenthood and a career."[122]

187. In the ***Company's 2020 ESG report, the Board committed to overseeing and maintaining a culture that was precisely the opposite of the culture it oversaw and maintained in fact***. And the Board committed itself to protecting the Company from the very "enterprise-level risks" it now faces in the wake of the DFEH investigation and lawsuit.

---

[120] *Id.*, p. 25.
[121] *Id.*, p. 9.
[122] *Id.*, p. 15.

188.  The charters of the responsible Board committees likewise charge committee members with supervising the Company's culture and protecting the Company from the reputational and financial risks created by a lawless culture of harassment and discrimination.

189.  Defendants Corti, Hartong, Nolan, and Morgado served on the **Audit Committee** from 2003 to present, from 2015 to present, from 2019 to present, and from 2008 to 2018, respectively.  Under that Committee's charter (as amended in April 2021), they were among other things required to ***"[m]onitor the adequacy of the Company's ethics and compliance program, including compliance with the Company's Code of Conduct,"*** and oversee the processes to ***"assess and manage the Company's exposure to risk" and any "steps management has taken to monitor and manage such exposures."***

190.  Until April 2021, the Audit Committee was also required to "[r]eview the Company's program to monitor compliance with its Code of Conduct, and meet periodically with individuals with operational responsibility for the compliance and ethics program and members of management to discuss compliance with the Code of Conduct."  Defendants Corti, Hartong, Nolan, and Morgado breached their fiduciary duty by failing to conduct that oversight.

191.  The current **Code of Conduct**, for which the Audit Committee is responsible, was adopted in 2017.  It ***prohibits sexual harassment and discrimination***.  It provides that Activision, and therefore the Board, "do [not] tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law."  Under the heading ***"Harassment: Don't Do It,"*** the Code provides that "[e]ach of us is expected to do our part to create a respectful workplace culture—one that is free of unlawful bias, harassment, intimidation, and discrimination of any kind."  Specific examples of behaviors the Company purportedly "does not tolerate . . . in any form" include: unwanted advances, inappropriate sexual jokes, sexually suggestive comments,

inappropriate touching, requests for sexual favors, and inappropriate comments about another's appearance. ***The Code "encourage[s]" employees to report misconduct, and promises that after an internal investigation, "the right disciplinary action will be taken, where appropriate, in accordance with applicable laws."*** The Code also provides that Activision, and therefore the Board, "do [not] tolerate retaliation against employees for asking questions or attempting to invoke their rights under applicable laws."

192.   Defendants Nolan, Morgado, Meyer, and Wasserman served on the **Nominating and Corporate Governance Committee** from 2016 to 2018, from 2002 to 2021, from 2014 to present, and from 2019 to present, respectively.  Under that Committee's charter, they were among other things tasked with ***"mak[ing] recommendations to the Board" about the adequacy of the "Company's Corporate Governance Principles and Policies," and overseeing the "Company's environmental, social, and governance ('ESG') strategy, practices, and policies."***

193.   The current Corporate Governance Principles and Policies, for which the Nominating and Corporate Governance Committee ("N&CG Committee") was responsible, were adopted in 2016.  The Principles and Policies provide that the "primary responsibility of the Board is to oversee the affairs of the Company for the benefit of stockholders," and to "oversee the CEO's performance" in managing the "day-to-day" operations of the Company.  The Principles and Policies also required the Board to "oversee[] a corporate compliance program which includes a Company code of conduct, the maintenance of accounting, financial and other controls, and review of the adequacy of such controls."  Defendants Nolan, Morgado, Meyer, and Wasserman breached their fiduciary duty by failing to conduct that oversight.

194.   Defendants Morgado, Bowers, Wasserman, and Ostroff served on the **Compensation Committee** from 1998 to 2021, from 2018 to present, from 2016 to 2018, and from 2021 to present, respectively.  Under that Committee's charter, they were among other things tasked with overseeing the ***"Company's key human capital***

1     *management strategies and programs," which include "attracting, retaining, and*

2     *developing talent."* Defendants Morgado, Bowers, Wasserman, and Ostroff breached

3     their fiduciary duty by failing to conduct that oversight.

4        195. The Company has also ***charged several high-level officers with***

5     ***maintaining a workplace culture free of harassment and discrimination***. Claudine

6     Naughton has served as the Company's Chief People & Diversity Officer since

7     August 2019. Naughton reports directly to Kotick and her duties include leading

8     company-wide human resources. Julie Machock has served as the Company's Vice

9     President, HR Operations & Effectiveness since April 2009. Machock is the

10    designated Equal Employment Opportunity Coordinator at the Company, and as such,

11    is responsible for implementing Activision's Equal Employment Opportunity Policy.

12    And Daniel Alegre, Chief Operating Officer since 2020, signed the Company's Equal

13    Employment Opportunity Policy, pledging to ***"personally make [a] commitment to***

14    ***all of the objectives of equal employment."***

15       196. The Company adopted its **Equal Employment Opportunity Policy** in

16    June 2020. The Policy applies to "employment, upgrading, demotion, transfer,

17    recruitment or recruitment advertising; layoff or termination; rates of pay or other

18    forms of compensation; and selection for training, including apprenticeship." The

19    Policy requires the Company to:

20             1.    Recruit, hire, train and promote, into all job classifications, the most

21                  qualified persons without regard to gender, race, color, …

22                  pregnancy, sexual orientation, gender identity, gender expression,

23                  marital status, medical condition … or because of genetic

24                  information or any other basis protected by applicable federal, state,

25                  or local law.

26             2.    Make employment and promotional decisions by utilizing

27                  reasonable standards based on the individual's qualifications and

28                  valid job requirements, as they relate to a particular job vacancy, in

1    accordance with equal employment opportunity requirements.

2        3.    Administer all personnel actions relating to the terms, conditions,

3    and privileges in a nondiscriminatory manner.

4    197.   These officers' responsibilities further illustrate **the Board's recognition**

5    **of the importance of high-level corporate responsibility** for the Company's

6    workplace culture.  Without any Board enforcement or oversight, however, these

7    responsibilities existed on paper only.

8    **F.    Activision's Board Was On Notice Of Harassment**
     **And Discrimination Through Regulatory Investigations**

9

10        **1.    The DFEH Investigation Was A**
               **Red Flag Of Serious Misconduct By Activision**

11    198.   The DFEH's investigation began in October 2018.  It operated as a "red

12    flag" to the Director Defendants that the Company was at risk of violating the law.

13    Activision's Board has been "informed at all times with respect to the status of

14    regulatory matters."[123]

15    199.   The DFEH is the largest state-based civil rights agency in the United

16    States.  It is charged with enforcing California's civil rights laws, including "**the right**

17    **and opportunity of all persons to seek, obtain, and hold employment without**

18    **discrimination**."  *See* Cal. Gov. Code § 12920.  To that end, California Government

19    Code § 12930 authorizes the DFEH to receive, investigate, conciliate, mediate, and

20    prosecute complaints of alleged violations of California's FEHA and other civil rights

21    laws.

22    200.   Like many public prosecutors, the DFEH conducts investigations—on its

23    own initiative or based on individual complaints—and it exercises discretion in

24    deciding whether and how to prosecute claims.[124]  If the DFEH decides to pursue a

25    claim, it files and serves a formal administrative complaint on the employer accused

26

27    ───────────────
      [123]  November 16, 2021, *WSJ Report*.

28    [124]  Cal. Gov. Code §§ 12930, 12965, 12965(a)

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the unlawful practice.[125]  After an administrative complaint is filed, the DFEH has ample discovery tools available to assist in conducting a thorough investigation, including investigative subpoenas, interrogatories, requests for production, witness interviews, formal depositions, and site visits.[126]

201.   The DFEH is not limited to representing the interests of a particular claimant; instead, it is authorized to seek relief beyond what individuals acting alone can pursue directly.[127]  When the DFEH seeks redress on behalf of a group as opposed to just a single claim, it files a "Director's Complaint," *which is subjected to heightened regulatory requirements ensuring that the investigation and decision-making process is more rigorous*.  The time for investigating a Director's Complaint is extended by one year.[128]

202.   Receipt of a DFEH administrative complaint *is noteworthy to any company in California*.  In 2019 alone, the DFEH settled 710 cases for monetary value of $14,834,753.25 prior to the filing of a civil action.[129]  Many of these settlements include affirmative relief, which do not require companies to pay money directly to complainants, but rather focus on creating fair employment opportunities for future employees.  Furthermore, given that the DFEH always attempts to mediate a settlement, *only a tiny fraction of its cases move from an administrative complaint to the filing of a civil action*.  Of the over 28,000 intake forms and complaints received by the DFEH in 2019, *only four resulted in civil court actions—just 0.014% of cases brought to the Department*.[130]  Since 2011, the DFEH has filed civil actions in less than 0.2% of the cases it received.

---

[125]  Cal. Code Regs. Tit. 2 § 10011; § 10021.

[126]  Cal. Code Regs. Tit. 2 §§ 10026–28.

[127]  Cal. Gov. Code § 12965(c).

[128]  Cal. Code Regs. Tit. 2 § 10013(h)(1).

[129]  "2019 Annual Report." *Activision Blizzard*, p. 14, https://investor.activision.com/static-files/e610f6ff-cdf2-4f92-b373-4df046a590bb

[130]  *Id.*, p. 17.

203.   Here, the DFEH first filed its administrative Director's Complaint against Blizzard on October 12, 2018, with two amended complaints filed shortly thereafter to include the entirety of the Company.  Importantly, because the DFEH's investigation was under a Director's Complaint ***it was subject to a more thorough investigation***.



204.

205.   Since then,

131

132

133

134

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



208.   At the conclusion of its investigation, the DFEH issued a cause finding on June 24, 2021, in which the Department concluded that the Company "discriminated against female employees and contingent or temporary workers in terms and conditions of employment, including compensation, assignment, promotion, termination, constructive discharge, and retaliation."[140]  The DFEH also found that "female employees and contingent or temporary workers **were subject to sexual harassment**" and that the Company "failed to take all reasonable steps to **prevent unlawful discrimination, harassment, or retaliation**."[141]  Lastly, the DFEH

---



[135]
[136]
[137]
[138] .
[139]
[140]  ¶18.
[141]  ¶18.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

further found that the Company violated the California Labor Code by "***paying female employee[s] less than their male counterparts for substantially similar work.***"

209.   The cause finding prompted even more procedural safeguards.  After an investigation finds merit to the complaint, DFEH regulations "require[s] the parties to participate in ***mandatory dispute resolution*** in an effort to resolve the dispute without litigation."[142]   If no settlement is reached, a civil action can then be filed.  Here, according to the DFEH, ***Activision refused to participate in the mandatory mediation process***, a decision that certainly could not have been made without high-level approval.

210.  With no mediation available, the DFEH filed its civil action on July 20, 2021, and filed its First Amended Complaint on August 23, 2021.  The First Amended Complaint sets forth eleven causes of action, including five counts for different types of employment discrimination based on sex; two counts for failure to prevent discrimination and harassment; and counts for retaliation, unequal pay, improper waiver of rights, and failure to maintain and produce records.  Specifically, the DFEH alleged that, despite receipt of a document retention notice, ***the HR Department shredded documents and failed to retain evidence*** that related to the Company's internal investigation of employee complaints.

211.   Such a thorough investigatory process, which threatened to expose the Company to massive civil liability and reputational harm, ensures that the ***Company's top executives and Board would be aware of the charges***.  And because the DFEH's complaint concerned sexual harassment, the Company's Audit Committee—which is charged with monitoring the Company's ethics and compliance program, including compliance with the Code of Conduct, which forbids harassment—and, in turn, the Board as a whole, ***was on notice of the claims of misconduct at the Company***.

---

[142]  Cal. Code Regs. Tit. 2 § 10025.

212.   Moreover, the ***cause finding*** served as an additional "red flag" to the Board, putting the Director Defendants on notice that there was a mandatory mediation process, and that if the mediation was unsuccessful, a civil complaint would be filed publicly.  The Board must have been aware that the Company ***shirked its legal responsibility*** to participate in the DFEH's mandatory mediation process.   The shareholders, the market, and the SEC were ***unaware*** of this fact, however, as the Company ***failed to disclose*** the DFEH's investigation in its quarterly filings until after it had become public.  The SEC is currently investigating Activision for its failure to disclose the DFEH investigation to investors.[143]

### 2.  Activision Ran A Parallel Internal Investigation Which Should Have Alerted The Board To The Underlying Problems

213.   After the DFEH opened its investigation into Activision's unlawful harassment and discrimination, the Company used legal counsel to internally investigate claims of discrimination or harassment.  This parallel investigation should have put the Board on further notice of the wrongdoing within the Company.

214.   According to the DFEH, after the investigation began in 2018, Activision employees made additional complaints to the Company.  The DFEH requested information relating to such complaints but was told that the Company's "investigation of discrimination or harassment complaints is privileged," because "[the investigator] is an attorney" and therefore "her work related to receipt or investigations" would not be produced.[144]

215.   Furthermore, as part of the Company's parallel investigation, the Company "obtain[ed] repressive, if not punitive, secret settlements of sexual harassment claims, non-disclosure agreements, and non-disparagement agreements with severe penalties against employees."[145]   Importantly, the Company obtained

---

[143]  November 16, 2021, *WSJ Report*.

[144]  ¶52.

[145]  ¶54.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

these waivers and releases without providing its employees "*any notice of the pending government enforcement action under the California Fair Employment and Housing Act and the California Labor Code.*"[146]

216.  According to the DFEH, the Company obtained waivers which required employees to:

      a.    release all known and unknown claims against the Company, including claims under the FEHA;

      b.    agree to never disclose settlement terms beyond attorneys and immediate family;

      c.    agree not to "criticize, denigrate, or otherwise disparage the Company";

      d.    notify the Company prior to communicating with the DFEH;

      e.    jointly request with the Company that certain disclosures be filed under seal in legal proceedings; and

      f.    agree that entitlement to any and all benefits "shall immediately and permanently cease" upon any breach of agreements with Company.[147]

217.  As with other documents relating to the parallel investigation, the Company *repeatedly withheld documents* relating to the waivers on the purported basis of privilege.

218.  Thus, the Company revealed to the DFEH that it retained counsel to investigate sexual harassment and discrimination complaints *since at least 2018* and used counsel to help facilitate and negotiate waivers stemming from its investigation.

219.  This parallel investigation regarding discrimination and harassment is an *additional red flag that should have alerted the Board* to the misconduct at the

---

[146]  ¶54 (emphasis in original).
[147]  ¶54.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Company.

2      **3.      The EEOC's Investigation
                 Was A Red Flag To The Board**

3

4      220.   In the fall of 2018—at the same time the California DFEH was

5  investigating Activision—the federal EEOC began investigating the Company

6  through a Commissioner's Charge signed on September 26, 2018 ("EEOC Notice"),

7  which, as required by law, was served on the Company soon thereafter.[148] ████

8  ████████████████████████████████████████████████████████████████████

9  ██████████████████████████████████ ██

10     221.  ██████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ██████████████████████████ ██████ ███████████████████████████████

13 ████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████

17 ██ ███ ██████████████████████████████████████████████████████████████

18 ██████████████████████████████████ ██

19     222.  ██████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████

23

24 _____

[148] 29 C.F.R. § 1601.14 (notice of the charge is served on the respondent).

25 [149] ████████████████████████████

26 [150] ██████████████████████████

27 [151] ████ ████████████████████████████████████████████████████

28 [152] ██████████████████████████

**SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████

223.   As part of its investigation, the EEOC, in August 2020, sent a letter to both current and former employees at all levels of Activision asking them to participate in a survey on "gender-based and/or sexual harassment" at the Company.

