**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
KristenO@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiffs Luke Kahnert and Boyan Gigov*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE KAHNERT and BOYAN GIGOV, derivatively on behalf of ACTIVISION BLIZZARD, INC. <br><br> Plaintiffs , <br><br> v. <br><br> ROBERT A. KOTICK, BRIAN KELLY, REVETA BOWERS, ROBERT CORTI, HENDRIK HARTONG III, BARRY MEYER, ROBERT MORGADO, PETER NOLAN, DAWN OSTROFF, AND CASEY WASSERMAN, <br><br> Defendants, <br><br> ACTIVISION BLIZZARD, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: 2:21-cv-08968-PA-JEM <br><br> **THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> [REDACTED VERSION OF AMENDED COMPLAINT PROPOSED TO BE FILED UNDER SEAL] <br><br> <u>DEMAND FOR JURY TRIAL</u> <br><br> *Assigned for all purposes to:* <br> *USDC Judge: Hon. Percy Anderson* <br> *Mag. Judge: Hon. John E. McDermott* |

# **TABLE OF CONTENTS**

Page

I.    NATURE AND SUMMARY OF THE ACTION ................................................. 1

II.   JURISDICTION AND VENUE ........................................................................ 6

III.  PARTIES ......................................................................................................... 7

    A.    Plaintiffs ................................................................................................ 7

    B.    Defendants ............................................................................................. 7

    C.    Relevant Non-Parties ......................................................................... 10

IV.   STATEMENT OF FACTS .............................................................................. 10

    A.    Background Of Activision's Business ................................................. 10

    B.    Department Of Fair Employment And Housing Commission ............. 13

    C.    The Director's Complaint Places The Board On Notice Of
        Unlawful Gender Discrimination In Pay And Promotions
        At Activision .......................................................................................... 15

    D.    DFEH Conducts A Thorough Two-Year Investigation Of
        Activision's Unlawful Gender Discrimination Practices ....................... 18

    E.    DFEH Served Activision With A "Cause Finding"
        Confirming Activision's Unlawful Gender Discrimination Practices .. 21

    F.    DFEH Commences A Legal Civil Action Against
        Activision For Civil Rights Violations ................................................. 23

    G.    Defendants' Public Denial Response To The DFEH Action
        Prompts Activision's Employees To Stage A Work Stoppage ............. 27

    H.    Investigative Reports By *The Washington Post* And
        *Bloomberg* Confirm Widespread Discrimination ................................. 29

    I.    EEOC's Investigation And Hasty Settlement ....................................... 30

V.    BREACH OF FIDUCIARY DUTY ALLEGATIONS ................................... 33

    A.    Director Defendants' Duties ................................................................ 33

        1.    Activision May Not Operate In Violation Of The Law ............ 33

        2.    The Board's Charters Recognize The Importance
            Of Director Responsibility For Workplace Culture ................... 37

    B.    The Board's Oversight Failures .......................................................... 39

1.      Applicable Laws Governing Gender
         Discrimination And Retaliation ......................................... 44

2.      Specific Gender Discrimination Oversight Failures .................. 46

3.      Specific Retaliation Oversight Failures ....................................... 49

C.      Harm To Activision ......................................................... 51

VI.    IMPROPER PROXY STATEMENTS ................................................ 55

VII.   DERIVATIVE AND FUTILITY ALLEGATIONS ....................................... 61

A.      Derivative Allegations ........................................................... 61

B.      Demand Futility Allegations ..................................................... 61

1.      A Majority Of The Director Defendants Face
         A Substantial Likelihood of Liability ........................................ 62

2.      Demand On Activision's Shareholders Is Futile ......................... 65

VIII.  CLAIMS FOR RELIEF ................................................................ 65

IX.    PRAYER FOR RELIEF ............................................................... 70

X       DEMAND FOR JURY TRIAL ......................................................... 72

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Luke Kahnert and Boyan Gigov (collectively, "Plaintiffs"), by and through their undersigned counsel, for their complaint against Defendants (defined below) brings this shareholder derivative action upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of corporate records produced by Activision in response to a Demand for Inspection of Books and Records pursuant to 8 *Del. C.* § 220 (the "Books and Records Production")[1]; (ii) review and analysis of public filings made by Activision and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (iii) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (iv) review of news articles, shareholder communications, and postings on Activision's website concerning the Company; (v) the civil rights enforcement action instituted by California's Department of Fair Employment and Housing ("DFEH") styled *DFEH v. Activision Blizzard, Inc., et al.*, Case No. 21STCV26571 (Cal. Sup. Ct., Los Angeles Cnty.) (the "DFEH Action"); (vi) the federal civil rights enforcement action instituted by the U.S. Equal Employment Opportunity Commission ("EEOC") styled *U.S. Equal Employment Opportunity Commission v. Activision Blizzard, Inc., et al*., Case No. 2:21-CV-07682 DSF-JEM (C.D. Cal.) (the "EEOC Action"); and (vii) review of other publicly available relevant information.

## I.   NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action arising out of breaches of fiduciary duties by board members entrusted with diligently, consistently, and disinterestedly protecting the interests of Activision Blizzard, Inc. ("Activision" or the "Company"). The Activision board of directors (the "Director Defendants" or the "Board"), led by

---

[1]  By letter dated November 15, 2021, Activision's counsel certified completion of the Books and Records Production ("This completes Activision's rolling production of the documents the Company agreed to produce in response to your client's demand.").

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Company's founder and Chief Executive Officer Robert Kotick ("Kotick"), created a toxic culture of unchecked gender bias at Activision, causing it great harm. This gender discrimination included perpetuating wage disparities between men and women, pregnancy discrimination, discrimination against women in terms of salary, bonus, stock option, and restricted stock grants, and gender discrimination in terms of denied or delayed promotions.  And those who complained suffered quick retaliation.

2.      Activision claims the mantle of one of the largest American video game developers in the world.  The Company's once-vaunted reputation is now juxtaposed with a newly emerged [damning] picture of the Company: a gaming empire plagued by a toxic glut of gender discrimination, pay disparity, and retaliation.

3.      Federal and state law protects all genders from discriminatory pay and promotion practices.   The law prohibits a gamut of specific discriminatory employment practices, including refusing to hire or promote a person because of their gender or paying a person less than a commensurately qualified colleague because of their gender.  Unbeknownst to the investing public for many years, Activision, as an employer, *was an acute perpetrator of gender discrimination with respect to pay and promotion*.  The import is not insignificant: Activision employs approximately 9,500 people worldwide.

4.      Activision's day of reckoning came on July 21, 2021, when *Bloomberg Law* reported that the DFEH—the California agency responsible for enforcing California's civil rights laws and the largest state civil rights agency in the United States—had filed a complaint against Activision alleging damning civil rights violations following more than two years of investigation *principally focused on pay and promotion discrimination at the Company*. [2]  A chorus of reports from reliable media outlets, including *Bloomberg Law*, *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, would further reveal the dark underbelly of

_____

[2]  The previously defined DFEH Action.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Activision: a place where women are paid far less than men for the same work, women
2  are offered lower-level jobs, and the "risk" of pregnancy means women are not
3  promoted.

4       5.     The DFEH Action was based on an investigation lasting more than two
5  years and set forth a systemic pattern of gender discrimination throughout the
6  Company, finding that: "[l]ike the executive ranks, women across the company are
7  *assigned to lower paid and lower opportunity levels*.  Female employees receive
8  *lower starting pay* and also *earn less than male employees* for substantially similar
9  work.  Defendants *promote women more slowly and terminate them more quickly*
10 than their male counterparts.  Faced with such adverse terms and conditions of
11 employment, many women have been forced to leave the company."[3]   On
12 August 23, 2021, the DFEH filed its First Amended Civil Rights Complaint ("First
13 Amended Complaint") and concluded that Activision's "discriminatory practices
14 continue to the date of this complaint."[4]

15      6.     Moreover, according to the DFEH Action, "[i]n retaliation for complaints
16 regarding harassment and discrimination, female employees experienced retaliation
17 by Defendants that included involuntary transfers, selection for layoffs, and denial of
18 projects and other opportunities."[5]

19      7.     The propriety of the DFEH's investigation has already been adjudicated.
20 The Court in the DFEH Action recently rejected the Company's attempt to paint the
21 investigation as inadequate, holding, *inter alia*, that the DFEH had sufficiently
22 "investigated" the dispute through substantial discovery practice over the course of
23 two years.  Activision had moved the Court to summarily adjudicate the matter on two
24 grounds: (i) that DFEH's over two-year investigation "stopped short" of a full
25 investigation; and (ii) and DFEH did not expend enough efforts at conciliation and

26 ───────────────────
[3]  All emphasis added unless otherwise indicated.
27 [4]  ¶45; All references to "¶__" herein refer to the DFEH First Amended Complaint.
28 [5]  ¶51.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    mediation.  Both arguments were rejected, and, notably, Activision failed to challenge

2    the underlying discrimination misconduct alleged by the DFEH.  On the contrary,

3    Activision's motion for summary adjudication claims that the Company "cooperated"

4    in the agency's multi-year investigation into "sex-based discrimination in pay and

5    promotion" at Activision.

6         8.     The DFEH investigation, and the Company's "cooperation" into

7    extensive discovery practice relating to pay and promotion practices, furnished the

8    Board with full visibility into the gross pay and promotion disparities between men

9    and women at the Company.  The Board was also aware of its woefully deficient

10   internal controls, which they were later forced to purportedly "***elevate***"—*as of*

11   *June 16, 2022—to "best practices for compliance and pay equity in the workplace*."

12   Despite the patent concession that pay equity "best practices" were not in place at the

13   Company until after this action was initially filed, the Board caused Activision to

14   repeatedly state the opposite to investors for many years.  Indeed, in specific contrast

15   to the foregoing statements, the Board repeatedly assured the investing public in the

16   Company's 2020 and 2021 proxy statements that Activision's corporate governance

17   practices did, in fact, "***follow best practices***."  The Board also assured investors that

18   the data supported diversity and pay equity.  In reality, the Board knew—as they

19   would later admit—that their "data" and Activision workers' experiences were totally

20   irreconcilable.

21        9.     Moreover, notwithstanding that Activision was an acute perpetrator of

22   gross pay disparities between men and their female counterparts performing

23   substantially similar work, the Board failed, entirely, to take any remedial actions to

24   remedy an illegal pay delta among genders.  Specifically, ██████████████

25   ████████████████████████████████████ *into, among*

26   *other misconduct, __illegal pay practices__, the Board failed to discuss or implement a*

27

28

4

*remedial response to those illegal pay practices*.[6]  The Board has not undertaken any good faith **action** to remedy the misconduct during the nearly four years Activision has been investigated for illegal pay practices.  Thus, the Board has breached, and continues to breach, its fiduciary duties of good faith oversight.

10.  The Company's cultural problems were not limited to pay discrimination.  As Activision's recent settlement with the EEOC—*i.e.*, the federal agency responsible for investigating and prosecuting federal antiharassment and antidiscrimination laws—reveals, the Company also endorsed and enabled a broadly lawless culture of rampant sexual harassment.  But that settlement does not relate to pay discrimination.  As Activision would later concede, despite that the Company was under investigation by both the DFEH and the EEOC for more than two years, the two agencies had agreed that the **EEOC would take jurisdiction of a sexual harassment investigation and DFEH would take on an investigation related to sex-based discrimination in pay and promotion**.  When the EEOC investigation ultimately culminated in civil litigation, Activision rushed to settle the action for $18 million.  Those monies will be specifically distributed to claimants of "sexual harassment, pregnancy discrimination, or related retaliation."  **There is no relief contemplated for the potentially thousands of victims of gender discrimination who have been, and/or continue to be, underpaid or underpromoted on the basis of sex**.

11.  The DFEH has challenged the EEOC settlement on a number of grounds, including that it contains: (i) an overbroad scope and release; (ii) missing information; and (iii) concerning ethical defects, not the least of which is **a requirement that Activision destroy evidence of wrongdoing and obstruct the DFEH Action**.  The settlement also fails to account for the broad protections of California

---

[6]

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

antidiscrimination law, which are significantly stronger than corresponding federal law. Thus, the Board's total refusal to remedy, settle, or forestall pay and promotion discrimination at Activision—***or otherwise make whole the potentially thousands of gender discrimination victims***—constitutes a substantial (and ongoing) abdication of their fiduciary duties.

12.    Plaintiffs did not bring a pre-suit demand upon the Board because doing so was, and is, a useless and futile act as a majority of the Director Defendants face a substantial likelihood of liability for breach of fiduciary duty for oversight and disclosure failures.

13.    Plaintiffs rightfully bring this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Activision and its shareholders.

## II.    <u>JURISDICTION AND VENUE</u>

14.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.    This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    This Court has personal jurisdiction over each of the defendants because each Defendant is either a corporation conducting business in this district or is an individual, who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone

communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d), and because: (i) Activision maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, dissemination to the public of materially false and misleading information, occurred in and were issued from this District, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Activision, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III.    **PARTIES**

   A.    **Plaintiffs**

19.    Plaintiff Luke Kahnert is a current shareholder of Activision.  He first acquired Activision common stock on April 4, 2019, and has continuously held such stock during the relevant times alleged herein.  Plaintiff Luke Kahnert is a citizen of Ontario, Canada.

20.    Plaintiff Boyan Gigov is a current shareholder of Activision.  He first acquired Activision common stock on June 24, 2016, and has continuously held such stock during the relevant times alleged herein.  Plaintiff Gigov is a citizen of Sofia City, Bulgaria.

   B.    **Defendants**

21.    Nominal Defendant Activision is incorporated under the laws of the State of Delaware and has its principal executive offices located in Santa Monica,

California.  Activision's stock trades on NASDAQ under the symbol "ATVI."  As of September 20, 2022, the Company had approximately 782.31 million shares outstanding.

22.    Defendant Kotick is the Company's founder and has served as Chief Executive Officer ("CEO") and a director since 1991.  Defendant Kotick received $33,065,560 in total compensation from the Company in 2016, $28,698,375 in 2017, $30,841,004 in 2018, $30,122,896 in 2019, $154,613,318 in 2020, and $826,549 in 2021.  Defendant Kotick is a citizen of California.

23.    Defendant Brian Kelly ("Kelly") has served as Chairman of the Board since September 2013 and as a director of the Company since 2013.  Defendant Kelly received $290,517 in total compensation from the Company in 2016, $489,677 in 2017, $489,713 in 2018, $489,434 in 2019, $489,631 in 2020, and $489,674 in 2021.  Defendant Kelly is a citizen of California.

24.    Defendant Reveta Bowers ("Bowers") has served as a Company director since 2018.  Defendant Bowers received $470,239 in total compensation from the Company in 2018, $344,934 in 2019, $345,131 in 2020, and $347,007 in 2021.  Bowers is a citizen of California.  Defendant Bowers served on the Compensation Committee.