224.   The gaming website *Dextero* contemporaneously obtained and published a full copy of the EEOC's letter to Activision's employees.  The letter disclosed that the EEOC "is investigating [the Company], in regard to allegations of gender-based and/or sexual harassment."  The letter asked for submissions from employees who had "personally experienced or witnessed gender-based and/or sexual harassment at [the Company]."   The letter promised that responses would be protected, as "it is a violation of federal law for an employer to retaliate against you because you participate in an EEOC investigation."[156]

225.   *Dextero* noted that the EEOC's letter "comes after a long, heavily publicized period of internal unrest around working conditions" at Activision. *Dextero* also reported that ***some employees had been contacted by the EEOC as early as May 2020***.  The gaming website *Dot Esports* commented that the Company had been under fire over the past few years for allegations of racism and sexism within their company culture, and that "[i]t appears that Activision Blizzard may have a pattern of ignoring discriminatory behavior."[157]

---

[153] ██████████████████████

[154] █████████████████████████████

[155] █████████████████████████████

[156] Lewis, Richard. "EEOC Contact Activision Employees Amid Sexual Harassment Investigation."  *Dextero.com,* 12 Aug. 2020, https://www.dexerto.com/general/eeoc-contact-activision-employees-amid-harassment-investigation-1405199/.

[157] Alford, Aaron. "Activision Blizzard Employees Reportedly Contacted by EEOC Over Allegations of Discrimination"  *Dot Esports,* 12 Aug. 2020, https://dotesports.com/business/news/activision-blizzard-employees-reportedly-contacted-by-equal-employment-opportunity-commission-over-allegations-of-discrimination.

226. █████████████████████████████████████

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

227.   In June 2021, the EEOC sent the Company a letter ***"finding reasonable cause to believe violations of Title VII occurred" at the Company*** and inviting the Company to conciliate the discrimination charges.  Apparently, the Company agreed to conciliation, though this confidential process was interrupted by the DFEH's public filing.[159]

228.   Nonetheless, the toxic workplace and discriminatory practices ***remained in place at the Company*** through at least August 23, 2021, according to the DFEH's First Amended Complaint.



---

[158] ███████████████████████████████████████████

[159]   Declaration of Rosa Viramontes in Support of Opposition to Motion to Intervene ¶¶ 24, 36, *U.S. EEOC v. Activision Blizzard Inc.*, No. 2:21-cv-07682-DSF-JEM (C.D. Cal., Nov. 8, 2021), ECF No. 35-2.

[160] ███████████████████████

[161] ███████████████████████

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



234. ████████████████████████████████████████
████████████████████████████████ ████████ ████████████████
████████████████████████████████████████████ ██

### G.   The Board Received Numerous Additional Red Flags Concerning Sexual Harassment And Discrimination

235.   In addition to the foregoing regulatory investigations and action demonstrating the Director Defendants' knowledge or conscious disregard of the problem of endemic harassment, discrimination, pay disparity, and retaliation at Activision, the Board failed to respond in good faith to additional red flags that began appearing at least early as 2015:

236.   *First*, prior internal investigations were red flags to the Board that directors were discriminating on the basis of sex.  From 2015 to 2017, Activision retained the law firm Paul Hastings LLP to analyze compensation data at the Company. In 2018, the Company retained the Miller Law Group to conduct a similar analysis. Despite the fact that these analyses were authorized, ***the Board failed to take effective steps to remedy the gender pay gap at the Company***.  Indeed, according to the DFEH, the pay disparities at the Company affected 2,500 female employees and women were generally underpaid by an average of $16,000 a year.

237.   *Second*, ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

169 ████████████████████████
170 ████

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

238.   *Third*, **the Board should have been directly apprised of a pattern of leadership-level sexual misconduct**.  Specifically, the Board was or should have been on notice of the Company's investigations into harassment and assault allegations and terminations concerning: (i) Dan Bunting, the co-head of Activision's Treyarch studio accused of sexually harassing a female employee; (ii) Javier Panameno, the supervisor accused of raping an Activision employee; (iii) Eduard Roehrich, the Sledgehammer employee accused of sexual harassment; (iv) Ben Kilgore, former Activision technology officer who faced multiple allegations of sexually harassing female staffers over the course of several years; (v) Tyler Rosen, a former business leader for Blizzard's esports group, accursed in October 2018 for inappropriate sexually misconduct; and (vi) Activision's out-of-court settlement with an employee who alleged she was violently raped by her Activision supervisor.

239.   *Fourth*, the Board was apprised of a steady influx of harassment, discrimination, and retaliation complaints lodged with Activision's HR department. These specific red flags included: (i) a civil rights lawsuit in 2020 alleging a female employee was fired after complaining to HR about being passed over for promotional opportunities in favor of male candidates; (ii) as confirmed by the DFEH First Amended Complaint, *The Washington Post*, and *Bloomberg Law*, droves of complaints lodged over the years with both HR and Activision executives—including Blizzard Entertainment's then-President Brack; and (iii) reports to HR of multiple rapes of an Activision employee by her supervisor in 2016 and 2017.[171]

---

[171]   *Adelmeyer v. Infinity Ward, Inc., et al.,* No. 20STCV05581 (Cal. Sup. Ct., Los Angeles Cnty.), naming Activision as a defendant; Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booze and Fear of Retaliation Tainted 'Magical' Workplace." *The Washington Post*, 6 Aug. 2021, https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/; Schreier, Jason. "Blizzard Turned Game Developers into Rock Stars. Misbehavior Followed." *BloombergQuint,*   9   Aug.   2021, https://www.bloombergquint.com/technology/activision-blizzard-atvi-news-cultureof-misbehavior-festered-before-lawsuit.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

240.   *Fifth*, 

241.   *Finally*,

242.   Taken together, the foregoing facts adequately evidence scienter for Activision's Board, especially considering that each allegation should not be scrutinized in isolation; rather, all red flags should be assessed holistically.

**H.   Activision's Board Was On Notice Of Harassment And Discrimination Through Media Reports**

**1.   In Recent Years, Prominent Press Outlets Have Reported On Misogyny And Discrimination At Activision**

243.   In the years leading up to the DFEH First Amended Complaint, Activision's culture of harassment and discrimination was reported in numerous prominent publications.  Such articles should have caused the Board to institute changes within the Company, but the Director Defendants took no action.

244.   On April 10, 2019, *The Washington Post* reported how Activision was surveilling its female employees' fertility and reproductive health.  The fertility tracking program at the Company was covered in other technology and gaming

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

publications, including *TechSpot*, *Kotaku, GameIndustry.Biz,* and *PC Gamer*.  *The Washington Post* cited a health and privacy expert, who discussed "discrimination against mothers and families in the workplace" and how "they can't trust their employer to have their best interests at heart"—***the exact issues later raised by the DFEH***.  *PC Gamer* directly questioned the Company's motive, stating: "it's hard for me to believe that the best way to prevent preterm births and infant illnesses is an app that shares statistics with Activision, and not access to excellent, private prenatal medical care and a low-stress environment."

245.   Sexual harassment at the Company was again publicly discussed by multiple news outlets in the summer of 2020.  The press covered the quiet removal of Tyler Rosen, and popular *Call of Duty* commentators Philip "Momo" Whitfield and Ben "Benson" Bowe, and criticized the Company for downplaying their sexual harassment.

246.   For example, *ESPN's* July 2020 report on Momo quoted that a victim decided to publicize her story so as to not let "another abuser to try to downplay what they did to OVER TEN GIRLS in this community."[172]  The *ESPN* report stated that "[m]ultiple other women were critical of Momo's alleged downplaying of the misconduct."  Regarding Benson, *GameRant*'s July 2020 report noted how "many fans are wondering what prompted [the Company] to fire him."[173]

247.   Tyler Rosen's 2018 termination was similarly reported on in the summer of 2020.  For example, "Tyler Rosen & Gaming's Yellow Fever Problem" by Jae Lin, one of Rosen's victims, was published on July 6, 2020 on *Medium.com*, a suite of blogs

---

[172] "Activision Blizzard Terminates Momo's Contract."  *ESPN*, 4 Jul. 2020, https://www.espn.com/esports/story/_/id/29410509/activision-blizzard-terminates-momo-contract.

[173] Mathys, Quinn. "*Call of Duty* League Caster No Longer with Activision." *Gamerant.com,* 14, Jul. 2020, https://gamerant.com/call-of-duty-benson-cdl-fired-quit/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and publications which boasts "over 100 million readers and growing."[174]  The article noted that Lin was not the only Rosen victim and how "in 2017, [another victim] privately reported [an] incident to Tyler's employer, Blizzard.  This led to two other Asian women also coming forward and identifying very similar sexually harmful incidents that Tyler enacted, though Blizzard's investigation concluded in 'no wrongdoing'…"  The article added, "[t]hough the sexual misconduct required his termination, ***Blizzard continues to cover up for him by allowing him to say he was leaving on his own accord to start a new venture***."

248.  Additionally, national media outlets alerted directors that unfair compensation practices existed at the Company.  On August 3, 2020, *Bloomberg* reported that Blizzard employees were anonymously sharing their salaries after discovering large wage disparities.  According to *Bloomberg*, a company survey revealed that many employees were unsatisfied with their pay and, to advocate for better pay, employees created and circulated a spreadsheet disclosing individuals' salaries and recent pay increases.  In response, Company spokeswoman Jessica Taylor stated: "Our goal has always been to ensure we compensate our employees fairly and competitively."[175]

249.  On August 5, 2020, *Bloomberg* released a follow-up report, "Blizzard Workers Organize on Company Slack Seeking Pay Increases,"[176] and *Forbes* published an article titled "Blizzard's Spreadsheet Revolt Serves as a Reminder That We Should Normalize Talking Money with Colleagues," which should have further put directors

---

[174] Lin, Jae. "Tyler Rosen & Gaming's Yellow Fever Problem" 6. Jul. 2020, https://medium.com/@jaelin.type/tyler-rosen-gamings-yellow-fever-problem-22d609615c9d.

[175] Schreier, Jason. "Blizzard Employees Share Salaries in Revolt Over Pay." *Bloomberg,* 3 Aug. 2020, https://www.bloomberg.com/news/articles/2020-08-03/blizzard-workers-share-salaries-in-revolt-over-wage-disparities

[176] Schreier, Jason. "Blizzard Workers Organize on Company Slack Seeking Pay Increases." *Bloomberg,* 5. Aug. 2020, https://www.bloomberg.com/news/articles/2020-08-05/blizzard-workers-organize-on-company-slack-seeking-pay-increases

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    on alert as to the major employment issues festering at the Company.[177]

2        250.   Moreover, as detailed herein, on August 12, 2020, *Dextero* obtained and

3    published a full copy of the EEOC's letter to Activision's employees.  *Dextero* put the

4    EEOC's letter into context:  ***"[t]he email comes after a long, heavily publicized period***

5    ***of internal unrest around working conditions."***  The article cited "a number of

6    incidents that related specifically to alleged sexual harassment that made it into the

7    public domain," including, how "Tyler Rosen was publicly accused of sexual assault,

8    with claims that Activision Blizzard had been informed of the situation and didn't act

9    upon it."  On the same day, *Dot Esports* commented that the Company had been under

10   fire over the past few years for allegations of racism and sexism within their company

11   culture, and that ***"[i]t appears that Activision Blizzard may have a pattern of ignoring***

12   ***discriminatory behavior."***

13       251.   An August 13, 2020, article on the gaming website *WIN* also reported on

14   the EEOC's letter and the persistent claims of discrimination at the Company.[178]  The

15   article noted that "Blizzard has also been under fire for allegations of racism and

16   sexism," including allegations made against Tyler Rosen.  The article added, "Many

17   within the gaming and esports industry feel that there's not enough being done about

18   the sexism, racism, and discrimination within these fields.  The EEOC getting involved

19   may be what these companies need to start supporting employees that reveal the

20   discrimination they've experienced."

21       252.   Despite these red flags in respected media outlets specifically highlighting

22   problems with the Company, the Director Defendants took no good faith action to

23

---

24   [177]  Lanier, Liz. "Blizzard's Spreadsheet Revolt Serves as a Reminder That We Should
25   Normalize Talking Money with Colleagues."  *Forbes*, 5 Aug. 2020,
     https://www.forbes.com/sites/lizlanier/2020/08/05/blizzards-spreadsheet-revolt-
26   serves-as-a-reminder-that-we-should-normalize-talking-money-with-
     colleagues/?sh=2419fc06f09e.

27   [178]  Richman, Olivia. "EEOC Speaks to Blizzard Employees on Discrimination,
     Harassment."  *WIN.gg*, 13 Aug. 2020, https://win.gg/news/eeoc-speaks-to-blizzard-
28   employees-on-discrimination-harassment/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   correct the Company's culture of harassment.

2              **2.**    **The Director Defendants Were On**
                    **Notice Of The Need To Monitor The**
3                     <u>**Company Following Gamergate**</u>

4       253.   A *widespread cultural change in the broader entertainment industry,*

5 *and the gaming industry* in particular, also alerted the Board of the need to act before

6 it was too late.

7       254.   In 2014, the "Gamergate" controversy brought mainstream attention to the

8 harassment and discrimination routinely faced by women within the gaming industry.

9 Using the online hashtag "Gamergate," *thousands of male gamers harassed, heckled,*

10 *and threatened several prominent women in the gaming world*, in a coordinated

11 campaign to oppose the influence of feminism and progressivism in video game

12 culture.

13       255.   The national media *broadly reported on Gamergate and the video game*

14 *industry's need for change*. *Time* published an article titled "Misogynist Online Abuse

15 Is Everyone's Problem—Men Included."[179]  The article observed that Gamergate had

16 *"devolved into vile sexist harassment and death and rape threats."*  *Vox's* "The

17 Gaming Industry Could Stop Gamergate—But It Won't" article referenced Activision,

18 noting how "the industry would need to look a lot deeper at how it quietly enables this

19 culture."[180]  The article openly questioned why "women account for only 14 percent of

20 game designers and programmers" even when numbers "show that nearly half of

21 people who play games are women." *The New York Times* discussed the "campaign to

22 discredit or intimidate outspoken critics of the male-dominated gaming industry and its

23

24

---

25 [179] Poniewozik, James. "Misogynist Online Abuse Is Everyone's Problem—Men
26 Included." *Time,* 16 Oct. 2014, <u>https://time.com/3512896/gamergate-misogyny-men-anita-sarkeesian/</u>

27 [180] Johnson, Eric. "The Gaming Industry Could Stop Gamergate—But It Won't." *Vox,*
28 17 Oct. 2014, <u>https://www.vox.com/2014/10/17/11631990/the-gaming-industry-could-stop-gamergate-but-it-wont.</u>

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  culture," and noted that ***Activision refused to comment on the problem***.[181]

2  256.  At that time, the media also paid close attention to discriminatory

3  employment practices in the video gaming industry.  For example, a 2014 survey of

4  salaries within the gaming industry revealed that ***"women made 86 cents on every***

5  ***dollar that men made in the U.S. game industry."***[182]  *PC Magazine* reported on the

6  "pronounced gender gap in compensation," noting that the issue could not merely be

7  blamed on the fact that woman held fewer positions of seniority in the industry.  Rather,

8  *PC Magazine* explained, "across all of the job types ranging from management to

9  programming, women made less on average than their male counterparts."[183]

10  257.  The media coverage of discrimination and harassment in the gaming

11  industry continued in the years that followed.  In 2018, there was acknowledgment that

12  gaming industry had a "#MeToo" problem.[184]  By July 2020, a report revealed that

13  "[o]ver the last two years, in a protracted and devastating #MeToo movement for the

14  video games industry, hundreds of women have spoken out about the manipulative and

15  predatory behavior they have experienced in their video game careers."[185]

16

17

18

19

20

---

[181]  Wingfield, Nick. "Feminist Critics of Video Games Facing Threats in 'GamerGate' Campaign." *The New York Times,* 10 Oct. 2014, https://www.nytimes.com/2014/10/16/technology/gamergate-women-video-game-threats-anita-sarkeesian.html

[182]  http://www.gamesetwatch.com/2014/09/05/GAMA14_ACG_SalarySurvey_F.pdf

[183]  Poeter, Damon. "Game Industry Salaries Stabilizing." *PC Magazine,* 23 Jul. 2014, https://www.pcmag.com/news/game-industry-salaries-stabilizing

[184]  MacDonald, Keza. "The Video Games Industry Isn't Ready For its #MeToo Movement."        *The        Guardian*,        24        Jan.        2018, https://www.theguardian.com/commentisfree/2018/jan/24/video-games-industry-metoo.