25.    Defendant Robert Corti ("Corti") has served as a Company director since 2003.  Defendant Corti received $379,543 in total compensation from the Company in 2016, $379,667 in 2017, $379,713 in 2018, $379,434 in 2019, $379,631 in 2020, and $379,674 in 2021.  Corti is a citizen of New York.  Defendant Corti served on and was Chair of the Audit Committee.

26.    Defendant Hendrik Hartong III ("Hartong") served as a Company director from 2015 through early 2022.  Defendant Hartong received $350,543 in total compensation from the Company in 2016, $350,667 in 2017, $350,713 in 2018, $350,434 in 2019, $379,631 in 2020, and $350,674 in 2021.  Hartong is a citizen of Connecticut.  Defendant Hartong served on the Audit Committee.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.    Defendant Barry Meyer ("Meyer") has served as a director of the Company since 2014.  Defendant Meyer received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $345,213 in 2018, $344,934 in 2019, $345,131 in 2020, and $345,174 in 2021.  Meyer is a citizen of California.  Defendant Meyer served on the Nominating and Governance Committee ("N&GC").

28.    Defendant Robert Morgado ("Morgado") has served as a director of the Company since 1997.  Defendant Morgado received $420,543 in total compensation from the Company in 2016, $920,001 in 2017, $448,546 in 2018, $459,434 in 2019, $459,631 in 2020, and $459,674 in 2021.  Morgado is a citizen of New York.  Defendant Morgado served on the Audit Committee from January 2016 through January 2018 and was the Chair of the N&GC and Chair of the Compensation Committee.

29.    Defendant Peter Nolan ("Nolan") has served as a director of the Company since 2013.  Defendant Nolan received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $347,963 in 2018, $350,434 in 2019, $350,631 in 2020, and $350,674 in 2021.  Nolan is a citizen of Florida.  Defendant Nolan served on the N&GC from January 2016 through January 2018 and was a member of the Audit Committee.

30.    Defendant Dawn Ostroff ("Ostroff") has served as a director of the Company from since 2020.  Defendant Ostroff received $302,687 in total compensation from the Company in 2020, and $351,841 in 2021.  Ostroff is a citizen of New York.  Defendant Ostroff has served on the Compensation Committee since June 2020.

31.    Defendant Casey Wasserman ("Wasserman") served as a director of the Company from 2015 through early 2022.  Defendant Wasserman received $345,043 in total compensation from the Company in 2016, $345,167 in 2017, $345,213 in 2018, $344,934 in 2019, $345,131 in 2020, and $345,174 in 2021.  Defendant Wasserman is a citizen of California.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.     Collectively, the defendants identified in ¶¶22–31 are referred to herein as the "Director Defendants" or the "Board" and along with Activision as the "Defendants."

**C.     Relevant Non-Parties**

33.     Non-party Lulu Cheng Meservey ("Meservey") recently joined Activision's Board of Directors in April 2022.  Meservey stood for re-election to the Board at the Company's 2022 annual meeting on June 21, 2022.

34.     Non-party Kerry Carr ("Carr") recently joined Activision's Board of Directors in June 2022.

**IV.     STATEMENT OF FACTS**

**A.     Background Of Activision's Business**

35.     Video games are big business.  According to the Entertainment Software Association (the "ESA"), a trade association that calls itself the "voice and advocate for the video game industry," "[o]ne in three people on the planet play video games," and "more than 214 million people play video games in the United States."[7]  In total, there are over 2 billion "gamers" world-wide, which is roughly 26% of the global population.

36.     Gaming news is principally reported on websites, including *Kotaku*, *Dot Esports*, and *PC Gamer*, which publish their stories to millions of Twitter and Facebook followers.

37.     Activision lauds itself as a leading global developer and publisher of "legendary" entertainment content and services.  The Company's venerable portfolio of video game franchises includes *Call of Duty* (which has generated an estimated $27 billion in sales and holds the Guinness World Record as the best-selling first-person shooter game series), *Overwatch* ($1 billion in revenue during the first year of its release) and *World of Warcraft* (over $9 billion in total revenue).  Over 400 million

_____

[7]  ESA California fact sheet.

1    people in over 190 countries play the Company's games.  Half of those gamers are
2    women.

3        38.    Activision operates through three reportable business subsidiaries:
4    (i) Activision Publishing, Inc., ("Activision Publishing") which develops and
5    publishes interactive software products and entertainment content primarily for
6    console platforms; (ii) Blizzard Entertainment, Inc., ("Blizzard") which develops and
7    publishes interactive software products and entertainment content primarily for PC
8    platforms; and (iii) King Digital Entertainment ("King"), which develops and
9    publishes interactive entertainment content and services primarily for mobile
10   platforms (Activision Publishing, Blizzard, and King are collectively referred to
11   herein as simply "Activision" or the "Company").

12       39.    Activision was founded in October 1979 by former Atari, Inc., game
13   developers.  In 1991, Defendant Kotick and a group of investors purchased Activision,
14   then known as Mediagenic.  Kotick became CEO in February 1991.  Since 2007,
15   Kotick has received $461 million in compensation—making him the second-highest
16   paid male CEO in the S&P 500 index in 2020.[8]

17       40.    Blizzard has been called a "magical place to create video games."
18   Founded in 1991, under the name Silicon & Synapse, Inc. by three UCLA graduates:
19   Michael Morhaime, Frank Pearce, and Allen Adham, the company grew and three
20   years later changed its name to Blizzard Entertainment.

21       41.    In 2004, Blizzard released *World of Warcraft*, a major critical and
22   commercial success that quickly became the most popular MMORPG ("Massively
23   Multiplayer Online Role-Playing Game") of all-time, with estimated cumulative
24   revenues of more than $11 billion through 2018.

25       42.    "Activision Blizzard, Inc." (herein referred to as "Activision") was

26   _____
27   [8] As calculated by The Associated Press and Equilar.  *See* "Paycom Software's
     Richison, AMD's Su Among Highest Paid CEOs." *AP NEWS*, 28 May 2021,
28   apnews.com/article/who-are-the-highest-paid-ceos-2021-
     719ad52ec522a79baf9870cd2bc73f1d.

formed in 2008 when Activision, Inc. merged with Vivendi Games. Kotick had long eyed Blizzard, which had become a top player in the market for PC-based games with its blockbuster *World of Warcraft*. Kotick was particularly eager to secure *World of Warcraft*'s subscription fees, telling investors that they would "benefit from significantly increased earnings power and the recurring nature and predictability of subscription-based revenues."[9] Blizzard's financial success was naturally critical to Kotick's authority at the Company. The newly merged company adopted the name Activision Blizzard, and Kotick was installed as its President and CEO.

43. In 2016, the Company acquired King, a mobile game creator and owner of *Candy Crush*, one of the highest grossing mobile game franchises ever created, for $5.9 billion.

44. Activision has an established global presence, operating nearly 50 offices across seven states and 20 countries.

45. According to *The Wall Street Journal*, Defendant Kotick, as the Company's CEO, "approves high-profile hiring decisions and the exit and pay packages of star developers, and he is typically aware of any major problems in each of Activision's 12 development studios and three major business units." Kotick also controls the narrative of the Company's response to allegations that the work environment at Activision is rife with discrimination. *The Wall Street Journal* reports that Kotick "approves most internal companywide emails, as well as media responses." He drafted the July 2021 companywide email to employees about the California DFEH Action, claiming it included "factually incorrect, old and out of context stories," (but he directed that it be sent by Frances Townsend, one of the Company's few female senior executives).[10]

---

[9] "Vivendi And Activision To Create Activision Blizzard," 2 Dec. 2007, https://www.sec.gov/Archives/edgar/data/718877/000110465907086435/a07-30510_4ex99d1.htm.

[10] Grind, Kirsten, et al. "Activision CEO Bobby Kotick Knew for Years About Sexual-

46.     Activision employees heavily-criticized the email, which prompted an employee walkout.  Following the walkout, Kotick backtracked, calling the statement he had drafted "tone deaf" in a new message to employees; without admitting he had drafted the message himself.  Kotick only conceded that point four months later, in a November 2021 statement sent by an Activision spokeswoman to *The Wall Street Journal*.  Meanwhile, Townsend herself apologized for the statement and resigned from the women's group she led at the Company.[11]

### B.     Department Of Fair Employment And Housing Commission

47.     California's Department of Fair Employment and Housing Commission or DFEH is the largest state-based civil rights agency in the United States.  It is charged with enforcing California's civil rights laws, including "***the right and opportunity of all persons to seek, obtain, and hold employment without discrimination***."  Cal. Gov. Code § 12920.  California Government Code § 12930 authorizes the DFEH to receive, investigate, conciliate, mediate, and prosecute complaints of alleged violations of California's FEHA and other civil rights laws.

48.     Like many public prosecutors, the DFEH conducts investigations—on its own initiative or based on individual complaints—and exercises discretion in deciding whether and how to prosecute claims.[12]  If the DFEH decides to pursue a claim, it files and serves a formal administrative complaint on the employer accused of the unlawful practice.[13]  After an administrative complaint is filed, the DFEH has ample discovery tools available to assist in conducting a thorough investigation, including investigative subpoenas, interrogatories, requests for production, witness interviews, formal

---

Misconduct Allegations at Videogame Giant." *The Wall Street Journal,* 16 Nov. 2021, (the "November 16, 2021, *WSJ Report*") https://www.wsj.com/articles/activision-videogames-bobby-kotick-sexualmisconduct-allegations-11637075680.

[11] *Id.*

[12] Cal. Gov. Code §§ 12930, 12965, 12965(a).

[13] Cal. Code Regs. Tit. 2 § 10011; §10021.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

depositions, and site visits.[14]

49.    The DFEH is not limited to representing the interests of a particular claimant; instead, it is authorized to seek relief beyond what individuals acting alone can pursue directly.[15]  When the DFEH seeks redress on behalf of a group as opposed to just a single claim, it files a Director's administrative complaint," *which is subjected to heightened regulatory requirements ensuring that the investigation and decision-making process is more rigorous*.  The time for investigating a Director's administrative complaint is extended by one year.[16]

50.    Receipt of a DFEH Director's administrative complaint *is noteworthy to any company in California*.  In 2019 alone, the DFEH settled 710 cases for monetary value of $14,834,753.25 prior to the filing of a civil action.[17]   Many of these settlements include affirmative relief, which do not require companies to pay money directly to complainants, but rather focus on creating fair employment opportunities for future employees.

51.    Furthermore, given that the DFEH always attempts to mediate a settlement, *only a tiny fraction of its cases move from a Director's administrative complaint to the filing of a civil action*.  Of the over 28,000 intake forms and complaints received by the DFEH in 2019, *only four resulted in civil court actions— just 0.014% of cases brought to the Department*.[18]  Since 2011, the DFEH has filed civil actions in less than 0.2% of the cases it received.

---

[14]  Cal. Code Regs. Tit. 2 §§ 10026–28.

[15]  Cal. Gov. Code § 12965(c).

[16]  Cal. Code Regs. Tit. 2 § 10013(h)(1).

[17]  2019 Annual Report. *Activision Blizzard*, p. 14, https://investor.activision.com/static-files/e610f6ff-cdf2-4f92-b373-4df046a590bb

[18]  *Id.*, p. 17.

1
2

**C.    The Director's Complaint Places The Board On Notice Of Unlawful Gender Discrimination In Pay And Promotions At Activision**

3    52.    Between October 12, 2018, and December 7, 2018, DFEH Director

4 Kevin Kish served Activision with three Director's administrative complaints

5 (collectively, the "DFEH Director's Complaint") alerting the Board to unlawful

6 gender discrimination and retaliation practices at Activision.    Specifically, on

7 October 12, 2018, the DFEH filed a Notice of Group or Systemic Investigation and

8 Director's Complaint for Group/Class Relief, *In re Kish Complaint,* DFEH Case

9 No. 201810-03875512 (the "October 12, 2018 Director's Complaint").    The

10 October 12, 2018 Director's Complaint placed Activision and the Board on notice that

11 the DFEH would investigate, *inter alia*, "potential gender discrimination claims,

12 including pay equity and discrimination in the 'terms, conditions or privileges of

13 employment'" at Blizzard.

14    53.    The October 12, 2018 Director's Complaint specifically notified

15 Activision and the Board that the agency had "obtained information, which, if proven,

16 indicates [Blizzard] may have engaged, and may continue to engage, in discriminatory

17 practices against female employees and job applicants on the basis of gender, in

18 violation of Government Code section 12940."[19]  This complaint further alleged that

19 Blizzard had "discriminated in compensation or in terms, conditions or privileges of

20 employment on the basis of gender.  If proven, these allegations would constitute a

21 violation of Government Code section 12940."[20]    The DFEH further alleged that

22 Blizzard had "failed to hire, select, or employ women based on their gender.  If proven,

23 these allegations would constitute violations of Government Code section 12940."[21]

24 Finally, the DFEH alleged that Activision "failed to take all reasonable steps to

25

26 ─────────────────
[19]  October 12, 2018 Director's Complaint, ¶1.

27 [20]  *Id.*, ¶2.

28 [21]  *Id.*, ¶3.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    prevent [unlawful] discrimination."[22]

2        54.   California Government Code § 12940, which is part of the FEHA,

3    prohibits discrimination of applicants and employees for employers with five or more

4    employees based on a protected category, such as race, religion, or gender.

5    Specifically, FEHA proscribes "unlawful employment practices," which are defined

6    to include:

7        For an employer, because of the race, religious creed, color, national
         origin, ancestry, physical disability, mental disability, medical condition,
8        genetic information, marital status, sex, *gender, gender identity, gender
         expression*, age, sexual orientation, or military and veteran status of any
9        person, *to refuse to hire or employ the person or to refuse to select the
         person for a training program leading to employment, or to bar or to
10       discharge the person from employment or from a training program
         leading to employment, or to discriminate against the person in
11       compensation or in terms, conditions, or privileges of employment*.[23]

12

13

14        55.   On October 29, 2018, the DFEH amended the October 12, 2018

15   Director's Complaint to include Activision as a respondent.  On December 7, 2018,

16   the DFEH amended the complaint again, to add Activision Publishing as a respondent.

17   Thus, *by December 2018, Activision and the Board were on notice that the Company*

18   *and two of its three primary subsidiaries (Activision Publishing and Blizzard) were*

19   *under investigation for pay and promotion discrimination by the DFEH*.

20        56.   The DFEH's two-year investigation *was principally focused on pay and*

21   *promotion discrimination at the Company*.  Although the Company was also under

22   investigation by the EEOC beginning at least as early as September 26, 2018, the

23   agencies agreed that the EEOC would take jurisdiction of a sexual harassment

24   investigation *and DFEH would take on an investigation related to gender-based*

25   *discrimination in pay and promotion*.

26

27   _____
     [22] *Id.*, ¶4.

28   [23] Cal. Gov. Code § 12940(a).