[185]  MacDonald, Keza. "Is the Video Games Industry Finally Reckoning with Sexism?" *The Guardian*, 22 Jul. 2020, https://www.theguardian.com/games/2020/jul/22/is-the-video-games-industry-finally-reckoning-with-sexism.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

258.   Data from the International Game Developers Associations' annual Developer Satisfaction Survey recognizes a growing awareness of inequity in the gaming industry, including in hiring, promotion, and working conditions over the last several years.[186]



259.   A September 2021 report highlighting these trends observed:

Companies are responsible for creating inclusive workplaces.  The gaming industry is behind the curve in establishing and enforcing policies to prevent discrimination, harassment and exclusionary practices.

In the 2021 Developer Satisfaction Survey, eight per cent of respondents said that their companies had no equity, diversity or inclusion policies at all, and 22 per cent did not know if they did.  Only one-quarter said that their companies had a safe space policy.

The numbers look better for policies on sexual harassment and general discrimination, but there is far from universal adoption.  Worse, less than half of respondents said that there was a formal disciplinary process or a

---

[186] Weststar. Johanna. "Activision Blizzard's Sexual Harassment Scandal is Not a One-Off for the Gaming Industry." *The Conversation,* 8 Sept. 2021, https://theconversation.com/activision-blizzards-sexual-harassment-scandal-is-not-a-one-off-for-the-gaming-industry-166729.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     formal complaint procedure.[187]

2

3          260.   In June 2020, numerous women took to social media to expose rampant

4     sexual harassment and discrimination they had experienced in the industry.  According

5     to a *CNN* report from June 25, 2020, ***"[m]ore than 100 people in the gaming industry,***

6     ***most of them women . . . publicly alleged they were sexually assaulted, harassed or***

7     ***discriminated against on the basis of their gender by fellow gamers."***  The report

8     explained that the ***"floodgates" opened*** as "[o]ne by one, gamers posted on social

9     media their accounts of encountering people—mostly men—who were manipulative

10    and influential in the gaming industry, and who allegedly used their positions of power

11    to coerce illicit photos, take advantage of them, or commit sexual crimes."[188]  *The Los*

12    *Angeles Times* explained that due to the online unmasking, "the entirety of the game

13    industry has been put on blast," (*i.e.*, exposed).[189]

14         261.   As a direct result of this public outcry, major gaming companies—***other***

15    ***than Activision***—took significant, concrete actions to reform their organizations and

16    to promote an inclusive, equal and compliant corporate culture.  The French video

17    game publisher Ubisoft, for example, ***responded with a complete overhaul of its***

18    ***workplace culture***.  At least four of its top executives were removed from office in the

19    summer of 2020, and the company hired an external consultant to audit its HR

20    processes.  Ubisoft's CEO publicly stated that "Ubisoft has fallen short in its obligation

21    to guarantee a safe and inclusive workplace environment for its employees" and that it

22    was "committed to implementing profound changes across the company to improve

23

24    _____

25    [188]   Liao, Shannon. "Gaming Companies are Responding to a Wave of Sexual
      Misconduct       Allegations"       *CNN,*      25       Jun.       2020,
26    https://www.cnn.com/2020/06/25/tech/gaming-metoo-twitch/index.html.

27    [189]   The Los Angeles Times, "Resignations and Reckoning: Game Industry's
      Existential Quest for a More Inclusive Space" (July 9, 2020) *available at:*
28    https://www.latimes.com/entertainment-arts/story/2020-07-09/game-industry-
      reckoning-sexual-harassment-ubisoft-chris-avellone.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | and strengthen our workplace culture."

2 | 262. Despite the sea-change in the industry, the Director Defendants
3 | disregarded the media coverage and ***took no good faith steps to reform the toxic***
4 | ***culture of harassment and discrimination at the Company***. This lack of good faith
5 | remedial action is even more brazen considering that both the EEOC and DFEH were
6 | actively investigating the Company at the time. Thus, despite widespread media
7 | coverage about cultural movements reaching the gaming industry and the fact that the
8 | Company was actively being investigated by two governmental bodies, the Board
9 | allowed harassment and discrimination to remain a part of Activision's operations until
10 | the DFEH was forced to file its lawsuit.

11 |
12 |

### 3. Activision's Competitor Riot Games Faced Immense Financial And Reputational Backlash From Its Own Toxic Culture

13 | 263. Another red flag highlighting the need for the Director Defendants to
14 | remediate Activision's toxic culture was the immense public pressure put on the
15 | Company's competitor Riot Games. Years before the DFEH filed its lawsuit, ***Riot***
16 | ***went through a similar ordeal as the Company now faces***. For example, Riot (i) was
17 | exposed for its "bro culture"; (ii) faced multiple lawsuits alleging gender
18 | discrimination and harassment; (iii) had multiple employees participate in a highly
19 | publicized walkout; (iv) was sued by the DFEH, who also intervened in a class action
20 | settlement of allegations against Riot; and (v) lost important sponsorships. The Board
21 | should have protected Activision from this fate, but did not, in breach of their fiduciary
22 | duty.

23 | 264. The parallels between Riot and Activision are striking. Specifically, in
24 | August 2018, the prominent gaming industry website *Kotaku* published an exposé of
25 | the "Culture of Sexism" at Riot Games[190] (the "*Kotaku* Exposé"). The article
26 | documented Riot's "bro culture" that was characterized by sexist, misogynistic and

27 |
28 |

---

[190] D'Anastasio, Cecilia "Inside the Culture of Sexism at Riot Games," *Kotaku*, 7 Aug. 2018, https://kotaku.com/inside-the-culture-of-sexism-at-riot-games-1828165483.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

unfair practices toward women, with one woman explaining "It's like working at a giant fraternity." According to the *Kotaku* Exposé, women employees at Riot were overlooked for promotions, suffered unwanted sexual advances, and were subjected to a toxic culture in which male employees openly discussed the physical attributes of female colleagues in the workplace. "[T]hree women described being groomed for promotions, and doing jobs above their title and pay grade, until men were suddenly brought in to replace them." One woman was informed "she was on a list getting passed around by senior leaders detailing who they'd sleep with."

265. In the wake of the *Kotaku* Exposé, many former and current Riot employees came forward to share their personal experiences of sexual harassment and discrimination at the company on social media. The incident also generated **widespread press coverage from numerous media outlets** throughout the country in 2018, including *ESPN*, *Variety*, *Business Insider*, and *The Los Angeles Times*. Within a month, **Riot released a statement apologizing to both current and former employees for the sexist and misogynistic workplace environment**, admitting "the steps we have taken thus far aren't enough," and seeking to persuade "people considering a career at Riot" that the company would take steps to address its toxic culture in the future.

266. In November 2018, Riot was named in multiple actions brought by individual employees and a putative class action alleging gender discrimination and harassment stemming from the "bro-culture" inside the company. After forcing two of these lawsuits into arbitration, Riot immediately faced intense backlash. **Riot employees participated in a highly publicized walkout in May 2019** demanding "that forced arbitration be ended for all past, current, and future Riot employees." *CBS News* reported that the walkout "was the first of its kind in the video game industry,"[191] and *Kotaku*'s coverage cited a walkout participant who "expressed hope that today's

---

[191] Min, Sarah. "Riot Games Employees Walk Out to Protest Forced Arbitration in Sexual Harassment Claims." *CBS News,* 7 May 2019, https://www.cbsnews.com/news/riot-games-walkout-league-of-legends-employees-protest-forced-arbitration-sexual-harassment-claims/.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   walkout will inspire game developers at other companies too."[192]  Game Workers Unite

2   International—a game industry labor group—released a public statement expressing

3   that its "several thousand members" supported the walkout and noting that "in the years

4   ahead…we will look back on the day Rioters (a fitting name given the daily courage

5   and determination you display) walked out as the first strong and confident step

6   towards ending our industry's culture of harassment and worker exploitation."[193]

7      267.   In December 2019, Riot reached a tentative settlement in the class action

8   case for $10 million; ***however, the DFEH along with the Division of Labor Standards***

9   ***Enforcement intervened in the litigation and objected to the settlement, arguing that***

10   ***the employees' claims were worth more than $400 million***, as well as injunctive relief.

11   Thereafter, Riot forced the class action lawsuit into private arbitration.  The DFEH's

12   investigation of Riot remains ongoing, and fallout for Riot continues, including

13   continuing litigation and lost sponsors.  The incident has featured prominently in recent

14   academic discussion about the existence of an "#E-Too Movement" in the gaming

15   community and industry.[194]

16      268.   Despite the high-profile exposé and the damage to Riot resulting

17   therefrom, directors failed to look inward and clean up Activision's internal problems.

18   Director Defendants, instead, ignored this warning and waited until the DFEH forced

19   the issue through its public lawsuit.

20   **I.    The Activision Board's Responses To The**
     **Red Flags Were Inadequate And Not In Good Faith**

21

22      269.   As explained above, for a period of at least four years, the Director

23   Defendants—who themselves characterized workplace culture as "***mission critical***" to

---

[192]   Grayson, Nathan, et al. "Over 150 Riot Employees Walk Out to Protest Forced Arbitration and Sexist Culture,"  *Kotaku,* 6 May 2019, https://kotaku.com/over-150-riot-employees-walk-out-to-protest-forced-arbi-1834566198.

[193]   "Statement of Solidarity with the Workers of Riot."  *Game Workers Unite,* 9 Apr. 2021, https://www.gameworkersunite.org/post/riot-walkout-statement-of-solidarity.

[194]   *See, e.g.*, Holden, John T. *et al.* "The #E-Too Movement: Fighting Back Against Sexual Harassment in Electronic Sports," 52 Ariz. St. L.J. 1 (2020).

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   the Company in multiple proxy statements—were routinely confronted with a battery

2   of red flags alerting them to Activision's hostile work environment and toxic culture.

3   Despite taking certain perfunctory, "save-face" internal steps in response to a few of

4   those red flags, the Board wholly ignored that the problems plaguing Activision were

5   not confined to a few employees and sufficiently dealt with on a one-off basis through

6   termination, ***but rather a systemic issue that was rampant throughout all three***

7   ***business units of Activision and covering multiple areas including sexual***

8   ***harassment, assault, discrimination, unlawful pay disparity, and retaliation.***

9        270.   Notwithstanding their knowledge that the Company's controls were

10  inadequate and work environment hostile, the Director Defendants knowingly failed to

11  stop further problems from occurring, thus breaching their fiduciary duties to

12  Activision.   Defendants' purported "responses" to the damning banner of red flags

13  screaming "illegal harassment and discrimination" were woefully inadequate and not

14  executed in good faith.   Such failures of oversight do not find protection under

15  Delaware law.

16       271.   Most notably, ***despite the fact that the DFEH and EEOC investigations***

17  ***found significant Company-wide violations of law on gender pay disparities and***

18  ***retaliation, the Board took no meaningful steps to cure that illegal misconduct***.

19  Moreover, the Board wholly ignored that Activision was plagued by ***a pattern of***

20  ***leadership-level sexual misconduct***.

21       272.   Where the Board did purport to respond to the red flags, these efforts, as

22  demonstrated by the Company's Books and Records production, as well as the repeated

23  and ongoing unlawful activities according to multiple sources, including the current

24  DFEH Action, demonstrate that the Board failed to take these measures in good faith,

25  as required.   For the following reasons, each of these purported responses were not

26  taken in good faith and have not remedied the misconduct:

27

28

1    **1.   Activision's Board Offered**
         **No Response To Unlawful Gender Pay Disparity**

2

3    273.   As alleged in the DFEH Action, Activision has long engaged in

4    discriminatory and illegal practices regarding pay, assignment, promotion and other

5    terms and conditions of employment which negatively affect and impact female

6    employees and contingent or temporary workers.  As of August 23, 2021, the filing of

7    the operative complaint in the DFEH Action, those sweeping and illegal pay practices

8    had not been remedied.[195]

9    274.   Notwithstanding that Activision's "frat" cultural paradigm was rife with

10   gross pay disparities between men and their female counterparts performing

11   substantially similar work, the Board has failed, entirely, to take any remedial actions

12   to remedy the illegal pay delta among genders.  Specifically, ███████████████

13   ████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████

15   275.   While the Company's 2020 report on Environmental, Social and

16   Governance practices ("ESG Report") made a self-serving representation that

17   Activision was aspirationally undertaking a "Companywide *analysis* of pay by gender

18   and nonbinary populations" to be published in its 2022 ESG report, ██████████

19   ████████████████████████████████████████████████████████████████

20   ███████████████████████████████████   Thus, the Board has breached, and

21   continues to breach, its fiduciary duties of oversight with respect to the illegal pay

22   practices at Activision, which it has utterly failed to remediate.

23

24   _____

[195]   ¶¶31–45.

25   [196]

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

1

### 2. Activision's Board Failed To Respond To Unlawful Retaliations

2

3    276.   The DFEH Action alleges that Activision has long engaged in an illegal

4    practice of retaliating for complaints of harassment and discrimination—including

5    subjecting female employees to involuntary transfers, selection for layoffs, and denial

6    of projects and other opportunities, and curtailing employee rights for participating in

7    the DFEH investigation.[197]  As of August 23, 2021, the filing of the operative complaint

8    in the DFEH Action, the practice of illegal retaliation at Activision had not been

9    remedied.[198]

10    277.   Despite █████████████████████████████████████████

11    ███████████████████████████████████████████████████████████

12    ████████████████████████████████     Thus, the Board has breached, and

13    continues to breach, its fiduciary duties of oversight with respect to the illegal

14    retaliation at Activision, which it has utterly failed to remediate.

15

### 3. Activision's Board Provided No Response To Systemic Leadership-Level Sexual Harassment

16

17    278.   Since at least as far back as 2017, ***the Board should have been aware of***

18    ***a pattern of leadership-level misconduct and did nothing to effect company-wide***

19    ***policies to correct that misconduct***.  As the Company's books and records produced

20    to Plaintiffs clearly show, ██████████████████████████████████

21    ███████████████████████████████████████████████████████████

22    ███████████████████████████████     The Board should have been

23    _____

24    [197]  ¶¶49–56.