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

57.     The agreement between the DFEH and EEOC to work together in their investigations had significant import because of the differences in state and federal antidiscrimination laws.  As the DFEH would later detail in a letter to the EEOC on June 15, 2021:

> FEHA and the California Equal Pay Act are not duplicative of Title VII. For example, unlike Title VII, *FEHA provides Californians broader legal protections and rights* such as, among other protections, coverage of interns and contractors, strict liability for supervisor harassment, individual liability against supervisors for harassment, *uncapped damages*, a three-year administrative complaint deadline, and *recognition of anticipatory retaliation by California employers*.  The California Equal Pay Act is also *one of the strongest pay equity laws in the nation*, and includes a substantially similar work standard, back pay, liquidated damages, interest and penalties.  We expect that you agree that California workers should not be deprived of these greater rights and remedies under state law in the pending investigation.[24]

58.     Thus, the DFEH's two-year investigation—which focused on pay and promotion claims—contemplated *broader state law protections for Activision employees than the EEOC investigation*, as well as different authorities, protocols and resources, with respect to those claims.

59.     Over three months after the DFEH Director's Complaint was first served on Activision, on January 30, 2019,



---

[24] EEOC Action, ECF No. 35-8, p. 3.

[25]

[26]

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ████████████████ ██████████████████████

### D. DFEH Conducts A Thorough Two-Year Investigation Of Activision's Unlawful Gender Discrimination Practices

60.     Following service of the Director's Complaint, the DFEH began its two-year investigation (the "DFEH Investigation"), wherein over the course of more than two years of investigation, DFEH served 40 requests for production of documents, deposed seven PMK witnesses and reviewed over 17,000 pages of documents prior to filing the civil complaint against Activision.

61.     Such a thorough investigatory process, which threatened to expose the Company to massive civil liability and reputational harm, ensures that the ***Company's top executives and Board would be aware of the gender discrimination and unlawful retaliation charges***.  Since then, ████████████████████████



62.     On January 26, 2021, ████████████████████████



THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



63.     Under an interagency agreement between the DFEH and the EEOC, the agencies agreed to cooperate and divide responsibilities on the Activision investigation (the "Interagency Agreement").  The Interagency Agreement limited the scope of the EEOC's investigation to harassment claims, and ***specifically excluded from its investigation pay and promotion claims***.[34]    Under the Interagency Agreement, ***DFEH's investigation would focus on pay and promotion claims***.  ***The DFEH has stated that its investigation contemplated "broader state law protections for Activision employees than the EEOC investigation, as well as different authorities, protocols and resources, with respect to those claims."***[35]

64.     Activision recently challenged the adequacy of the DFEH's investigation, which was recently adjudicated in the DFEH Action.  In a motion for summary adjudication filed in the DFEH Action on May 6, 2022, (the "Activision MSA"), Activision alleged, *inter alia*, that the DFEH had "failed to complete its statutorily required investigation" prior to filing suit, arguing:

(i)     The harassment and retaliation claims were expressly excluded from the scope of the DFEH's investigation.

(ii)     The DFEH and the EEOC entered into an agreement in December

---

[30] ▪.

[31] ▬▬▬▬▬▬▬▬▬▬▬▬▬

[32] ▬▬▬▬▬▬▬.

[33] ▬▬▬▬▬▬▬

[34]  EEOC Action, ECF No. 35-2, p. 6.

[35]  EEOC Action, ECF No. 35-8, p. 3.

2018 (the previously defined "Interagency Agreement"), under which the DFEH would investigate pay and promotion claims while the EEOC would investigate harassment and related retaliation claims.

    (iii)  Having agreed in writing that it would not investigate any harassment-related claims, the DFEH cannot now claim that it conducted the required investigation or gathered enough evidence to decide whether harassment or retaliation occurred.

    (iv)  Accordingly, the court should dismiss the DFEH's harassment and retaliation claims.

    65.   Activision specifically acknowledged in its MSA that, pursuant to the Interagency Agreement, "DFEH would take on the investigation related to gender-based discrimination in pay and promotion" and that Activision had "cooperated" with DFEH "for more than two years."[36]  Thus, Activision did not challenge the adequacy or quality of the DFEH Investigation concerning gender discrimination.

    66.   On August 10, 2022, the Honorable Timothy Patrick Dillon denied Activision's MSA in its entirety.  Rejecting Activision's "extraordinary" argument that summary adjudication was proper because the DFEH's investigation "stopped short" of a full investigation, the Court noted, *inter alia*, the propriety and breadth of the DFEH's investigation:

> Here, Defendants' evidence establishes that the DFEH served subpoenas and requests for the production of documents . . . In addition to written discovery, DFEH . . . served a notice of PMK depositions on February 19, 2020, seeking depositions on ten different topics and 52 sub-topics.  In the ensuing months, Defendants produced seven witnesses for depositions . . . ***Therefore, the DFEH "investigated" the dispute by***

---

[36]  DFEH Action, Activision's MSA, p. 15.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*compelling testimony and production of documents*.[37]

67.    The Court further held that Activision failed to meet its burden of establishing that the DFEH Action had no merit on the grounds that the DFEH failed to satisfy its investigation requirement under the FEHA.  In short, Judge Dillon weighed the evidence and on August 10, 2022, rejected Activision's challenge to the two-year DFEH Investigation and instead confirmed its propriety and scope, which Activision did not even challenge with respect to the DFEH's gender discrimination in pay and promotion claims.

### E.    DFEH Served Activision With A "Cause Finding" Confirming Activision's Unlawful Gender Discrimination Practices

68.    On June 24, 2021, following the conclusion of its two-year investigation, the DFEH served Activision with a cause finding (the "DFEH Cause Finding") which found the Company "*discriminated against female employees and contingent or temporary workers in terms and conditions of employment, including compensation, assignment, promotion, termination, constructive discharge, and retaliation*." [38]

69.    The DFEH also found that Activision "*failed to take all reasonable steps to prevent unlawful discrimination*." [39]  The DFEH concluded that Activision violated California Labor Code by "*paying female employee[s] less than their male counterparts for substantially similar work*."[40]

70.    The DFEH Cause Finding prompted even more procedural safeguards. After an investigation finds merit to the complaint, DFEH regulations "require[s] the parties to participate in *mandatory dispute resolution* in an effort to resolve the

---

[37] DFEH Action, Order on Activision's MSA, p. 20.
[38] ¶18.
[39] *Id*.
[40] *Id*.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    dispute without litigation."[41]  If no settlement is reached, a civil action can then be

2    filed.

3        71.   Here, according to the DFEH, ***Activision refused to participate in the***

4    ***mandatory mediation process***, a decision that certainly could not have been made

5    without high-level approval.  This was confirmed by Judge Dillon after evaluating the

6    evidence presented in Activision's MSA, which alleged it was Activision that failed

7    to properly mediate the matter.[42]

8        72.   As Judge Dillon noted in his August 10, 2022, decision denying the

9    Activision MSA:

10         The court finds Defendants' argument that they did not know what they
     would be mediating on July 15, 2021—unpersuasive.  The Directors'
11         Complaints, the parties' counsels' discussions, discovery the DFEH
12         propounded, and the alleged battle between the EEOC and the DFEH
     gave Defendants enough information to begin the mediation process.
13         Defendants' refusal to agree to waive issue and claim preclusion
14         arguments (during the tolling discussions) suggests they knew what
     claims were at issue.  Moreover, any charge filed with the EEOC was
15         deemed filed with the DFEH.  (RJN, Exhibit 13–FY 2019 EEOC/FEPA
16         Model Worksharing Agreement, p. 2, Section II.A ["The EEOC's receipt
     of charges on the FEPA's behalf will automatically initiate the
17         proceedings of both the EEOC and the FEPA for the purposes of Section
18         705 (c) and (e) (1) of Title VII"].)  To the extent required, the DFEH
     expended efforts at conciliation.  When counsel could not agree on an
19         extension of the tolling agreement, the DFEH filed this action the day
20         before the deadline in the existing tolling agreement expired.  (DAE,
     Baca Decl., ¶49, Exh. 17.).[43]
21

22       73.   The DFEH Cause Finding served as an additional "red flag" to the Board,

23   putting the Director Defendants on notice that there was a mandatory mediation

24   process, and that if the mediation was unsuccessful, a civil complaint would be filed

25   publicly.  The Board must have been aware that the Company ***shirked its legal***

26   _____

27   [41]  Cal. Code Regs. Tit. 2 § 10025.
     [42]  DFEH Action, Order on Activision's MSA, p. 30.
28   [43]  *Id.*

*responsibility* to participate in the DFEH's mandatory mediation process.

74.    The shareholders, the market, and the SEC were *unaware* of this fact, however, as the Company *failed to disclose* the DFEH's investigation in its quarterly filings until after it had become public.  The SEC is currently investigating Activision for its failure to disclose the DFEH Investigation to investors.[44]

### F.    DFEH Commences A Legal Civil Action Against Activision For Civil Rights Violations

75.    With no mediation available, the DFEH filed its civil action on July 20, 2021, and filed its First Amended Complaint on August 23, 2021 (the previously defined "DFEH Action").  The DFEH First Amended Complaint sets forth eleven causes of action, including five counts for different types of employment discrimination based on gender; two counts for failure to prevent discrimination and harassment; and counts for retaliation, unequal pay, improper waiver of rights, and failure to maintain and produce records.

76.    The DFEH found that Activision "engaged in and continue[d] to perpetuate *discriminatory practices regarding pay, assignment, promotion and other terms and conditions of employment* which negatively affect and impact female employees and contingent or temporary workers."[45]   Significantly, the DFEH determined that Activision "failed to take effective steps to remedy or adequately correct its compensation disparities *despite its awareness that such disparities existed*" and these "discriminatory practices" *continue to the date the DFEH filed its First Amended Complaint on August 23, 2021*.[46]   According to the DFEH, the pay disparities at the Company affected *2,500 female employees* and women were generally underpaid by *an average of $16,000 a year*.

77.    According to the DFEH, these "discriminatory practices" first started

---

[44] November 16, 2021, *WSJ Report*.

[45] ¶31.

[46] ¶45.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

when the employee was hired at which time "***women were offered lower compensation and less lucrative job assignments and opportunities than their male counterparts***."[47]   Moreover, the DFEH determined that Activision "paid female employees ***significantly less in starting pay*** then their male counterparts at hire" as a "pattern or practice" and the "violations are continuing."[48]

78.    At Activision, female employees were even provided "less stock and incentive pay opportunities" and "[f]emale employees were overwhelming assigned into lower grades/levels without stock and incentive pay opportunities" and "received less stock and incentive compensation than male employees" according to the DFEH.[49]   The DFEH concluded that "the pay disparity continued throughout employment for female employees and contingent or temporary workers" and Activision "paid female employees significantly less than their male counterparts after hire" as a continuing pattern and practice in violation of applicable law.[50]

79.    The DFEH First Amended Complaint provided several examples showing that female employees were "***steered into the lower levels***" of the Company's hierarchy and "often had to work harder and longer ***to earn equal promotional and other opportunities*** as their male counterparts."[51]

80.    *First*, a female Blizzard employee was "assigned to a lower level role, denied equal pay, and subsequently sought a promotion because she had been carrying out duties exceeding her job description" but was "repeatedly told it was not her turn and others deserved a promotion ahead of her."[52]   This female employee was not promoted until three years while her male counterpart was promoted within a year of

---

[47] ¶32.
[48] *Id.*
[49] ¶34.
[50] ¶33.
[51] ¶35.
[52] *Id.*

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    his hire despite having started several months after her.[53]

2    81.   *Second*, another female employee at Blizzard was assigned to a "lower

3    level, denied equal pay, and passed over for a promotion despite multiple factors that

4    suggested she earned it: (1) highly rated performance reviews; (2) she generated

5    significantly more revenue in her marketing campaigns than her male counterpart; and

6    (3) she ran almost twice as many campaigns as her male counterpart."[54]  Despite her

7    accomplishments, she was passed over for a promotion in favor of her male

8    counterpart.[55]

9    82.   *Third*, a female human resources employee at Activision "was delayed

10   and passed over for a promotion despite receiving positive performance reviews,

11   doing substantial more work than her male counterpart, and taking over the actual

12   responsibilities of the departing person."[56]

13   83.   *Finally*, according to the DFEH, female accounting employees at

14   Activision reported that "male counterparts were paid significantly more than them

15   despite doing the same or less work and having less responsibilities."[57]

16   84.   Moreover, the DFEH found that at Activision, female employees were

17   also not promoted because of the Company's "***discriminatory practices against***

18   ***pregnant female employees***."[58]  For example, a female employee was refused equal

19   pay and a promotion because, as she recalled being told, "they could not risk

20   promoting her as ***she might get pregnant and like being a mom too much***."  *Id.*

21   85.   Other findings by the DFEH supporting its conclusion that "female

22   employees were further treated negatively due to their pregnancies" at Activision

23

24   ---

24   [53]  *Id.*

25   [54]  ¶36.

25   [55]  *Id.*

26   [56]  ¶38.

27   [57]  *Id.*

28   [58]  ¶39.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   include: (i) supervisors ignored medical restrictions given to female employees and
2   gave them negative evaluations while they were out on maternity leave; (ii) other
3   female employees reported that they were criticized for leaving to pick up their
4   children from daycare while their male counterparts were playing video games; and
5   (iii) female employees were kicked out of lactation rooms so employees could use the
6   room for meetings.[59]

7       86.   The DFEH also found that Activision "**terminated female employees**
8   **more quickly than their male counterparts**.  This pattern or practice and violations
9   were continuing."[60]

10      87.   As a result of these discriminatory pay, assignment, promotion and other
11  practices, the DFEH concluded following its two-year investigation that Activision's
12  "**gender pay gap is significant**" in that the Company paid female employees
13  significantly less in base pay and total compensation then their male counterparts as a
14  continuing pattern or practice in violation of the law.[61]  The DFEH concluded that
15  Activision "**failed to take effective and reasonable steps to prevent pay**
16  **discrimination as the pay disparity between male and female employees was not**
17  **remedied and continued**."[62]

18      88.   Finally, masses of female employees specifically complained to various
19  human resources personnel of the foregoing discriminatory practices, according to the
20  DFEH, yet no reasonable actions were taken in response thereto.   Activision
21  employees further complained to the DFEH during its investigation that their
22  complaints were not kept confidential.  According to the DFEH, female employees,
23  "experienced retaliation by [Activision] that included **involuntary transfers, selection**

24

25

_____

[59] *Id*.
[60]  ¶44.
[61]  ¶41.
[62]  ¶42.

26

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*for layoffs, and denial of projects and other opportunities*."[63]   The DFEH "conservatively estimate[d]" that 10% of female employees suffered a compensable retaliation at the Company, *and that the retaliation claims amount to $56 million in damages against the Company*.