25    [198]  *Id.*

    [199]

26    ████████████████████████████████████████████████████████

27    ████████████████████████████████████████████████████████

28    ████████████████████████████████████████████████████████

93

1   well-alerted to the fact that the issue of leadership-level misconduct was not
2   sufficiently dealt with and *was a systemic issue that was rampant throughout the*
3   *Company.*

4       279.   As reported by *The Wall Street Journal*, management, including Kotick,
5   was directly alerted to complaints of sexual harassment by former Sledgehammer
6   Games employee Eduard Roehrich in 2017.  His subsequent punishment was *two-*
7   *weeks paid leave, and remaining at Activision in a different position*.[200]   The
8   Company's reaction to Roehrich's misconduct is evidence that the Board has not
9   ensured comprehensive or consistent policies and consequences for offenders are in
10  place, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11      280.   Further, in July 2018, according to *The Wall Street Journal*, Kotick was
12  directly alerted to allegations by an employee that she had been twice raped by her
13  supervisor, Javier Panameno.[201]  Notably, the ▬▬▬▬▬▬▬▬▬
14  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
15  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
16  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
17  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
18  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
19  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
20  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
21  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
22  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23
24  [200]   Grind, Kirsten, et al.  "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant."  *The Wall Street Journal*,
25  16 Nov. 2021, https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexual-misconduct-allegations-11637075680.
26  [201]  *Id*.
27  [202]  ▬▬▬▬▬▬▬▬▬
    [203]  ▬▬▬▬▬▬▬▬▬
28  [204]  ▬▬▬▬▬▬▬▬▬

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ████████████████

2    281.   ████████████████████████████████████

3 ████████████████████    ████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████

6    282.   The Board should have been aware that Activision had effected a number

7 of other high-level employee terminations for sexual misconduct.  These terminations

8 included Ben Kilgore, the former Activision technology officer who faced multiple

9 allegations of sexually harassing female staffers over the course of several years, and

10 Tyler Rosen, the former business leader for Blizzard's esports group, in October 2018

11 for inappropriate conduct.[207]  Moreover, according to *The Wall Street Journal*, Dan

12 Bunting, co-head of Activision's Treyarch studio, was investigated for sexual

13 misconduct in 2020 and the Company elected not to terminate him but to impose "other

14 disciplinary measures."  The 2020 investigation followed an earlier, 2019 investigation

15 of Mr. Bunting for sexual harassment, in which Kotick intervened in order to keep him

16 employed.[208]  Thus, the Board failed to respond in good faith to effect company-wide

17 policies to correct the ongoing pattern of leadership-level misconduct.

18

19

20

---

21 [205] *Id.*

22 [206] ████████████████████

23 [207] "More Harassment Details Surface on Ben Kilgore, Blizzard Entertainment's Former CTO, and Derek Ingalls, Former CIO."  Wowhead, 14 Aug. 2021,

24 https://www.wowhead.com/news/more-harassment-details-surface-on-ben-kilgore-blizzard-entertainments-former-323703; Liao, Shannon. "At Blizzard, Groping, Free-

25 Flowing Booze and Fear of Retaliation Tainted 'Magical' Workplace." *The Washington Post*, 6 Aug. 2021, https://www.washingtonpost.com/video-

26 games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/.

27 [208] Grind, Kirsten, et al. "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." *The Wall Street Journal*,

28 16 Nov. 2021, https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexual-misconduct-allegations-11637075680.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



In fact, the Board failed to implement effective remedial measures in good faith the address these problems, as clearly demonstrated by the systemic and ongoing sexual harassment, discrimination, pay disparity and retaliation found by the DFEH's two-plus year investigation.

286.

287.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



288.

289.   First,

290.   Second,

291.   Third,

The Board should have known that offenders, including high-level and supervisory employees, were not being held

214 *Id.*

215

216

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accountable under any consistently executed policy.  This was plainly evident from the Company's varying—and oftentimes negligible—responses, detailed above, to sexual misconduct allegations lodged against numerous Activision high-ranking employees.

**6.    Activision's Board Failed To Respond To Reports Of Sexual Misconduct In Good Faith**

292. ███████████████████████████████████████

███ ████ ████████ ██████ ██████ ██████████ ██████ ████████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ████

293. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  The Board knew that: (i) sexual harassment offenders like Roehrich and Bunting were not being held accountable for their misconduct, and thus no meaningful policies or consequences for offenders were in place, ████████

217 ████████████████████████████████████████████████

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    ███████████████████████████; and (ii) the DFEH and EEOC were well into their

2    investigations (and robust discovery practice with the Company) into systemic

3    harassment, discrimination, pay disparity, and retaliation problems at Activision.

4    Nevertheless, the Board did not cause any Company-wide policies or actions ██

5    ████████████████████████████████████████████████████████████████████

6    ██████████████████████████████ The Board's failure to respond to endemic, company-

7    wide wrongdoing with commensurately broad, company-wide policies and actions was

8    thus not a good faith response.

9    **J.    The Board's Breaches Of Fiduciary**
     **Duty Are Ongoing And Require Extensive**
10   **Corporate Governance Reform To Rectify**

11       294.   Despite being put on notice of the nature of the Company's wrongdoing

12   by regulatory investigations, media reports, and actions taken against its competitors,

13   the Director Defendants' breach of their fiduciary duty continues to this day.   The

14   Director Defendants are doing everything in their power to avoid accountability.

15       295.   On October 19, 2021, Activision requested that the DFEH's lawsuit be

16   stayed while it gathers evidence regarding an allegation that DFEH attorneys violated

17   professional conduct rules.[218]  The Los Angeles Superior Court ***denied the Company's***

18   ***request within less than a week***.[219]

19       296.   Further, the Board has entrusted Frances Townsend, the very same person

20   who called the DFEH Action "truly meritless and irresponsible," ***to lead the charge in***

21   ***addressing the Company's widespread gender-based discrimination and***

22

23

---

24   [218]  Townsend, Frances. "Creating a More Accountable Workplace." *Activision*
     *Blizzard,* 19 Oct. 2021,
25   https://www.activisionblizzard.com/content/atvi/activisionblizzard/ab-
26   touchui/ab/web/en/newsroom/2021/10/creating-a-more-accountable-workplace.html.
     [219]  Batchelor, James. "Court Refuses Activision Request to Pause DFEH Suit Over
27   Alleged Ethics Violations." *GamesIndustry.biz,* 25 Oct. 2021,
     https://www.gamesindustry.biz/articles/2021-10-25-court-refuses-activision-request-
28   to-pause-california-lawsuit-over-alleged-ethics-violations.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*harassment*.[220]  Indeed, instead of fulfilling their responsibility to oversee this process as required by law, "Kotick and the Board basically gave [Townsend] a blank cheque."[221]  As one employee said, "The fact that she's still in charge of overseeing improvements in this area makes me have very little belief in whatever she wants to tell us."[222]

297.    Finally, despite the fact that public news reports make clear that Defendant Kotick has known for years about sexual misconduct at the Company, ***the Board continues to demonstrate its lack of independence from and its unwavering support of Kotick as the Company's CEO***.[223]

298.    Given these and other ongoing failures of oversight, expansive corporate governance reforms are necessary to fundamentally change how Activision operates, and to respond in good faith to the Company's systemic sexual harassment, discrimination, pay disparity, and retaliation problems.

## V.    MATERIAL PERSONAL BENEFITS

### A.    Insider Trading Allegations

299.    Not all of Activision's shareholders were harmed by the Director Defendants' mismanagement and wrongdoing alleged herein.  During the pendency of the DFEH investigation—which began at least as early as June 24, 2019, and lasting until the *WSJ Report* issued on November 16, 2021 (the "DFEH Investigation

---

[220]  Townsend, Frances. "Creating a More Accountable Workplace." *Activision Blizzard,* 19 Oct. 2021, https://www.activisionblizzard.com/content/atvi/activisionblizzard/ab-touchui/ab/web/en/newsroom/2021/10/creating-a-more-accountable-workplace.html.

[221]  McGee, Patrick, "Activision Blizzard Fired 20 Employees Over Harassment Claims." *Financial Times*, 19 Oct. 2021, https://www.ft.com/content/7cb805b9-4d14-40ee-a1f2-72bc3c3e1ea6.

[222]  Wilde, Tyler. "Activision Blizzard Employees Skeptical that Executive who Denied Sexism Problems Can Solve Them." *PC Gamer,* 25 Oct. 2021, https://www.pcgamer.com/activision-blizzard-employees-respond-townsend/.

[223]  "Activision Blizzard Board of Directors Issues Statement Regarding Recent Article." *Activision Blizzard,* 16 Nov. 2021, https://investor.activision.com/news-releases/news-release-details/activision-blizzard-board-directors-issues-statement-regarding.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Period")—while in possession of material, adverse, non-public information, Defendants Morgado and Wasserman unloaded their holdings of Activision stock at artificially inflated prices.

300.   Defendants Morgado and Wasserman took advantage of the artificially inflated prices to sell their Activision shares for substantial proceeds.  Specifically, these Defendants unlawfully sold $2,799,267 of personally held common stock during the DFEH Investigation Period, and before the existence of the DFEH and EEOC investigations was finally revealed to shareholders.

301.   The timing and nature of the foregoing sales were suspicious.  For example, on February 12, 2020—███████████████████████████ ████████████████████████████████████████████ ██████████████████████████—Defendant Morgado sold 32,000 shares of Activision stock at artificially inflated prices for proceeds of $1,991,561.60.  The sale amounted to *a stunning 42.58% of Morgado's holdings*.

302.   This was particularly suspect because ████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████  Two weeks later, he sold nearly half of his stock position.

303.   Then, on December 4, 2020, Defendant Wasserman sold at least 10,000 personally held shares of Activision stock—*i.e.*, approximately *46%* of his total equity stake in the Company—at artificially inflated prices for proceeds of $807,706.18. Prior to this sale, *Wasserman had only sold 2 shares for proceeds of $166.18 during*

---

224 ████████████████████████████████████ ██████████████████████████████████████████████

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*his entire tenure as a Board director at Activision*. 

226

304.    The foregoing sales were unlawful and damaged Activision because they were made with the benefit of nonpublic knowledge of the pendency of the investigations described herein as well as the un-remediated culture of endemic sexual harassment and discrimination.   These sales were likewise traded on non-public information that was ***material*** to the market.   Indeed, the revelatory events that unfolded beginning in July 20, 2021 indicate that the sweeping scale of Activision's culture problems—on which the Insider Trading Defendants misappropriated non-public information—were material.

305.    *First*, on July 20, 2021, the DFEH filed its action against Activision following a nearly two-year investigation into allegations of "discrimination against [Company] employees on the basis of sex-gender, including failing to hire, select, or employ persons because of their sex, as well as discriminating in compensation or in the terms, conditions, privileges of employment due to their sex."   The action also alleged Activision's failure "to take all reasonable steps to prevent unlawful discrimination, harassment, or retaliation."   Activision issued a response to the DFEH Action by sending a company-wide email—which Defendant Kotick would later admit was "tone deaf"—claiming the DFEH Action "presented a distorted and untrue picture of the company, including factually incorrect, old, and out of context stories— some from more than a decade ago."   Activision employees did not agree as more than

225
226 *Id.*

2,000 of them would sign a letter calling the response "abhorrent and insulting."  After it became clear that Activision's denial of the DFEH's allegations was false and the risk of employee unrest, loss of productivity and large-scale resignations and terminations had become apparent to the market, on July 27, 2021, the price of Activision's stock traded at unusually high volumes and fell $6.09, or over 6.75%, to close at $84.05 per share.

306.   *Second*, on August 2, 2021, Blizzard Entertainment President, J. Allen Brack—who the DFEH Action alleges directly received numerous complaints about harassment and discrimination and failed to take remedial measures—stepped down amid the colossal backlash from the DFEH Action and the Company's ensuing response.  On the same day, *The Motley Fool* reported that "[f]ighting a two-front war against both the state and its own employees apparently didn't appeal to Activision [ ], and so today, ***the company moved to end the crisis by replacing Brack***."  Activision shares dropped 4% on August 3, 20201 following Brack's exit.

307.   *Third*, on September 20, 2021, the Company announced that it was under investigation by the SEC relating to "employment matters".  The next two days, the price of Activision's stock fell $6.53, or more than 8%, to close at $73.03 per share after *The Wall Street Journal* reported that the SEC had opened an investigation into the toxic culture at Activision, including employee allegations of sexual harassment and gender discrimination.

308.   *Fourth*, on November 2, 2021, after the market closed, Activision announced that *Overwatch 2* and *Diablo IV* were delayed due to the termination of "***a number of individuals across the company" and "higher voluntary turnover" as a result of the unfolding scandal***, which was further revelation of the risk posed by the DFEH and EEOC investigations.   The next day, Activision's shares traded at unusually high volumes and fell $10.92, or more than 14%, to $66.75 per share.

309.   *Finally*, on November 16, 2021, *The Wall Street Journal* published the *WSJ Report* detailing how Defendant Kotick had not only known of the endemic

1  sexual harassment, retaliation, and discrimination problems at Activision for years,
2  but that Kotick was also one of the culprits guilty of such misconduct.  Within minutes
3  of the *WSJ Report*'s publication, Activision's stock price began dropping from the
4  day's high of $72.13 per share.  Then at about 2:30 p.m. *Bloomberg* reported that
5  Activision employees had planned a walkout protest to force the resignation of the
6  Company's CEO.  Defendant Kotick was an essential part of the Company and his
7  possible departure created uncertainty and fear among investors.  This one-two punch
8  of bad news caused Activision's stock price to decline $5.99 per share from its high
9  of $72.13 per share that day or 8.3% to close at $66.14 per share.

10  ### B.    The Board Is Being Unjustly Enriched

11      310.    Notwithstanding the Director Defendants' malfeasance described herein,
12  not one of them has been held accountable or removed from the Board.  Rather, they—
13  along with Defendant Kotick, who the Board has refused to terminate despite the
14  litany of damning allegations against him—have been permitted to continue onward
15  in their roles as [wayward] fiduciaries of the Company.  As a result, they have enjoyed
16  massive material personal benefits, constituting unjust enrichment to themselves and
17  waste to the Company they were always duty-bound to manage in good faith.

18      311.    According to Activision's most recent proxy statement, the Director
19  Defendants are compensated through a mix of cash and equity awards, ***with most of***
20  ***that compensation in the form of equity***:

21      Our non-employee directors receive a mix of cash and equity awards, ***with***
22      ***most of the compensation in the form of equity***.  The amount of
        compensation varies with each director's role and responsibilities.
23      Mr. Kotick, our Chief Executive Officer and the only employee director,
24      does not receive any additional compensation for his service on our Board.

25      The Compensation Committee annually reviews the total compensation
        paid to our non-employee directors and each element of our director
26      compensation program and makes recommendations to our Board
        regarding the program as needed. In doing so, our Compensation
27      Committee considers various factors, including our directors'
28

105

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

responsibilities, their experience and skills, and whether the form and amount of our director compensation is competitive as compared to the peer group against which the Compensation Committee benchmarks our executive compensation. (Please see "Executive Compensation—Compensation Discussion and Analysis—How We Make Decisions About Executive Compensation—How We Use Peer Company Data and Compensation Surveys" below for information about our peer group.) The Compensation Committee engages an independent compensation consultant—Exequity—to assist in this review. Our executive officers may assist the Compensation Committee in obtaining benchmarking and other information relevant to determining director compensation, but management has no role in recommending or determining the amount or form of director compensation.

Although the structure of the director compensation program and the amounts payable thereunder are reviewed annually, the annual cash retainer and the value of the equity granted to our non-employee directors have remained unchanged for over eight years.[227]

312.   The stunning degree to which the Director Defendants have been and will be unjustly enriched by virtue of their own malfeasance is well-illustrated by the chart below. Because the Director Defendants remain in control of—and, in the case of Defendant Kotick, directly employed by—the Company notwithstanding their intentional and reckless mismanagement, the Director Defendants stand to receive a total of *$574.9 million* should the Proposed Acquisition successfully close.

313.   In other words, the Director Defendants have been permitted to continue in their roles as the decision-makers and managers of the Company and have continued to be compensated for those roles—despite mismanaging the Company to such a severe degree that they elected to sell the Company to Microsoft in an all-cash transaction.

---

[227] "Schedule 14A," 29 Apr. 2022, https://www.sec.gov/Archives/edgar/data/718877/000130817922000310/latvi2022_def14a.htm.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

314.   On April 28, 2022, Activision's shareholders approved the sale of the Company to Microsoft for $95 per share.  As a result, because they have not been rightfully removed from the Board or discharged with cause for the malfeasance described herein—and stripped of their massive and ill-gotten equity awards—the Director Defendants will be able to enjoy a substantial payout in connection with the Company's Proposed Acquisition by Microsoft.