## G. Defendants' Public Denial Response To The DFEH Action Prompts Activision's Employees To Stage A Work Stoppage

89.   On July 21, 2021, the Director Defendants responded to the DFEH Action with a blanket denial of wrongdoing, calling into question the integrity and veracity of the DFEH's investigation.   Among other criticisms, Defendant Kotick caused the Company to respond by claiming the DFEH Action distorted and lied about the Company's past, characterizing the DFEH Action as "inaccurate," "disgraceful," and "unprofessional."

90.   The Director Defendants' patent attempt to minimize their own malfeasance was met with public outrage.   On July 23, 2021, just two days after the Company's statement, a chorus of current and former employees confirmed widespread abuse suffered at the hands of Activision management.   Hundreds of personal accounts poured in across multiple social media platforms corroborating the DFEH Action's findings of illegal gender discrimination and retaliation.

91.   In response, on July 23, 2021, Activision's Chief Compliance Officer, Frances F. Townsend, sent a companywide email to Activision staff.   The email *doubled down on the Director Defendants' denial of wrongdoing*, characterizing the DFEH Action as "a distorted and untrue picture of our company, including factually inaccurate, old, and out of context stories - some from more than a decade ago."

92.   On July 26, 2021, hundreds of former and current employees signed a petition condemning the Director Defendants' July 21, 2021, response to the DFEH Action.   Also on July 26, 2021, according to media reports, Activision hosted an "all

---

[63]   ¶51.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   hands" meeting to address the DFEH Action, though only 500 employees were
2   reportedly able to attend the Zoom call.  Activision Publishing's Chief Operating
3   Officer, Joshua Taub, hosted the meeting, during which he reportedly suggested that
4   the only proper way to handle the allegations is through internal handling rather than
5   a lawsuit, *despite the lawsuit explicitly indicting Activision's failure to internally*
6   *handle the alleged misconduct*.

7          93.    Then, on July 27, 2021, Activision employees **organized a work**
8   **stoppage for Wednesday, July 28, 2021, to support their open letter against the**
9   **Company** and to thoroughly denounce the Director Defendants' failure to admit fault
10  or effect any prophylactic changes.

11         94.    On July 28, 2021, Activision employees walked out in protest, with in-
12  person employees meeting at the gates of Activision's Irvine headquarters and virtual
13  employees abstaining from work.  One week later, the Company's Senior Vice
14  President of Human Resources resigned from the Company.  Defendant CEO Kotick
15  then issued an email to all Company employees apologizing for the Company's "tone
16  deaf" initial response to the DFEH Action—the response he drafted and had sent.

17         95.    Activision continues to engage in blatant and unlawful pay
18  discrimination and unlawful retaliation **even after the DFEH commenced its**
19  **investigation**.  For example, in 2020, an Activision employee filed a civil rights
20  lawsuit against the Company for gender discrimination, alleging that, *inter alia*,
21  (i) during her tenure, a female was never promoted to or offered a director-level
22  position, (ii) she was passed over for promotional opportunities in favor of male
23  candidates, despite having consistently strong performance reviews, and (iii) *she was*
24  *terminated after she formally complained to Activision's Human Resources*
25  *department and upper management* on the basis of an unlawful subterfuge.[64]  This
26  action settled for an undisclosed amount in 2021.

27  ───────────────
    [64] *See Adelmeyer v. Infinity Ward, Inc., et al.,* No. 20STCV05581 (Cal. Sup. Ct., Los
28  Angeles Cnty.), naming Activision as a defendant.

96.     Similarly, Jennifer Oneal, Blizzard's first female co-leader, who was appointed in August 2021 alongside Mike Ybarra to replace Blizzard's outgoing president, J. Allen Brack , *was denied equal pay*.  While Blizzard's announcement of Oneal and Ybarra's new roles purported them to be equals, *the Company refused to pay them equally*.  Due to the pay inequity, *Oneal resigned just one month after being promoted to the position*, later explaining in an email: "While the company informed me before I tendered my resignation that they were working on a new proposal, *we were made equivalent offers only after I tendered that resignation*."  Oneal, who is Asian-American and openly gay, said she had been "tokenized, marginalized, and discriminated against" while at Activision.[65]

### H.  Investigative Reports By *The Washington Post* And *Bloomberg* Confirm Widespread Discrimination

97.     In August 2021, *The Washington Post* and *Bloomberg* published investigative reports further confirming the DFEH Action's findings of widespread gender discrimination at Activision.  In an article titled "At Blizzard, groping, free-flowing booze and *fear of retaliation tainted* 'magical' workplace," *The Washington Post* reported:

> Almost every woman I know of at Blizzard has a story of … a man with power over her, undermining her and taking credit for her work, dismissing her, talking over her, being the last person to get promoted, despite being eminently capable," said Jennifer Klasing, a former *World of Warcraft* quest designer who left the company in October 2020. Almost every single woman I know that's been there longer than a year has at least one of these stories.[66]

---

[65]  Bailey, Kat, "Former Blizzard Co-Lead Jen Oneal Says She Was Offered Equal Contract Only After Resigning," *IGN*, 17 Nov. 2021. https://www.ign.com/articles/blizzard-jen-oneal-mike-ybarra-equal-pay-after-resignation.

[66]  Liao, Shannon. "At Blizzard, Groping, Free-Flowing Booze and Fear of Retaliation Tainted 'Magical' Workplace." *The Washington Post,* 6 Aug. 2021. https://www.washingtonpost.com/video-games/2021/08/06/blizzard-culture-sexual-harassment-alcohol/

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

98.   *The Washington Post* further confirmed the DFEH's gender discrimination and retaliation findings when it reported that an Activision employee claimed the Human Resources department was "like a gang that would ruin your career if you reported certain individuals."[67]  Similarly, *Vice* reported that an employee noted "speaking up against [certain executives] was putting a target on your back." Employees who complained to Human Resources would be put on a performance improvement plan and forced to meet goals or be fired.

## I.   EEOC's Investigation And Hasty Settlement

99.   In the fall of 2018—at the same time the California DFEH was investigating Activision—the federal EEOC began investigating the Company through a Commissioner's Charge signed on September 26, 2018 ("EEOC Notice"), which, as required by law, was served on the Company soon thereafter.[68]  As part of its investigation, the EEOC, in August 2020, sent a letter to both current and former employees at all levels of Activision asking them to participate in a survey on "gender-based and/or sexual harassment" at the Company.

100.   In June 2021, the EEOC sent Activision a letter ***"finding reasonable cause to believe violations of Title VII occurred" at the Company*** and inviting the Company to conciliate the discrimination charges.  Apparently, the Company agreed to conciliation, though this confidential process was interrupted by the DFEH's public filing.[69]  Nonetheless, the toxic workplace and discriminatory practices ***remained in place at Activision*** through at least August 23, 2021, according to the DFEH First Amended Complaint.

101.   On September 27, 2021, Activision and the EEOC lodged a proposed settlement of the EEOC Action, in the form of a consent decree (the "Consent Decree").  On October 25, 2021, the DFEH moved to intervene in the EEOC Action

---

[67]  *Id.*

[68]  29 C.F.R. § 1601.14 (notice of the charge is served on the respondent)

[69]  EEOC Action, ECF No. 35-2, p. 7.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in order to, *inter alia*, "comment[] on the proposed [C]onsent [D]ecree lodged by the [EEOC] and [Activision]."[70]   Specifically, the DFEH alleged that the EEOC and Activision "secretly negotiated a proposed consent decree without the DFEH's input and beyond the EEOC's statutory authority to pursue only federal claims. . ."[71]

102.   The DFEH cited three key-ways the Consent Decree was improper:

i.   **Overbroad Scope and Release**.   The proposed consent decree encompasses an improperly large scope, purporting to impermissibly release California state law claims that the EEOC lacks standing to litigate or settle, which are significantly more valuable than the federal claims under EEOC's jurisdiction, and which are currently being actively prosecuted by the DFEH in the DFEH [State] Action.   The proposed consent decree also covers individuals and claims not included in the EEOC's investigation.

ii.   **Missing Information**.   The proposed consent decree is ambiguous and inadequately justified.   *First*, it is incomplete, failing to provide a proposed notice, plan of allocation, claim form, individual release language, and details about implementation.   *Second*, the parties have failed to present adequate information to allow the Court to properly evaluate the reasonableness of the settlement and decide whether to approve it, including key information regarding the value of the claims, the strengths and weaknesses of the claims, the degree of discovery conducted to date, the scope of the release, and how much money each Covered Individual may receive.

iii.   **Defects**.   The proposed consent decree has defects that require or caution in favor of denial of approval.   *First*, it requires Activision to destroy evidence of wrongdoing and change employees' termination classification information, which will obstruct the State Action.   *Second*, it creates a lopsided and highly irregular process by which individual victims will be potentially release claims outside of the EEOC lawsuit through a sixty-minute consultation with a lawyer paid by Activision.   *Third*, it provides inadequate monetary relief in exchange for a release of federal ***and state claims without discovery or any notice of DFEH's***

---

[70]  EEOC Action, ECF No. 24-1, p. 6.

[71]  *Id.*, p. 8.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*pending State Action*.

103.   In moving to intervene in the EEOC Action, the DFEH also noted that *California antidiscrimination law with respect to pay discrimination is significantly stronger than corresponding federal law*.   Specifically, 29 U.S.C. § 206(d)(1) (federal Equal Pay Act ("EPA")) limits plaintiffs to the use of comparators who perform "equal work" requiring "equal skill, effort, and responsibility" within the same "establishment."

104.   By comparison, Cal. Lab. Code § 1197.5(a) (California EPA) allows plaintiffs to use comparators who perform "substantially similar work, when viewed as a composite of skill, effort, and responsibility," without the same establishment limitation.   California law also protects contractors for pay discrimination claims; federal law does not. Cal. Gov. Code § 12940(j).  Finally, *compensatory and punitive damages are capped under federal law*, but not California law. 42 U.S.C. § 1981(a).

105.   On March 29, 2022, the District Court approved the operative version of the Consent Decree.  In response, on May 13, 2022, the DFEH issued a press release explaining its opposition to the settlement:

> The DFEH case has not settled and continues to move forward.  DFEH has opposed the EEOC settlement claiming it provides insufficient funds to women who experienced harassment and discrimination and that the settlement seeks to preclude any woman who participates in the EEOC settlement from receiving any monetary compensation from the DFEH state case.

> The EEOC's settlement with Activision Blizzard provides $18 million for a potential class in excess of 10,000.  Under California law, there is no cap on the damages that can be awarded for sexual harassment.  In contrast, federal law limits such damages to $300,000 per person.  Although the EEOC can only bring harassment and discrimination claims based on federal law, Title VII, the EEOC Consent Decree states that any employee who elects to participate in the federal lawsuit waives their right to receive compensation under state law through the DFEH lawsuit.  That is, if you participate in the EEOC settlement, you will be

32

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

asked to sign an agreement not to participate in the DFEH case no matter how much money, if any, is secured by DFEH. For these and other reasons, the DFEH is challenging the validity of the EEOC Consent Decree in federal appellate court.

106.    Significantly, the Consent Decree ***does not*** purport to settle or otherwise make whole Activision employees ***who suffered gender discrimination with respect to pay and promotion***.    Nor does the Consent Decree purport to enjoin any discriminatory employment practices with respect to pay and promotion.

## V.    BREACH OF FIDUCIARY DUTY ALLEGATIONS

### A.    Director Defendants' Duties

#### 1.    Activision May Not Operate In Violation Of The Law

107.    The Director Defendants, as corporate fiduciaries, are accountable to shareholders for operating the Company within the bounds of the law.    Under Delaware law, a corporation may be chartered "to conduct or promote any *lawful* business or purposes."[72] Accordingly, for a corporate director knowingly or recklessly to cause the corporation to engage in unlawful acts or activities or enter an unlawful business is disloyal in the most fundamental of senses.    Activision's workplace as described herein was in continuous, notorious, and systemic violation of state and federal law.    The Board's maintenance of this workplace was thus "disloyal in the most fundamental of senses."

108.    By reason of their positions as directors and fiduciaries of Activision, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed and owe, the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage Activision in a fair, just, honest, and equitable manner.

---

[72] Del. Code § 101(b) (emphasis added).

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

109.   At all times relevant hereto, the Director Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.  Each of the Director Defendant's conduct—who were officers and/or directors of the Company—was ratified by the remaining Director Defendants who collectively comprised Activision's board of directors at all relevant times herein.

110.   The Board is responsible for overseeing the Company's workplace culture and preventing the systemic abuses the Director Defendants enabled.  This charge has been imposed by the expectations of all market participants—most critically, shareholders, current and potential employees, consumers, and advertisers—with particular urgency following a widely recognized shift in attitudes towards workplace discrimination.  Moreover, the Board expressly accepted this charge by various instruments, including its representations to shareholders, its committee charters, the Company's Code of Conduct, and the Company's Equal Employment Opportunity Policy.

111.   The Director Defendants, as corporate fiduciaries, are accountable to shareholders to prevent and eliminate a culture of gender discrimination at the Company to avoid liability costs and risk, minimize brand damage, and maximize capacity to attract, maintain, and motivate talented employees.

112.   Maintaining a workplace free of gender discrimination *is critical to a company's capacity to attract and retain talented employees*.  In 2020, video games generated $155 billion in revenue, "larger than the movie and music industry combined."[73]  Game development has become an exceedingly complex and resource-intensive undertaking.  Accordingly, talented developers, designers, and other industry professionals are in high demand and subject to *intense competition* from potential employers.  Activision will be incapable of attracting and retaining such

---

[73]   Beattie, Andrew. "How the Video Game Industry Is Changing." *Investopedia*, 31 Oct. 2021, https://www.investopedia.com/articles/investing/053115/how-video-game-industry-changing.asp.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   employees unless it is free, and known to be free, of the abusive pay and promotion

2   practices the Director Defendants enabled, and known to hold accountable those who

3   enable them.

4       113.   Further, because success as a gaming industry professional requires "an

5   interest in video games in general and an ability to keep up with rapidly changing

6   technical and artistic trends," **the industry's workforce is much younger than the**

7   **workforce in general**, with two-thirds of respondents in a 2016 industry survey of

8   game developers being between the ages of 20 and 34 years old.[74]   Activision's

9   continuing success therefore **depends on attracting and retaining talented workers**

10  **who came of age and entered the workforce during the drive to hold responsible**

11  **those who enable workplace discrimination**.

12      114.   A culture of, and reputation for, gender discrimination impairs a

13  company's ability to deal with all other market participants as well.  Consumers are

14  increasingly unwilling to patronize businesses known to enable such conduct, a trend

15  to which Activision is especially vulnerable in light of the virtually limitless digital

16  entertainment options available to them.  As the Company stated in its 2019 10-K

17  filing, "We compete for the leisure time and discretionary spending of consumers with

18  other interactive entertainment companies, as well as with providers of different forms

19  of entertainment, such as film, television, social networking, music and other

20  consumer products. The interactive entertainment industry is intensely competitive

21  and new interactive entertainment software products and platforms are regularly

22  introduced."[75]   Among the "main competitive factors" identified by the Company is

23  "brand name recognition."   The Company's business will be permanently and

24

---

25  [74] "Developer Satisfaction Survey 2014 & 2015: Diversity in the Game Industry
    Report."   *International Game Developers Association*, 12 Jun. 2016, p. 7,
26  https://igda-website.s3.us-east-2.amazonaws.com/wp-
    content/uploads/2019/04/21180408/IGDA_DSS_2014-2015_DiversityReport-
27  2016.pdf.
    [75] Form 10-K. *Activision Blizzard,* 27 Feb 2020.
28  https://investor.activision.com/static-files/32abe798-add2-4770-9c7d-4cd3a840ede2.