315.   By virtue of their equity stakes *derived in full or substantial part from annual equity awards*, the Director Defendants stand to receive the following unjust payouts in connection with Microsoft's acquisition:

| **DEFENDANT** | **SHARES OWNED** | **PAYOUT** |
| --- | --- | --- |
| Bowers | 15,955 | **$1,515,725** |
| Corti | 121,687 | **$11,560,265** |
| Hartong | 39,064 | **$3,711,080** |
| Kelly | 1,156,091 | **$109,828,645** |
| Meyer | 51,723 | **$4,913,685** |
| Morgado | 120,090 | **$11,408,550** |
| Nolan | 221,449 | **$21,037,655** |
| Ostroff | 5,438 | **$516,610** |
| Wasserman | 23,730 | **$2,254,350** |
| Kotick | 4,296,550 | **$408,172,250** |

316.   In addition, if Kotick is fired "without cause" or otherwise leaves his Activision employment "with good reason" following the Proposed Acquisition, Kotick stands to receive a $15 million "golden parachute" from Microsoft.  Thus, Kotick's potential compensation in connection with the deal, between the 4.3 million shares he already owns and the 2.2 million he is still entitled to acquire, *totals up to more than $500 million*.  Defendant Kotick will enjoy these ill-gotten benefits

1  *because he has not been terminated "with cause" for the malfeasance described*
2  *herein*.

3  317.  The foregoing benefits—coupled with the Director Defendants' acts of
4  lining their own pockets with excessive compensation while failing to properly
5  oversee the Company in good faith—wasted, and continue to waste, valuable
6  Company resources while grossly enriching the Director Defendants.

7  **VI.  IMPROPER PROXY STATEMENTS**

8  318.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act,
9  provides that no proxy solicitation shall contain "any statement which, at the time and
10 in the light of the circumstances under which it is made, is false or misleading with
11 respect to any material fact, or which omits to state any material fact necessary in
12 order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

13 319.  The 2020 and 2021 proxy solicitation process, in which all Director
14 Defendants participated, ***was an essential link in the re-election of the Director***
15 ***Defendants and in seeking the shareholders' advisory approval on executive***
16 ***compensation***.  For example, with respect to the first agenda matter (*i.e.* the Director
17 Defendants' solicitation for their own re-election), the 2020 Proxy Statement listed
18 Director Defendants Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan,
19 Ostroff, and Wasserman and their respective qualifications as Board nominees with
20 purported "strong professional characteristics, judgement, and leadership…"

21 320.  According to the Audit Committee charter, the members of the Audit
22 Committee prepare part of the Company's annual proxy statement.  Thus, Director
23 Defendants Corti, Hartong, and Nolan also participated directly in the drafting of the
24 2020 and 2021 proxy solicitations in connection their duties as members of the Audit
25 Committee.

26 321.  The Director Defendants issued, caused to be issued, and participated in
27 the issuance of materially misleading written statements to shareholders which were
28 contained in the 2020 and 2021 proxy solicitations.  In the proxy solicitations, ***the***

***Director Defendants solicited shareholder votes to reelect themselves to Activision's board of directors and cast an advisory vote on executive compensation while concealing*** that government investigations and systemic sexual harassment, discrimination, unlawful pay disparities, and retaliation issues were plaguing the Company.

322.   These omissions from the 2020 and 2021 proxy solicitations were particularly glaring and unlawful in light of the explicit admission by the Director Defendants in the proxy solicitations that "fostering an inclusive culture where employees feel valued and heard, and a sense of belonging is ***mission critical***"—in soliciting shareholder votes to support the Director Defendants' re-election.

323.   The 2020 and 2021 proxy solicitations misrepresented and failed to disclose the following true facts about Activision:

      i.    Activision lacked adequate Board-level policies, procedures and controls concerning employee sexual harassment, discrimination, unlawful pay disparities, and retaliation claims and to ensure a safe and lawful work environment for all Company employees.

      ii.    Activision fostered and engendered a culture that permitted rampant employee sexual harassment, discrimination, unlawful pay disparities, and retaliation.

      iii.    Activision actively participated in the culture of employee sexual harassment, discrimination, unlawful pay disparities, by retaliating against and/or ignoring employee complaints of harassment and discrimination, and by failing to adequately investigate claims and take action against known violator of employee rights.

      iv.    Activision failed to ensure that its managers, employees, and officers and directors complied with anti-harassment and anti-

discrimination laws, pay disparities, and anti-retaliation regulations.

v.   Activision was under investigation by California and Federal government agencies for more than two years for sexual harassment, discrimination, unlawful pay disparities, and retaliation claims.

vi.   As a result of the foregoing, Activision's public 2020 and 2021 statements were materially false and misleading at all relevant times.

324.   While shareholders remained in the dark about the ongoing pendency of the government investigations, and the endemic employee sexual harassment, discrimination, unlawful pay disparities, and retaliation claims crippling the Company, each of the Director Defendants solicited their own re-elections through false and misleading proxy statements.

325.   On April 24, 2020, the Board caused Activision to issue its definitive 2020 proxy statement in advance of the annual shareholder meeting scheduled for June 11, 2020 (the "2020 Proxy Statement"), signed by Defendant Kotick.  As made clear in the opening "Purpose of [the] Proxy Statement," the 2020 Proxy Statement was "furnished in connection with the solicitation by [the] Board of Directors. . .of proxies from holders of issued and outstanding shares of the Company's common stock."  Thus, the Director Defendants, and each of them, directly participated in the solicitation of shareholder votes on matters set forth in the 2020 Proxy Statement.

326.   The 2020 Proxy Statement called on shareholders to vote on the following agenda matters, among others: (i) election of directors, and (ii) advisory vote to approve executive compensation.

327.   Under a section titled "Advisory Vote to Approve the Company's Executive Compensation," the 2020 Proxy Statement called on shareholders to cast an advisory vote (or a "say-on-pay") on the compensation of Activision's executive

officers, including Kotick.  In 2020, Kotick was one of the highest-paid CEOs of any publicly traded company in the U.S., with a total compensation package worth nearly $155 million.

328.   The 2020 Proxy Statement also characterized "[d]iversity and inclusion" as "a strategic priority for Activision Blizzard," citing the Company's purported efforts on that front, including the following so-called "strategic areas":

- ***Our People***—We believe that in order to create products that attract a growing global audience, it is important that our employees reflect that diversity, and that they have the opportunities and resources to unlock their potential. While we define diversity in its broadest sense to include characteristics both seen and unseen, we know representation at all levels of the organization matters.

- ***Our Culture***—Across our entire organization, ***fostering an inclusive culture*** where employees feel valued and heard, and a sense of belonging ***is <u>mission critical</u>***.

329.   The 2020 Proxy Statement was entirely devoid, however, of any disclosure of the pendency of the government investigations or the systemic employee sexual harassment, discrimination, unlawful pay disparities, and retaliation claims problems already plaguing Activision which prompted those investigations.

330.   The misrepresentations and omissions were also material to Activision shareholders in voting on the matters set forth for shareholder determination, including: (i) the re-election of directors with purported "strong professional characteristics, judgement, and leadership…"; and (ii) shareholders' advisory approval of executive compensation.  Thus, Activision's shareholders were misled into electing certain Director Defendants and approving executive compensation because ***material adverse information was omitted from the 2020 Proxy Statement concerning government investigations into ongoing sexual harassment, discrimination, pay disparities, and retaliation at the Company***.

331.   On April 30, 2021, in advance of the Company's annual shareholder meeting scheduled for June 14, 2021, the Director Defendants caused the Company to issue its definitive 2021 proxy statement (the "2021 Proxy Statement").  The 2021 Proxy Statement was signed by Defendants Kotick and Kelly.

332.   As with the 2020 Proxy Statement, the 2021 Proxy Statement was "furnished in connection with the solicitation by [the] Board of Directors. . .of proxies from holders of issued and outstanding shares of the Company's common stock." Thus, while shareholders were in the dark about the ongoing pendency of the government investigations, and the endemic harassment and discrimination crippling the Company, *each of the Director Defendants directly participated in the solicitation of shareholder votes on matters set forth in the 2021 Proxy Statement*.

333.   Director Defendants Corti, Hartong, and Nolan also participated directly in the drafting of the 2021 Proxy Statement in connection their duties as members of the Audit Committee.

334.   The Director Defendants submitted the following matters for shareholder vote in the 2021 Proxy Statement, among others: (i) election of directors, and (ii) advisory vote to approve executive compensation.

335.   Once again, in listing the Company's director nominees—including Defendant Directors Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan, and Wasserman, who were soliciting their own re-election—the 2021 Proxy Statement touted the nominees' "*distinguished records of leadership and success*" and their "*strong professional characteristics, judgment, and leadership abilities necessary to keep our Company performing competitively in the market*."

336.   The 2021 Proxy Statement also stated that the Company "follow[s] best practices in corporate governance—not just among our peer group, but in the market generally.   Highlights of our corporate governance program include: . . . Our Nominating and Corporate Governance Committee oversees risks associated with overall governance and Board succession planning, as well as ESG."

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

337.   The 2021 Proxy Statement also included a letter from the Compensation Committee stating, in relevant part:

> In direct response to the feedback we heard in conversations with our shareholders, we extended Mr. Kotick's 2016 employment agreement on April 28, 2021, amending it in several key aspects, and made several changes to our broader executive compensation program and disclosures.
>
> Highlights of the changes to Mr. Kotick's agreement, and other arrangements with the Company, are detailed further on pages 59–60, include:
>
>                    \*        \*        \*
>
> •    Increased the weighting of financial metrics in the annual cash bonus program (*i.e.*, the CAIP) for the CEO and the broader executive compensation team from 60% to 80%, and for the remaining 20% of strategic objectives, ***these will be based on measurable ESG initiatives (i.e., human capital management, corporate social responsibility, and sustainability goals, which may include diversity, equity and inclusion metrics centered around the hiring/promotion of members of underrepresented communities, hiring of veterans and sustainability)***.
>
>                    \*        \*        \*
>
> In response to shareholder feedback received the Committee has committed to two changes in the operation of the CAIP:
>
> •    Disclose ESG objectives, which may include diversity, equity, inclusion, recruiting veterans, and sustainability, will be incorporated into the strategic objective component for 2021.

338.   As with the 2020 Proxy Statement, the 2021 Proxy Statement iteratively touted "***fostering an inclusive culture*** where employees feel valued and heard, and a sense of belonging" as "**mission critical**."

339.   The 2021 Proxy Statement was devoid, entirely, of any disclosure of the pendency of the state and federal investigations or the systemic harassment and discrimination issues already plaguing the Company.

340.   On June 15, 2021, and unbeknownst to Activision's shareholders, ███
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ ██ *Just six days later*, the say-on-pay resolution solicited by the 2021 Proxy Statement was approved by a narrow 55% margin, ███████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████

341.   The misrepresentations and omissions were also material to Activision shareholders in voting on the matters set forth for shareholder determination, including: (i) the re-election of directors with purported "strong professional characteristics, judgement, and leadership…"; and (ii) shareholders' advisory approval of executive compensation.  Thus, Activision's shareholders were misled into electing certain Director Defendants and approving executive compensation because ***material adverse information was omitted from the 2021 Proxy Statement concerning government investigations into ongoing sexual harassment, discrimination, pay disparities, and retaliation at the Company***.

342.   The 2020 and 2021 Proxy Statements were materially false and misleading because they purported to portray the Company as improving upon its toxic work culture through various reforms, including linking Defendant Kotick's pay to certain performance metrics, without disclosing to shareholders government investigations regarding ongoing problems, including that: (i) physical, verbal, and non-verbal sexual harassment were all pervasive and tolerated at Activision and ongoing; (ii) women who brought sexual harassment complaints were frequently ignored or retaliated against and men who were known harassers were allowed to

---

228 ██████████████████████████

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

continue to harass women; and (iii) significant unlaw pay disparities existed for female employees throughout the Company.   According to the DFEH, this wrongdoing was still ongoing as of the time it filed its First Amended Complaint against Activision on August 23, 2021.

343.   Both the 2020 and the 2021 Proxy Statements stressed the importance of and referred the Company's shareholders to the Company's Code of Conduct with statements substantively identical as follows:

**CODE OF CONDUCT**

> We have a code of ethics—our Code of Conduct—which applies to all our directors and employees worldwide, including our chair, chief executive officer, president, chief operating officer, chief administrative officer, chief financial officer, and chief accounting officer.  We also have a chief compliance officer, who administers our ethics and compliance program.  You can access our Code of Conduct on our website   at   http://investor.activision.com/corporategovernance.cfm. Furthermore, we will post any amendments to, or waivers of, the Code of Conduct that apply to our chief executive officer, chief financial officer, chief accounting officer, or any person performing similar functions, and any other related information, on that website.

344.   Activision's Code of Conduct states that the Company "does not tolerate [sexual harassment] in any form":

**HARASSMENT: DON'T DO IT**

> What it all comes down to is one simple, yet so important word: Respect. We all want to go to work feeling safe and comfortable when we step through the doors and interact with each other.  It's an absolute necessity in order to work well together and achieve our goals.  Each of us is expected to do our part to create a respectful workplace culture—one that is free of unlawful bias, harassment, intimidation, and discrimination of any kind.
>
> ***We do not tolerate these actions in any form***—physical, verbal or non-verbal—including:
>
> •     Remarks, gestures or behavior relating to a legally protected characteristic that offends someone

- Offensive comments, jokes or pictures related to personal characteristics

- ***Sexual harassment***, like unwanted advances, inappropriate sexual jokes, sexually suggestive comments, inappropriate touching, requests for sexual favors and inappropriate comments about another's appearance.

345.   The foregoing statements were materially false and misleading because physical, verbal, and non-verbal sexual harassment were all pervasive and tolerated at the Company during the relevant period.  Women who brought sexual harassment complaints were frequently ignored or retaliated against and men who were known harassers were allowed to continue to harass women.  According to the DFEH, this wrongdoing was still ongoing as of the time it filed its First Amended Complaint against Activision on August 23, 2021.

346.   The Code of Conduct further stated: "Of course, we don't tolerate retaliation against employees for asking questions or attempting to invoke their rights under applicable laws":

### *Workplace laws: we follow them*

We comply with all applicable wage and labor laws. This can be a complex area, so always feel free to reach out to someone on the ASK list if you have any questions. Of course, we don't tolerate retaliation against employees for asking questions or attempting to invoke their rights under applicable laws.

347.   Later the Code of Conduct states:

### RETALIATION: WE DON'T TOLERATE IT

Our company does not tolerate retaliation against you or your coworkers for asking questions, making a good faith report or taking part in investigations.  If you come across, or hear about, anyone who retaliates against another employee (*e.g.*, by discouraging, harassing or threatening), please contact your manager or someone else on the ASK list.  If you feel you have faced retaliation for reporting a concern, you

116

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

should contact your manager, or anyone on the ASK list.  Anyone who does retaliate, or threatens to retaliate, can face consequences up to and including the termination of their employment, as well as civil and criminal penalties.  If you're a manager who has received a report, please escalate it right away to one of the resources on the ASK list. Please see the Reporting and Non-Retaliation Policy.

348.   The foregoing statements were materially false and misleading because during the relevant period retaliation against female employees of the Company who made sexual harassment and discrimination claims was rampant and tolerated by the Company.  According to the DFEH, this wrongdoing was still ongoing as of the time it filed its First Amended Complaint against Activision on August 23, 2021.

349.   The Code of Conduct further stated that "the rules described in this Code apply to all employees" regardless of whether that person is "a studio head or an art intern on your first day":

**We all play by the same rules**

*It doesn't matter if you are a studio head or an art intern on your first day—the rules described in this Code* apply to all employees.  We all work together, and we're all expected to follow our Code—doing the right thing and even admitting when we're wrong.