1  irreparably harmed if consumers come to associate the Company's brands, not with
2  its globally popular entertainment products, ***but with gender discrimination***.

3    115.   Advertisers are increasingly unwilling to risk their own reputations in
4  sponsoring and promoting businesses known to be abusive, as illustrated by the
5  hemorrhage of sponsors from the Company's esports leagues described above.
6  Vendors are increasingly unwilling to do likewise in providing critical goods and
7  services, as illustrated by the "misogyny tax" imposed on Activision.  A culture such
8  as that overseen by the Director Defendants here seriously impairs a business's ability
9  to function in the marketplace at all.

10    116.   Finally, a culture that causes a company to operate in perpetual and
11  notorious violation of antidiscrimination laws exposes the company to potentially
12  crushing public and private liability.  The drive for workplace accountability means
13  closer scrutiny from public regulators and private plaintiffs.  ***Even settling one***
14  ***plaintiff's individual discrimination lawsuit can lead to eight-figure payouts***.  For
15  example, in 2020, social media company ***Pinterest settled a discrimination and***
16  ***retaliation lawsuit brought by a former executive for $22 million***.[76]  The maximum
17  potential liability incurred by years of enterprise-wide discrimination, and retaliation
18  at the hands of colleagues and supervisors is almost incalculable.

19    117.   Each of the above considerations bears special weight with respect to a
20  company's most important products (such as the Company's *World of Warcraft*), its
21  most important employees, and its most important public events (such as BlizzCon),
22  as these are the linchpins of the Company's reputation and profitability.

23    118.   Director responsibility for workplace culture is as essential to a
24  company's vitality as director responsibility for major business transactions,
25  regulatory compliance, and corporate governance.

---

[76]  Griffith, Erin. "Pinterest Settles Gender Discrimination Suit for $22.5 Million."
*The New York Times*, 14 Dec. 2020,
https://www.nytimes.com/2020/12/14/technology/pinterest-gender-discrimination-lawsuit.html.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**2.    The Board's Charters Recognize The Importance
Of Director Responsibility For Workplace Culture**

119.    The charters of the responsible Board committees charge committee members with supervising the Company's culture and protecting the Company from the reputational and financial risks created by a lawless culture of gender discrimination.

120.    Defendants Corti, Hartong, Nolan, and Morgado served on the **Audit Committee** from 2003 to present, from 2015 to 2022, from 2019 to present, and from 2008 to 2022, respectively.  Under that Committee's charter (as amended in April 2021), they were among other things required to ***"[m]onitor the adequacy of the Company's ethics and compliance program, including compliance with the Company's Code of Conduct,"*** and oversee the processes to ***"assess and manage the Company's exposure to risk" and any "steps management has taken to monitor and manage such exposures."***  Until April 2021, the Audit Committee was also required to "[r]eview the Company's program to monitor compliance with its Code of Conduct, and meet periodically with individuals with operational responsibility for the compliance and ethics program and members of management to discuss compliance with the Code of Conduct."  Defendants Corti, Hartong, Nolan, and Morgado breached their fiduciary duty by failing to conduct that oversight.

121.    The current **Code of Conduct**, for which the Audit Committee is responsible, was adopted in 2017.  It ***prohibits discrimination***.  Under a heading titled "Diversity and Non-Discrimination: Respect Differences," the Code provides that Activision, and therefore the Board, "do [not] tolerate discrimination or make employment-related decisions on the basis of a protected characteristic or any other basis protected by applicable law."  The Code provides that "it's up to each and every one of us to help our company build and maintain an inclusive work environment that fosters respect and reflects the diversity of the communities where we operate."  The Code also provides that Activision, and therefore the Board, "do [not] tolerate

1  retaliation against employees for asking questions or attempting to invoke their rights
2  under applicable laws."

3  122.  Defendants Nolan, Morgado, Meyer, and Wasserman served on the
4  **Nominating and Corporate Governance Committee** from 2016 to 2018, from 2002
5  to 2021, from 2014 to present, and from 2019 to 2022, respectively.  Under that
6  Committee's charter, they were among other things tasked with ***"mak[ing]***
7  ***recommendations to the Board" about the adequacy of the "Company's Corporate***
8  ***Governance Principles and Policies," and overseeing the "Company's***
9  ***environmental, social, and governance ('ESG') strategy, practices, and policies."***

10  123.  The current Corporate Governance Principles and Policies, for which the
11  Nominating and Corporate Governance Committee ("N&CG Committee") was
12  responsible, were adopted in 2016.  The Principles and Policies provide that the
13  "primary responsibility of the Board is to oversee the affairs of the Company for the
14  benefit of stockholders," and to "oversee the CEO's performance" in managing the
15  "day-to-day" operations of the Company.  The Principles and Policies also required
16  the Board to "oversee[] a corporate compliance program which includes a Company
17  code of conduct, the maintenance of accounting, financial and other controls, and
18  review of the adequacy of such controls."  Defendants Nolan, Morgado, Meyer, and
19  Wasserman breached their fiduciary duty by failing to conduct that oversight.

20  124.  Defendants Morgado, Bowers, Wasserman, and Ostroff served on the
21  **Compensation Committee** from 1998 to 2021, from 2018 to present, from 2016 to
22  2018, and from 2021 to present, respectively.  Under that Committee's charter, they
23  were among other things tasked with overseeing the ***"Company's key human capital***
24  ***management strategies and programs," which include "attracting, retaining, and***
25  ***developing talent."***  Defendants Morgado, Bowers, Wasserman, and Ostroff breached
26  their fiduciary duty by failing to conduct that oversight.

27  125.  The Company adopted its **Equal Employment Opportunity Policy** in
28  June 2020.   The Policy applies to "employment, upgrading, demotion, transfer,

38

1 recruitment or recruitment advertising; layoff or termination; rates of pay or other
2 forms of compensation; and selection for training, including apprenticeship."  The
3 Policy requires the Company to:

     a.    Recruit, hire, train and promote, into all job classifications, the most
           qualified persons without regard to gender, race, color, …
           pregnancy, sexual orientation, gender identity, gender expression,
           marital status, medical condition … or because of genetic
           information or any other basis protected by applicable federal, state,
           or local law.

     b.    Make employment and promotional decisions by utilizing
           reasonable standards based on the individual's qualifications and
           valid job requirements, as they relate to a particular job vacancy, in
           accordance with equal employment opportunity requirements.

     c.    Administer all personnel actions relating to the terms, conditions,
           and privileges in a nondiscriminatory manner.

     126.   These responsibilities further illustrate ***the Board's recognition of the
importance of high-level corporate responsibility*** for the Company's workplace
culture.  Without any Board enforcement or oversight, however, these responsibilities
existed on paper only.

    **B.**    **The Board's Oversight Failures**

     127.   For a period of at least four years, the Director Defendants characterized
workplace culture as "***mission critical***" to the Company in multiple proxy statements.
These same Director Defendants were routinely confronted with a battery of red flags
alerting them to Activision's gender discrimination, including pay and promotion
disparities and retaliation against those who reported the misconduct.  The Board,
however, ignored the problems plaguing Activision and failed to sufficiently deal with
the ***systemic issue that was rampant throughout all three business units of Activision***
covering multiple areas including gender discrimination and unlawful pay disparity.

128.   Most notably, ***following a two-year investigation that went unchallenged by Activision***, the DFEH found significant ***companywide violations of law*** on gender discrimination, including pay and promotion disparities and retaliation.  Yet, despite knowledge of these allegations and findings ***dating back to 2018***, the Board failed to take any good faith action to cure that illegal misconduct.

129.   As alleged in the DFEH Action, Activision has long engaged in discriminatory and illegal practices regarding pay, assignment, promotion and other terms and conditions of employment which negatively affect and impact female employees and contingent or temporary workers.

130.   As underscored in the DFEH's motion to intervene in the EEOC Action:

> Sexism has plagued the male-dominated video game industry for decades. . . Activision is a particularly acute example . . . ***Activision underpays and underpromotes women.  Activision has given men higher starting pay and, on an ongoing basis, higher pay for virtually identical work.  Activision has promoted men more quickly and terminated them more slowly than comparable women***. (internal citations omitted).[77]

131.   As of August 23, 2021, the filing of the operative complaint in the DFEH Action, those sweeping and illegal pay practices ***had not been remedied***.[78]

132.   Notwithstanding that Activision's "frat" cultural paradigm was rife with gross pay disparities between men and their female counterparts performing substantially similar work, the Board has failed, entirely, to take any remedial actions to remedy the illegal pay delta among genders.  Specifically, ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[77]  EEOC Action, ECF No. 24-1, p. 6.

[78]  ¶¶31–45.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ████████████     Thus, the Board has breached, and continues to breach, its

2  fiduciary duties of oversight with respect to the illegal pay practices at Activision,

3  which it has utterly failed to remediate.

4      133.  On June 16, 2022, the Board had Activision file on Form 8-K with the

5  SEC a document entitled "Activision Blizzard Board Independent Directors Oversee

6  Review of Workplace Issues" (the "June 16 Board Admission"), claiming, among other

7  things: (i) the DFEH Action has no merit; (ii) the media is responsible for exaggerating

8  the instances of gender discrimination and retaliation at the Company; and (iii) that

9  their settlement with the EEOC would be sufficient to cover victims for all alleged

10  misconduct concerning sexual harassment and retaliation.  The filing, noted that "there

11  are many truths about our company—individual and collective, experiential and data-

12  driven—*and sometimes they can be difficult to reconcile*."[80]

13      134.  Significantly, in addition to denying any responsibility for Activision's

14  shameful state of affairs, the Board also admitted in the June 16 Board Admission that

15  *after finally reviewing* Activision's policies, procedures and controls for mitigating the

16  risk of liability for unlawful gender discrimination, retaliation, and hostile work

17  environment, *these controls were in need of significant "reforms and improvements*

18  across the Company in furtherance of [the Board's] commitment *to elevate the*

19  *Company to best practices* for compliance and pay equity in the workplace."  These

20  reforms include the following:

21      •  Combined the investigations groups into one centralized Ethics &

22      Compliance team, which is separate from business units and other groups

23  ―――――――――

[79] 

[80]  Form 8-K.  16 Jun. 2022,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/00011046592207160
3/tm2218593d1_8k.htm.

like Human Resources or Employee Relations;

- Broadened the Employee Relations Team to align the results of investigations with recommended actions and communication back to affected employees;

- Quadrupled the size of Activision Blizzard's Ethics & Compliance team since July 2021;

- Tripled investment in anti-harassment and anti-discrimination training resources;

- Announced the launch of a new companywide zero-tolerance harassment policy;

- Expanded the "Way2Play Heroes" program, created in 2018, which consists of volunteers who help other employees understand their reporting options, champion speaking up, and provide feedback and advice on how to strengthen Activision Blizzard's overall ethics & compliance program[;]

- Waived arbitration for individual claims of sexual harassment, unlawful discrimination, or related retaliation arising after October 28, 2021;

- Released Representation Data in December 2021, based on data in company records as of November 30, 2021;

- Implemented new policies, including a global drug and alcohol policy for Company-sponsored events and zero tolerance for alcohol consumption in the workplace;

- Hired a Senior Director of Equal Employment Opportunity, Equity & Compliance, since promoted to VP, Workplace Integrity and EEO, with relevant experience in gender discrimination, harassment, and related retaliation to serve as an internal EEO coordinator and assist the Company and the neutral, third-party EEO consultant with implementation of the Company's agreement with the EEOC;

- Made high level personnel changes in the executive and human resources teams—including new Chief People Officer Julie Hodges and Chief Diversity, Equity and Inclusion Officer Kristen Hines;

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Improved transparency to employees by providing regular updates on diversity representation and pay equity;

- Invested in and launched tools and systems that allow us to better track representation of women and UEG candidates at the applicant, interviewing, and hiring stages of the Company's recruiting processes;

- Made progress in ensuring there are diverse slates of candidates for all open positions;

- Launched "Upward Feedback," an annual process that gives employees a formal opportunity to share constructive, actionable feedback with their managers through an anonymous survey.

135.   In other words, ***much more is still needed to be done to bring Activision's policies and procedures in line with "best practices"*** for gender discrimination and retaliation compliance.  *Id*.  These "too little, too late" reforms were announced ***four years after*** the DFEH began its investigation.  The Board should have conducted this review and implemented these reforms well before 2018.

136.   ***Activision's Board continues to breach its fiduciary duties by denying that the Company is an acute perpetrator of gender discrimination with respect to pay and promotion***.  Despite the foregoing concession, the Board caused Activision to deny the existence of a corporate pay gap:

- [Activision has] released the U.S. Pay Equity Review for 2020 in October 2021, ***finding that, after accounting for factors that impact pay like role, location, tenure, and job classification, female employees on average earn about $1.01 for every dollar earned by men doing comparable work***.

- [Activision has] released our ESG report in May 2022, reflecting that our Global Pay Equity Review for 2021 found that, after accounting for factors that impact pay like role, location, tenure, and job classification, ***women and those who do not identify as men on average earned $1.00 for every dollar earned by men for comparable work***.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

137.   ***In other words, while the Board has conceded that Activision's workers' experiences and the Company's data are irreconcilable, it continues to deny discriminatory pay practices on the basis of data***.  This is further evidenced by the Company's failure to resolve or enjoin discriminatory pay and promotion practices in the Consent Decree with the EEOC.

## 1.   Applicable Laws Governing Gender Discrimination And Retaliation

138.   Activision's conduct exposed the Company to liability for claims of gender discrimination based on ***pay, promotion, and pregnancy***.

139.   <u>Unequal Pay:</u>  Numerous federal and state laws protect employees from wage discrimination on the basis of sex.

    a.   Under Title VII and the FEHA, it is unlawful for an employer to discriminate against any individual with respect to "compensation, terms, conditions, or privileges of employment" because of an individual's sex.[81]

    b.   Under the federal EPA, an employer is prohibited from paying different wages to an individual of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[82]

    c.   The California EPA offers additional protections, requiring equal pay "for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions," with inapplicable exceptions.[83]

---

[81] 42 U.S.C. § 2000e-2(a)(1); Cal. Gov. Code § 12940(a).
[82] 29 U.S.C. § 206(d).
[83] Cal. Lab. Code § 11975(a).

d.      In addition to liability for lost wages, interest, and liquidated damages under the CEPA, employers may also be subject to lawsuits filed under California's Private Attorney Generals Act (PAGA), Cal. Lab. Code §§ 558, 2698.   PAGA permits the California Labor Workforce Development Agency (LWDA) or individual employees to sue for penalties on the state's behalf.