350.   The foregoing statements were materially false and misleading because during the relevant period the employees frequently did not face any consequences for their harassment due to their seniority, importance and position.  According to the DFEH, this wrongdoing was still ongoing as of the time it filed its First Amended Complaint against Activision on August 23, 2021.

351.   The Code of Conduct further stated that: "Our company doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law":

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DIVERSITY AND NON-DISCRIMINATION:

## RESPECT DIFFERENCES

Diversity is one of our greatest strengths as a company.  With all of our unique talents and our great mix of people, we spark innovation, create stronger teams and stay ahead of our competition.  And it's up to each and every one of us to help our company build and maintain an inclusive work environment that fosters respect and reflects the diversity of the communities where we operate.  ***Our company doesn't tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law***.

352.   The foregoing statements were materially false and misleading because during the relevant period the Company discriminated against female employees based on their sex, including by giving them lower pay and fewer opportunities for promotion.

353.   The Code of Conduct further warned about abusing drugs and alcohol:

**Drugs and alcohol: stay sharp**

We trust each other to keep our heads straight and minds clear at work. That's why it's never okay to possess, use or be under the influence of illegal drugs while on the job.  Abusing drugs or alcohol at work, or before work, can lead to safety issues, damage your business relationships, or hurt your productivity and innovation.  Simply put, it all comes down to using good judgment and common sense.

354.   The foregoing statements were materially false and misleading because during the relevant period excessive drinking at work, including the "cube crawls" was encouraged by high-level employees of the Company.

355.   Accordingly, the Director Defendants violated § 14(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Activision misled and deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Activision's recommendation to reelect certain Director Defendants to Activision's board of directors and cast an advisory vote approving

1  executive compensation.

2  ## VII.   **HARM TO ACTIVISION**

3      356.   Public revelation of the hostile work environment, toxic culture, and

4  unlawful harassment and discrimination practices that Activision developed and

5  maintained on the Director Defendants' watch has caused catastrophic harm to the

6  Company.  The fallout has been swift and devastating.

7      357.   Activision faces significant liability in connection with the DFEH's suit

8  against the Company and related civil rights and employment law litigation.  Plaintiffs

9  anticipate that the Company's total liability will extend into the hundreds of millions

10  of dollars.  As one point of reference, the DFEH has asserted in analogous litigation

11  for sex discrimination, harassment, and related claims against video game developer

12  Riot Games, and that Riot is liable for *more than $400 million*.[229]  The Company's

13  deficiencies appear to be even more extensive than those at Riot, suggesting the DFEH

14  will ultimately pursue damages approaching or exceeding half of a billion dollars

15  against Activision.

16      358.   Activision also faces liability and expense in additional civil and

17  regulatory actions.  On September 27, 2021, Activision entered into a consent decree

18  with the EEOC to "settle claims and to further strengthen policies and programs to

19  prevent harassment and discrimination in the company's workplace."[230]    The

20  agreement required the Company to create an $18 million fund to compensate eligible

21  claimants.  Commenting on the agreement, Kotick stated in part, "There is no place

22  anywhere at our company for discrimination, harassment, or unequal treatment of any

23  kind, and I am grateful to the employees who bravely shared their experiences.  I am

24

25

---

26  [229] *McCracken v. Riot Games, Inc.*, DFEH's Objection to Plaintiffs' Motion for

27  Preliminary Approval of Settlement, p. 9 (Cal. Sup. Ct., Los Angeles Cnty.), No. 18STCV03957.

28  [230]  EEOC Action, ECF No. 11-1.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   sorry that anyone had to experience inappropriate conduct[.]"[231]   The consent decree

2   also requires the Company to engage a neutral, third-party equal employment

3   opportunity consultant to provide ongoing oversight of the Company's compliance

4   with the agreement, and further requires the Company to hire an internal EEOC

5   coordinator to assist in implementing the decree's requirements.

6       359.   The DFEH tried to stall the $18 million settlement the EEOC offered

7   Activision during the fall of 2021 by attempting to intervene, arguing the settlement

8   was inadequate.   But this effort was denied by the Hon. Dale Fischer of the U.S.

9   District Court for the Central District of California and the DFEH has since appealed

10   to the Ninth Circuit.   Then, on March 30, 2022, the EEOC announced that its

11   settlement with Activision for its discrimination action for "$18 million in monetary

12   relief and significant injunctive relief" was approved by Judge Fischer.   This

13   settlement approval ruling includes not only Activision but also Blizzard

14   Entertainment, Inc., Activision Publishing, Inc. and King.com, Inc. and the entities'

15   subsidiaries.[232]

16       360.   On May 23, 2022, former Activision employee Jessica Gonzalez

17   appealed the $18 million sexual harassment and discrimination settlement between

18   the EEOC and Activision.   Gonzalez filed an appeal on the grounds of workers

19   potentially losing their rights under state law and the Judge Fischer's decision to

20   ignore objections made by impacted employees.[233]   The EEOC's $18 million

21   _____

22   [231] "Activision Blizzard Commits to Expanded Workplace Initiatives, Reaches
     Agreement with the EEOC." *Activision Blizzard,* 27 Sept. 2021,

23   https://activisionblizzard.com/content/atvi/activisionblizzard/ab-
     touchui/ab/web/en/newsroom/2021/09/activision-blizzard-commits-to-expanded-

24   workplace-initiatives-reaches-agreement-with-eeoc.html.

25   [232] "Court Approved EEOC's $18 Million Settlement with Activision Blizzard." *U.S.
     E.E.O.C.,* 30 Mar. 2022, https://www.eeoc.gov/newsroom/court-approves-eeocs-18-

26   million-settlement-activision-blizzard.

27   [233] "Former Activision Employee Appeals Activision Blizzard EEOC Settlement."
     *Communications Workers of America,* 23 May 2022, https://cwa-

28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  settlement is currently being challenged on multiple fronts, with employees and the

2  DFEH contending the settlement is "woefully inadequate" as it would mean that no

3  more than 60 workers could receive the maximum settlement allowed—leaving

4  thousands of Company workers ineligible to receive compensation.

5  361.  There is a precedent for workers winning a better settlement in these

6  types of situations.  In conjunction with the Riot litigation pending in *McCracken*,

7  which alleged, as here, widespread sexual harassment and discrimination at gaming

8  developer, Riot, the Company was ordered to pay $10 million to eligible employees.

9  DFEH later blocked that settlement, and the amount was eventually increased to $100

10  million.

11  362.  Activision further faces significant liability in connection with federal

12  securities fraud litigation arising from its past false statements concerning the

13  Company's culture and compliance.  On July 27, 2021, one day after employees of

14  the Company staged a virtual and in-person walk out in response to Townsend's claim

15  that the DFEH's lawsuit was meritless, the Company's stock plummeted from $90.14

16  per share to $84.05 per share, wiping away nearly $5 billion in the Company's market

17  capitalization.  Since then, the stock has continued to drop, and the Company now

18  faces a federal securities fraud suit pending in this Court.[234]

19  363.  Moreover, Activision is now subject to a high-profile SEC investigation

20  with the potential to result in substantial liability.  On September 20, 2021, *The Wall*

21  *Street Journal* reported that the SEC has launched a "wide-ranging" investigation into

22  the Company's treatment of its employees.  Like the DFEH, the SEC has traced

23  responsibility for the Company's illegality to the highest levels of Company

24  leadership.  The SEC is reported to have subpoenaed among other documents,

25  _____

26  union.org/news/releases/former-activision-employee-appeals-activision-blizzard-eeoc-settlement.

27  [234] *See Cheng v. Activision Blizzard, Inc., et al.*, No. 2:21-cv-06240-PA-JEM (C.D.

28  Cal.).

including "separation agreements the company has reached this year with staffers," suggesting the Company continues to shield favored high-level employees from responsibility for their abusive and harassing behavior.[235]   The SEC also sent a subpoena to Kotick, asking for his communications with senior executives regarding complaints of sexual harassment or discrimination by Company employees or contractors, among other items.[236]

364.   On September 23, 2021, *Bloomberg Law* reported that the SEC's investigation is "certain to multiply the legal challenges" for the Company, in particular its senior executives, over how they handled the allegations.[237]   Ann Olivarius, a senior partner at the law firm McAllister Olivarius, is quoted in the article as stating, "The SEC getting involved is extraordinary.  This is a very serious thing for [the Company].  It's a hugely expensive situation for the company."[238]  In response to reporting in *The Wall Street Journal* that Kotick failed to report allegations of harassment and assault to the Board, Olivarius added, "If the allegations are true, I think this will give the SEC much more ammunition to go after Activision, and the board, if it keeps him in place."[239]

---

[235]   Grind, Kirsten, et al. "SEC Is Investigating Activision Blizzard Over Workplace Practices, Disclosures."   *The Wall Street Journal*, 20 Sept. 2021, https://www.wsj.com/articles/sec-is-investigating-activision-blizzard-over-workplace-practices-disclosures-11632165080.

[236]   Grind, Kirsten, et al. "Activision Blizzard Agrees to Pay $18 Million to Settle EEOC Probe."   *The Wall Street Journal,* 27 Sept. 2021, https://www.wsj.com/articles/activision-blizzard-agrees-to-pay-18-million-to-settle-eeoc-probe-11632784605

[237]   Allsup, Maeve. "Activision Harassment Probe From SEC Ups Risk to Top Executives."  *Bloomberg Law,* 23 Sept. 2021,  https://www.wsj.com/articles/sec-is-investigating-activision-blizzard-over-workplace-practices-disclosures-11632165080.

[238]   *Id.*

[239]   Allsup, Maeve. "Embattled Activision CEO Kotick Inflames Company's Legal Crisis."   *Bloomberg Law,* 18 Nov. 2021,  https://news.bloomberglaw.com/social-

365.   Then, on February 17, 2022, *The Wall Street Journal* reported that the SEC expanded its investigation by issuing an additional subpoena for documents on January 18, 2022.  This more recent subpoena, which *The Wall Street Journal* viewed, asked for records and communications from a much longer list of current and former executives than the SEC previously sought, and dating back farther, to 2016.[240]

366.   In addition to the financial harm described above, the reputational harm that Activision has suffered as a result of this highly public scandal is enormous.  The Company's ability to recruit talented employees has been damaged and may continue to be damaged, as potential employees, especially women, will be averse to enter a workplace pervaded by sexual harassment, discrimination, and retaliation.  Indeed, as Ms. Gonzales, one of the organizers of the employee walkout and who is currently appealing the EEOC's $18 million settlement, wrote in a statement to the company upon announcing her departure on November 30, 2021:

> "To [Bobby Kotick]: Your inaction and refusal to take accountability is driving out great talent and the products will suffer until you are removed from your position as CEO.  This may seem harsh, but you had years to fix the culture and look at where the company currently stands."[241]

367.   Current and potential employees are now aware that Activision's long-standing reputation as a "magical place to create video games," ***critical to its ability to attract and retain talent, is a lie that has been leveraged in effort to make the intolerable tolerable to its employees***.

justice/embattled-activision-ceo-kotick-inflames-companys-legal-crisis.

[240]   Grind, Kirsten. "Regulators Widen Activision Blizzard Probes Over Workplace Issues." *The Wall Street Journal*, 17 Feb. 2022, https://www.wsj.com/articles/regulators-widen-activision-blizzard-probes-over-workplace-issues-11645136343.

[241]   Francis, Bryant. "More Blizzard Employees are Leaving the Company Due to Ongoing Crisis." *Game Developer,* 30 Nov. 2021, https://www.gamedeveloper.com/culture/more-blizzard-employees-are-leaving-the-company-due-to-ongoing-crisis.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

368.    Advertisers recognize that sponsoring Company events or products is bad for their own brands, severing their ties with the Company.  The Company's President and Chief Operating Officer Daniel Alegre acknowledged that the "adverse publicity" and "significantly reduced productivity" arising from the DFEH's allegations would adversely impact business.  In the months since the information became public, several Company sponsors, including the U.S. Army, State Farm, T-Mobile, and Coca-Cola, have withdrawn from sponsoring esports leagues operated by the Company.[242]  The loss of sponsors as a direct result of the Director Defendants' misconduct has caused significant financial damages to the Company.

369.    Consumers are retreating from the Company.  Soon after the DFEH investigation went public, "dedicated fans" of the Company's products were reported to be considering a boycott.[243]  The third-party developers of a remake of *Diablo II*, an entry in one of the Company's most popular and best-known franchises, exhorted consumers to "do what they feel is right" when considering whether to buy the new game.  The developers suggested that refusing to buy their own game would be a way for consumers "to support [their] colleagues and co-workers" at the Company.[244]

## VIII.    **DEFENDANTS' DUTIES**

370.    By reason of their positions as directors and fiduciaries of Activision, and because of their ability to control the business and corporate affairs of the Company,

---

[242] "Activision Blizzard-Sponsors and Partnerships are Jumping Off." *Fragster*, 6 Aug. 2021, https://www.fragster.com/activision-blizzard-sponsors-and-partnerships-are-jumping-off/; Young, Rory. "US Army Sponsorship of *Call of Duty* League Ends Following Controversy." *GameRant*, 14 Aug. 2021, https://gamerant.com/call-of-duty-league-us-army-sponsorship-ends/.

[243] Farokhmanesh, Megan. "Activision Blizzard Employees Weigh in on Whether or Not to Boycott." *Axios*, 9 Aug. 2021, https://www.axios.com/activision-blizzard-boycott-fans-a2d85fa6-9826-4675-928f-a49eef5e5dfd.html.

[244] Totilo, Stephen. "'*Diablo*' Developers Speak on Game and Company Issues." *Axios*, 17 Sept. 2021, https://www.axios.com/diablo-developers-speak-game-company-issues-63a19e47-1c42-4c9c-8f71-dae67f50b540.html.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   the Director Defendants owed and owe, the Company and its shareholders the
2   fiduciary duties of care and loyalty, including the subsidiary duties of good faith,
3   oversight, and disclosure, and were, and are, required to use their utmost ability to
4   control and manage Activision in a fair, just, honest, and equitable manner.  The
5   Director Defendants were, and are, required to act in furtherance of the best interests
6   of the Company and its shareholders so as to benefit all shareholders equally, and not
7   in furtherance of their personal interest or benefit.

8       371.   Each director of the Company owed, and owes, to Activision and its
9   shareholders the fiduciary duties of due care, loyalty and good faith in the
10  administration of the affairs of the Company and in the use and preservation of its
11  property and assets.  The duty of care requires informed, deliberative decision-making
12  based on all material information reasonably available.  The duty of loyalty requires
13  acting (including deciding not to act) on a disinterested and independent basis, in good
14  faith, with an honest belief that the action is in the best interests of the Company and
15  its shareholders.

16      372.   Each director of the Company is required to act in furtherance of the best
17  interests of Activision and its shareholders to benefit all of the Company's
18  shareholders equally, and not in furtherance of their personal interest or benefit.

19      373.   The Director Defendants, because of their positions of control and
20  authority as directors and/or officers of Activision, were able to, and did, directly and
21  indirectly, exercise control over the wrongful acts complained of herein.  Because of
22  their advisory, executive, managerial, and/or directorial positions with the Company,
23  each of the Director Defendants had knowledge of material, non-public information
24  regarding the Company.  As directors of a publicly held company whose stock was
25  registered with the SEC under the Exchange Act and publicly traded, the Director
26  Defendants had a duty to promptly disseminate accurate and truthful information
27  regarding the Company's business prospects and compliance with state and federal
28  employment laws and regulations, so that the market price of the Company's stock

would be based on truthful and accurate information.

374.   At all times relevant hereto, the Director Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.  Each of the Director Defendants' conduct—who were officers and/or directors of the Company—was ratified by the remaining Director Defendants who collectively comprised Activision's board of directors at all relevant times herein.