140.   By systematically underpaying women in base pay and total compensation and assigning them to lower paid and less opportunity levels than their male counterparts, Activision exposed itself to liability under these various statutes for claims of *gender discrimination based on unequal pay*.

141.   Failure to Promote:  As with pay, federal and California law prohibit an employer from failing to promote an individual on the basis of sex.  Indeed, a *single* promotion opportunity is actionable.  By denying women promotional opportunities afforded to their male counterparts, steering women into lower-level positions, and using processes that disproportionately affected women's ability to advance at the Company, Activision exposed itself to liability for gender discrimination based on its *failure to promote its female employees*.

142.   Pregnancy:  Pregnancy discrimination is illegal under both federal and California law.[84]  This includes discrimination based on a *stereotypical assumption that a woman will become pregnant in the future*.

143.   In addition to prohibiting discrimination on the basis of pregnancy, childbirth, or other medical conditions, Title VII—and to a greater extent, the FEHA and the California Labor Code—requires employers to accommodate pregnant workers' health needs, such as those related to breastfeeding.

144.   Activision's conduct ran far afoul of state and federal law prohibiting discrimination based on pregnancy.  By refusing to promote women because they

---

[84]   *See* Title VII, 42 U.S.C §§ 2000e, *et seq.* (amended in 1978 to include pregnancy discrimination under the Pregnancy Discrimination Act); Cal. Gov. Code § 12940(a).

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    *might get pregnant* and refusing to accommodate their pregnancy-related medical

2    needs—indeed by allowing parties in lactation rooms—Activision exposed itself to

3    liability based on pregnancy discrimination.

4        145.   An employer categorically may not retaliate against an employee who

5    reports or otherwise opposes prohibited gender discrimination.[85]   Notably, the

6    standard of proof for a retaliation claim is lower than that of a discrimination claim—

7    a materially adverse employment action in the retaliation context is one that would

8    "dissuade a reasonable worker" from exercising protected rights.[86]  By not only failing

9    to address complaints of discrimination but also by retaliating against those who

10   complained, Activision compounded its potential liability.

**2.    Specific Gender Discrimination Oversight Failures**

12       146.   Under Delaware law, if directors learn of information that would put them

13   on notice of a threatened corporate trauma—the proverbial red flag—then *they must*

14   *take action in good faith to address it*.  Here, even though the DFEH placed the Board

15   on notice of companywide violations of law on *gender pay and promotion disparities*

16   through the Director's Complaint (October 12, 2018), DFEH Investigation

17   (December 7, 2018–June 23, 2021), DFEH Cause Finding (June 24, 2021), and DFEH

18   Action (July 20, 2021) (collectively, the "DFEH Red Flags"), the Board took no

19   meaningful steps to cure such wrongdoing, in breach of their fiduciary duties.  The

20   Board's bad faith is confirmed by the fact that the DFEH determined Activision failed

21   to take effective steps to remedy the wrongdoing and these problems *went unremedied*

22   *up to the date the DFEH filed its amended complaint on August 23, 2021*.

23       147.   Instead of using their supervisory authority over management to make

24   sure that Activision genuinely changed its culture and made employee safety and legal

25   compliance a genuine priority, the Director Defendants have done nothing of actual

26

27   _____

     [85]  42 U.S.C. § 2000e-2-3(a); Cal. Gov. Code §§ 12940(h), 12950(b)(7).

28   [86]  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

1   substance to change the direction of Activision's real policies concerning gender pay

2   and promotion equality.  This conclusion is based upon the DFEH's findings derived

3   from more than two years of investigating claims by Activision employees, wherein

4   the DFEH served 40 requests for production of documents, deposed seven PMK

5   witnesses, and reviewed over 17,000 pages of documents prior to filing the DFEH

6   Action.

7   148.   The Board offered no good faith response (including steps taken or plans

8   to combat noncompliance) to the DFEH Red Flags of unlawful gender discrimination.

9   For example, on August 23, 2021, just one month after the Audit Committee held a

10   regularly scheduled meeting, the DFEH determined that Activision "failed to take

11   effective steps to remedy or adequately correct its compensation disparities despite its

12   awareness that such disparities existed" and these "discriminatory practices" ***continue***

13   ***unremedied***.[87]   According to the DFEH, the pay disparities at the Company affected

14   ***2,500 female employees*** and women were generally underpaid by ***an average of***

15   ***$16,000 a year***.  The Director Defendants never requested any similar assessments or

16   received any similar presentations.

17   149.   The Director Defendants and the Company have not produced any

18   evidence showing when they first formally considered and documented the reforms the

19   Board announced in the June 16 Board Admission in response to the SAC, including:

20   (i) tripled investment in anti-discrimination training resources; (ii) waiver of arbitration

21   for individual claims of unlawful discrimination; and (iii) improved transparency to

22   employees by providing regular updates on diversity representation and pay equity.

23   This further confirms the Board failed to respond to the DFEH Red Flags in good faith

24   to remedy Activision's widespread and ongoing practice of gender discrimination.

25   150.   The Director's Complaint served on October 12, 2018 first alerted the

26   Board that Activision engaged in discrimination against its employees based on sex-

27

28   [87] ¶¶31–45.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

gender—including failing to hire, select, or employ persons because of their gender, as well as discriminating in compensation or in the terms, conditions, privileges of employment due to gender.  This failure is compounded, according to the Director's Complaint, because Activision *failed to take reasonable steps to prevent this misconduct*.  The Board failed to respond to this red flag in bad faith because they ███ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████ but failed to address or remedy the unlawful gender discrimination claims or assess and improve Activision's controls intended to mitigate such liability.[88]

151.   Following the completion of its two-year investigation, the DFEH served the DFEH Cause Finding (on June 24, 2021) and after Activision refused to mediate, commenced the DFEH Action (on July 20, 2021), which found the Company "engaged in and continued to perpetuate discriminatory practices regarding pay, assignment, promotion and other terms and conditions of employment [*e.g.,* pregnancy] which negatively impact female employees and contingent or temporary workers."[89]   The EEOC supported the DFEH's conclusions, "finding reasonable cause to believe violations of Title VII occurred".[90]

152.   The only "response" the Director Defendants could muster to these red flags ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ This meager example of a purported good faith "response" confirms further the Director Defendants failed to respond in good faith to the DFEH Red Flags by investigating claims, assessing controls, and

---

[88]  ¶¶31–45; ████████████████████████████████████████████████████
████████ ██ ████ ██ ██████ ███ ██ ██████ ███ ██
████████ ██ ████ ██ ██████ ███ ██ ██████ ███ ██
████████ ██ ████ ██ ██████ ███ ██ ██████ ███ ██

[89]  ¶¶31–45.
[90]  EEOC Action, ECF No. 35-2, p. 7.

implementing reforms to ***prevent*** further gender discrimination wrongdoing.  The reforms adopted in June 2022 further confirm the Board's past oversight failures.

### 3.   Specific Retaliation Oversight Failures

153.   The Director Defendants failed to take any real good faith action to prevent noncompliance with anti-retaliation laws in response to the DFEH Red Flags. *First*, despite the fact ████████████████████████████████████████████ ██████████████████ the Board failed to assess the effectiveness of internal controls or implement a remedial response to prevent further unlawful retaliation.  *Second*, as of August 23, 2021, the filing of the operative complaint in the DFEH Action, the practice of illegal retaliation at Activision ***had not been remedied***.[91]  *Finally*, the DFEH's two-year investigation, which included extensive discovery as detailed herein, "conservatively estimate[d]" that ***10% of female employees suffered a compensable retaliation at the Company***, and that the retaliation claims amount to ***$56 million in damages against the Company***.  The Company has failed to put forth any evidence, however, that includes any similar analysis sought by the Board or provided by management.  Moreover, there is no evidence the Board considered any of the reforms the Board announced in the June 16 Board Admission.

154.   A fiduciary does not satisfy her fiduciary duties by doing nothing to change the Company's business practices after learning that they were likely illegal. Rather, the directors must take tangible action to remedy the underlying issues.  The DFEH found after the conclusion of its two-year investigation that Activision compounded its liability by not only failing to address complaints of gender discrimination, including pay and promotion disparities, but also by retaliating against those who complained.  This was well-known among senior management.  The DFEH's conclusions were corroborated by credible media reports and other actions, including *The Washington Post*, *The Wall Street Journal*, *Vice,* and *Axios*.

---

[91]  ¶¶49–56.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

155.   Even though the October 12, 2018 Director's Complaint alleged that Activision failed to take all reasonable steps to prevent unlawful retaliation, the Director Defendants admit that they did not receive any ███████████████ ████████████████████████████████████████████ The Board further admits that ██████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████—*one month after* the DFEH Cause Finding and *six days after* the DFEH Action was filed on July 20, 2021.[92]   Moreover, ███████████████ ██████████████████████████████████████████████ does not investigate the retaliation claims, or assess, enforce, and implement new controls to prevent further wrongdoing.   Indeed, in the face of red flags, fiduciaries must act, *i.e.*, they must *prevent further wrongdoing* from occurring.

156.   Similarly, Director Defendants' reliance on ████████████████████ █████████████████████████████████████████████   ████████████ █████████[93]   At best, this document evidences a control that was in place at the time but is far short of a good faith response to the numerous red flags.   In fact, a board cannot leave compliance with employee safety mandates to management's discretion rather than implementing and then overseeing a more structured compliance system. The Board's blind deference and complete dependence on management here constitutes a further breach of their oversight duties.

---

[92]   ¶¶18–19.

[93]   Defendants have historically complained about the absence of some of their irrelevant board materials from pleadings filed earlier in this action.   But Plaintiff omitted those irrelevant board materials because they are no longer needed to support the Board's scienter for certain false and misleading statements no longer at issue in this operative complaint.   And what documents Plaintiff elects to include within the four corners of his complaint is what should govern on an MTD.   *See, e.g., Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018).

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## C.   <u>Harm To Activision</u>

157.   Public revelation of the discrimination practices that Activision developed and maintained on the Director Defendants' watch has caused significant harm to the Company.  The fallout has been swift and devastating.

158.   Activision faces significant liability in connection with the DFEH's suit against the Company and related civil rights and employment law litigation.  Plaintiffs anticipate that the Company's total liability will extend into the hundreds of millions of dollars.  As one point of reference, the DFEH has asserted in analogous litigation for discrimination and related claims against video game developer Riot Games, and that Riot Games is liable for *more than $400 million*.[94]  The Company's deficiencies appear to be even more extensive than those at Riot Games, suggesting the DFEH will ultimately pursue damages approaching or exceeding half of a billion dollars against Activision.

159.   Activision also faces liability and expense in additional civil and regulatory actions.  On September 27, 2021, Activision entered into the Consent Decree with the EEOC to "settle claims and to further strengthen policies and programs to prevent harassment and discrimination in the company's workplace."[95]  The agreement required the Company to create an $18 million fund to compensate eligible claimants.  Commenting on the agreement, Kotick stated in part, "There is no place anywhere at our company for discrimination, harassment, or unequal treatment of any kind, and I am grateful to the employees who bravely shared their experiences.  I am sorry that anyone had to experience inappropriate conduct[.]"[96]  The Consent

---

[94] *McCracken v. Riot Games, Inc.*, DFEH's Objection to Plaintiffs' Motion for Preliminary Approval of Settlement, p. 9, No. 18STCV03957 (Cal. Sup. Ct., Los Angeles Cnty.), (the "Riot Action").

[95] EEOC Action, ECF No. 11-1.

[96] "Activision Blizzard Commits to Expanded Workplace Initiatives, Reaches Agreement with the EEOC." *Activision Blizzard,* 27 Sept. 2021, https://activisionblizzard.com/content/atvi/activisionblizzard/ab-touchui/ab/web/en/newsroom/2021/09/activision-blizzard-commits-to-expanded-workplace-initiatives-reaches-agreement-with-eeoc.html.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Decree also requires the Company to engage a neutral, third-party equal employment
2   opportunity consultant to provide ongoing oversight of the Company's compliance
3   with the agreement, and further requires the Company to hire an internal EEOC
4   coordinator to assist in implementing the Consent Decree's requirements.

5       160.  As discussed above, the DFEH tried to stall the $18 million settlement
6   the EEOC offered Activision during the fall of 2021 by attempting to intervene,
7   arguing the settlement was inadequate.  But this effort was denied by the Honorable
8   Dale Fischer of the U.S. District Court for the Central District of California and the
9   DFEH has since appealed to the Ninth Circuit.  Then, on March 30, 2022, the EEOC
10  announced that its settlement with Activision for its discrimination action for "$18
11  million in monetary relief and significant injunctive relief" was approved by Judge
12  Fischer.   This settlement approval ruling includes not only Activision but also
13  Blizzard Entertainment, Inc., Activision Publishing, Inc. and King.com, Inc. and the
14  entities' subsidiaries.[97]

15      161.  On May 23, 2022, former Activision employee Jessica Gonzalez
16  appealed the $18 million sexual harassment and discrimination settlement between
17  the EEOC and Activision.   Gonzalez filed an appeal on the grounds of workers
18  potentially losing their rights under state law and the Judge Fischer's decision to
19  ignore objections made by impacted employees.[98]   The EEOC's $18 million
20  settlement is currently being challenged on multiple fronts, with employees and the
21  DFEH contending the settlement is "woefully inadequate" *as it would mean that no*
22  *more than 60 workers could receive the maximum settlement allowed—leaving*
23  *thousands of Company workers ineligible to receive compensation*.

24
25  [97]  "Court Approved EEOC's $18 Million Settlement with Activision Blizzard."  *U.S.*
    *E.E.O.C.,*  30  Mar.  2022,  https://www.eeoc.gov/newsroom/court-approves-eeocs-18-
26  million-settlement-activision-blizzard.
    [98]  "Former Activision Employee Appeals Activision Blizzard EEOC Settlement."
27  *Communications  Workers  of  America,*  23  May  2022,  https://cwa-
    union.org/news/releases/former-activision-employee-appeals-activision-blizzard-
28  eeoc-settlement.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

162.   There is a precedent for workers winning a better settlement in these types of situations.  In conjunction with the Riot Action pending in *McCracken*, which alleged, as here, widespread discrimination at gaming developer, Riot Games, the Company was ordered to pay $10 million to eligible employees.  That action included pay disparity allegations stunningly analogous to those alleged in the DFEH Action, including that (i) women were passed up for leadership roles in favor of male counterparts performing substantially similar work; (ii) Riot Games preferred men in the workplace, particularly with respect to hiring, promotions, and compensation, and (iii) internal complaints of pay and promotion disparity by women were disregarded or mishandled.[99]

163.   DFEH later blocked the Riot Action settlement on grounds of inadequate compensation, and—following the DFEH's intervention in that action—the amount was eventually increased to $100 million.  Notably, the settlement, which was preliminarily approved on July 22, 2022, also creates an annual $6 million dollar cash reserve for the three-year term of the Consent Decree (a total of $18 million) to make pay adjustments and to fund diversity, equity, and inclusion programs.  It will also require the engagement of third-party experts approved by the DFEH to conduct gender-equity analyses and audit compliance with workplace protections.  The final approval hearing on the settlement is December 1, 2022.