375.   To discharge their fiduciary duties, the directors of Activision were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

a.   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

b.   exercise good faith to ensure that Activision was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.   when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

d.   remain informed as to how Activision conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

e.   establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for the reporting of the business and internal affairs to the Board
and to periodically investigate, or cause independent investigation
to be made of, said reports and records;

f.    exercise reasonable control and supervision over the public
statements made by the Company's officers and employees and any
other reports or information that Activision was required by law to
disseminate;

g.    refrain from unduly benefiting themselves and other Company
insiders at the expense of the Company; and

h.    examine and evaluate any reports of examinations, audits, or other
information concerning the compliance, risk, and financial affairs
of the Company and to make full and accurate disclosure of all
material facts concerning, *inter alia*, each of the subjects and duties
set forth above concerning compliance with applicable state and
federal laws and regulations, including those concerning
employment and securities regulations.

## IX.    DERIVATIVE AND FUTILITY ALLEGATIONS

### A.    Derivative Allegations

376.   Plaintiffs bring this action derivatively in the right and for the benefit of
Activision to redress injuries suffered, and to be suffered, by the Company as a direct
result of the violations of breaches of fiduciary duty, misappropriation of confidential
information, unjust enrichment, waste of corporate assets, and violations of the federal
securities laws.

377.   Activision is named as a nominal defendant solely in a derivative
capacity.  This is not a collusive action to confer jurisdiction on this Court that it would
not otherwise have.

378.   Plaintiffs will adequately and fairly represent the interests of Activision
in enforcing and prosecuting the Company's rights.  Plaintiff Gigov is, and has

1  continuously been, a shareholder of Activision common stock since June 24, 2016.

2  Plaintiff Kahnert is, and has continuously been, a shareholder of Activision common

3  stock since April 4, 2019.

4       379.   Because a majority of the Director Defendants face a substantial

5  likelihood of liability for the acts and omissions complained of herein, lack

6  independence, and received a material personal benefit from the wrongdoing,

7  prosecution of this action, independent of the current board of directors, is in the best

8  interests of the Company and its shareholders.

9       380.   The wrongful acts complained of herein subjected, and continue to

10  subject, Activision to substantial harm.

11       **B.**    **Demand Futility Allegations**

12       381.   At the time this complaint was filed, Activision's board of directors

13  consisted of the following eleven individuals: Bowers, Corti, Hartong, Kelly, Kotick,

14  Meservey, Meyer, Morgado, Nolan, Ostroff, and Wasserman (excluding Meservey,

15  the previously defined "Director Defendants").  Plaintiffs have not made any pre-suit

16  demand on the Director Defendants to institute this action because such a demand

17  would be a futile, wasteful, and useless act for the following reasons.

18       **1.**    **A Majority Of The Director Defendants**

19             **Face A Substantial Likelihood of Liability**

20       382.   Plaintiffs incorporate ¶¶1–381.

21       383.   By failing to correct or prevent the Company's endemic hostile work

22  environment and toxic culture of sexual harassment and discrimination, and by

23  making, authorizing, and/or benefiting from the false and misleading Proxy

24  Statements alleged herein, the Director Defendants were each active and knowing

25  participants in breaches of duties of loyalty and the related subsidiary duties of good

26  faith and candor, and have subjected the Company to lawsuits asserting violations of

27  the federal securities laws, the DFEH Action, the EEOC Action, and an investigation

28  by the SEC, among other harm.  Accordingly, demand is futile as to Defendants

1  Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan, Ostroff, and
2  Wasserman.

3  384.  For a period of at least four years, the Director Defendants—who
4  themselves characterized workplace culture as "mission critical" to the Company—
5  were routinely confronted with a battery of red flags alerting them to Activision's
6  illegal hostile work environment and toxic culture.  Despite taking certain perfunctory,
7  "save-face" internal steps in response to certain of those red flags, the Board wholly
8  ignored that the problems plaguing Activision were not confined to a few employees
9  and sufficiently dealt with on a one-off basis through termination, but rather a
10 systemic issue that was rampant throughout the Company.

11 385.  Moreover, the Director Defendants failed to "undertake good faith
12 efforts" to remedy the hostile work environment and toxic work culture, and were
13 forced to eventually sell the Company as a result of their mismanagement and lack of
14 good faith.  Despite having knowledge that the Company's controls were inadequate,
15 the Director Defendants knowingly failed to stop further problems from occurring,
16 thus breaching their fiduciary duties to Activision.  Director Defendants' purported
17 "responses" to the damning banner of red flags screaming "illegal harassment and
18 discrimination" were woefully inadequate and not executed in good faith.  Such
19 failures of oversight do not find protection under Delaware law.

20 386.  Based upon the litany of published, personal accounts of harassment and
21 discrimination at Activision, reports to HR and executives of widespread harassment
22 and discrimination, Board and employee derogation from Company policy, and the
23 DFEH Action alleging similar misconduct over the span of over a decade, sufficient
24 "red flags" exist such that the Director Defendants knew, or must have known, that
25 Activision culture of sexual harassment and discrimination was chronically pervasive.

26 387.  Yet, the Director Defendants failed to implement remedial measures in
27 good faith, as demonstrated by the fact that the systemic sexual harassment,
28 discrimination, unlawful pay discrepancies and terminations, and retaliations were

still ongoing at the time the DFEH filed its First Amended Complaint on August 23, 2021:

> In sum, Defendants' discriminatory practices adversely affected women in compensation, assignment, promotion, and termination. Defendants failed to take effective steps to remedy or adequately correct its compensation disparities despite its awareness that such disparities existed. Defendants' discriminatory practices continue to the date of this complaint.[245]
>
> * * *
>
> Defendants' unlawful policies and practices effectively allowed and continue to allow retaliation and other unlawful conduct to occur in Defendants' workplace. Employees and contingent or temporary workers have suffered and will continue to suffer harm from Defendants' ongoing unlawful policies and practices unless they are remedied and enjoined by this Court.[246]

388.   Demand is futile as to Defendants Kelly and Kotick because they breached their fiduciary duties of loyalty, good faith, and candor by making or allowing to be made improper statements and omissions in Activision's SEC filings, press releases and other public statements.  Notably, Kelly and Kotick are both named defendants in the Securities Class Action and signed Company filings that repeated alleged false and misleading representations to shareholders that the Company was not subject to any "significant" "claims, suits, investigations, audits, and other proceedings" that would "have a material adverse, effect on [Activision's] business, financial condition, results of operations, or liquidity."  The pending Securities Class Action further alleges that Defendants Kelly and Kotick both violated §§ 10(b) and 20(a) of the Exchange Act by affirmatively making false and misleading statements and/or controlling Activision and its alleged § 10(b) violations.

---

[245]  ¶45.

[246]  ¶56.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

389.   Demand is futile as to Defendants Corti, Hartong, and Nolan because, as members of the Audit Committee, these board members had a duty to adequately oversee Activision's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.   Thus, Defendants Corti, Hartong, and Nolan were responsible for knowingly or recklessly allowing the improper statements and omissions contained in the false and misleading Proxy Statements.   Defendants Corti, Hartong, and Nolan breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failed to properly oversee Activision's compliance with legal and regulatory requirements, risk assessment, and the Company's internal controls.

390.   Demand is futile as to Defendants Meyer, Morgado, Nolan, and Wasserman because, in connection with their duties on the N&CG Committee, they directly oversaw the Company's environment, social and governance risks, including matters of corporate culture, diversity and inclusion, and anti-discrimination and anti-harassment policies.   Notwithstanding their explicit oversight of the foregoing policies, Defendants Meyer, Morgado, Nolan, and Wasserman allowed a rampant culture of harassment and discrimination to pervade Activision un-remediated, to the professional, personal, and pecuniary detriment of employees, contingent and temporary workers, as well as Activision itself.

391.   Demand is futile as to all Director Defendants because the 2020 and 2021 Proxy Statements were materially false and misleading and contained material omission.   Specifically, these proxy statements purported to portray the Company as improving upon its toxic work culture through various reforms, including linking Defendant Kotick's pay to certain performance metrics, without disclosing to shareholders government investigations regarding ongoing problems, including that: (i) physical, verbal, and non-verbal sexual harassment were all pervasive and tolerated at Activision and ongoing; (ii) women who brought sexual harassment complaints

1   were frequently ignored or retaliated against and men who were known harassers were

2   allowed to continue to harass women; and (iii) significant unlaw pay disparities

3   existed for female employees throughout the Company.  According to the DFEH,

4   these problems were ongoing as of August 23, 2021, rendering the Company's Code

5   of Conduct also false and misleading as incorporated into the 2020 and 2021 proxy

6   statements.  The misrepresentations and omissions set forth in the 2020 and 2021

7   Proxy Statements were material to Activision shareholders in voting on relevant

8   matters, including: (i) the re-election of directors that represented themselves as

9   having "strong professional characteristics, judgement, and leadership…"; and

10   (ii) advisory approval of executive compensation.

**2.    A Majority Of The Director
Defendants Lack Independence**

13   392.   Plaintiffs incorporate ¶¶1–391.

14   393.   Demand is also excused for the separate reason that Plaintiffs raise a

15   reasonable doubt that at least half of the Director Defendants could properly exercise

16   independent and disinterested judgment in responding to a demand.  At the time this

17   complaint was filed, the Board had eleven members.  At least a majority of the Board—

18   Defendants Kotick, Bowers, Hartog, Kelly, Nolan, and Wasserman—were interested

19   and/or lack independence, including being beholden to Activision's CEO, Defendant

20   Kotick, and therefore are unable to make an impartial decision concerning any

21   litigation demand.

22   394.   At all relevant times, Defendant Kotick was the Company's CEO, and

23   therefore was not independent under NASDAQ listing rules or Activision's own

24   independence guidelines.  As an employee, Kotick derives substantially all of his

25   income from his employment with Activision, and thus could not disinterestedly

26   consider a demand for action that might require him to sue the directors that control his

27   continued employment and/or fellow members of management with whom he works

28   with on a day-to-day basis.  Defendant Kotick received $154,613,318 in total

1    compensation (including salary, bonus, stock awards, option awards and other

2    compensation) from Activision in 2020.  Accordingly, Kotick is neither independent

3    nor disinterested.

4         395.   Moreover, as CEO, Kotick was responsible for the treatment of women in

5    Activision's workforce, and in violation of California and Federal law and breach of

6    his fiduciary duties, he allowed the wrongdoing described herein and concealed it from

7    shareholders who were being asked to approve hundreds of millions of dollars in his

8    own compensation.  As a result, Kotick would be interested in a demand regarding his

9    own wrongdoing or the wrongdoing of his fellow directors, and demand is futile as to

10   him.

11        396.   Defendant Kotick has packed the Board with his loyalists.  Defendants

12   Bowers, Hartong, Kelly, Nolan, and Wasserman, each possess longstanding personal,

13   near-familial, professional, and beneficial ties to Kotick that support a finding of a lack

14   of independence from Kotick.

15        397.   Defendant Bowers is not independent of Kotick.  Both Bowers and Kotick

16   are former trustees of Harvard-Westlake school in Los Angeles.[247]  Bowers was the

17   Head of School at the Center for Early Education in Los Angeles at the same time

18   Kotick was chairman of that board.[248]  Kotick has also donated significant sums of

19   money to causes supported by Bowers:  for example, Bowers served for three years on

20   the Board of Overseers of the UCLA Health Care Systems,[249] during which time Kotick

21

22   [247] Bobby Kotick, Chief Executive Officer, Activision Blizzard Founder and Co-
23   Chairman, The *Call of Duty* Endowment,
     https://www.callofdutyendowment.org/content/atvi/callofduty/endowment/code-
24   touchui/web/en/bobby_kotick.html.

25   [248] "Wealthiest Angelenos: 58, Robert Kotick." *Los Angeles Business Journal, the*
26   *Community of Business,* 28 Aug. 2017, https://labusinessjournal.com/news/weekly-
     news/wealthiest-angelenos-58-robert-kotick/.

27   [249] "Reveta Bowers: Interim Head of School." *The Center for Early Education.*
28   https://www.centerforearlyeducation.org/administration?pk=1114827.

133

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  and his foundation donated money to UCLA Health.  Bowers' relationship with Kotick

2  pre-dates her time on Activision's Board, and she served for many years as head of

3  school at an institution of which Kotick was a major donor.  Bowers therefore could

4  not independently and disinterestedly consider a demand for action against Kotick.

5       398.  Defendant Hartong is not independent of Kotick.  Hartong was the Vice

6  President of Marketing for Activision Inc. from 1996 to 1998 and became a director in

7  2015.   Kotick  therefore  hired  Hartong  in  1996  and  the  two  have  maintained  a

8  relationship since that time.  Hartong does not serve on any other public company

9  boards and has not, making his service on the Activision Board of great reputational

10  and professional importance to him.  Hartong is therefore not independent of Defendant

11  Kotick.

12       399.  Defendant Kelly is not independent of Kotick.  Kelly has known Kotick

13  for over 30 years.  The two partnered in 1990 to acquire a 25% stake in the near-

14  bankrupt Activision (then known as Mediagenic) and have since built the Company to

15  what it is today.[250]  Kelly was a Director of Activision beginning in 1995 and has served

16  as Activision's Board Chairman since 2013 (between 1998 and 2013, Kelly was co-

17  chairman of the Board).  Kelly is also a long-time executive of Activision.  He served

18  as Chief Financial Officer of Activision from February 1991 until July 1997, and

19  Secretary of Activision from May 1991 until October 1997.

20       400.  In 2009, Kelly and Kotick co-founded the *Call of Duty* Endowment, a non-

21  profit that helps veterans find careers.[251]  The *Call of Duty* Endowment is funded with

22  donations  from  Activision,  gamers,  corporate  partners  and  individual  donors.

23

24  [250] Schreier, Jason. "Activision's Board is Full of CEO's Old Friends." *Bloomberg*

25  *Law*,   19   Nov.   2021,   https://www.bloomberg.com/news/newsletters/2021-11-
   19/activision-blizzard-s-atvi-board-is-full-of-ceo-bobby-kotick-s-friends.

26

27  [251] "Board of Directors." *Activision Blizzard*,
   https://www.activisionblizzard.com/content/atvi/activisionblizzard/ab-

28  touchui/ab/web/en/board-of-directors.html.

1    Activision funds all of the operating costs for the Endowment, so 100% of donations
2    go directly to the Endowment's activities.  Kotick continues to serve as co-chairman of
3    the Endowment.  Moreover, Kotick was the founder and President of Intel Consumer
4    Tech Corp., and Kelly was the V.P. of Finance there.   Kelly therefore has a
5    longstanding business and philanthropic relationship with Defendant Kotick, and he
6    could not disinterestedly and independently consider a demand against Kotick.

7        401.   Defendant Nolan is not independent of Kotick.  Nolan was the Managing
8    Partner of Leonard Green (at the time he joined the Board), whom Kotick and Kelly
9    had approached privately about their bid and who had backed Activision's original
10   offer to Vivendi.  Nolan's addition to the Board would impact Leonard Green's ability
11   to trade Activision stock, but he joined over the objection of his Leonard Green partners
12   who observed the "[m]ain reason to even consider [joining the Board] is if Bobby/Brian
13   really want it."[252]   The Delaware Chancery Court previously concluded that Nolan's
14   "close ties to Kotick" meant he "could be viewed as not independent and who might
15   be expected to favor management."[253]   Accordingly, Nolan could not independently
16   and disinterestedly consider a demand for action against Kotick.