164.   In stark comparison to the Riot Action settlement, ***the Consent Decree between Activision and the EEOC provides no relief whatsoever to the potentially thousands of victims of gender discrimination who have been, and/or continue to be, underpaid or underpromoted on the basis of sex***.

165.   Moreover, Activision is now subject to a high-profile SEC investigation with the potential to result in substantial liability.  On September 20, 2021, *The Wall Street Journal* reported that the SEC has launched a "wide-ranging" investigation into

---

[99]  Riot Action, Third Amended Complaint, ¶¶27–79, 105–122.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   the Company's treatment of its employees.  Like the DFEH, the SEC has traced

2   responsibility for the Company's illegality to the highest levels of Company

3   leadership.[100]

4       166.  On September 23, 2021, *Bloomberg Law* reported that the SEC's

5   investigation is "certain to multiply the legal challenges" for the Company, in

6   particular its senior executives, over how they handled the allegations.[101]  Ann

7   Olivarius, a senior partner at the law firm McAllister Olivarius, is quoted in the article

8   as stating, "The SEC getting involved is extraordinary.  This is a very serious thing

9   for [the Company].  It's a hugely expensive situation for the company."[102]

10      167.  In addition to the financial harm described above, the reputational harm

11  that Activision has suffered as a result of this highly public scandal is enormous.  The

12  Company's ability to recruit talented employees has been damaged and may continue

13  to be damaged, as potential employees, especially women, will be averse to enter a

14  workplace pervaded by discrimination.   Indeed, as Ms. Gonzales, one of the

15  organizers of the employee walkout and who is currently appealing the EEOC's

16  $18 million settlement, wrote in a statement to the company upon announcing her

17  departure on November 30, 2021:

18          To [Bobby Kotick]: Your inaction and refusal to take accountability is
            driving out great talent and the products will suffer until you are removed
19          from your position as CEO.  This may seem harsh, but you had years to
            fix the culture and look at where the company currently stands.[103]
20

21

22

---

23  [100]  Grind, Kirsten, et al. "SEC Is Investigating Activision Blizzard Over Workplace
    Practices,   Disclosures."  *The   Wall   Street   Journal,*   20   Sept.   2021,
24  https://www.wsj.com/articles/sec-is-investigating-activision-blizzard-overworkplace-
    practices-disclosures-11632165080.
25  [101]  Allsup, Maeve. "Activision Harassment Probe From SEC Ups Risk to Top
    Executives." *Bloomberg Law,* 23 Sept. 2021,  https://www.wsj.com/articles/sec-is-
26  investigating-activision-blizzard-over-workplace-practices-disclosures-11632165080.
27  [102]  *Id.*
    [103]  Francis, Bryant. "More Blizzard Employees are Leaving the Company Due to
28

---

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

168.   Current and potential employees are now aware that Activision's long-standing reputation as a "magical place to create video games," *critical to its ability to attract and retain talent, is a lie that has been leveraged in effort to make the intolerable tolerable to its employees*.

## VI.   IMPROPER PROXY STATEMENTS

169.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

170.   Each of Defendants Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan, Ostroff, and Wasserman (*i.e.* the "Proxy Defendants") was responsible for the content of the 2020 and 2021 Proxy Statements (the "Challenged Proxies")[104] because they either: (i) *directly* participated in the *solicitation* of the Challenged Proxies, in seeking their own re-election to the Board and advisory approval on executive compensation; (ii) participated directly in the *drafting* of the Challenged Proxies; or (iii) *signed* the Challenged Proxies, thereby explicitly endorsing the content therein.  In other words, each of the Proxy Defendants was either a solicitor, author, and/or signer of the statements (and misstatements) contained in the Challenged Proxies.

171.   *First*, *all* Proxy Defendants *directly participated* in the *solicitation* of the Challenged Proxies.  The Challenged Proxies called on shareholders to vote on the

---

Ongoing   Crisis."   *Game   Developer,*   30   Nov.   2021, https://www.gamedeveloper.com/culture/more-blizzard-employees-are-leaving-the-company-due-to-ongoing-crisis.

[104]  The "2020 Proxy Statement" refers to Schedule 14A Proxy Statement, 29 Apr. 2020, https://www.sec.gov/Archives/edgar/data/718877/000130817920000210/latvi2020_def14a.htm.  The "2021 Proxy Statement" refers to Schedule 14A Proxy Statement, 30 Apr. 2021, https://www.sec.gov/Archives/edgar/data/718877/000130817921000286/latvi2021_def14a.htm.

following agenda matters, among others: (i) election of directors, and (ii) advisory vote to approve executive compensation.  Each of the Proxy Defendants was a member of the Board (or a director nominee in the case of Ostroff, with respect to the 2020 Proxy Statement) at the time the Challenged Proxies were issued.  Both of the Challenged Proxies concede:

> This proxy statement is furnished *in connection with the solicitation by our Board of Directors* (our "Board") of proxies from holders of issued and outstanding shares of the Company's common stock . . .

172.   The solicitation of the Challenged Proxies *was also an essential link in the re-election of the Proxy Defendants and in seeking the shareholders' advisory approval on executive compensation*.  For example, with respect to the first agenda matter (*i.e.* the Proxy Defendants' solicitation for their own re-election), the Challenged Proxies list Defendants Bowers, Corti, Hartong, Kelly, Kotick, Meyer, Morgado, Nolan, Ostroff, and Wasserman and their respective qualifications as Board nominees with purported "strong professional characteristics, judgement, and leadership…"  Additionally, under a section titled "Advisory Vote to Approve the Company's Executive Compensation," the Challenged Proxies called on shareholders to cast an advisory vote (or a "say-on-pay") on the compensation of Activision's executive officers, including Kotick.  In 2020, Kotick was one of the highest-paid CEOs of any publicly traded company in the U.S., with a total compensation package worth nearly $155 million.

173.   *Second*, according to the Audit Committee charter, members of the Audit Committee participated directly in preparing the Company's annual proxy statement. Thus, Defendants Corti, Hartong, and Nolan also participated directly in the *drafting* of the Challenged Proxies as members of the Audit Committee.

174.   *Third*, Defendant Kotick *signed* the 2020 Proxy Statement, thereby directly and expressly endorsing its contents.  Indeed, Kotick's introductory letter in the 2020 Proxy Statement explicitly characterizes the document as a "*guide to the matters on which you will be asked to vote*."  Additionally, Defendants Kotick and

56

1  Kelly **signed** the 2021 Proxy Statement, also directly and expressly endorsing its
2  contents.   Their introductory letter in the 2021 Proxy Statement promises that
3  Activision will "deliver superior shareholder returns . . ."

4       175.   Despite each of the Proxy Defendant's direct and knowing participation
5  in the propagation of the Challenged Proxies and the statements contained therein, **the**
6  **Challenged Proxies materially misrepresented the state of gender equity at**
7  **Activision—including with respect to pay and promotion**.

8       176.   The 2020 Proxy Statement characterized "[d]iversity and inclusion" as
9  "a strategic priority for Activision Blizzard":

10      Diversity and inclusion remain a strategic priority for Activision
11      Blizzard. **We are committed to building and sustaining a culture of**
    **belonging, where everyone thrives and diversity drives business value**
12      **and growth**. We believe this is one of the reasons why Activision
    Blizzard has been recognized for our efforts to create a great workplace
13      for all. . .

14       177.   Notably, the 2020 Proxy Statement also represented that "**fostering an**
15  **inclusive culture** where employees feel valued and heard, and a sense of belonging **is**
16  **mission critical**."   The 2020 Proxy Statement also assured shareholders that the
17  Company's "Board continues to monitor **emerging best practices in corporate**
18  **governance and adopts measures** when it determines them to be in the best interests
19  of our stakeholders."

20       178.   Similarly, the 2021 Proxy Statement touted "Diversity, Equity, and
21  Inclusion" at Activision, citing, in bolded font:

22      Since 2016, **the number of women in our game development leadership**
    **roles has more than doubled**. The promotion rates for minorities and
23      non-minorities are identical, and **the promotion rate for women is**
    **slightly higher than the promotion rate for men**.
24

25       179.   The 2021 Proxy Statement also stated that the Company "**follow[s] best**
26  **practices in corporate governance**—not just among our peer group, but in the market
27  generally.   Highlights of our corporate governance program include: . . . Our
28  Nominating and Corporate Governance Committee oversees risks associated with

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

overall governance and Board succession planning, as well as ESG."

180.   The foregoing statements in the Challenged Proxies were materially misleading for a number of reasons.

181.   *First*, the foregoing statements are devoid, entirely, of the pendency and findings of the two-year DFEH Investigation—which ***was principally focused on pay and promotion discrimination at the Company***.  As detailed herein, that investigation involved extensive discovery practice into the Company's pay and promotions practices, alerting the Board to rampant pay and promotion discrimination at Activision.  Activision's Board was also aware that their own "data" on the Company's pay practices (such as the data on promotion rates diversity touted in the Challenged Proxies) and the ***actual experiences*** of the Company's workers were "irreconcilable."[105]  These omissions from the Challenged Proxies were particularly glaring and unlawful in light of the explicit admission by the Proxy Defendants that "fostering an inclusive culture where employees feel valued and heard, and a sense of belonging is ***mission critical***"—in soliciting shareholder votes to support the Director Defendants' re-election.

182.   *Second*, the Challenged Proxies fail to disclose that Activision lacked adequate Board-level policies, procedures and controls concerning employee discrimination claims and to ensure a safe and lawful work environment for all Company employees.  Indeed, the representations in the Challenged Proxies that the Company followed "best practices in corporate governance" starkly conflict with the Board's later concession that the Board was forced to "***elevate the Company to best practices for compliance and pay equity in the workplace***."[106]

---

[105] *See* Form 8-K, 16 Jun. 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/000110465922071603/tm2218593d1_8k.htm ("[T]here are many truths about our company—individual and collective, experiential and data-driven—and ***sometimes they can be difficult to reconcile***.").

[106] *Id.*

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

183.   *Third*, the Challenged Proxies fail to disclose that Activision fostered and engendered a culture that permitted discrimination, and actively participated in discriminatory business practices by retaliating against and/or ignoring employee complaints of discrimination, and by failing to adequately investigate claims and take action against known violator of employee rights.

184.   Finally, the Challenged Proxies failed to disclose that Activision failed to ensure that its managers, employees, and officers and directors complied with anti-discrimination laws and regulations.

185.   As a result of the foregoing, Activision's public statements were materially false and misleading at all relevant times.

186.   The 2021 Proxy Statement also included a letter from the Compensation Committee stating, in relevant part:

> In direct response to the feedback we heard in conversations with our shareholders, we extended Mr. Kotick's 2016 employment agreement on April 28, 2021, amending it in several key aspects, and made several changes to our broader executive compensation program and disclosures.
>
> Highlights of the changes to Mr. Kotick's agreement, and other arrangements with the Company, are detailed further on pages 59–60, include:
>
> \*        \*        \*
>
> Increased the weighting of financial metrics in the annual cash bonus program (*i.e.*, the CAIP) for the CEO and the broader executive compensation team from 60% to 80%, and for the remaining 20% of strategic objectives, ***these will be based on measurable ESG initiatives (i.e., human capital management, corporate social responsibility, and sustainability goals, which may include diversity, equity and inclusion metrics centered around the hiring/promotion of members of underrepresented communities, hiring of veterans and sustainability)***.
>
> \*        \*        \*
>
> In response to shareholder feedback received the Committee has committed to two changes in the operation of the CAIP:
>
> Disclose ESG objectives, which may include diversity, equity, inclusion, recruiting veterans, and sustainability, will be incorporated into the strategic objective component for 2021.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    187. ████████████████████████████████████

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ██████████████████████████████ *Just six days*

5    *later*, the say-on-pay resolution solicited by the 2021 Proxy Statement was approved

6    by a narrow 55% margin, when shareholders remained in the dark about the ongoing

7    pendency of the DFEH Investigation, the EEOC Letter of Determination, and the

8    endemic discrimination, unlawful pay disparities, and retaliation crippling the

9    Company.

10   188.   The misrepresentations and omissions were also material to Activision

11   shareholders in voting on the matters set forth for stockholder determination,

12   including: (i) the re-election of directors with purported "strong professional

13   characteristics, judgement, and leadership…"; and (ii) shareholders' advisory

14   approval of executive compensation.   Thus, Activision's shareholders were misled

15   into electing certain Director Defendants and approving executive compensation

16   because *material adverse information was omitted from the Challenged Proxies*

17   *concerning government investigations into ongoing discrimination, pay disparities,*

18   *and retaliation at the Company*.

19   189.   The Challenged Proxies were materially false and misleading because

20   they purported to portray the Company as improving upon its discriminatory work

21   culture through various reforms, including linking Defendant Kotick's pay to certain

22   performance metrics, without disclosing to shareholders government investigations

23   regarding ongoing problems, including that unlawful pay disparities existed for

24   female employees throughout the Company.   According to the DFEH, this

25   wrongdoing was still ongoing as of the time it filed its First Amended Complaint

26   against Activision on August 23, 2021.

27

28   [107] ██████████████████████

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

190. Accordingly, the Director Defendants violated § 14(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Activision misled and deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Activision's recommendation to reelect certain Director Defendants to Activision's board of directors and cast an advisory vote approving executive compensation.

## VII.  DERIVATIVE AND FUTILITY ALLEGATIONS

### A.  Derivative Allegations

191. Plaintiffs bring this action derivatively in the right and for the benefit of Activision to redress injuries suffered, and to be suffered, by the Company as a direct result of the violations of breaches of fiduciary duty and violations of the federal securities laws.

192. Activision is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

193. Plaintiffs will adequately and fairly represent the interests of Activision in enforcing and prosecuting the Company's rights. Plaintiff Gigov is, and has continuously been, a shareholder of Activision common stock since June 24, 2016. Plaintiff Kahnert is, and has continuously been, a shareholder of Activision common stock since April 4, 2019

194. Because a majority of the Director Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current board of directors, is in the best interests of the Company and its shareholders.

195. The wrongful acts complained of herein subjected, and continue to subject, Activision to substantial harm.

### B.  Demand Futility Allegations

196. At the time this complaint was filed, Activision's board of directors

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

consisted of the following ten individuals: Bowers, Carr, Corti, Kelly, Kotick, Meservey, Meyer, Morgado, Nolan, and Ostroff, (excluding Meservey and Carr, the previously defined "Director Defendants"). Plaintiffs have not made any pre-suit demand on the Director Defendants to institute this action because such a demand would be a futile, wasteful, and useless act for the following reasons.