17       402.   Defendant Wasserman is not independent of Kotick.  Wasserman serves
18   as a Los Angeles County Museum of Art trustee, alongside Kotick.[254]   In 2008,
19   Wasserman donated tens of thousands of dollars to Activision Presents Stand Up For
20   Skateparks, with proceeds going to the Tony Hawk Foundation, an event Kotick
21   sponsored.[255]  Wasserman is a trustee of several UCLA-affiliated institutions, including

---

[252]  *In re Activision Blizzard, Inc. Stockholder Litigation*, 124 A.3d 1025 (2015).

[253]  *Id.*, at 1037.

[254]  "About."  *LACMA.org,* https://www.lacma.org/about?tab=leadership#leadership.

[255]  "Paving the Way to Healthy Communities."  *Skatepark.org*, 2008 Annual Report, https://skatepark.org/wp-content/uploads/2016/06/THF-2008-Annual-Report.pdf.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the UCLA Stein Eye Institute at UCLA Health,[256] and the Centennial Campaign for UCLA, part of the UCLA Foundation,[257] both of which Kotick has donated to in recent years.[258]   Wasserman and Kotick have both attended the Allen & Co. media and technology conference in Sun Valley, Idaho, and have been photographed together at the event.[259]   Defendant Wasserman therefore has a longstanding business and philanthropic relationship with Defendant Kotick, and he could not disinterestedly and independently consider a demand against Kotick.

### 3. A Majority Of The Director Defendants Received A Material Personal Benefit From The Misconduct

403.   Plaintiffs incorporate ¶¶1–402.

404.   Demand is also futile because a majority of the Director Defendants received a material personal benefit arising from the misconduct alleged herein.

405.   The Director Defendants, including Defendant Kotick—who the Board has refused to terminate despite the litany of damning allegations against him—have been permitted to continue onward in their roles as [wayward] fiduciaries of the Company.   As a result, they have enjoyed massive material personal benefits, including equity stakes derived in substantial part from massive and ill-gotten equity awards, at the waste and expense the Company.   As a further result, and because

---

[256] "UCLA Eye Institute."   *UCLAHealth.org,* Annual Report 2017-2018, p. 27, https://www.uclahealth.org/eye/workfiles/news/Annual%20Reports/SteinEyeAnnualRpt2017-18.pdf.

[257] "Endowment in Action 2020."   *UCLAFoundation.org,* p. 17, https://www.uclafoundation.org/docs/reports/AR2019-2020.pdf.

[258] "UCLA Eye Institute."   *UCLAHealth.org,* Annual Report 2017-2018, p. 20; Form 990s for 1011 Foundation (Kotick's foundation) for reflecting UCLA Foundation donations in 2006, 2007, 2010, 2014, 2015, 2016, 2017, and 2019).

[259] "Business Leaders Meet in Sun Valley for Conference."   *Zimbio.com,* https://www.zimbio.com/photos/Bobby+Kotick/Casey+Wasserman/6F55w7GO4Ob/Business+Leaders+Meet+Sun+Valley+Conference.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  they have not been removed from the Board or otherwise stripped of their equity

2  awards for their misconduct in permitting the hostile work environment and toxic

3  work culture to exist and worsen on their watch, ***they stand to enjoy a total of $574.9***

4  ***million in connection the Company's impending acquisition by Microsoft***.

5       406.   Moreover, Defendants Morgado and Wasserman (the previously defined

6  "Insider Trading Defendants"), while in possession of material, nonpublic information

7  concerning the government investigations and Activision's unlawful hostile work

8  environment and toxic culture, strategically sold stock pursuant to suspicious trades

9  both in terms of timing and quantity, in order to take advantage of artificially inflated

10 share prices of Activision stock (Plaintiffs' *Brophy* claim).  Specifically, these

11 Defendants unlawfully sold $2,799,267.78 of personally held common stock while the

12 DFEH and EEOC investigated but before the existence of the DFEH and EEOC

13 investigations was finally revealed to the public.

14                **4.**     **Demand On Activision's Shareholders Is Futile**

15      407.   Plaintiffs have not made any demand on shareholders of Activision to

16 institute this action  since such demand would be a futile and useless act for the

17 following reasons:

18               i.       Activision is a publicly traded company with thousands of

19                      shareholders of record and at least hundreds of thousands of

20                      beneficial owners;

21              ii.      Making demand on such a number of shareholders would be

22                      impossible for Plaintiffs, who have no means of collecting the

23                      names, addresses, or phone numbers of Activision's

24                      shareholders; and

25             iii.     Making demand on all shareholders would force Plaintiffs to

26                      incur excessive expenses and obstacles, assuming all shareholders

27                      could even be individually identified  with any degree of certainty.

28

## X.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Director Defendants)

408.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

409.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Activision, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Director Defendants were aware, or reckless in not being aware, posed a risk of serious injury to Activision.

410.    The Director Defendants owed fiduciary duties to Activision and its shareholders.  By reason of their positions as fiduciaries to and/or controlling persons of the Company, the Director Defendants owed duties of good faith, loyalty, candor and truthful disclosure.  In addition, the Director Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to Activision.

411.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

i.      Consciously failing to monitor or oversee systems and controls intended to curtail violations of the state and federal employment laws at Activision, and, despite knowing such controls were inadequate, failing to stop further problems from occurring;

ii.     Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Activision's press releases, SEC filings, proxy solicitations, conference calls, and other public statements, relating to, among other things, Activision's compliance with all applicable state and federal rules and regulations concerning sexual

138

harassment and discrimination, as well as any related government investigations and/or legal actions;

iii.   Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including, but not limited to, requirements imposed under federal and state securities laws, as well as laws prohibiting sexual harassment and discrimination;

iv.   Failing to implement, maintain and monitor adequate internal controls, including compliance with laws prohibiting sexual harassment and discrimination; and

v.   Paying or causing Activision to pay themselves compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

412.   As the Director Defendants breached their fiduciary obligations, the Company has sustained significant damages.  Accordingly, the Director Defendants are liable to Activision.

413.   In addition, each of the Director Defendants had actual knowledge of the Director Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and the Company has sustained significant damage as a result. Accordingly, the Director Defendants are further liable to Activision for aiding and abetting their fellow defendants' breaches.

414.   Plaintiffs, on behalf of Activision, have no adequate remedy at law.

## COUNT II

### Claim For Insider Trading (*Brophy* Claim)
### (Against the Insider Trading Defendants)

415.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

416.   By reason of their fiduciary role as a director of Activision, the Insider Trading Defendants specifically owed and continue to owe the Company the highest

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

obligations of due care, good faith, and loyalty.

417.   When the Insider Trading Defendants sold their Activision stock as alleged herein, they were in possession of material, non-public information described above, and sold Activision stock because they were motivated, in whole or in part, by the substance of such information.

418.   The information described above was proprietary, non-public information concerning the Company's financial condition, future business prospects, and regulatory compliance status.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Activision stock.

419.   The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.  The Insider Trading Defendants are therefore liable to Activision for unlawful insider trading.

420.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorgement and/or the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

421.   Plaintiffs, on behalf of Activision, have no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### (Against the Director Defendants)

422.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

423.   By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of Activision.  The Director Defendants were unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

140

424.   The Director Defendants sold Activision stock while in possession of material, adverse nonpublic information that artificially inflated the price of Activision stock.  As a result, the Director Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

425.   The Director Defendants have also been enriched by virtue of their equity stakes derived in full or substantial part from annual equity awards.  Because they have not been rightfully removed from the Board or discharged with cause for the malfeasance described herein, and stripped of their ill-gotten equity awards, the Director Defendants will be able to enjoy a substantial and unjust payout in connection with the Proposed Acquisition.

426.   Plaintiffs, as shareholders and representatives of Activision, seek restitution from the Director Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Director Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

427.   Plaintiffs, on behalf of Activision, have no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against the Director Defendants)

428.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

429.   As a result of the Director Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, and by failing to remedy the Company's cultural problem of illegal sexual discrimination and harassment, Activision is subject to the DFEH Action, the EEOC Action, and the Securities Class Action, among other legal proceedings and investigations.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

430.   The Director Defendants have caused Activision to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigations and investigations, in addition to any ensuing costs from a potential settlement or adverse judgment.

431.   The Director Defendants have further caused Activision to waste its corporate assets by paying themselves ill-gotten equity awards and significant compensation, despite that they should have been discharged from their respective positions and stripped of such material personal benefits.

432.   As a result of their waste of corporate assets, the Director Defendants are liable to the Company.

433.   Plaintiffs, on behalf of Activision, have no adequate remedy at law.

## COUNT V

### Violations of §§ 14(a) and 20(a) of the Exchange Act
### (Against the Director Defendants)

434.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

435.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 78l]."

436.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

437.   The Director Defendants issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the proxy solicitations.   In the proxy solicitations, the Director Defendants solicited shareholder votes to reelect themselves to Activision's board of directors and cast an advisory vote on executive compensation while government investigations and the systemic sexual harassment and discrimination issues were plaguing the Company.

438.   These omissions from the proxy solicitations were particularly glaring and unlawful in light of the explicit admission by the Director Defendants in the proxy solicitations that—in soliciting shareholder votes to support the Director Defendants' re-election—reporting on ESG issues was of material importance to shareholders and, because of the material importance of ESG issues, the Director Defendants caused the engagement of a consultant to focus on disclosure of "human capital management practices" and "diversity and inclusion initiatives."

439.   The proxy solicitations, however, misrepresented and failed to disclose the following true facts about Activision's business, operations and prospects:

       i.     Activision lacked adequate Board-level policies, procedures and controls concerning employee sexual harassment and discrimination claims and to ensure a safe and lawful work environment for all Company employees;

      ii.    Activision fostered and engendered a culture that permitted rampant sexual harassment and discrimination;

   iii.    Activision actively participated in the culture of sexual harassment and discrimination by retaliating against and/or ignoring employee complaints of harassment and discrimination, and by failing to adequately investigate claims and take action against known

violator of employee rights;

iv.   Activision failed to ensure that its managers, employees, and officers and directors complied with anti-harassment and anti-discrimination laws and regulations;

v.   Activision was under investigation by government agencies for more than two years for sexual harassment and discrimination against employees; and

vi.   As a result of the foregoing, Activision's public statements were materially false and misleading at all relevant times.

440.   By reasons of the conduct alleged herein, the Director Defendants violated § 14(a) of the Exchange Act.  As a direct and proximate result of the Director Defendants' wrongful conduct, Activision misled and deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Activision's recommendation to reelect certain Director Defendants to Activision's board of directors and cast an advisory vote on executive compensation.

441.   The misleading information contained in the proxy solicitations was material to the integrity of the directors that were proposed for election to Activision's board of directors and the propriety of executive compensation.

442.   Plaintiffs, on behalf of Activision, thereby seek relief for damages inflicted upon Activision based upon the misleading proxy solicitations in connection.

443.   Activision was damaged as a result of the Director Defendants' materially false and misleading statements in the proxy solicitations.  Plaintiffs, on behalf of the Company, hereby seek relief for damages inflicted upon Activision based upon the misleading proxy solicitations in connection with the improper reelection of the members of the board of directors and vote on executive compensation.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

444.   Because of their positions of control and their authority over Activision, the Director Defendants were able to and did control the actions of the Company, its employees, and the contents of the proxy solicitations, as set forth herein.   The Director Defendants therefore qualify as "controlling persons" within the meaning of § 20(a) of the Exchange Act.

445.   By reason of the above conduct, the Director Defendants are also, or alternatively, liable as control persons of Activision pursuant to § 20(a) of the Exchange Act.

## XI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Declaring that this action is a proper derivative action maintainable under the law, that demand was excused as futile, and that Plaintiffs are adequate representatives of Activision;

B.   Declaring that Director Defendants have breached their fiduciary duties owed to Activision and its shareholders;

C.   Determining and awarding to Activision the damages it sustained by it as a result of the misconduct and violations of law set forth above from each Director Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.   Directing Activision to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including putting forward for a shareholder vote resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to effect the following corporate governance policies:

1.   Immediate termination for cause of Defendant Kotick and all culpable executives and officers, who is, or has been, credibly alleged to have

sexually harassed or discriminated on the basis of sex against a colleague, subordinate employee, or other person performing a function for Activision in violation of the Company's internal policies or codes, or applicable federal, state, or local law, and such terminations reported through the filing of a Form 8-K with the SEC.  Except as otherwise stated in his or her employment agreement, such person shall not receive any severance benefits or other benefits as a result of such termination of employment, and all outstanding incentive compensation owing to such person, including stock options and/or stock awards, shall be cancelled;

2.     Cancellation of the amount to be paid upon Kotick's termination due to a "change in control," *i.e.*, the Proposed Acquisition;

3.     A proposal to strengthen the Company's reporting and response mechanisms for complaints of harassment and discrimination;

4.     Appointment of directors with experience in employment law and/or handling of workplace harassment, abuse, and discrimination;

5.     Creation of a permanent committee of the Board meant to oversee workplace issues and company culture;

6.     Establishment of a regular system of reporting on workplace harassment, abuse, and discrimination issues to the Board and the newly established committee;

7.     Establishment of an internal compliance program, including a Diversity, Equity, and Inclusion Consultant with expertise in the area of sexual harassment in the corporate setting, to help ensure the successful implementation of the above changes;

8.     Replacement of six (6) directors prior to the Company's next annual meeting;

9.     Requiring that the foregoing corporate governance reforms transfer along with Activision to Microsoft in the event the Proposed Acquisition

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  successfully closes and endures for at least ten (10) years from the date of

2  closing.

3       E.     Extraordinary equitable or injunctive relief as permitted by law or equity,

4  including attaching, impounding, imposing a constructive trust on, or otherwise

5  restricting Director Defendants' assets so as to assure that Plaintiffs, on behalf of

6  Activision, have an effective remedy;

7       F.     Awarding to Activision restitution from the Director Defendants, and each

8  of them, and ordering disgorgement of all profits, benefits, and other compensation

9  obtained by Director Defendants, including the proceeds of insider transactions made

10  in violation of federal and state securities laws;

11       G.     Canceling the votes to re-elect the Director Defendants in connection with

12  the annual shareholder meetings in 2020 and 2021, and ordering Director Defendants

13  to disgorge to the Company the compensation they received for service on the Board

14  following those invalid elections;

15       H.     Awarding to Plaintiffs costs and disbursements related to this action,

16  including reasonable attorneys' fees, consultant and expert fees, costs, and expenses;

17  and

18       I.     Granting such other and further relief as the Court deems just and proper.

19  **XII.    DEMAND FOR JURY TRIAL**

20       Plaintiffs demand a trial by jury as to all issues so triable.

21

22                              Respectfully submitted,

23  Dated:  June 1, 2022          **JOHNSON FISTEL, LLP**

24                         By:   *s/ Brett M. Middleton*

25                              BRETT M. MIDDLETON

26

27

28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FRANK J. JOHNSON
KRISTEN O'CONNOR
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
BrettM@johnsonfistel.com
FrankJ@johnsonfistel.com
KristenO@johnsonfistel.com

*Counsel for Plaintiffs Luke Kahnert
and Bovan Gigov*

148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Civil Local Rules 79-5.3 and 5-3.1.2, I, Brett M. Middleton, hereby certify that the Second Amended Verified Shareholder Derivative Complaint was filed electronically under seal on June 1, 2022.  Notice of this filing will be sent to all electronically registered parties by e-mail transmission.

**JOHNSON FISTEL, LLP**

*s/ Brett M. Middleton*
BRETT M. MIDDLETON

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Luke Kahnert, hereby declare as follows:

I am a plaintiff in this action.  I have reviewed the allegations made in the foregoing verified second amended shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:


Dated: 5/31/2022


DocuSigned by:

*Luke Kahnert*

82BC173216444BC...

Luke Kahnert

## <u>VERIFICATION</u>

I, Boyan Gigov, hereby declare as follows:

I am a plaintiff in this action.  I have reviewed the allegations made in the foregoing verified second amended shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:


Dated: 5/31/2022

BOYAN GIGOV