## 1. A Majority Of The Director Defendants Face A Substantial Likelihood of Liability

197. Plaintiffs incorporate ¶¶1–196.

198. By failing to correct or prevent the Company's toxic culture of discrimination, and by making, authorizing, and/or benefiting from the false and misleading Proxy Statements alleged herein, the Director Defendants were each active and knowing participants in breaches of duties of loyalty and the related subsidiary duties of good faith and candor, and have subjected the Company to lawsuits asserting violations of the federal securities laws, the DFEH Action, the EEOC Action, and an investigation by the SEC, among other harm. Accordingly, demand is futile as to Defendants Bowers, Corti, Kelly, Kotick, Meyer, Morgado, Nolan, and Ostroff.

199. For a period of at least four years, the Director Defendants—who themselves characterized workplace culture as "mission critical" to the Company— were routinely confronted with a battery of red flags alerting them to Activision's illegal pay and promotion practices. The Board wholly ignored that the problems plaguing Activision were not confined to a few employees, but rather a systemic issue that was rampant throughout the Company.

200. Moreover, the Director Defendants failed to "undertake good faith efforts" to remedy the hostile work environment and toxic work culture, and were forced to eventually sell the Company as a result of their mismanagement and lack of good faith. Despite having knowledge that the Company's controls were inadequate, the Director Defendants knowingly failed to stop further problems from occurring, thus breaching their fiduciary duties to Activision. Director Defendants' purported

1   "responses" to the damning banner of red flags screaming "illegal discrimination"

2   were woefully inadequate and not executed in good faith.  Such failures of oversight

3   do not find protection under Delaware law.

4       201.   Based upon the litany of published, personal accounts of discrimination

5   at Activision, reports to Human Resources and executives of widespread

6   discrimination, Board and employee derogation from Company policy, and the DFEH

7   Action alleging similar misconduct over the span of over a decade, sufficient "red

8   flags" exist such that the Director Defendants knew, or must have known, that

9   Activision's discriminatory pay practices were chronically pervasive.

10       202.   Yet, the Director Defendants failed to implement remedial measures in

11  good faith, as demonstrated by the fact that the systemic gender discrimination,

12  unlawful pay discrepancies, and retaliations were still ongoing at the time the DFEH

13  filed its First Amended Complaint on August 23, 2021:

14  *In sum, Defendants' discriminatory practices adversely affected
    women in compensation, assignment, promotion, and termination*.
15  Defendants failed to take effective steps to remedy or adequately correct
    its compensation disparities despite its awareness that such disparities
16  existed.  Defendants' discriminatory practices continue to the date of this
    complaint.[108]
17

18                                    *   *   *

19
    Defendants' unlawful policies and practices effectively allowed and
20  continue to allow retaliation and other unlawful conduct to occur in
    Defendants' workplace.  Employees and contingent or temporary workers
21  have suffered and will continue to suffer harm from Defendants' ongoing
    unlawful policies and practices unless they are remedied and enjoined by
22  this Court.[109]

23

24       203.   Demand is futile as to Defendants Kelly and Kotick because they

25  breached their fiduciary duties of loyalty, good faith, and candor by making or

26

27  _____
    [108]   ¶45.
28  [109]   ¶56.

allowing to be made improper statements and omissions in Activision's 2020 and 2021 Proxy Statements, as alleged here, which falsely claimed the Company's controls were adequate to protect it from corporate trauma.

204.   Demand is futile as to Defendants Corti and Nolan because, as members of the Audit Committee, these board members had a duty to adequately oversee Activision's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  Thus, Defendants Corti and Nolan were responsible for knowingly or recklessly allowing the improper statements and omissions contained in the false and misleading 2020 and 2021 Proxy Statements.  Defendants Corti and Nolan breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failed to properly oversee Activision's compliance with legal and regulatory requirements, risk assessment, and the Company's internal controls.

205.   Demand is futile as to Defendants Meyer, Morgado, and Nolan because, in connection with their duties on the N&CG Committee, they directly oversaw the Company's environment, social and governance risks, including matters of corporate culture, diversity and inclusion, and anti-discrimination policies.  Notwithstanding their explicit oversight of the foregoing policies, Defendants Meyer, Morgado, and Nolan allowed a rampant culture of discrimination to pervade Activision un-remediated, to the professional, personal, and pecuniary detriment of employees, contingent and temporary workers, as well as Activision itself.

206.   Demand is futile as to all Director Defendants because the 2020 and 2021 Proxy Statements were materially false and misleading and contained material omission.  Specifically, these proxy statements purported to portray the Company as improving upon its toxic work culture through various reforms, including claiming the Company's controls were adequate and linking Defendant Kotick's pay to certain performance metrics, without disclosing to shareholders government investigations

1  regarding ongoing problems, including that significant unlaw pay disparities existed
2  for female employees throughout the Company.   According to the DFEH, these
3  problems were ongoing as of August 23, 2021.  The misrepresentations and omissions
4  set forth in the 2020 and 2021 Proxy Statements were material to Activision
5  shareholders in voting on relevant matters, including: (i) the re-election of directors
6  that represented themselves as having "strong professional characteristics, judgement,
7  and leadership…"; and (ii) advisory approval of executive compensation.

8                    **2.     Demand On Activision's Shareholders Is Futile**

9         207.   Plaintiffs have not made any demand on shareholders of Activision to
10  institute this action  since such demand would be a futile and useless act for the
11  following reasons:

12              i.      Activision is a publicly traded company with thousands of
13                      shareholders of record and at least hundreds of thousands of
14                      beneficial owners;

15             ii.      Making demand on such a number of shareholders would be
16                      impossible for Plaintiffs, who have no means of collecting the
17                      names,   addresses,   or   phone   numbers   of   Activision's
18                      shareholders; and

19            iii.      Making demand on all shareholders would force Plaintiffs to
20                      incur excessive expenses and obstacles, assuming all shareholders
21                      could even be individually identified  with any degree of certainty.

22  **VIII.    CLAIMS FOR RELIEF**

23                              **COUNT I**

24                     **Breach Of Fiduciary Duties**
25                  **(Against The Director Defendants)**

26         208.   Plaintiffs incorporate by reference and reallege each and every allegation
27  set forth above, as though fully set forth herein.

28         209.   The conduct of the Director Defendants complained of herein involves a

knowing and culpable violation of their obligations as officers and/or directors of Activision, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Director Defendants were aware, or reckless in not being aware, posed a risk of serious injury to Activision.

210. The Director Defendants owed fiduciary duties to Activision and its shareholders.  By reason of their positions as fiduciaries to and/or controlling persons of the Company, the Director Defendants owed duties of good faith, loyalty, candor and truthful disclosure.  In addition, the Director Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to Activision.

211. The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

i.    Consciously failing to monitor or oversee systems and controls intended to curtail violations of the state and federal employment laws at Activision, and, despite knowing such controls were inadequate, failing to stop further problems from occurring;

ii.   Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Activision's 2020 and 2021 Proxy Statements, Activision's controls, policies, and procedures for compliance with all applicable state and federal rules and regulations concerning discrimination, as well as any related government investigations and/or legal actions;

iii.  Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including, but not limited to, requirements imposed under federal and state securities laws, as well as laws prohibiting discrimination and retaliation; and

iv.   Failing to implement, maintain and monitor adequate internal controls, including compliance with laws prohibiting discrimination and retaliation.

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

212.   As the Director Defendants breached their fiduciary obligations, the Company has sustained significant damages.  Accordingly, the Director Defendants are liable to Activision.

213.   In addition, each of the Director Defendants had actual knowledge of the Director Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and the Company has sustained significant damage as a result. Accordingly, the Director Defendants are further liable to Activision for aiding and abetting their fellow defendants' breaches.

214.   Plaintiffs, on behalf of Activision, have no adequate remedy at law.

## COUNT II

### Violations Of §§ 14(a) And 20(a) Of The Exchange Act
### (Against The Director Defendants)

215.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

216.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

218.   The Director Defendants issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the proxy solicitations.   In the proxy solicitations, the Director Defendants solicited shareholder votes to reelect themselves to Activision's board of directors and cast an advisory vote on executive compensation while government investigations and the systemic discrimination issues were plaguing the Company.

219.   These omissions from the proxy solicitations were particularly glaring and unlawful in light of the explicit admission by the Director Defendants in the proxy solicitations.  For example, the 2021 Proxy Statement stated that the Company "***follow[s] best practices in corporate governance***—not just among our peer group, but in the market generally.  Highlights of our corporate governance program include: . . . Our Nominating and Corporate Governance Committee oversees risks associated with overall governance and Board succession planning, as well as ESG."   The representations in the Challenged Proxies that the Company followed "best practices in corporate governance" starkly conflict with the Board's later concession that the Board was forced to "elevate the Company to best practices for compliance and pay equity in the workplace."

220.   The proxy solicitations, however, misrepresented and failed to disclose the following true facts about Activision's business, operations, and prospects:

    i.   Activision lacked adequate Board-level policies, procedures and controls concerning employee discrimination claims and to ensure a safe and lawful work environment for all Company employees;

    ii.   Activision fostered and engendered a culture that permitted discrimination and retaliation;

    iii.   Activision actively participated in gender discriminatory business practices by retaliating against and/or ignoring employee complaints of discrimination, and by failing to adequately investigate claims and take action against known violator of

employee rights;

iv.    Activision failed to ensure that its managers, employees, and officers and directors complied with anti-discrimination laws and regulations;

v.    Activision was under investigation by government agencies for more than two years for discrimination and retaliating against employees, including with respect to pay and promotion; and

vi.    As a result of the foregoing, Activision's public statements were materially false and misleading at all relevant times.

221.   By reasons of the conduct alleged herein, the Director Defendants violated § 14(a) of the Exchange Act.  As a direct and proximate result of the Director Defendants' wrongful conduct, Activision misled and deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Activision's recommendation to reelect certain Director Defendants to Activision's board of directors and cast an advisory vote on executive compensation.

222.   The misleading information contained in the proxy solicitations was material to the integrity of the directors that were proposed for election to Activision's board of directors and the propriety of executive compensation.

223.   Plaintiffs, on behalf of Activision, thereby seek relief for damages inflicted upon Activision based upon the misleading proxy solicitations in connection.

224.   Activision was damaged as a result of the Director Defendants' materially false and misleading statements in the proxy solicitations.  Plaintiffs, on behalf of the Company, hereby seek relief for damages inflicted upon Activision based upon the misleading proxy solicitations in connection with the improper reelection of the members of the board of directors and vote on executive compensation.

225.   Because of their positions of control and their authority over Activision, the Director Defendants were able to and did control the actions of the Company, its employees, and the contents of the proxy solicitations, as set forth herein.   The Director Defendants therefore qualify as "controlling persons" within the meaning of § 20(a) of the Exchange Act.

226.   By reason of the above conduct, the Director Defendants are also, or alternatively, liable as control persons of Activision pursuant to § 20(a) of the Exchange Act.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Declaring that this action is a proper derivative action maintainable under the law, that demand was excused as futile, and that Plaintiffs are adequate representatives of Activision;

B.   Declaring that Director Defendants have breached their fiduciary duties owed to Activision and its shareholders;

C.   Determining and awarding to Activision the damages it sustained by it as a result of the misconduct and violations of law set forth above from each Director Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.   Directing Activision to take all necessary actions to reform and improve its corporate governance and internal procedures, comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including putting forward for a stockholder vote resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to effect the following corporate governance policies:

1.   Immediate termination for cause of Defendant Kotick and all culpable executives and officers, who is, or has been, credibly alleged to have

70

discriminated on the basis of gender against a colleague, subordinate employee, or other person performing a function for Activision in violation of the Company's internal policies or codes, or applicable federal, state, or local law, and such terminations reported through the filing of a Form 8-K with the SEC. Except as otherwise stated in his or her employment agreement, such person shall not receive any severance benefits or other benefits as a result of such termination of employment, and all outstanding incentive compensation owing to such person, including stock options and/or stock awards, shall be cancelled;

2.      A proposal to strengthen the Company's reporting and response mechanisms for complaints of discrimination;

3.      Appointment of directors with experience in employment law and/or handling of workplace discrimination;

4.      Creation of a permanent committee of the Board meant to oversee workplace issues and company culture;

5.      Establishment of a regular system of reporting on workplace discrimination issues to the Board and the newly established committee;

6.      Establishment of an internal compliance program, including a Diversity, Equity, and Inclusion Consultant with expertise in the area of pay and promotion discrimination in the corporate setting, to help ensure the successful implementation of the above changes; and

7.      Replacement of six (6) directors prior to the Company's next annual meeting.

E.      Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Director Defendants' assets so as to assure that Plaintiffs, on behalf of Activision, have an effective remedy;

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

F.      Awarding to Activision restitution from the Director Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Director Defendants;

G.      Canceling the votes to re-elect the Director Defendants in connection with the annual stockholder meetings in 2020 and 2021, and ordering Director Defendants to disgorge to the Company the compensation they received for service on the Board following those invalid elections;

H.      Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## X.      DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues so triable.

Respectfully submitted,

Dated:  September 23, 2022          **JOHNSON FISTEL, LLP**

By: _s/ Brett M. Middleton_
BRETT M. MIDDLETON

FRANK J. JOHNSON
KRISTEN O'CONNOR
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
BrettM@johnsonfistel.com
FrankJ@johnsonfistel.com
KristenO@johnsonfistel.com

*Counsel for Plaintiffs*

72

1

## **CERTIFICATE OF SERVICE**

2          Pursuant to Civil Local Rules 79-5.3 and 5-3.1.2, I, Brett M. Middleton, hereby

3   certify that the Third Amended Verified Shareholder Derivative Complaint was filed

4   electronically under seal on September 23, 2022.  Notice of this filing will be sent to

5   all electronically registered parties by e-mail transmission.

6                                              **JOHNSON FISTEL, LLP**

7                                      *s/ Brett M. Middleton*
                                   _____
8                                      BRETT M. MIDDLETON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Luke Kahnert, hereby declare as follows:

I am a plaintiff in this action. I have reviewed the allegations made in the

foregoing verified third amended shareholder derivative complaint, know the

contents thereof, and authorize its filing. To those allegations of which I have

personal knowledge, I believe those allegations to be true. As to those allegations

of which I do not have personal knowledge, I rely upon my counsel and their

investigation and believe them to be true.

I declare under penalty of perjury pursuant to the laws of the United States of

America that the foregoing is true and correct.

Signed and Accepted:

Dated: 9/23/2022

DocuSigned by:

Luke Kahnert

82BC1732164448C...



## <u>VERIFICATION</u>

I, Boyan Gigov, hereby declare as follows:

I am a plaintiff in this action. I have reviewed the allegations made in the foregoing verified third amended shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:


Dated: 9/21/2022


BOYAN GIGOV